E-FILED
Friday, 01 October, 2004  04:07:33 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| REBECCA LUCERA, | ) | |
| | ) | |
| Plaintiff, | ) | Judge Baker |
| | ) | No. 02-2268 |
| v. | ) | |
| | ) | |
| CINGULAR WIRELESS, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Defendant Cingular Wireless LLC ("Defendant" or "Cingular"), by its attorneys, Fisher & Phillips LLP,  hereby submits its Memorandum in Support of its Motion for Summary Judgment.[1]

## I.  INTRODUCTION

Plaintiff maintains her termination was motivated by discriminatory animus and in retaliation for lodging complaints about her boss.  Plaintiff's claims are without factual support and her contentions logically flawed.

The undisputed facts paint an entirely different picture.  In early summer 2001, Plaintiff's supervisor, Joe Schnaufer, transferred to a new Cingular call center located in Ocala, Florida.  Plaintiff had a strong relationship with Schnaufer, and felt that he "empowered" her.  Schnaufer was replaced by Jack Johnston who was new to the Rantoul Call Center; in fact, during the summer of 2001 Johnston split his time between his prior Cingular responsibilities in Schaumburg, Illinois

---

[1] The factual basis for Defendant's Motion for Summary Judgment is detailed in Defendant's Statement of Undisputed Material Facts Pursuant to Local Rule 7.1, filed contemporaneously herewith. That statement is expressly incorporated herein and the material facts will be restated in this Memorandum only to the extent necessary to present Defendant's legal argument in support of its Motion.  References made to "(¶ ___ )" refer to Defendant's Statement of Undisputed Material Facts Pursuant to Local Rule 7.1.

and Rantoul.  Johnston exercised a different more restrictive management style which included enforcement of more fiscally conservative travel and expense reimbursement procedures – procedures that were clearly communicated to Plaintiff during early summer 2001.

Plaintiff and her new husband, Jon Lucera (also a Cingular employee), decided to pursue possible transfer opportunities with Plaintiff's old boss, Schnaufer, in Ocala, Florida.  This decision was perhaps motivated by Plaintiff's affinity for Schnaufer, perhaps by an animus for Johnston, or perhaps by persistent rumors that Cingular was going to close the Rantoul Call Center.  Irrespective of her motivations, Plaintiff exercised extremely poor judgment in her approach to the desired transfer.

On July 19, 2001, Plaintiff and her husband began a five day trip to Ocala, Florida where they "informally" explored employment opportunities with Schnaufer at his call center, which had not yet opened.  Upon return, Plaintiff instructed her husband, a more junior employee, to submit their excessive expenses in a combined report to a Cingular manager, Elizabeth Ross, who was located in Cingular's Hoffman Estates facility and who had absolutely no responsibility for the Rantoul Call Center.  Plaintiff attempted to justify the submission to Ross by asserting Johnston was "out of town;" however, Ross quickly discerned that was not the case when she participated in a conference call with Johnston. Uncomfortable with what she was being asked to do, Ross brought the matter to Johnston's and Regional Vice President Grace Seymour's attention.

Despite having issued a clearly articulated mandate that all business travel must be pre-approved by him, Johnston was unaware that the Luceras had been to Ocala, at least for business related purposes.  Additionally, the expense report was being tendered for reimbursement by the Rantoul Call Center.  Johnston had clearly communicated to Plaintiff that Rantoul would not bear the costs of employees traveling to other call centers for interviews.  Plaintiff herself had

communicated that very policy to a subordinate employee a mere day before she began her own clandestine trip to Ocala. There were other problems with the report; the time spent in Ocala was two to three days more than what is typically provided for interview trips and the expenses themselves were excessive. Troubled by what he saw, Johnston reported the matter to Human Resources. Margaret Franklin and Cheryl Bentley from Human Resources began an investigation. Jim Klimas, Director of Human Resources, was also involved. After concluding that Plaintiff should be terminated for her flagrant abuse of company policy and insubordination to Johnston, Human Resources involved Seymour as well as Cingular's Legal and Ethics Departments in the matter. All collaboratively agreed that Plaintiff's actions warranted termination.

Plaintiff attempted to circumvent the appropriate approval process to get authorization for a trip that was excessive, both from a temporal and monetary perspective; a trip that should have been pre-approved but was not; a trip whose cost should have been absorbed by Ocala, but was instead submitted for payment to Rantoul. Her conduct clearly warranted termination. This was not just the conclusion of one rogue supervisor; it was the collaborative assessment by multiple high level managers in different departments. She took a calculated risk with her handling of the trip to Ocala. In short, she gambled and lost.

With regard to her state law retaliatory discharge claim, Plaintiff is unable to identify any matter of public policy affected by her termination. Most significantly, it is undisputed that any "issues" she had regarding her supervisor were neither considered nor discussed during the deliberative process resulting in her termination. It is axiomatic that she could not therefore be terminated in retaliation for raising such "issues."

## II.  PLAINTIFF FAILS TO PRODUCE ANY EVIDENCE SUPPORTING HER GENDER DISCRIMINATION CLAIM UNDER TITLE VII.

An employee alleging sex discrimination may proceed by presenting direct evidence of discriminatory intent or by using the McDonnell Douglas burden-shifting method.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, (1973). Plaintiff has not provided any direct evidence of discriminatory intent, and thus must establish a *prima facie* case of sex discrimination under the burden-shifting method.  To do so, Plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she was performing her job satisfactorily; (3) she suffered an adverse employment action; and (4) at least one similarly situated male employee was treated more favorably.  Wyninger v. New Venture Gear, Inc., 361 F.3d 965, 978 (7th Cir. 2004).  As in any Title VII action, the ultimate burden of persuasion remains with the plaintiff to show that the employer intentionally discriminated against her.  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993).

Here, Plaintiff fails to establish a *prima facie* case of discrimination because: (1) she cannot provide evidence that she was performing her job in a satisfactory manner; and (2) she cannot show that any male employees were treated differently.  Even if she was able to establish  a *prima facie* case, the undisputed record clearly establishes that Defendant had a legitimate non-discriminatory and non-pretextual reason for her termination.

### 1.  Plaintiff Was Not Meeting Defendant's Legitimate Expectations.

Plaintiff fails to make out a *prima facie* case of discrimination because she was not meeting Defendant's legitimate expectations.  As the Seventh Circuit articulated in Grayson v. O'Neill, 308 F.3d 808, 817 (7th Cir. 2002), Plaintiff  "is out of luck if [s]he can't show that [s]he was meeting [her] employer's legitimate expectations."  See also Hong v. Children's Memorial Hosp., 993 F.2d 1257, 1262 (7th Cir. 1993) (Title VII plaintiff cannot make out a *prima facie* case by

merely showing her performance was adequate for some period of time during her employment). Here, Plaintiff simply does not and cannot show that she was satisfactorily performing her job as an Area Manager at the time of her termination.

Defendant has a legitimate expectation that its employees will abide by its employment practices and policies, particularly upper level management employees such as Plaintiff.  Liner v. Dontron, Inc., 9 Fed.Appx. 523, 2001 U.S. App. LEXIS 10855 (7th Cir. May 21, 2001) (attached as Exhibit A).  Plaintiff violated Defendant's policies and procedures in the following respects:  by failing to obtain the requisite prior approval for days off; intentionally failing to obtain proper approval for business trip expenses; submitting an expense report containing excessive and un-reimbursable expenditures; and attempting to circumvent Johnston and all Rantoul Call Center management by sending the excessive expense report to a manager outside the Rantoul Call Center.   (¶¶ 24-167).   Additionally, Plaintiff's conduct was in direct contravention of well established custom regarding interview trips, in the Great Lakes Region generally and in the Rantoul Call Center specifically.  ( ¶¶ 24-53).

Where, as here, Plaintiff violated her employer's policies and procedures, she cannot show that she was meeting Defendant's legitimate expectations.  Liner, 9 Fed. Appx. at 529, 2001 U.S. App. LEXIS 10855, *13 (despite plaintiff's fine sales record, she was not performing her job in a satisfactory manner because she failed to comply with company policies and procedures).  See also DeBruin v. Appleton Papers, Inc., 69 Fed.Appx. 332, 335, 2003 U.S. App. LEXIS 13621, *6 (7th Cir. July 3, 2003) (affirming summary judgment for defendant where defendant was dissatisfied with plaintiff's managerial and interpersonal skills) (attached as Exhibit B).  Accordingly, on this ground alone Plaintiff has failed to establish a *prima facie* case of discrimination.

2. **Plaintiff Cannot Show That Defendant Treated Similarly Situated Male Employees Differently.**

Plaintiff additionally fails to make out a *prima facie* case because she cannot present any evidence that similarly situated male employees were treated more favorably. The crux of Plaintiff's sex discrimination claim rests on her assertion that she was subjected to different and less favorable treatment than her husband. (¶¶ 21-23). However, not only is Plaintiff unable to present any evidence that her husband was similarly situated, the record clearly establishes the opposite. (¶¶ 6, 10-15). To be similarly situated, another employee must be directly comparable to Plaintiff in all material respects. See Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002). Employees are directly comparable only if they: (1) held the same or similar job; (2) were subject to the same standards; (3) were supervised by the same person; and (4) had comparable experience, education, and other qualifications. See Ajayi v. Aramark Bus. Serv., Inc., 336 F.3d 520, 532 (7th Cir. 2003).

First, Plaintiff and her husband neither held the same or similar jobs nor were they supervised by the same person. Plaintiff was an Area Manager reporting directly to Johnston, the Director of the Rantoul Call Center. (¶¶ 6, 10-15). In contrast, her husband was a Customer Service Manager reporting to another Area Manager, Debbie Thompson who was Plaintiff's peer. (¶¶ 13-15). When two employees report to different supervisors and have different levels of responsibilities they are not similarly situated as a matter of law. Patterson, 281 F.3d at 680; see also, Hoffman v. MCA, Inc., 144 F.3d 1117, 1124 (7th Cir. 1998)(defendant can "reasonably expect a higher level of professionalism from [plaintiff] with less need for supervision than it could expect from [lower ranking employees].)."

Second, Plaintiff's conduct was more egregious than that of her husband, thereby warranting termination compared to the final warning he received. (¶¶ 151-153, 158, 165-166, 169, 171-179). Upon investigation, Human Resources concluded that Plaintiff deliberately

Chicago 48771.1                                        6

attempted to circumvent the expense approval process and that she knowingly submitted excessive expenses that normally would not be covered by Rantoul.    (¶¶ 54-65, 77-166).   The same conclusion could not necessarily be reached for Jon Lucera.  Johnston had specifically discussed expense procedures with Plaintiff, who was his direct report.  Indeed, a mere day before her departure to Ocala, Plaintiff reiterated that policy to a subordinate employee seeking expense reimbursement for the very same type of travel expenses ultimately sought by Plaintiff.  (¶¶ 65-64).   Conversely, Human Resources was unable to determine if Mr. Lucera had actual knowledge of expense practices in question.  (¶ 177).  Furthermore, Human Resources determined that Plaintiff instructed her husband to circumvent the chain of command and that she was the one who forwarded the expenses to Ross.  (¶ 176).  The investigators concluded that Plaintiff knew the policy and intentionally chose not to comply, whereas they were unable to draw the same conclusion with respect to Jon Lucera.  (¶¶ 54-65, 77-153, 158, 165-166, 169, 171-181).  Accordingly, because Plaintiff's conduct was more egregious than that of her husband and she was held to a higher standard (as a result of her higher level position), Defendant determined her conduct warranted termination.  (¶¶ 165-167, 179).

The case of Logan v. Caterpillar, Inc. 246 F. 3d 912 (7th Cir. 2001) is instructive.  There, as here, defendant provided several reasons for the plaintiff's dismissal: (1) his abuse of the company e-mail policy; (2) his failure to obey his superior's directive; and (3) his harassment of other employees.  Id. at 920.  There, as here, the plaintiff contended that he was subject to sex discrimination because a female employee violated the e-mail policy and was not terminated.  Id. The Seventh Circuit held that the female employee was not similarly situated to the plaintiff because she was only "guilty of one of these infractions--abuse of the e-mail system."  Id.  Here, too, even if Plaintiff's husband had violated Johnston's expense and interview trip policies, he was not the one who decided to circumvent the chain of command and submit the expenses to Ross.

<u>Finally</u>, Defendant replaced Plaintiff with another woman.  (¶ 168).  Where a plaintiff is replaced by someone of the same sex, the plaintiff is unable to establish the fourth prong of the *prima facie* case.  See <u>Steinhauer v. State of Wisconsin</u>, 359 F.3d 481, 484-485 (7th Cir. 2004) (affirming summary judgment for defendant where plaintiff was replaced by someone of the same sex and, therefore, could not establish the final element of the *prima facie* case).

Each of these reasons independently establishes that no similarly situated male employees were treated more favorably.  Plaintiff has the burden of establishing a *prima facie* case of sex discrimination.  Not only has she failed to do so, but Defendant has affirmatively and indisputably established she was not subject to gender discrimination.

### 3.    <u>Defendant Has Articulated A Legitimate, Non-Discriminatory Reason for Plaintiff's Termination.</u>

Even if Plaintiff was able to establish a *prima facie* case of discrimination, Defendant has articulated a legitimate, non-discriminatory reason for Plaintiff's discharge.  The reasons for Plaintiff's termination include that she failed to seek approval for days off; failed to obtain proper approval from Johnston for business trip expenses despite knowledge of the policy requiring same; submitting that approval should be obtained from Johnston; submitted an expense report containing expenses Johnston previously told her were not covered by the Rantoul Call Center; attempted to circumvent Johnston and the Rantoul Call Center management; and attempted to seek reimbursement for excessive expenses incurred on a trip which exceeded customary length.  (¶ 165).  As such, Defendant has articulated legitimate, non-discriminatory reasons for Plaintiff's termination.  See <u>Bagnell v. Komatsu Dresser Co.</u>, 838 F.Supp. 1279, 1284 (N.D.Ill. 1993) (expense account and report violations "surely qualify as a legitimate good faith reason why an employer would terminate an employee").  Furthermore, the legitimacy of Defendant's decision is underscored by the fact that it was collaboratively reached after much discussion among at least seven high level managers.  (¶¶ 160-166).

**4.    Plaintiff Cannot Demonstrate That the Reason for Her Termination was Pretextual.**

To establish that these proffered reasons are pretextual, Plaintiff must demonstrate that the explanation is dishonest, rather than merely an error.  Wells v. Unisource Worldwide, Inc., 289 F.3d 1001, 1006 (7th Cir. 2002); Kulumani v. Blue Cross Blue Shield Ass'n, 224 F.3d 681, 685 (7th Cir. 2000).  "A pretext for discrimination means more than an unusual act; it means something worse than a business error; pretext means deceit used to cover one's tracks."  Grube v. Lau Indus., Inc., 257 F.3d 723, 730 (7th Cir. 2001) (internal quotations omitted).  Plaintiff must demonstrate that defendant's articulated reason for her discharge either: (1) had no basis in fact; (2) did not actually motivate her discharge; or (3) was insufficient to motivate her discharge.  Wells, 289 F.3d at 1006.  See also Fairchild v. Forma Scientific, Inc., 147 F.3d 567, 573 (7th Cir. 1998) (the court's task is to determine whether the defendant employer has given an honest explanation of its behavior and "does not sit as a super-personnel department that reexamines an entity's business decisions").

Here, Plaintiff cannot set forth any evidence that shows her violations of Defendant's policies were not the real reasons for her termination and that Defendant's articulated basis for her termination is dishonest.  See Henry v. Ameritech Corp., 2004 U.S. Dist. LEXIS 3719 (N.D.Ill. March 8, 2004) (granting summary judgment to defendant, where plaintiff failed to show pretext after termination for falsification of company documents in violation of defendant's unwritten policy regarding sales sharing) (attached hereto as Exhibit C).

Even if it is "disputed" whether the policies actually existed or whether Plaintiff actually violated these policies, such "disputes" are insufficient to show pretext.  "Whether she [violated the policy] or not is irrelevant; what is relevant is the undisputed fact that her [superiors] thought she did."  Johnson v. Nordstrom, Inc., 260 F.3d 727, 733 (7th Cir. 2001) (affirming summary

judgment for defendant-employer).  See also Gusewelle v. City of Wood River, 374 F.3d 569, (7th Cir. 2004) (whether plaintiff was in violation of the residency requirement is irrelevant; "[t]he question, of course, is whether the decision-maker honestly believed he was in violation of the requirement.")  It is uncontested that the individuals who made the decision to terminate Plaintiff honestly believed she violated policies and reached that decision after substantial deliberation.  (¶¶ 123-167).

In short, there is simply no evidence that Defendant's termination of Plaintiff was a pretext for gender discrimination.

## III.    PLAINTIFF CANNOT PRODUCE ANY EVIDENCE TO SUPPORT HER CLAIM FOR RETALIATORY DISCHARGE UNDER ILLINOIS COMMON LAW.

### 1.    Legal Framework

Illinois follows the common-law doctrine that employment-at-will means termination-at-will and is presumed to exist whenever an employee is hired without a fixed term. See Duldulao v. St. Mary of Nazareth Hosp. Ctr., 115 Ill. 2d 482, 505 N.E.2d 314, 317-18, 106 Ill. Dec. 8 (Ill. 1987).  The tort of retaliatory discharge is a narrow exception to that rule.  See Barr v. Kelso-Burnett Co., 106 Ill. 2d 520, 478 N.E.2d 1354, 1356, 88 Ill. Dec. 628 (Ill. 1985).  It permits an employee "who is dismissed in violation of a clearly mandated public policy to bring a cause of action for retaliatory discharge."  Belline v. K-Mart Corp., 940 F.2d 184, 186 (7th Cir. 1991) (emphasis added).  To establish her claim of retaliatory discharge, Plaintiff must prove that she was (1) discharged (2) in retaliation for her activities and (3) that the discharge violated a clear mandate of public policy.  Id.  In Illinois, public policy is limited to those matters that "strike at the heart of a citizen's social rights, duties, and responsibilities" and do not impinge only on private interests.  Palmateer v. Int'l Harvester Co., 85 Ill. 2d 124, 421 N.E.2d 876, 878-9 (Ill. 1981).  While a cause of action for retaliatory discharge "is allowed where the public policy is clear, . . . [the

cause of action] is denied where it is equally clear that only private interests are at stake." Long v. Commercial Carriers, Inc., 57 F.3d 592, 595 (7th Cir. 1995) (internal quotations and citations omitted).

Time and time again, the Illinois Supreme Court has "sought to restrict the common law tort of retaliatory discharge." Metzger v. DaRosa, 209 Ill.2d 30, 805 N.E.2d 1165 (Ill. 2004). For instance, retaliatory discharge claims have not been allowed where employees were fired for informing fellow employees of layoff procedures being utilized, (Barr v. Kelso-Burnett Co., 106 Ill. 2d 520, 478 N.E.2d 1354, 1355 (Ill. 1985)), where a city manager was fired by the mayor for refusing to perform his official duties improperly for the political benefit of the mayor, (Fellhauer v. City of Geneva, 142 Ill. 2d 495, 568 N.E.2d 870 (Ill. 1991)), where an employee was discharged after voicing concern that a co-employer was not certified pursuant to a city ordinance, (Gould v. Campbell's Ambulance Service, 111 Ill. 2d 54, 488 N.E.2d 993 (Ill. 1986)), and where an employee was fired for refusing to lie in an entirely internal city investigation, (Lambert v. City of Lake Forest, 186 Ill. App. 3d 937, 542 N.E.2d 1216 (Ill. App. Ct. 1989)).

Plaintiff's retaliatory discharge claim fails because:  (1)  Plaintiff cannot prove that her termination violated a clear mandate of public policy and (2) Plaintiff cannot prove that her "complaints" caused her termination.

## 2. **Plaintiff Cannot Prove That Her Termination Violated A Clear Mandate of Public Policy.**

Plaintiff cannot prove that her termination violated a clear mandate of public policy. Plaintiff's "reports," for which she claims she was terminated, consist of a call to Defendant's Ethics hotline on or about August 22, 2001 and two e-mails to its Human Resource Department, all made or sent after she realized her trip to Ocala was under investigation. (¶¶ 182-187, 202).  In her call to the Ethics Line, Plaintiff reported that Johnston had an issue with the expenses she had

incurred on her Ocala trip (no surprise there) and that he had also allegedly advised her of a nepotism policy.  The e-mails, copies of which are exhibits to Defendant's statement of uncontested facts, constitute a recitation of petty grievances which, on their face, do not come even remotely close to "strik[ing] at the heart of a citizen's rights, duties, and responsibilities," as the Illinois Supreme Court has found necessary to maintain a claim of this nature.  <u>Palmateer</u>, 421 N.E. 2d at 878-9.

Plaintiff's articulated "concerns" solely involved Defendant's internal affairs (*e.g.*, termination, salary, hiring, and expense decisions, *etc.*).  None of these "issues" raise the specter that a clear mandate of public policy had been violated.  The Seventh Circuit and lower district courts have consistently made clear that such routine internal concerns do not constitute violations of public policy.  <u>See</u> <u>O'Regan v. Arbitration Forums, Inc.</u>, 121 F.3d 1064 (7th Cir. 1997) (affirming summary judgment for defendant where plaintiff claimed retaliatory discharge, in part, for reporting improper business expense deductions by her superior); <u>Long v. Commercial Carriers, Inc.</u>, 57 F.3d 592, 596 (7th Cir. 1995) (affirming summary judgment for defendant where plaintiff reported violations of federal regulations dealing with  "financial and contractual interests"); <u>Tipswood v. Ogilvy & Mather, Inc.</u>, 918 F. Supp. 217 (N.D.Ill. 1996) (granting summary judgment for defendant where plaintiff's retaliatory discharge claim was based upon her questioning a superior's accounting decision); <u>Crampton v. Abbot Laboratories</u>, 186 F.Supp. 2d 850 (N.D.Ill. 2002) (granting summary judgment where plaintiff complained of improper intra-company billing and falsification of expense reports).  <u>See also</u> <u>Acuff v. IBP, Inc.</u>, 65 F.Supp.2d 866, 869 (C.D.Ill. 1999) (explaining that a "former employee does not state a claim for retaliatory discharge based on his dismissal over ethical concerns, accounting practices, or intentional contractual breaches, or other business improprieties not rising to the level of crimes")

(internal citations omitted).

To the extent that Plaintiff asserts that she "believed" that she was reporting a crime, such an assertion is disingenuous and unsupported by the record.  The undisputed facts show that Plaintiff could not have reasonably believed that she was reporting a crime.  Plaintiff's "complaints" are replete with references to "deformation" (presumably Plaintiff meant defamation, a civil wrong) and Defendant's internal rules and procedures.  When questioned about why she emailed her "issues" to Franklin, Plaintiff testified that "she was told to," and because she "had ethical concerns."  (¶ 190).  When specifically questioned about whether she believed there "was anything illegal about what Jack was doing," Plaintiff replied:  "Not that I am aware of."  (¶ 191).

Here, a reasonable belief of criminal activity simply is not present.  <u>See</u>  <u>Stebbings v. Univ. of Chicago</u>, 312 Ill.App.3d 360, 726 N.E.2d 1136 (Ill.App.Ct. 2000) ("For a 'citizen crime fighter' type of retaliatory discharge claim, there must also be law that applies, and that the employee believes in good faith that it is being violated"); <u>Edmundson v. Continental Pipeline Co.</u>, 1991 U.S.App. LEXIS 18202 (7th Cir. Aug. 8, 1991)(affirming summary judgment for defendant where plaintiff's complaint "to higher-ups at [defendant] took the form of a diatribe against a supervisor which [s]he fashioned as a novella").

In short, because Plaintiff's "issues" with Johnston implicated Defendant's and her own private interests, she cannot establish that her termination was in violation of a clearly mandated public policy which strikes at the "heart of a citizen's social rights, duties, and responsibilities." <u>Palmateer</u>, 421 N.E. 2d at 878-9.

3.    **Plaintiff Cannot Show Causation.**

Even if Plaintiff's "issues" with Johnston implicated a clearly mandated public policy, which they do not, the record is devoid of any facts from which a reasonable trier of fact could conclude that it was Plaintiff's purported "complaints" about Johnston which caused her termination.[2] The causation element of retaliatory discharge requires that Plaintiff demonstrate the existence of a genuine issue of material fact as to Defendant's motive. Hartlein v. Illinois Power Co., 151 Ill. 2d 142, 601 N.E.2d 720, 728 (1992). If the employer has a valid non-pretextual basis for discharging the employee, the employee loses. Id.. As explained *supra*, Plaintiff cannot set forth any evidence that anything other than her own conduct, relative to the Ocala trip, was the real reason for her discharge.

Additionally, it is undisputed that Plaintiff's phone call to the Ethics hotline and her August 27th and 28th e-mails played no role in Defendant's investigation of Plaintiff's alleged misconduct (which was already underway at the time of Plaintiff's communications) and did not influence the decision to terminate her. (¶¶ 195-201). No allegations of impropriety by Johnston were ever discussed during the process which resulted in Plaintiff's termination and her husband's warning. (¶ 201). In fact, many of those involved in the decision, including Johnston, did not even know about the "issues" Plaintiff had raised. (¶¶ 195-196, 198). Plaintiff could not have been terminated in retaliation for complaining about Johnston, since the "complaints" were not known or considered during the decision-making process. Consequently, because Plaintiff will be unable to present evidence sufficient to raise a genuine issue of material fact as to causation, Defendant is

---

[2] The Human Resources Department conducted an investigation into the "issues" raised by Plaintiff and determined that  Johnston did not engage in any inappropriate conduct and had not violated any of Cingular's policies. The investigation into the allegations brought by Plaintiff (relative to Johnston) was treated separately from the investigation which led to Plaintiff's termination.  (¶¶ 194, 200)

entitled to summary judgment.  See Crampton v. Abbott Laboratories, 186 F. Supp. 2d 850

(N.D.Ill. 2002) (granting summary judgment for defendant where plaintiff was unable to disprove

defendant's stated motive for terminating her -- *i.e.,* as a high level employee, plaintiff displayed

poor judgment and lack of loyalty by encouraging subordinates to seek employment with a

competitor -- and unable to prove that her termination was the result of her complaints regarding,

*inter alia*, intra-company billing and falsification of expense reports).

## IV.    CONCLUSION

Plaintiff fails to present any evidence of a genuine issue of material fact which, if resolved

in her favor, would allow a trier of fact to infer that she was terminated as a result of gender

discrimination or in retaliation for complaining about violations of a clearly mandated public

policy.  Rather, the record clearly demonstrates that there was no unlawful motivation in

Defendant's decision.  Defendant is therefore entitled to judgment as a matter of law.

Respectfully submitted,

s/Jane M. McFetridge
Illinois Bar No. 6201580

s/Nadine C. Abrahams
Illinois Bar No. 6209382
Attorneys for Defendant
FISHER & PHILLIPS LLP
420 Marquette Building
140 South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 346-8061
Fax: (312) 346-3179
E-mail: jmcfetridge@laborlawyers.com
E-mail: nabrahams@laborlawyers.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 1, 2004, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Nadine C Abrahams     nabrahams@laborlawyers.com, llewandowski@laborlawyers.com

Richard P Klaus     rklaus@hrva.com, urbecf@hrva.com

Gary R Lietz     glietz@lbflaw.com, slong@lbflaw.com

Jane M McFetridge     jmcfetridge@laborlawyers.com, llewandowski@laborlawyers.com

Edward M Wagner     ewagner@hrva.com, urbecf@hrva.com

and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:  N/A

Respectfully submitted,

s/Jane M. McFetridge
Illinois Bar No. 6201580
Attorney for Defendant
FISHER & PHILLIPS LLP
420 Marquette Building
140 South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 346-8061
Fax: (312) 346-3179
E-mail: jmcfetridge@laborlawyers.com


s/Nadine C. Abrahams
Illinois Bar No. 6209382
Attorney for Defendant
FISHER & PHILLIPS LLP
420 Marquette Building
140 South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 346-8061
Fax: (312) 346-3179
E-mail: nabrahams@laborlawyers.com

Chicago 48771.1

**EXHIBIT A**

### GLENDA J. LINER, Plaintiff-Appellant, v. DONTRON, INC., T/A RADIO STATION WYCA-FM, a wholly owned subsidiary, Defendant-Appellee.

### No. 00-4088

### UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

*9 Fed. Appx. 523; 2001 U.S. App. LEXIS 10855*

**April 24, 2001, Argued**
**May 21, 2001, Decided**

**NOTICE:** [**1] RULES OF THE SEVENTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Rehearing and Rehearing En Banc Denied June 18, 2001, Reported at: *2001 U.S. App. LEXIS 13906.* Certiorari Denied November 13, 2001, Reported at: *2001 U.S. LEXIS 10377.*

**PRIOR HISTORY:** Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 99 C 1261. Wayne R. Andersen, Judge.

**DISPOSITION:** Dontron's motion to strike Liner's appendix and portion's of her reply brief GRANTED. Dontron's motion for leave to file a reply in support of their motion to strike DENIED AS MOOT.

**LexisNexis(R) Headnotes**

**COUNSEL:** GLENDA LINER, Plaintiff - Appellant, Pro se, Chicago, IL.

For DONTRON INCORPORATED, Defendant - Appellee: Christopher A. Garcia, PONTIKES & GARCIA, Chicago, IL.

**JUDGES:** Before Hon. RICHARD A. POSNER, Circuit Judge, Hon. TERENCE T. EVANS, Circuit Judge, Hon. ANN CLAIRE WILLIAMS, Circuit Judge.

**OPINION:** [*525]

#### ORDER

Glenda Liner appeals a grant of summary judgment to her former employer, T/A Radio Station WYCA-FM (WYCA), a wholly owned subsidiary of Dontron, Inc. (Dontron), in her lawsuit under Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e* et seq., alleging sex discrimination and retaliatory discharge.

In 1988 Liner began working as a sales account [**2] executive for radio station WYCA selling advertising air time, collecting

advertising fees, and servicing advertising clients. She quit in 1991 based on her disapproval of how her immediate supervisor, Taft Harris, who acted as general manager, station manager, and sales manager, treated employees at the station. Although Harris continued to manage the station and the sales department, Liner returned to work for WYCA in 1993, again as a sales account executive.

With respect to her ability to sell advertising time, it is undisputed that Liner was very good, and WYCA generated a high amount of sales revenue for the station's parent company, Dontron, due to her efforts. It is also not disputed that at one point, Dontron and Harris planned to train Liner to take over Harris's position as [*526] sales manager. Despite Liner's excellent sales record, however, Harris in 1995 began issuing a series of written reprimands and instituting disciplinary actions based on what he saw as Liner's failure to comply with company policy. Among other things, Harris reprimanded Liner and sometimes retained a portion of her earned commission for failing to submit sales and time log forms on a daily basis; accepting [**3] a faxed copy of a signed contract in lieu of an original; not attending a mandatory sales department staff meeting; executing a contract with a client for an air time rate without Harris's prior approval; allowing an advertising account to remain on the air even though it was behind on payments; allowing advertising to air although the client's contract had expired; and showing a client the station's "rate card" for advertising time.

In a May 2, 1997, memorandum, in which Harris reprimanded Liner for accepting payment on an account with a check made out to her personally and then reimbursing the station in cash, Harris warned her that she would be terminated if she violated company policy another time. Liner was again reprimanded the following month for not seeking approval on an account contract from Kyle Simpson, a male account executive who had been promoted to

sales coordinator (an intermediate position between sales manager and account executive) and was eventually promoted to sales manager. Harris did not, however, move to discharge Liner, stating that he and Simpson would give her another chance. Liner received two more memoranda during June, both from Simpson, reprimanding [**4] her for not submitting a contract to him for approval and submitting contracts for approval that were either incomplete or deviated from station rate or contract length policy.

On June 12, 1997, the owner of WYCA, Donald Crawford, authorized Harris to fire Liner. Sometime after June 13, 1997, Crawford received notice from the EEOC that Liner had filed a charge of discrimination with the agency against the station alleging sex harassment and sex discrimination based on deductions from her commission. n1 Liner was terminated from her employment at WYCA on June 27, and she filed a second EEOC charge claiming that she was terminated in retaliation for filing her initial EEOC charge. After receiving a right-to-sue letter from the EEOC, she filed this lawsuit, alleging that she was discriminated against on the basis of sex during her employment at WYCA, that she was terminated in retaliation for filing a charge with the EEOC, and that she was wrongfully terminated in violation of Illinois law.

---

n1 In its order, the district court cited June 12, 1997, as the date the notice of Liner's EEOC charge was sent to Dontron. The notice, which was included in the record in the district court, states June 13, 1997. Liner does not contest on appeal that June 13 is the correct date.

[**5]

Dontron moved for summary judgment, and Liner, who was then represented by counsel, responded. The district court granted Dontron's

motion, reasoning primarily that Liner failed to present direct evidence of discrimination and that she did not meet her burden of producing evidence that she was performing her job satisfactorily, or that Harris's and/or Simpson's reprimands were a pretext for discrimination. The court also concluded that Liner failed to provide a causal link between her EEOC charge and her termination from which a jury could infer retaliation. Liner, now without counsel, appeals. n2

n2 Both parties erroneously name Donald Crawford as a defendant. Crawford was voluntarily dismissed from the lawsuit shortly after Dontron filed its motion for summary judgment, and Liner does not challenge this voluntary dismissal.

[*527]

Although Liner argued in the district court that a statement made by Harris to a female coworker constituted direct evidence of discrimination, she does not raise this point on appeal and [**6] therefore it is waived as an issue. See *United States v. Turner, 203 F.3d 1010, 1019 (7th Cir. 2000).* Liner instead appears to rely on the indirect burden-shifting method of proof outlined in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).* To satisfy a prima facie case of discrimination pursuant to McDonnell Douglas, Liner must demonstrate that she belonged to a protected class, she performed her job satisfactorily, she suffered an adverse employment action, and similarly situated employees not in the protected class were treated more favorably. *O'Regan v. Arbitration Forums, Inc., 246 F.3d 975, 2001 U.S. App. LEXIS 6026,* Nos. 99-4044 & 00-1306, slip op. at 7 (7th Cir. 2001). If Liner demonstrates a prima facie case, then the burden shifts to Dontron to present a legitimate, nondiscriminatory reason for firing her. Id. To

rebut the offered explanation, Liner must present evidence that Dontron's reason is a pretext for sex discrimination, pretext meaning "a dishonest explanation, a lie rather than an oddity or an error." Id. (citations and internal quotations omitted).

The district court, in granting summary judgment, concluded [**7] that Liner failed to establish a prima facie case of discrimination because she did not produce evidence that she was performing her job in a satisfactory manner and, even if she had produced such evidence, she did not offer evidence from which a jury could infer that Dontron's reason for firing her was dishonest. On appeal, Liner seems to argue first that she was performing her job satisfactorily based on her excellent sales record and that she was qualified to be promoted to sales manager, a position ultimately given to Mr. Simpson. Liner's evidence of her proven ability to sell advertising, however, is undisputed but irrelevant to the question whether she was performing her job in a satisfactory manner. Dontron did not refuse to promote her because her sales were lagging; rather, Liner's personnel file contained a litany of complaints of insubordination and failure to comply with company policies and procedures that, despite her fine sales record, constituted substandard work performance. Cf. *Mills v. First Fed. Sav. & Loan Ass'n, 83 F.3d 833, 846 (7th Cir. 1996)* (with respect to pretext analysis, employee's satisfactory performance in some aspects of job does not [**8] necessarily undermine employer's explanation for termination).

Liner's other arguments apparently relating to whether Harris's disciplinary actions were a pretext for discrimination are similarly unavailing. Liner believes that a state court's determination that the deductions from her earned commission violated the Illinois Wage Payment and Collection Act, 820 ILCS 115/9 (1997), somehow demonstrates a violation of Title VII. That the deductions were not valid

under state law, however, does not speak to the issue whether Dontron honestly believed that it should deduct commissions to prevent future violations of company policy. See, e.g., O'Regan, Nos. 99-4044 & 00-1306, slip op. at 8-9 (although company's employment agreement may have been illegal, unenforceable, and "bad business decision," that company forced employees to sign agreement did not establish pretext).

Furthermore, a February 12, 1997, memorandum from Harris to Liner and Simpson declaring that neither employee would be promoted to sales manager at that time does not relate to whether Harris's decision not to promote Liner was pretextual. The memo was addressed to both Liner and Simpson, and Liner has not produced [**9] any evidence to refute Harris's legitimate explanation for temporarily [*528] suspending the promotion of either Liner or Simpson to sales manager--that there was no need to hire or train additional sales executives at that time. Liner also does not explain the relevance of Harris's inability to remember during his deposition whether some of the policies he instituted with the sales department were transmitted in writing or verbally. Nor does Liner elucidate how Harris's awareness (or unawareness) of account executive billing relates to the issue of pretext. n3

n3 In her brief, Liner also claims that Harris admitted that a client can see a schedule of rates for air time, or a "rate card." But this alleged admission appears nowhere in Harris's deposition and is therefore not supported by the record.

A closer question relating to pretext, however, is presented by Liner's argument that the company policies she was accused of violating were either inconsistently applied to all sales executives or established after the fact [**10] in order to entrap her. Liner produced evidence that she was not at fault for the episode in which she was reprimanded for allowing an ad to go on the air even though the client's contract had expired. Specifically, both Liner and a coworker of Liner's named Tara Locke testified during their depositions that the problem was obviously a bookkeeping error beyond Liner's control. Second, although Harris insisted during his deposition that he pre-approved all extensions of existing contracts, Liner testified that that was not the policy as she understood it. Locke also testified that Simpson was once late for a sales meeting, but Harris's reaction was informal and mild compared to the yelling and formal reprimand Liner received for the same offense. Finally, Locke explained that Harris himself would often violate the same policies for which he would reprimand Liner: using faxed copies in place of original contracts, allowing clients to air ads despite delinquent accounts, and writing personal checks to the station to cover his client's delinquent accounts.

Assuming that the above facts demonstrate that the station's policies were inconsistently applied or unclearly established, a recent [**11] Title VII decision of this court may support Liner's contention that she established a genuine issue of material fact regarding whether the establishment and application of the policies was pretextual. In *Gordon v. United Airlines, Inc., 246 F.3d 878, 2001 U.S. App. LEXIS 5048,* slip op. at 15 (2001) (petition for rehearing and petition for rehearing en banc pending), a flight attendant trainee for an airline carrier was terminated after committing a series of company policy violations. A divided panel reversed the grant of summary judgment to the defendant employee because the court's "review of the record revealed inconsistencies in definition and disparities in application" of disciplinary policies that called into question the employer's explanation for firing the employee. Id. at 19-20. We reversed the grant of summary judgment even though the employee admitted

4

that he performed an unauthorized action leading to his termination. Id. at 20.

Like the employee in Gordon, Liner has produced evidence that Harris disciplined her more harshly than Simpson for a similar infraction, that she was not at fault for a violation of company policy for which she was held responsible, and that she [**12] was not made aware of some of Harris's policies until after she was reprimanded for violating them. She also produced evidence that Harris himself was not following some of the policies that he reprimanded her for violating. Finally, as in Gordon, Liner admitted that she had violated company policy. But unlike the plaintiff in Gordon, see id. at 15, Liner was warned several times that any further violations of company policy, specifically executing contracts [*529] without prior approval from Simpson and providing incomplete information when seeking contract approval, would result in her termination.

In addition, at one point in her deposition Liner admitted that regardless of whether it was actual company policy not to accept checks from clients personally made out to her, Harris believed that Liner violated company policy for doing so. This admission, coupled with Locke's testimony that Harris "was a lousy manager in general" whose "inability to manage did not just affect the women, it affected the men, anyone who had a family, outside obligations," paint a picture of Harris as a poor manager, with perhaps unreasonable expectations of his employees. Nevertheless, showing that an [**13] employer is a bad manager does not demonstrate pretext because "the issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers." Wade v. Lerner New York, Inc., 243 F.3d 319, 323 (7th Cir. 2001) (citation and internal quotations omitted). See also Pitasi v. Gartner Group, Inc., 184 F.3d 709, 718 (7th Cir. 1999) (To demonstrate pretext, it is insufficient for employee "to show that his employer fired him for incorrect or poorly considered reasons. He must establish that the employer did not honestly believe the reasons it gave for terminating him."). We do not believe that Liner has offered any evidence to dispute her own concession that Harris actually believed that Liner violated company policy, regardless of whether a company policy was actually established. Therefore, Liner has not established that irregularities in company policy constituted evidence of a pretext for sex discrimination.

Liner next argues that the district court improperly granted summary judgment on her retaliation claim. She offered [**14] no direct evidence of retaliatory discharge, and so, to establish a prima facie case of retaliation, she must provide evidence that she reported or opposed conduct protected by Title VII; she suffered an adverse employment action; and there is a causal relationship between her opposition to the prohibited activity and the adverse job action. Basith v. Cook County, 241 F.3d 919, 933 (7th Cir. 2001). It is undisputed that Liner meets the first two requirements of a prima facie case of retaliation. In order to establish the third requirement, causation, Liner must demonstrate that Dontron would not have fired her "but for" her opposition to the prohibited conduct. Id. She has not done so. Dontron did not receive notice of Liner's EEOC charge until after June 13, 1997, one day after Crawford authorized Harris to terminate her. Thus, there is no chronological link between the receipt of the EEOC charge and Crawford's decision to terminate Liner. Furthermore, as explained in the above discussion regarding Liner's sex discrimination claim, Liner has not produced evidence to refute Dontron's legitimate business reason for firing her: that she repeatedly failed to conform [**15] to company policy despite repeated warnings that she would be terminated if the violations continued.

Liner raises several other issues relating to her retaliation claim, none of which were raised before the district court. First, she claims that Crawford knew about Harris's alleged discriminatory treatment against her before she filed her EEOC complaint because she wrote a letter to him complaining of the deductions from her commission and of Harris's harsh reprimands. But to state a valid retaliation claim, the employee's "complaint must involve discrimination that is prohibited by Title VII," *Hamner v. St. Vincent Hosp.* [*530] *and Health Care Ctr., Inc., 224 F.3d 701, 707 (7th Cir. 2000),* and in this letter she does not mention sex discrimination or any type of harassment based on gender. Thus, her letter did not constitute protected expression under Title VII and she does not satisfy a prima facie case of retaliation.

She also appears to make an ineffective investigation claim by arguing that Dontron's corporate officers did not address Harris's alleged discrimination or hostile environment when they visited the station and that Dontron does not have a human resources [**16] department. Besides not raising these issues in the district court, Liner does not develop a comprehensible argument supported by anything in the record. Accordingly, the issue is waived. See *Anderson v. Hardman, 241 F.3d 544, 545 (7th Cir. 2001)* (even pro se litigants must provide "cogent arguments in any appellate brief).

As a final matter, Dontron moved to strike Liner's appendix and parts of her reply brief. Only four of the documents in Liner's appendix were presented to the district court, and the remainder are unauthenticated and were not presented in Liner's response to summary judgment or in the record on appeal. Liner responds that the district court was aware of the substance of the documents because she referenced the contents of them in her deposition. But because we do not permit litigants "to stray beyond the bounds of the record for reasons so obvious and familiar that

they scarcely require mention," see *United States v. Hoover, 246 F.3d 1054, 2001 U.S. App. LEXIS 6175,* No. 98-2600 et al., slip op. at 15 (7th Cir. 2001) (Rovner, J., concurring), those documents presented for the first time in Liner's appendix are struck from the record, and we disregard statements in her reply [**17] brief that cite only those documents for support, *McClendon v. Indiana Sugars Inc., 108 F.3d 789, 795 (7th Cir. 1997)* ("Evidence that was not proffered to the district court . . . is not part of the appellate record" and "has no place in an appellate brief."); *United States v. Phillips, 914 F.2d 835, 840 (7th Cir. 1990)* ("An appellant may not attempt to build a new record on appeal to support his position with evidence that was never admitted in the court below.").

Because Liner has failed to provide any evidence demonstrating that she performed her job satisfactorily or that Dontron's reasons for firing her were pretextual or retaliatory, we AFFIRM. We moreover GRANT Dontron's motion to strike Liner's appendix and portion's of her reply brief. We DENY AS MOOT Dontron's motion for leave to file a reply in support of their motion to strike.

EXHIBIT B

LEXSEE

**DEBRA DEBRUIN, Plaintiff-Appellant, v. APPLETON PAPERS, INCORPORATED, Defendant-Appellee.**

**No. 02-4053**

**UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT**

*69 Fed. Appx. 332; 2003 U.S. App. LEXIS 13621*

**June 11, 2003, Argued**
**July 3, 2003, Decided**

**NOTICE:** [**1] RULES OF THE SEVENTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the Eastern District of Wisconsin. No. 01 C 506. Lynn Adelman, Judge.

**DISPOSITION:** Affirmed.

**LexisNexis(R) Headnotes**

**COUNSEL:** For DEBRA DEBRUIN, Plaintiff - Appellant: Ellen Roggensack Brostrom, EARLE & BROSTROM, Peter G. Earle, Milwaukee, WI USA.

For APPLETON PAPERS, INCORPORATED, Defendant - Appellee: Winston A. Ostrow,

Donald L. Romundson, GODFREY & KAHN, Green Bay, WI USA.

**JUDGES:** Before Hon. RICHARD A. POSNER, Circuit Judge, Hon. JOHN L. COFFEY, Circuit Judge, Hon. KENNETH F. RIPPLE, Circuit Judge.

**OPINION:**

[*333] **ORDER**

Debra DeBruin filed this action against her former employer, Appleton Papers. She alleged that she was terminated because of her sex in violation of *Title VII of the Civil Rights Act of 1964*.

After extensive discovery, Appleton moved for summary judgment. The district court granted the motion on the ground that Ms. DeBruin had not established that she was meeting Appleton's legitimate employment expectations. Ms. DeBruin now appeals. For the reasons set forth in this order, we affirm [**2] the judgment of the district court.

# I

## BACKGROUND

Ms. DeBruin worked at Appleton Papers for sixteen years and was eventually promoted to Director of the Credit and Finance Customer Service Department. Ms. DeBruin's performance reviews were consistently positive, although occasionally her superiors observed that she was an "emotional person" and, as a result, sometimes clashed with co-workers during meetings. Joint App. I at 202. Her superiors, however, never identified her emotionalism as a serious problem.

Ms. DeBruin began to encounter more serious difficulties after the appointment of Dale Parker as the chief financial officer of Appleton Papers in February 2000. Parker was her immediate supervisor. Shortly after he became CFO, Parker proposed reorganizing Ms. DeBruin's department by reassigning some of her responsibilities to her subordinate, Amy Werner. During one meeting with Ms. DeBruin, Parker outlined the suggested changes on an organizational chart. Ms. DeBruin alleges that Parker banged his fist on the table, pointed to the area of the chart that represented her remaining duties and said, "I want you to sit over here as the Queen of Sheba." Joint App. I at 131-32. Ms. [**3] DeBruin testified at her deposition that, given Parker's tone and the context of his remark, she interpreted "the Queen of Sheba" as a derogatory term for an assertive woman.

At some point, Parker became displeased with Ms. DeBruin to such an extent that he contemplated replacing her. Parker claims that, by late June 2000, he had become concerned by Ms. DeBruin's reluctance to discipline one of her subordinates. He also perceived Ms. DeBruin as working too hard and failing to maintain an appropriate balance between her work and her personal life. In addition, Parker had doubts about Ms. DeBruin's honesty, but the record does not clarify the basis for his concerns. Parker admits, however, that none of

these issues proved as serious as he initially believed.

In late June, Beverly Stieber, a human resources representative, received complaints from three of Ms. DeBruin's subordinates--Amy Werner, Allison Harpel and Lisa Rottier--about Ms. DeBruin's managerial style. Werner, Harpel and Rottier characterized Ms. DeBruin as abusive, intimidating and domineering, and they claimed that she publicly criticized her employees, often brought them to tears when reprimanding them, and discouraged [**4] them from reporting problems to the human resources department. All three expressed to Stieber that they feared how Ms. DeBruin would react if she discovered that they had spoken with her. According to Stieber, Amy Werner broke down into tears while discussing Ms. DeBruin's behavior.

[*334] The record does not establish with any precision when Parker began to consider firing Ms. DeBruin or to what extent factors other than Werner's, Harpel's and Fottier's complaints influenced his decision. On June 23, Stieber wrote in an e-mail to Parker that she had discussed finding a replacement for Ms. DeBruin with her supervisor, Dave Badilla. According to Stieber, Badilla advised Parker to compose a written description of Ms. DeBruin's current position, including a list of qualifications. Parker responded by e-mail, asserting that he would put together the suggested job description. At the time of this e-mail exchange, however, Parker was unaware that Ms. DeBruin's subordinates had filed complaints about her with the human resources department.

Parker testified at his deposition that he recalled neither receiving nor responding to Stieber's e-mail regarding a replacement for Ms. DeBruin. He also [**5] stated that he did not remember having a discussion with Stieber before June 23 regarding the possibility of replacing Ms. DeBruin. Further, there is no

evidence that Parker ever created the written job description referred to in Stieber's e-mail.

When Stieber informed Parker in mid-July that Werner, Harper and Rottier viewed Ms. DeBruin as an abusive supervisor, he directed Stieber to draft a memorandum detailing the substance of the complaints. Parker intended the memorandum as a warning letter to inform Ms. DeBruin of deficiencies in her performance and to threaten disciplinary action if she did not improve. Neither Parker nor Stieber investigated the complaints or asked Ms. DeBruin for her side of the story.

Parker met with Ms. DeBruin again on August 3 to discuss her performance and to give her the memorandum detailing his dissatisfaction with her managerial and interpersonal skills. Parker informed Ms. DeBruin that she must attend a Creative Center for Leadership ("CCL") seminar in September in order to improve her leadership skills. In addition, Parker ordered Ms. DeBruin to seek counseling with Appleton's employee assistance program. Parker warned Ms. DeBruin that she could [**6] be disciplined or terminated if she refused to attend the CCL seminar or failed to schedule her initial counseling session by August 15.

The memorandum shocked Ms. DeBruin, and she became distraught. Ms. DeBruin testified at her deposition that, when Parker saw how distraught she was, he commented that people on Wall Street often jump out of windows when they become upset: "... Dale started talking about when he had worked in New York. And he said, it brought back memories of when he worked in New York and how when people were upset they would jump from the building and commit suicide." Joint App. I at 161. Ms. DeBruin interpreted Parker's comment as a suggestion that she commit suicide. Less than two weeks later, Werner, Harpel and Rottier resigned. Parker fired Ms. DeBruin within days after receiving their resignations.

The record is not clear as to when Parker finally decided to terminate Ms. DeBruin. When Werner tendered her resignation on August 10, Stieber informed her that a decision to terminate Ms. DeBruin already had been made. Stieber, however, met with Ms. DeBruin on August 11 to help her prepare for the CCL seminar. Moreover, Parker claims that he did not make the final [**7] decision to terminate Ms. DeBruin until August 14. On August 16, Parker called Ms. DeBruin, who was at home sick that day, and notified her that she was fired. Stieber subsequently met with Ms. DeBruin's subordinates and claims that they expressed relief that Ms. [*335] DeBruin would no longer be supervising them.

Parker replaced Ms. DeBruin on an interim basis with Jay Vanderhoof, who worked in Appleton's Finance and Risk Management department. Vanderhoof was qualified for the position, although he did not have as much experience as Ms. DeBruin in bankruptcy and credit management. Eventually Vanderhoof was appointed as Ms. DeBruin's permanent replacement.

Ms. DeBruin filed this action, alleging that she had been fired because of her sex, not because of any deficiency in her managerial style. Appleton moved for summary judgment, arguing that it fired her because of her disrespectful behavior towards her subordinates. In response to Appleton's motion for summary judgment, Ms. DeBruin argued that she was indeed an effective manager and that her subordinates' complaints were not as serious as Parker and Stieber claimed. The district court, however, found that Ms. DeBruin could not make out [**8] a *prima facie* case of discrimination because she had not been meeting Appleton's legitimate employment expectations at the time of her termination. Ms. DeBruin filed a motion for reconsideration under *Federal Rule of Civil Procedure 59(e)*, attempting to bolster her claim that she was an effective manager by attaching complete copies

of certain depositions from which she had previously cited only excerpts. The court refused to consider this additional evidence because nothing had prevented Ms. DeBruin from submitting it when she responded to Appleton's motion for summary judgment. In any event, the court concluded, the newly submitted evidence did not change its view that Ms. DeBruin could not establish that she was meeting Appleton's legitimate expectations.

## II

## DISCUSSION

On appeal, Ms. DeBruin submits that the district court's conclusion that she did not make out a *prima facie* case of employment discrimination was erroneous. *See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).* We review the court's grant of summary judgment *de novo,* construing the record in the light most favorable to the non-movant in this [**9] case, Ms. DeBruin. *Hardy v. Univ. of Ill. at Chicago, 328 F.3d 361, 364 (7th Cir. 2003).*

Ms. DeBruin first argues that the record establishes that she was meeting the expectations of her employer. She points to her history of positive performance reviews and emphasizes the most recent one, given in December 1999--only two months before Parker became CFO. However, a *prima facie* case of sex discrimination requires proof that the employee was performing at a satisfactory level at the time of her termination. *See Peele v. Country Mutual Ins. Co., 288 F.3d 319, 329 (7th Cir. 2002)*; *Fortier v. Ameritech Mobile Comm. Inc., 161 F.3d 1106, 1113 (7th Cir. 1998).* That Ms. DeBruin's performance was satisfactory in December 1999 does not establish that it was satisfactory at the time she was discharged eight months later, in August 2000. *See Fortier, 161 F.3d at 1113.* By themselves, her past performance reviews are therefore insufficient for Ms. DeBruin to meet her burden of establishing that she was an effective manager.

*Clay v. City of Chicago Dep't of Health, 143 F.3d 1092, 1094-95 (7th Cir. 1998)*; *Fortier, 161 F.3d at 1113.* [**10]

Ms. DeBruin also argues that Werner's, Harpel's and Fottier's depositions demonstrate that she was meeting Appleton's legitimate expectations. In their depositions, [*336] all three employees testified that, despite their complaints to management, they considered Ms. DeBruin a good manager who was often supportive of her employees. Ms. DeBruin also argues that the complaints of her abusiveness were exaggerated. She notes that, although the employees' affidavits depicted Ms. DeBruin as uniformly abusive and ineffective, their deposition testimony suggested otherwise. An examination of these documents does reveal inconsistencies between the employees' affidavits and their later deposition testimony. For instance, all three employees wrote in their affidavits that they left Appleton Papers because of Ms. DeBruin; but each testified later that Ms. DeBruin's behavior was not the primary reason for her resignation. In another instance, Harpel's deposition testimony directly contradicted her earlier assertions in her affidavit that Ms. DeBruin had ceased giving her developmental opportunities and had discouraged subordinates from proposing new ideas. Furthermore, all the employees had difficulty [**11] describing specific examples of Ms. DeBruin's abusiveness.

Ms. DeBruin does identify discrepancies between the affidavits of the employees who filed complaints against her and their deposition testimony. Arguably, these discrepancies provide a basis for inferring that the substance of the complaints was false and, therefore, that the complaints were a pretextual for terminating Ms. Debruin's employment. However, "in determining whether an employer's proffered reason for an employment action was pretextual, we are not concerned with the correctness or desirability of reasons offered for employment decisions, but rather the issue of whether the

employer honestly believes in the reasons it offers. *Grayson v. O'Neill, 308 F.3d 808, 820 (7th Cir. 2002)*. Nothing in the record indicates that Parker did not give credence to the complaints at the time they were filed or that he was presented with evidence that would have warranted his believing that the reports were not true. Consequently, even if Ms. DeBruin did make out her *prima facie* case, n1 she is unable to establish that Appleton's legitimate, nondiscriminatory reason for terminating her was pretextual. *See, e.* [**12] *g., Millbrook v. IBP, Inc., 280 F.3d 1169, 1175 (7th Cir. 2002)* (holding that a plaintiff can establish pretext only by showing that her employer's explanation is a lie).

> n1 Ms. De Bruin also argues that she fulfilled the fourth prong of the *McDonnell Douglas* test by establishing that she was replaced by a male employee who had less experience than she. Although we have reservations as to whether she has met her burden under the circumstances presented here, we need not decide the matter definitively. *See Leffel v. Valley Fin. Servs., 113 F.3d 787, 794 (7th Cir. 1997)*.

Ms. DeBruin submits that Parker and Stieber's June 23 e-mail exchange regarding a search for her replacement raises an inference that Parker had decided to terminate Ms. DeBruin *before* he learned in mid-July of the complaints filed by Harpel, Werner and Fottier.

Thus, Ms. DeBruin submits, Parker was lying when he offered the employee complaints as the primary basis for terminating her.

We cannot accept this [**13] argument. The e-mail exchange does not establish that Parker was lying. The most we can infer from the e-mail is that Parker had developed reservations about Ms. DeBruin's effectiveness before learning of the complaints filed against her. Whatever the accuracy of those reservations, there is no evidence that they had a discriminatory basis. Furthermore, no matter what Parker thought about Ms. DeBruin before he learned of the complaints, he did not make the decision to terminate her until after he learned of the complaints and the subsequent [*337] resignations of Werner, Harpel and Rottier.

The discrepancies between Werner's, Harpel's and Rottier's deposition testimony and their affidavits cannot, of course, establish pretext. These discrepancies did not emerge until discovery, and Ms. DeBruin does not dispute that Werner, Harpel and Rottier actually filed the complaints upon which Parker relied in making his decision. At the time, Parker made his decision to terminate Ms. DeBruin, he had no reason to doubt the substance of the complaints, and we see no reason why he would not have been justified in relying on them.

For these reasons, we must affirm the judgment of the district court. [**14]

AFFIRMED

**EXHIBIT C**

LEXSEE 2004 US DIST LEXIS 3719

**BARBARA JO HENRY, Plaintiff, v. AMERITECH CORPORATION, Defendant.**

**No. 02 C 4946**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2004 U.S. Dist. LEXIS 3719*

**March 8, 2004, Decided**
**March 9, 2004, Docketed**

**DISPOSITION:** [*1] Defendant's motion for summary judgment under Fed. R. Civ. P. 56 granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** For BARBARA JO HENRY, plaintiff: Arlene Y. Coleman, Coleman & Goss, Chicago, IL.

For AMERITECH CORPORATION aka SBC Ameritech, defendant: Hubert O. Thompson, Ronald Austin, Jr., Brothers & Thompson, P.C., Chicago, IL. Daniel A. Kazlauski, Ameritech Corporation, Chicago, IL.

**JUDGES:** Robert W. Gettleman, United States District Judge.

**OPINIONBY:** Robert W. Gettleman

**OPINION:**

### MEMORANDUM OPINION AND ORDER

Plaintiff Barbara Jo Henry filed the instant lawsuit against her former employer, Ameritech Corporation ("Ameritech"), alleging that Ameritech "intentionally engaged in discrimination by terminating Plaintiff from her employment because of her race, Black, in violation of Title VII [*42 U.S.C. § § 2000e et seq.*] and *42 U.S.C. § 1981*." Defendant has moved for summary judgment pursuant to *Fed. R. Civ. P. 56*, arguing that plaintiff has failed to establish a prima facie case of discrimination and also failed to rebut defendant's asserted non-discriminatory reason for terminating plaintiff's [*2] employment. For the reasons stated herein, defendant's motion for summary judgment is granted.

**FACTS** n1

n1 Unless otherwise noted, the following facts, taken from the parties' L. R. 56.1 Statements and attached exhibits, are not in dispute.

Plaintiff, an African-American woman, worked for Ameritech from November 11, 1971, through her termination on September 21, 2001. After working in a management position from 1999 to May 2001 in Ameritech's Chicago Heights office, plaintiff assumed the position of Customer Advocate in June 2001. Plaintiff's responsibilities included receiving incoming calls, handling disputes for local usage, new service, and misdirected payments. Customer Advocates also performed a sales function that required them to consult with clients about additional services and products.

In 2001, Customer Advocates in the Chicago Heights Office participated in Ameritech's Cash Incentive Plan, which encouraged sales by awarding cash bonuses to employees who exceeded their monthly sales objectives [*3] as follows: (1) if a Customer Advocate achieved 100% of her monthly sales objective, she received a $ 250 award; (2) if she achieved 112% of her monthly sales objective, she received a $ 400 award; and (3) if she achieved 120% of her monthly sales objective, she received a $ 500 award. In June 2001, the monthly sales requirement was $ 3500 per month; this objective was reduced proportionately when a Customer Advocate took vacation or was temporarily assigned to another position.

Each Customer Advocate is assigned a sales code, which is a unique designation that is used to identify the Customer Advocate who negotiated an order for a particular service (in case there is later contact from the customer concerning the order) and track his productivity. Customer Advocates are trained to accurately record their sales codes whenever contact with a customer results in negotiation of an order for services.

The parties dispute whether Ameritech's management condoned a practice called "sales sharing," in which one Customer Advocate would take credit for a sale that she neither negotiated nor worked on herself. Although Ameritech did not provide a written directive explicitly prohibiting sales [*4] sharing per se, Ameritech's Code of Business Conduct provides as follows:

You are responsible for the integrity of company records over which you have control. Company business records must be prepared accurately. Reliable records are of critical importance in meeting our financial, legal and management obligations. Reports, vouchers, bills, payroll and service records, benefit claims and records, measurement and performance records, and other essential data should be prepared with care and honesty. Service and cost performance measures, for example, are a key to the successful management of the business. Making a false or misleading report or record of measurement data is as serious as falsifying vouchers, financial data or records pertaining to company funds or property.

Plaintiff received a copy of Ameritech's Code of Business Conduct and was given an opportunity to read the Code and ask any questions. Each year, Customer Advocates are required to re-read the Code and sign an acknowledgment that they have done so.

According to plaintiff, Ameritech managers Tina Fisher-Harper, Kim Burdine, and Keith Roberts were aware that sales sharing occurred among Ameritech employees [*5] to enable those employees to attain their monthly sales objectives. To this end, plaintiff submitted affidavits from Sheila Childs and Ardilia Cross, Customer Advocates who were supervised by Fisher-Harper, in which they both state that Customer Advocates supervised by Fisher-Harper routinely shared sales, and that Fisher-Harper encouraged her team members to assist other team members in meeting their sales objectives. According to Cross, on at least one occasion, Fisher-Harper personally provided Childs with the sales code of a Customer Advocate on her team, Belinda Barnes, so that Childs could give Barnes a sale.

When plaintiff was working as a Customer Advocate, she was not supervised by Fisher-Harper, Roberts, or Burdine, but rather was directly supervised by Kezia Morris. Plaintiff's senior manager was Jacqueline Payne. There is no evidence that either Morris or Payne were aware of sales sharing or otherwise condoned or authorized the practice.

In May 2001, just before plaintiff was supposed to leave her temporary management position and resume her duties as a Customer Advocate, Sheila Childs asked plaintiff if she needed any sales to meet her monthly objective. Plaintiff felt [*6] that such a sale would give her a start for June and thus accepted Childs' offer. Plaintiff gave Childs her sales code so that Childs could complete the order and apply the sales revenue to plaintiff's sales code.

This was not the first time that plaintiff had shared sales. When she was working in her temporary management position from 1999 to May 2001, under Keith Roberts' supervision, plaintiff did not have a sales objective. Rather than have plaintiff take credit for sales that did not amount to anything, Roberts permitted plaintiff to share her sales with Customer Advocates who had failed to meet their quotas.

In June 2001, Childs brought plaintiff a slip of paper with an order number on it for the sale that Childs had offered plaintiff. Plaintiff does not dispute that she did not do any work on this particular sale. Childs told plaintiff that the order was for an ISDN contract. Plaintiff believed the contract was worth $ 1,800 and that Childs had made the sale herself, even though Childs did not indicate to plaintiff that she had done any work on the sale. Plaintiff placed the order number onto a tracking log on which Customer Advocates keep track of the value of their sales. [*7]

As it turned out, the order was actually one of 23 ISDN Prime n2 orders generated by an Ameritech Authorized Distributor, not Childs, and resulted in $ 4,865 in revenue being credited to plaintiff's sales account. ISDN sales by Ameritech Authorized Distributors are forwarded to Ameritech's ISDN Provisioning Center (the "AIPC Center") for provisioning by Market Support Specialists ("MSS"), who neither have direct contact with customers nor receive any credit or bonus for ISDN sales. At least some of these 23 ISDN Prime orders came into the AIPC Center without a sales code. At Childs' request, two MSS's, Tondaleria Marcus and Latasha Sanders, placed Childs' sale code on those orders, and Childs in turn replaced her sales code with those of other Customer Advocates in the Chicago Heights Call Center, including plaintiff. The parties dispute whether Marcus and Sanders were authorized by their supervisor, Roberts, to place Childs' sales code on the unaccounted-for orders.

n2 ISDN Prime is a high speed voice and data communications service that Ameritech offers its customers.

[*8]

In July 2001, Payne, the senior supervisor, asked Area Manager Jacqueline Jones to run a computerized report examining the sales activities of the Chicago Heights Call Center. In running the report, Jones noticed that the same customer number was appearing on several Customer Advocates' sales sheets for ISDN Prime orders. Further investigation revealed that the sales of the ISDN Prime orders were made by an Ameritech Authorized Distributor, not an Ameritech employee.

Payne and Cynthia Williams, an employee in Ameritech's Human Resources Department, subsequently interviewed every Chicago Heights employee whose sales code appeared on any of the ISDN Prime orders. Of the nine employees involved, three actively changed sales codes on the ISDN Prime orders resulting in sales revenue being credited to themselves or another Customer Advocate: Sheila Childs, Michelle Tate, and Leslie Edwards. Sheila Childs claimed that she called the AIPC Center to request that her sales code be placed on ISDN Prime orders because her supervisor, Fisher-Harper, told her to do so. Fisher-Harper denied authorizing Childs to request sales credit for the ISDN Prime orders from the AIPC Center, and further stated [*9]  that she did not authorize Childs to place other Customer Advocates' sales codes on those orders.

Three other employees, Alice Quarles, Charlotte Hamilton, and Rebecca Johnson, acknowledged authorizing use of their sales codes, but the particular ISDN orders on which their sales codes were placed did not generate sales revenue. Two other Customer Advocates, Belinda Barnes and Susan Hawkins, denied any knowledge of the scheme, denied authorizing the use of their sales codes, and did not receive sales revenue credit from the orders on which their sales codes were placed. Plaintiff acknowledged that she knew of the scheme, authorized the use of her sales code in furtherance thereof, and received sales revenue credit as a result, which led to a $ 500 bonus that she would not have otherwise received. n3

n3 The $ 4,865 plaintiff received in revenue credit from the ISDN Prime sale, taken together with the $ 3,001 in other sales secured by plaintiff in June 2001, resulted in a $ 500 bonus (based on plaintiff's $ 3,500 objective). According to Ameritech's Performance Status Report for June 2001, attached as an exhibit to plaintiff's L.R. 56.1 statement, plaintiff's sales objective for June 2001 was actually only $ 2,667, not $ 3,500, because she had taken a week-long vacation the first week of June. Thus, plaintiff was actually entitled to a $ 400 bonus even without the extra sale she received from Childs (because plaintiff's $ 3,001 in sales was more than 112% of her $ 2,667 June sales objective).

[*10]

Of the nine Customer Advocates whose activities were under scrutiny, only Rebecca Johnson and Sue Hawkins are white. The remaining seven Customer Advocates, Sheila Childs, Michelle Tate, Leslie Edwards, Charlotte Hamilton, Alice Quarles, Belinda Barnes, and plaintiff, are African-American.

After Williams and Payne conducted these interviews, employees of Ameritech's Asset Protection Department interviewed eight of the nine employees (except for Barnes, who was absent from the office at the time). All eight employees provided written statements, which were then forwarded to

9

Payne for her consideration. According to plaintiff's statement, she would not have been able to meet her sales objective in June 2001 if Childs had not processed the ISDN Prime order for her. n4

> n4 In her L.R. 56.1 statement, plaintiff contends that she signed her written statement under duress. The cited portions of her deposition that purportedly support that contention are conspicuously absent from plaintiff's L.R. 56.1 exhibits, however. Moreover, in her response to defendant's L.R. 56.1 statement, plaintiff admits that she testified in her deposition that the portion of her written statement claiming that "no force, threats, coercion, promises, or gratuities have been made to me to induce this statement," was correct.

[*11]

Based on the interviews and the employees' written statements provided to Asset Protection, Payne suspended Childs, Tate, Edwards, Hamilton, Quarles, Johnson and plaintiff, pending termination. Barnes and Hawkins received no discipline.

As members of the Local 188 of the International Brotherhood of Electrical Workers, the suspended Customer Advocates were entitled to hearings before the Union-Management Review Board. Plaintiff's hearing occurred in October 2001. According to Payne's affidavit, she decided to terminate plaintiff because she knowingly allowed her sales code to be used in furtherance of the scheme and received revenue credit for ISDN sales. Payne also terminated Childs, Edwards, and Tate because they changed codes on ISDN orders and received revenue credit for ISDN Prime Sales. Payne allowed Hamilton, Quarles, and Johnson to return to work following their suspensions without pay; even though they allowed their sales codes to be used improperly, they did not receive revenue credit for any ISDN Prime sales.

In deciding what levels of discipline to impose, Payne received input from Williams and Toni McGhee, the Labor Relations Case Manager. The final decision regarding [*12] discipline was Payne's, however.

Prior to plaintiff's termination, Ms. Payne had received numerous letters from clients commending plaintiff's service to customers. Moreover, plaintiff's Performance Status Reports for June 2001 and July 2001 rated plaintiff as "above expectations" and "significantly above expectations," respectively.

## DISCUSSION

A movant is entitled to summary judgment under *Fed. R. Civ. P. 56* when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. See *Fed. R. Civ. P. 56(c)*; *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*; *Unterreiner v. Volkswagen of America, Inc., 8 F.3d 1206, 1209 (7th Cir. 1993)*. Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. See *Fed. R. Civ. P. 56(e)*; *Becker v. Tenenbaum-Hill Assoc., Inc., 914 F.2d 107, 110 (7th Cir. 1990).* [*13] The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).* "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position

will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).*

Plaintiff has not produced direct evidence that establishes defendant discriminated against her because of her race. Accordingly, to establish her prima facie case of discrimination with respect to her termination, plaintiff must show that: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) other similarly-situated employees who were not members of the class were treated more favorably. See *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*; *Wells v. Unisource Worldwide, Inc., 289 F.3d 1001, 1006 (7th Cir. 2002).* [*14]

Once plaintiff has established a prima facie case of discrimination, the employer must then produce evidence of a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the employer proffers such a reason, the burden then shifts back to the plaintiff to demonstrate that the employer's proffered reason is a pretext. Id.

Defendant does not dispute that plaintiff is a member of a protected class, or that she suffered adverse employment action through her termination. Rather, defendant disputes that plaintiff has satisfied the second and fourth elements of her prima facie case. According to defendant, an employee who falsifies her employer's documents or is otherwise dishonest is not meeting her employer's reasonable expectations, and plaintiff has not produced evidence that similarly situated employees who are not African-American were treated more favorably than she. The court addresses each of these contentions separately below.

According to defendant, "it is universally recognized that an employee who falsifies her employer's documents or is otherwise dishonest is not meeting her employer's reasonable expectations." In support of this proposition, [*15] defendant cites to *Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359 (7th Cir. 1988)*, *Williams v. United Parcel Service, Inc, 1994 U.S. Dist. LEXIS 13252, 1994 WL 517244 (N.D.Ill. Sept. 20, 1994)*, and *Bagnell v. Komatsu Dresser Co., 838 F. Supp. 1279 (N.D.Ill. 1993)*. None of those cases, however, held that an employee did not meet his employer's reasonable expectations due to falsification of employer documents. To the contrary, all of those cases were decided under the pretext prong of the discrimination analysis, and thus do not compel the conclusion that plaintiff in the instant case failed to meet her employer's reasonable expectations. See, e.g., *Williams, 1994 U.S. Dist. LEXIS 13252, 1994 WL 517244, at *3* ("Although UPS says that Williams was not performing satisfactorily because he violated the timecard policy, this argument is relevant to our inquiry regarding whether UPS' explanation for terminating plaintiff is legitimate or pretextual, and not to plaintiff's prima facie case.").

The court also notes that plaintiff has produced evaluations from June and July 2001 indicating that she was performing above her employer's expectations. Moreover, there is no evidence [*16] that plaintiff had ever been disciplined before the incident at issue in the instant dispute. Drawing all reasonable inferences in plaintiff's favor, the court thus concludes that plaintiff has satisfied the second element of her prima facie case.

The court is not persuaded that plaintiff has satisfied the fourth element of her prima facie case, however. To demonstrate that employees are similarly situated to her, plaintiff must show that they are "directly comparable to [her] in all material respects." *Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002)*. In the context of alleged discrimination in a disciplinary situation, "a

plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct." *Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000)* (citation omitted). "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.*

The evidence [*17] in the instant case is that all of the Customer Advocates who gave their sales codes to Childs and received revenue credit as a result were terminated by Payne. The two white employees who were not terminated as a result of Payne's investigation, Hawkins and Johnson, were not similarly situated to plaintiff because neither of them received revenue credit, and thus a bonus, as a result of the use of their sales codes on the ISDN Prime orders.

Nor were Hawkins and Johnson the only employees who received a lesser punishment than plaintiff. Three black employees, Barnes, Quarles, and Hamilton, who Payne determined did not receive revenue credit, were either suspended without pay or received no discipline. If anything, this suggests that Payne treated similarly situated employees similarly, not differently. Accordingly, plaintiff has failed to establish the fourth element of her prima facie case.

Even if the court concluded otherwise, defendant would still be entitled to summary judgment. Defendant has articulated a legitimate, non-discriminatory reason for plaintiff's termination: falsification of company documents in violation of Ameritech's Code of Conduct. In order to [*18] establish that defendant's preferred reason is pretextual, plaintiff must demonstrate that the explanation is dishonest, rather than merely an error. *Wells, 289 F.3d at 1006* (citing *Kulumani v. Blue Cross Blue Shield Ass'n, 224 F.3d 681, 685 (7th Cir. 2000)).* "A pretext for discrimination means more than an unusual act; it means something worse than a business error; pretext means deceit used to cover one's tracks." *Grube v. Lau Indus., Inc., 257 F.3d 723, 730 (7th Cir. 2001)* (internal quotations omitted). To demonstrate pretext, plaintiff must demonstrate that defendant's articulated reason for her discharge either: (1) had no basis in fact; (2) did not actually motivate her discharge; or (3) was insufficient to motivate her discharge. *Wells, 289 F.3d at 1006.* For the reasons stated below, the court concludes that plaintiff has not established pretext in the instant case.

The undisputed facts establish that plaintiff accepted sales credit for an order negotiated by an Authorized Ameritech Distributor, and received a $ 500 bonus as a result. Thus, plaintiff cannot maintain that her discharge had no basis in fact. [*19]

The crux of plaintiff's argument instead seems directed at the second and third bases for establishing pretext. According to plaintiff, sales sharing occurred routinely among Customer Advocates, and thus could not have been, or perhaps should not have been, the basis for her termination. Although plaintiff has produced evidence that Fisher-Harper and Roberts condoned sales sharing, this is insufficient to establish pretext under Seventh Circuit precedent because there is no evidence whatever that Payne, or any other decisionmaker involved in plaintiff's termination, was aware of the practice or otherwise condoned it.

In *Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1366 (7th Cir. 1989)*, the Seventh Circuit affirmed summary judgment in favor of a defendant employer who fired an employee for violating the employer's time card policy. In that case, the plaintiff argued that the stated reason for firing him was pretext in light of the undisputed fact that other employees routinely entered hours on their time cards that did not reflect the actual time worked. *Id.* According to the plaintiff, strict adherence to the time card falsification policy in his case was merely [*20] pretext for age discrimination.

The Mechnig court rejected that argument, noting that the plaintiff's evidence of time card practices "does not bear in any significant manner upon the question of whether [the individuals involved] in [plaintiff's] termination were aware of time cards being improperly completed and administered Sears['] clear time card falsification policy in a discriminatory manner." *Id.* The court emphasized that no one involved in the termination decision in that case "was aware of or had investigated time card practices of other employees prior to [plaintiff's] termination." Id. The court thus rejected the plaintiff's pretext argument and affirmed summary judgment for the defendant. *Id., 1366-1368.*

As noted above, in the instant case, there is simply no evidence that Payne, or any other individual involved in plaintiff's termination, condoned or otherwise authorized sales sharing. n5 That Roberts and Fisher-Harper authorized sales sharing, tacitly or explicitly, does not establish that Payne's stated reason for firing plaintiff is pretext.

> n5 The court notes that the parties disagree about whether the scheme for which plaintiff was terminated actually involved "sales sharing" at all, since the sales that Childs "shared" with other Customer Advocates were not actually her own, but rather were negotiated by an Ameritech Authorized Distributor. This point is merely academic, however, since there is no evidence that Payne or the other individuals involved in the termination decision condoned or authorized "sales sharing" as defined by either party.

[*21]

The undisputed evidence establishes that Payne created three categories of violations, based on the employees' varying degrees of involvement, and dispensed discipline accordingly. There is simply no evidence that the facts on which Payne relied in making those determinations, including both interviews of the nine employees involved in the sales sharing scheme, as well as the written statements produced as a result of Asset Protection's investigation, were insufficient to warrant plaintiff's termination. Nor is there any evidence that these facts did not actually motivate Payne's decision to terminate plaintiff.

The undisputed evidence is that every employee who received sales credit as a result of the sales sharing scheme was terminated. All of the employees who allowed their sales codes to be used, but did not receive revenue credit as a result, were suspended without pay. The two employees who disclaimed allowing their sales codes to be used, Barnes and Hawkins, received no discipline. Although plaintiff has produced evidence calling into question the veracity of Hawkins' story, it does not appear that Payne was made aware of that evidence during her decisionmaking process.  [*22]

There is simply no evidence that Payne's three categories of discipline were pretext for discrimination. To the contrary, it appears that there were both African-American and white employees who received lesser punishment than plaintiff: of the employees suspended without pay, two were African-American and one was white; of the employees who received no discipline at all, one was African-American and one was white. In the instant case, it appears that similarly situated employees were disciplined similarly, regardless of race.

As the Seventh Circuit has noted, the court "does not sit as a super-personnel department that reexamines an entity's business decisions." *Fairchild v. Forma Scientific, Inc., 147 F.3d 567, 573 (7th Cir. 1998)* (quotations omitted). Rather, the court's task is to determine whether the defendant

employer has given an honest explanation of its behavior. *Id.* With these standards in mind, and in the absence of evidence to the contrary, the court concludes that defendant's stated basis for plaintiff's termination was not pretext. Accordingly, for this reason and plaintiff's failure to establish a prima facie case, defendant's motion for summary [*23] judgment is granted.

### CONCLUSION

For the reasons stated herein, defendant's motion for summary judgment under *Fed. R. Civ. P. 56* is granted.

**ENTER: March 8, 2004**

**Robert W. Gettleman**

**United States District Judge**

**JUDGMENT IN A CIVIL CASE**

Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that defendant's motion for summary judgment under *Fed. R. Civ. P. 56* is granted.

Date: March 8, 2004