E-FILED
Friday, 01 October, 2004  04:39:38 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION**

| | | |
|---|---|---|
| REBECCA LUCERA, | ) | |
| | ) | |
| Plaintiff, | ) | Judge Baker |
| | ) | |
| | ) | No. 02-2268 |
| v. | ) | |
| | ) | |
| CINGULAR WIRELESS, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S STATEMENT OF UNDISPUTED
MATERIAL FACTS PURSUANT TO LOCAL RULE 7.1**

Defendant Cingular Wireless LLC ("Defendant" or "Cingular Wireless"), by its attorneys, Fisher & Phillips LLP, states as follows for its Local Rule 7.1 Statement of Undisputed Material Facts submitted in support of Defendant's Motion for Summary Judgment.

**I.    BACKGROUND FACTS**

1.    Cingular Wireless ("Defendant") is a provider of wireless telephone services. Affidavit of Jack Johnston ("Johnston Aff.") ¶ 3, attached hereto as Exhibit A.

2.    At some point in late 2000 or early 2001, a merger was effectuated between Cingular Wireless/ SBC Cellular and Ameritech Cellular.  Deposition of Jack Johnston ("Johnston dep.") at p. 13, attached hereto as Exhibit B.

3.    In 2001, Cingular Wireless was broken down internally into various geographic regions including the Great Lakes Region which encompassed Illinois, Wisconsin, Ohio, Michigan and Indiana.  Exh. A, Johnston Aff. ¶ 4; Deposition of Grace Seymour ("Seymour dep.") at p. 10, attached hereto as Exhibit C.

4.      In 2001, the call centers located in Rantoul, Springfield and Schaumburg, Illinois as well as the call center located in Farmington Hills, Michigan were part of the Great Lakes Region.   Exh. B, Johnston dep. at pp. 12-13; Exh. C, Seymour dep. at pp. 10-11.

5.      The Rantoul Call Center was an Ameritech facility prior to the merger with Cingular/SBC.  Deposition of Jon Lucera ("J. Lucera dep.") at p. 17, attached hereto as Exhibit D; Deposition of Joseph Schnaufer ("Schnaufer dep.") at p. 5, attached hereto as Exhibit E.

6.      In the summer of 2001, Plaintiff Rebecca Lucera ("Plaintiff") was employed by Defendant as an Area Manager in the Rantoul Call Center located in Rantoul, Illinois. Complaint at ¶ 1, attached hereto as Exhibit F.

7.      Prior to the end of June 2001, Plaintiff reported directly to Joseph Schnaufer ("Schnaufer") who was the Director of Customer Operations at the Rantoul Call Center from May 1997 until June 2001.  Exh. E, Schnaufer dep. at pp. 4-5.

8.      In late June 2001, Mr. Schnaufer left Rantoul to become one of two directors in a Cingular call center located in Ocala, Florida.  Exh. B, Johnston dep. at p. 25; Exh. E, Schnaufer dep. at p. 21.

9.      Plaintiff was "saddened" and "disheartened" about Mr. Schnaufer leaving and had enjoyed working with him.  Deposition of Plaintiff Rebecca Lucera ("Plaintiff dep.") at p. 45, attached hereto as Exhibit K; Exh. D, J. Lucera dep. at p. 18.

10.     On or about June 25, 2001, Jack Johnston ("Johnston") assumed the responsibilities of the Director of Customer Operations at the Rantoul Call Center.  Exh. B, Johnston dep. at pp. 15-16, 35; Exh. A, Johnston Aff. ¶5.  From that time until August 30, 2001 when her employment was terminated, Plaintiff reported directly to Mr. Johnston. Exh. A,

Johnston Aff. ¶ 6; Affidavit of Cheryl Bentley ("Bentley Aff.") ¶ 43, attached hereto as Exhibit L.

11.    As Director of Customer Services for the Rantoul Call Center,  Mr. Johnston was the highest level manager at the call center. Exh. A, Johnston Aff. ¶ 6.

12.    In July 2001, Debbie Thompson and Rebecca Lucera were the two Area Managers in the Rantoul Call Center.  Both Area Managers reported directly to Mr. Johnston. Exh. B, Johnston dep. at p. 24; Affidavit of Debbie Thompson ("Thompson Aff.") ¶1, attached hereto as Exhibit G.

13.    In the summer of 2001, Plaintiff's husband Jon Lucera was a Customer Service Manager in the Rantoul Call Center who reportedly directly to Debbie Thompson.  Exh. D, J. Lucera dep. at pp. 10-13, 33; Exh. G, Thompson Aff. ¶3; Exh. A, Johnston Aff. ¶ 8.

14.    Within the Rantoul Call Center there were four management levels.  The first level was manager; second level was Area Manager; third level was Director; and fourth level was Regional Vice President.  Exh. A, Johnston Aff. ¶ 7.

15.    Jon Lucera's position was a first level front line manager.  Exh. E, Schnaufer dep. at p. 46; Deposition of Cheryl Bentley ("Bentley dep.") at p. 36, attached hereto as Exhibit H; Exh. A, Johnston Aff. ¶ 9.  He was at a lower level in the management hierarchy than Plaintiff and in fact reported directly to Plaintiff's peer, Debbie Thompson.  Exh. A, Johnston Aff. ¶ 9; Exh. H, Bentley dep. at pp. 36-37; Exh. K, Plaintiff dep. at p. 37.

16.    In July 2001, there was uncertainty about whether the Rantoul Call Center would remain open and trepidation among the staff regarding the future of the center.  Exh. E, Schnaufer dep. at p. 9; Deposition of Sandy Gammage ("Gammage dep.") at p. 48, attached hereto as Exhibit I;   Exh. B, Johnston dep. at p. 41; Exh. C, Seymour dep. at p. 16.

17.    At the time there was a concern that Mr. Johnston had come to Rantoul to close down the call center.  Exh. I, Gammage dep. at p. 92.

18.    In the summer of 2001, a higher number of employees than usual were traveling from Rantoul, Illinois to other call centers to explore their options due to the fact that there were more opportunities in the organization around that time and also due to concerns about the future of the Rantoul Call Center.  Exh. E, Schnaufer dep. at p. 9; Exh. A, Johnston Aff. ¶ 10; Affidavit of Anita Moxley ("Moxley Aff.") ¶ 5, attached hereto as Exhibit N.

19.    During the period from July 19, 2001 through July 24, 2001, Rebecca and Jon Lucera traveled to the Cingular call center located in Ocala, Florida to explore employment opportunities.   Exh. D, J. Lucera dep. at p. 43; Exh. K, Plaintiff dep. at pp. 74-75, 100.

20.    On or about December 20, 2002, Plaintiff filed this action alleging that she was terminated due to her gender and in retaliation for having allegedly made complaints about Jack Johnston.  Exhibit F.

21.    Plaintiff asserts that she was subject to sex discrimination because she was treated differently from her husband Jon Lucera.  Exh. K, Plaintiff. dep. at p. 37.

22.    Other than the fact that her husband was not terminated and she was, she has no other basis for believing she was subject to gender discrimination.  Exh. K, Plaintiff. dep. at p. 37.

23.    Other than her husband, Plaintiff is unaware of any other male employees whom she believes were given more favorable treatment or treated differently from her. Exh. K, Plaintiff. dep. at pp. 37-38.

II.  **CUSTOM AND PRACTICE IN THE GREAT LAKES REGION REGARDING LENGTH OF INTERVIEW TRIPS, APPROVAL PRIOR TO GOING ON A TRIP AND RELOCATION EXPENSES.**

A.  **Length of Interview Trips**

24.  The customary and reasonable length of time for interview trips to other locations is one to two days.  Affidavit of Nancy Wells ("Wells Aff.") ¶10, attached hereto as Exhibit J; Exh. A, Johnston Aff. ¶ 11; Exh. C, Seymour dep. at p. 79.

25.  Five days for an interview trip is excessive.  Exh. C, Seymour dep. at p. 79.

26.  Mr. Schnaufer cannot recall any individuals who spent four or five days on an interview trip.  Exh. E, Schnaufer dep. at p. 71.

27.  During his tenure as Director of the Shaumburg and Rantoul Call Centers, Mr. Johnston cannot recall approving an interview trip of four or more days in length.  Exh. A, Johnston Aff.  ¶ 12.

28.  Likewise, Nancy Wells, Director of the Springfield Call Center located in the Great Lakes Region,  cannot recall ever approving an interview trip of four or more days in length. Exh. J, Wells Aff. ¶¶1-2, 10.

29.  Plaintiff is unaware of any employee at Cingular who was allowed to take a five day interview trip without receiving prior approval from his or her supervisor and was reimbursed for such trip.  Exh. K, Plaintiff dep. at p. 214.

B.  **Payment for Interview Trips to Other Location**

30.  In the summer of 2001, it was the policy of Grace Seymour, Regional Vice President of the Great Lake Region, which includes the Rantoul Call Center and the Springfield Call Center,  that if an employee went on an interview trip to another call center, the call center

from which the employee traveled would not reimburse employees for such expenses. Exh. C, Seymour dep. at p. 76; Exh. A, Johnston Aff. ¶ 13.

31.    Ms. Seymour believes she would have asked Mr. Johnston to institute a policy mandating that Rantoul would not reimburse employees for trips taken to other call centers. Exh. C, Seymour dep. at p. 76.

32.    Since 1995, the policy in the Springfield Call Center was that if an employee was to travel to another call center for an interview trip, the center to which the employee traveled was responsible for bearing the costs of such a trip. Exh. J, Wells Aff. ¶3.

**C.    Pre-approval for Interview Trips**

33.    Because new call centers were being created, Ms. Seymour implemented a rule which would allow the call centers to know who would be transferring where and requiring pre-approval of such expenses. Exh. C, Seymour dep. at pp. 21, 23.

34.    While Mr. Schnaufer was the Director at the Rantoul Call Center it was the practice that employees would obtain advance approval from him before going on an interview trip. Exh. E, Schnaufer dep. at p. 26.

35.    In 2001, all employees in the Springfield Call Center were required to obtain approval from their managers prior to going on an interview trip to another center. Exh. J, Wells Aff. ¶4.

36.    The Springfield Call Center's policy with regard to reimbursement for interview trips and pre-approval  was consistent with SBC/Cingular's policies on these matters in the Great Lakes Region. Exh. J, Wells Aff. ¶5.

### D.    Policy Regarding Spousal Travel

37.    In July 2001, SBC had in effect a policy regarding Spousal Travel.  Exh. L, Bentley Aff. ¶ 4.

38.    The policy states as follows: "With advance approval from the employee's supervisor, in those instances when it is deemed necessary for your spouse to accompany you on company business, reimbursement of expenses will be according to your Company's Schedule of Authorizations." Exh. L, Bentley Aff. ¶ 6.

39.    Under this policy, only if the Luceras had received advance approval from their supervisors, could they have jointly filed one Employee Expense Reimbursement form for their trip to Ocala, Florida.  Exh. L, Bentley Aff. ¶ 7.

### E.    Relocation Expenses

40.    When an employee is considering relocating to another facility, it is understood that the employee travels to the location for the interview without his or her spouse and a decision is then made if the job is a good fit.  Exh. B, Johnston dep. at p. 60.

41.    If there is a fit, the company provides a relocation package that has built into it the ability to take house-hunting trips or trips to locate an acceptable neighborhood or school district. Exh. B, Johnston dep. at p. 60.

42.    There is no allowance for a spouse to travel to the location prior to the employee accepting an offer for the purpose of determining whether the community is a good fit.  Exh. B, Johnston dep. at p. 61.

III.  **JACK JOHNSTON'S POLICIES AND PROCEDURES REGARDING INTERVIEW TRIPS**

43.    When he assumed responsibility for Rantoul, Mr. Johnston had observed that Rantoul had a much looser or less conservative fiscal policy than SBC facilities and he wanted to make sure that money was spent wisely.  Exh. B, Johnston dep. at p. 42.

44.    Within approximately one week of him assuming responsibility for the Rantoul Call Center, Mr. Johnston informed his staff, including the two Area Managers Rebecca Lucera and Debbie Thompson, that he needed to approve in advance all proposed call center expenses, including travel expenses.  Exh. B, Johnston dep. at pp. 40-42; Exh. A, Johnston Aff. ¶ 14 ; Exh. G, Thompson Aff. ¶2.

45.    Additionally, at a second meeting in July 2001 prior to Ms. Lucera's trip to Ocala, Mr. Johnston had informed his management team that the Rantoul Call Center would not be reimbursing employees for interview trips to other call centers. Exh. B, Johnston dep. at pp. 40-41; Exh. A, Johnston Aff. ¶ 15.

46.    Shortly after he began as Director of the Rantoul Call Center, Mr. Johnston discovered that Rantoul had reimbursed Victoria Bean-Lewsader for the expenses incurred on her trip to Ocala, Florida on July 9 and 10, 2001.  Her trip was approved by Plaintiff.  Mr. Johnston did not approve such payment and was not aware that Ms. Lewsader had been reimbursed by Rantoul until after payment had already been made.  Exh. A, Johnston Aff. ¶ 16; Exh. B, Johnston dep. at p. 45.

47.    Mr. Johnston subsequently discovered that Mike Mallin and Carla Gass had taken and been reimbursed for interview trips without his knowledge. Exh. B, Johnston dep. at p. 45; Exh. A, Johnston Aff. ¶17.

48.     Mr. Johnston was also requested to reimburse Joe Abbott for an interview trip he had taken on July 13, 2001.  Based on the fact that other employees had been reimbursed for such expenses, Mr. Johnston approved Mr. Abbott's expenses.  Exh. A, Johnston Aff. ¶18.

49.     After July 14th but prior to Plaintiff leaving on her trip to Ocala, Mr. Johnston made it clear to both Plaintiff and Debbie Thompson that this policy would cease.  Exh. A, Johnston Aff. ¶19.

50.     Shortly after the reiteration of his policy, Connie Gass advised him that  Plaintiff had refused to sign-off on some travel expenses incurred by Anita Moxley stating that she (Plaintiff) believed he would not approve them.   Ms. Gass asked him if he would approve the expenses for the interview trip taken by Ms. Moxley on July 14th.  Mr. Johnston reluctantly approved the expenses because Ms. Moxley had traveled with the mistaken impression that she would be reimbursed for her trip. Exh. A, Johnston Aff. ¶ 20.

51.     He once again reiterated to his Area Managers that no travel expenses for interview trips would be reimbursed by the Rantoul Call Center.   Again, this occurred prior to Plaintiff going to Ocala.  Exh. A, Johnston Aff. ¶ 21.

52.     The trips taken by Ms. Lewsader, Mr. Mallin and Ms. Gass fell within the transitionary period during which Mr. Johnston reissued his edict regarding travel expenses.  Exh. B, Johnston dep. at p. 46.

53.     In the period between July 9th and July 16th, Johnston reiterated his policy to his management team regarding not reimbursing for travel expenditures to other locations.  Exh. B, Johnston dep. at p. 46.

## IV. PLAINTIFF'S AWARENESS OF JACK JOHNSTON'S POLICIES REGARDING INTERVIEW TRIPS

54.     Plaintiff was aware of Mr. Johnston's policy that the Rantoul Call Center would not reimburse employees for interview trips.  Exh. N, Moxley Aff. ¶¶ 4-5; Affidavit of Connie Gass ("Gass Aff.") ¶¶ 3-9, attached hereto as Exhibit M.

55.     On July 14, 2001, Anita Moxley ("Moxley") an on-line representative for customer support in the Rantoul Call Center  had traveled to Johnson City, Tennessee for an interview at the Cingular Call Center located in  Johnson City.  Exh. M, Gass Aff. ¶4; Exh. N, Moxley Aff. ¶¶1-2.

56.     Ms. Moxley's direct supervisor Connie Gass, former Technical Support Leader at the Rantoul Call Center, was out of the office on July 17th, 2001, when Ms. Moxley returned to work.  Therefore, Ms. Moxley called Plaintiff, who was Connie Gass' immediate supervisor, to discuss approval for reimbursement of the expenses for her trip to Johnson City. Exh. N, Moxley Aff. ¶3; Exh. M, Gass Aff. ¶ 2,4.

57.     During a July 17, 2001 telephone conversation with Ms. Moxley, Plaintiff informed Ms. Moxley that any expenditures Ms. Moxley had incurred in connection with her trip to Johnson City would not be covered by the Rantoul Call Center. Exh. N, Moxley Aff. ¶4.

58.     Plaintiff indicated to Ms. Moxley that, due to the uncertainty of the future of the Rantoul Call Center, many Rantoul employees were exploring options at Cingular locations outside Rantoul and a decision had therefore been made that Rantoul would no longer bare the costs of such trips.  She informed Ms. Moxley that Johnson City would need to pay for her travel expenses.  Exh. N, Moxley Aff. ¶5.

59.     On July 17, 2001, Ms. Moxley contacted Ms. Gass and advised her that she had approached Plaintiff to discuss her trip to Johnson City and that Plaintiff had informed her that

any expenditures Ms. Moxley had incurred from her trip would not be covered by the Rantoul Call Center.  Exh. M, Gass Aff. ¶5.

60.    After her conversation with Ms. Moxley, Ms. Gass contacted Plaintiff regarding whether Ms. Moxley would be reimbursed for her trip to Johnson City.  Plaintiff indicated to Ms. Gass that the Rantoul Call Center should not be paying for Ms. Moxley's expenses for her interview trip to Johnson City.  Exh. M, Gass Aff. ¶¶ 3, 6.

61.    It was Plaintiff's position that expenses for interview trips to other locations would not be reimbursed by the Rantoul Call Center. Exh. M, Gass Aff. ¶7.

62.    On July 18, 2001, Ms. Gass sent Plaintiff an e-mail regarding Ms. Moxley's "release date" and requesting clarification regarding payment of her interview expenses.   Exh. M, Gass Aff. ¶8.

63.    On July 19, 2001, Plaintiff responded to the July 18th e-mail and stated that Carla Gass was the only individual whose expenses had been paid by Rantoul.  According to Plaintiff, "[a]ll other expenses have come from the other markets job codes, including Ocala & Cedartown." Exh. M, Gass Aff. ¶9.

64.    Plaintiff  also stated that Ms. Gass should "be aware that Jack [Johnston] may push it back" and that Ms. Gass should let Ms. Moxley know.  Exh. M, Gass Aff. ¶9.

65.    Additionally, Plaintiff admits that she was aware that Mr. Johnston required that he be notified in advance before employees went on interview trip.  Exh. K, Plaintiff dep. at pp. 73-74.

## V.    PLAINTIFF'S TRIP TO OCALA, FLORIDA

66.    On July 19, 2001, a mere day after advising Ms. Gass that expenses must be absorbed by the visiting call centers, Plaintiff and her husband Jon Lucera left Rantoul, Illinois

for their trip to Ocala, Florida. Exh. D, J. Lucera dep. at p. 43; Exh. K, Plaintiff dep. at pp. 74-75; Exh. M, Gass Aff. ¶ 9.

      67.    The Luceras were gone on their trip to Ocala, Florida from July 19, 2001 through July 24, 2001. Exh. D, J. Lucera dep. at p. 43; Exh. K, Plaintiff dep. at pp. 74-75, 100.

      68.    In July 2001, Plaintiff told Debbie Thompson that she and her husband Jon Lucera were traveling to Ocala, Florida to visit the new call center. During that conversation, Plaintiff informed Ms. Thompson that she had not told Jack Johnston that she was traveling to Ocala and that she had no intention of telling him about the trip. Exh. G, Thompson Aff. ¶¶4-5.

      69.    At some point around the time of Rebecca and Jon Lucera's trip to Ocala, Jack Johnston approached Ms. Thompson and asked her if she knew Plaintiff's whereabouts. Ms. Thompson felt uncomfortable that she knew that Plaintiff was in Ocala but that Mr. Johnston was unaware of Plaintiff's whereabouts. Exh. G, Thompson Aff. ¶6.

      70.    The purpose of the trip was for the Luceras to explore opportunities and the area. Exh. E, Schnaufer dep. at p. 18.

      71.    The Luceras did not have formal interviews during their trip to Ocala. Exh. D, J. Lucera dep. at p. 42; Exh. E, Schnaufer dep. at p. 51; Exh. K, Plaintiff dep. at p. 101.

      72.    The area director position which Plaintiff was seeking in Ocala was not yet available for hiring at the time she went to Ocala. Exh. D, J. Lucera dep. at p. 44; Exh. E, Schnaufer dep. at p. 20.

      73.    Plaintiff may have had to travel back to Ocala to interview with other individuals if an Area Manager position was to become available. Exh. E, Schnaufer dep. at p. 22.

74.    Mr. Schnaufer did not provide the Luceras any direction regarding cost codes or discuss which center would pay for the travel expenses.  Exh. D, J. Lucera dep. at pp. 32-33; Exh. E, Schnaufer dep. at p. 23.

75.    Mr. Johnston had not pre-approved any time off for the Luceras, was unaware that they were absent on a trip they classified as business travel, and knew of no bona fide business purpose for travel.  Exh. B, Johnston dep. at pp. 69-70.

76.    They were not traveling to Ocala, Florida for an authorized interview approved in advance.  Exh. B, Johnston dep. at p. 63.

## VI.    SUBMISSION OF EXPENSE REIMBURSMENT FORM TO ELIZABETH ROSS

77.    On August 3, 2001, Jon Lucera began preparing an Employee Expense Reimbursement form for the trip to Ocala.  Exh. D, J. Lucera dep. at p. 54.

78.    Jon Lucera completed the expense form on or about August 10, 2001.  Exh. D, J. Lucera dep. at p. 55.

79.    Jon Lucera questioned Plaintiff regarding to whom they should submit the form for approval.  Exh. D, J. Lucera dep. at pp. 55, 68.

80.    Plaintiff suggested that Elizabeth Ross, Director of Operations in Hoffman Estates, Illinois sign off on the form.  Exh. D, J. Lucera dep. at pp. 56, 65, 68; Exh. K, Plaintiff dep. at pp. 115-116.  She claims to have done so because Mr. Johnston was purportedly "out of the office."  Exh. K, Plaintiff dep. at p. 117.  Plaintiff had never previously requested that Ms. Ross sign-off on expense reimbursement forms.  Exh. K, Plaintiff dep. at 116.

81.    Jon Lucera does not recall if Mr. Johnston was working in Rantoul on August 10, 2001 and did not attempt to determine if Mr. Johnston was in Rantoul at the time he completed

the form or what his schedule would be for the next week. Exh. D, J. Lucera dep. at pp. 56-57, 68-69.

83.     Neither Jon nor Rebecca Lucera contacted Sandy Gammage to find out Jack Johnston's whereabouts at any time in August 2001. Exh. I, Gammage dep. at p. 97.

83.     On or after August 10, 2001, Jon Lucera gave the Employee Expense Reimbursement form to his wife to be forwarded for approval to Ms. Ross. Exh. D, J. Lucera dep. at p. 65.

84.     The Employee Expense Reimbursement form was sent to Elizabeth Ross for approval via inter-office mail. Exh. D, J. Lucera dep. at p. 66.

85.     The mail from Rantoul to both Schaumburg and Hoffman Estates was sent via next day delivery. Exh. I, Gammage dep. at p. 98.

86.     The Employee Expense Reimbursement form contained $1376.02 in expenses. Exh. L, Bentley Aff. ¶ 9.

87.     Mr. Johnston was not on vacation between July 28 and August 30, 2001. Exh. A, Johnston Aff. ¶ 22.

88.     Mr. Johnston was in the Rantoul Call Center on August 2, 3, 6, 7, 10-11, and 13-14, 2001. Exh. B, Johnston dep. at p. 73.

## VII.   STANDARD PRACTICE AT THE RANTOUL CALL CENTER FOR SEEKING APPROVAL OF EXPENSES ACTUALLY INCURRED DURING AN INTERVIEW TRIP

89.     The practice in the Rantoul Call Center during 2001 was that employees were required to submit their requests for expense reimbursement to their direct supervisors for approval. Exh. M, Gass Aff. ¶ 12; Exh. G, Thompson Aff. ¶9; Exh. N, Moxley Aff. ¶6.

90.    There were no circumstances that would have been so urgent as to justify submitting expenses for approval to a supervisor outside the Rantoul Call Center.  Exh. G, Thompson Aff. ¶9; Exh. N, Moxley Aff. ¶¶7-8; Exh. M, Gass Aff. ¶¶12-13.

91.    If a direct supervisor was out of the office, employees would wait for them to return to the office instead of submitting the forms for approval to a supervisor outside the Rantoul Call Center.  Exh. M, Gass Aff. ¶13.

92.    It would not be permissible to submit a request for reimbursement to an individual outside the Rantoul Call Center without first discussing it with a direct supervisor and receiving approval to do so.  Exh. M, Gass Aff. ¶13.

93.    During Mr. Schnaufer's reign as Director, it would be an exception to the rule for his direct reports to submit their reimbursement request to someone other than him for approval. Exh. E, Schnaufer dep. at p. 27.

94.    Mr. Schnaufer is unaware of any specific occasions on which another Director signed off on expenses for an employee in the Rantoul Call Center in Mr. Schnaufer's absence. Exh. E, Schnaufer dep. at pp. 28-29, 72.

95.    Mr. Schnaufer cannot recall ever signing-off on expenditures for an employee from another call center.  Exh. E, Schnaufer dep. at p. 30.

96.    According to Mr. Schnaufer, if Mr. Johnston was in his Rantoul office on the days in question, Plaintiff probably should have submitted the reimbursement request to Mr. Johnston. Exh. E, Schnaufer dep. at p. 66.

97.    Mr. Schnaufer also indicated that it would have been appropriate for Plaintiff to have attempted to find out when Mr. Johnston was going to be in Rantoul and then to submit the reimbursement form to him when he was in Rantoul.  Exh. E, Schnaufer dep. at p. 67.

98.    On days when Mr. Johnston was not in Rantoul, Plaintiff could have sent the reimbursement form via inter-office mail to Mr. Johnston's office in Schaumburg as she had done with the form she sent to Ms. Ross.  Exh. E, Schnaufer dep. at p. 67; Exh. D, J. Lucera dep. at p. 65.

99.    If Jack Johnston was not in the Rantoul Call Center on any particular day and Debbie Thompson needed his approval on documents, her practice was to forward the documents via overnight mail to his Schaumburg office for his signature.  Exh. G, Thompson Aff. ¶10.

100.    It would have been a departure from normal practice for Plaintiff to submit her reimbursement form to Elizabeth Ross.  The usual procedure was that the form should be submitted to the employee's direct supervisor unless he was going to be away from his office for an extended period of time.  Exh. I, Gammage dep. at pp. 53-54.

101.    Ms. Wells has never been requested to sign-off on expenditures incurred by employees from any other call center, including the Rantoul Call Center or had such requests for reimbursement submitted to her for approval.  Exh. J, Wells Aff. ¶8.

102.    Neither Mr. Schnaufer, former Director of the Rantoul Call Center nor Jack Johnston, current Director of the Rantoul Call Center, requested that Ms. Wells sign-off on expenditures of their employees in their absence.  Exh. J, Wells Aff. ¶9.

## VIII.   PLAINTIFF'S CIRCUMVENTION OF THE APPROVAL PROCESS

103.    At some point between August 10, 2001 and August 16, 2001, Mr. Johnston was contacted by Elizabeth Ross regarding the Employee Expense Reimbursement form submitted to her in connection with the Lucera's trip to Ocala.  Exh. B, Johnston dep. at p. 70; Exh. A, Johnston Aff. ¶ 24.

104.    In July 2001, Elizabeth Ross was not a Director of a call center or within call center management.  Exh. B, Johnston dep. at pp. 102-103; Exh. C, Seymour dep. at p. 37.

105.    Neither Plaintiff nor Mr. Lucera reported to Ms. Ross nor was she within either of their chain-of-command.  Exh. A, Johnston Aff. ¶ 25.

106.    Ms. Ross indicated to Mr. Johnston that it had never been her practice in the past to sign-off on expenditures for employees from other locations.  Exh. B, Johnston dep. at p. 77; Exh. A, Johnston Aff. ¶ 26.

107.    Ms. Ross informed Mr. Johnston that she felt uncomfortable signing-off on the expenses and expressed concern that Plaintiff had by-passed a direct supervisor and gone to someone outside call center leadership.  Exh. B, Johnston dep. at p. 108.

108.    On the day that Ms. Ross received the expense reimbursement form from Plaintiff, Mr. Johnston was in the office.  Exh. B, Johnston dep. at pp. 107-108.

109.    Ms. Ross also contacted Grace Seymour and stated that she was not comfortable signing-off on the Luceras' expense reimbursement request and wanted to know why it did not go to Jack Johnston.  Exh. C, Seymour dep. at pp. 72-73.

110.    Ms. Seymour asked Ms. Ross if it was a common practice when she had worked at an Ameritech facility for her to be provided with such a form for approval.  Ms. Ross stated that it was not standard protocol for her to review such forms.  She indicated that she had never approved expense reports from call centers.  Exh. C, Seymour dep. at pp. 73, 83-84.

111.    Under normal business practices, Ms. Ross was not authorized to sign expense reports for employees at the Rantoul Call Center.  Ross' July 1, 2002 Statement attached hereto as Exhibit O; Exh. L, Bentley Aff. ¶¶ 30-32.

112. Ms. Ross had not approved any expense reports for Plaintiff at any time. Exhibit O; Exh. L, Bentley Aff. ¶30.

113. In July 2001, Sandy Gammage was Jack Johnston's administrative assistant at the Rantoul Call Center. Exh. I, Gammage dep. at p. 36.

114. For a period of about seven to eight years, Ms. Gammage had been involved in maintaining the Employee Expense Reimbursement forms for Rantoul employees. Exh. I, Gammage dep. at p. 47.

115. Ms. Gammage is unaware of any time an employee at Rantoul submitted an expense form to someone outside the call center for approval. Exh. I, Gammage dep. at pp. 94-95.

116. During the seven years that she maintained a practice of keeping copies of expense reimbursement forms, Ms. Gammage does not recall ever seeing an expense form from a Rantoul employee which was signed by someone outside the call center. Exh. I, Gammage dep. at p. 95.

117. The normal procedure would be for the Luceras to submit the expense reimbursement form to Mr. Johnston if he was in the office instead of to Ms. Ross. Exh. I, Gammage dep. at pp. 96-97.

118. If Mr. Johnston was not going to be out of the office for an extended period of time, it would have been unusual and out of the ordinary for Plaintiff to have submitted the expense reimbursement form to Elizabeth Ross for approval. Exh. I, Gammage dep. at pp. 98-99.

119.    Up to the time of his conversation with Ms. Ross, Mr. Johnston was unaware that Plaintiff was absent from work on July 19-24, 2001, because she was on a fact-finding trip to Ocala, Florida.  Exh. B, Johnston dep. pp. 69-70; Exh. A, Johnston Aff. ¶ 27.

120.    After his conversation with Ms. Ross, Mr. Johnston was concerned about the fact that Plaintiff had not received pre-approval for her business travel; the expense reimbursement had not been submitted within the call center hierarchy; his prior direction regarding pre-approval had not been followed; the number of days of the trip were elongated; and specific expenses appeared to be exorbitant.  Exh. B, Johnston dep. at pp. 75-76.

121.    Mr. Johnston relayed his concerns regarding the trip to his supervisor Grace Seymour.  Exh. B, Johnston dep. at p. 75.

122.    Ms. Seymour and Mr. Johnston made the determination that Human Resources should be involved and for them to determine if an investigation was necessary.   Exh. B, Johnston dep. at p. 75.

## IX.    <u>INVESTIGATION BY HUMAN RESOURCES</u>

123.    On or about August 16, 2001, Jack Johnston contacted Margaret (Peggy) Franklin, Employee Relations Specialist in Cingular's Human Resources Department located in Schaumburg, Illinois and informed her that he believed Rebecca and Jon Lucera had engaged in misconduct in relation to a trip they had taken to Ocala, Florida.   Deposition of Margaret Franklin ("Franklin dep.") at p. 45, attached hereto as Exhibit P; Affidavit of Margaret Franklin ("Franklin Aff.") ¶ 5, attached hereto as Exhibit Q; Exh. A, Johnston Aff. ¶ 28.

124.    Also, on August 16, 2001, Jack Johnston faxed a copy of the Employee Expense Reimbursement form from his office in Rantoul to the Human Resources' Office.  Exh. A, Johnston Aff. ¶ 29; Exh. L, Bentley Aff. ¶ 8.

125.    Mr. Johnston informed Ms. Franklin that Plaintiff had not sought his prior approval for the days off or for business travel; the expense report contained excessive expenditures; and the expenses for which Plaintiff sought reimbursement were ones which Mr. Johnston had previously informed her would not be reimbursed by the Rantoul Call Center.  Exh. A, Johnston Aff. ¶ 30; Exh. Q, Franklin Aff. ¶ 7.

126.    During his conversation with Ms. Franklin, Mr. Johnston also informed her that rather that submitting the expense reimbursement form to him for approval as was the practice, Plaintiff had attempted to circumvent Mr. Johnston and all Rantoul Call Center management by sending the expense form to a manager outside the Rantoul Call Center.  Exh. Q, Franklin Aff. ¶ 8; Exh. A, Johnston Aff. ¶ 31.

127.    Mr. Johnston requested that Human Resources investigate the potential misconduct of Plaintiff and her husband Jon Lucera.  Exh. Q, Franklin Aff. ¶9; Exh. A, Johnston Aff. ¶ 32.

128.    Based on the allegations made by Mr. Johnston, Cheryl Bentley, Human Resources Manager, and Ms. Franklin conducted an investigation into the interview trip taken by the Luceras.  Exh. H, Bentley dep. at p. 14; Exh. P, Franklin dep. at pp. 43-44; Affidavit of Jim Klimas ("Klimas Aff.") ¶ 6, attached hereto as Exhibit S.

129.    During the investigation, Ms. Bentley and Ms. Franklin conducted numerous interviews and obtained written documentation. Specifically they interviewed Joe Schnaufer, Rebecca Lucera, Jon Lucera, Connie Gass and Debbie Thompson.  Exh. P, Franklin dep. at p. 44.

130.    On August 21, 2001, Ms. Franklin and Ms. Bentley interviewed Joe Schnaufer the Director at the Ocala, Florida Call Center and former Director of the Customer Operations for

the Rantoul Call Center.   Exh. Q, Franklin Aff. ¶ 10; Exh. L, Bentley Aff. ¶ 11; Exh. E, Schnaufer dep. at p. 16.

131.    Mr. Schnaufer confirmed that Rebecca and Jon Lucera had visited the Ocala Call Center from July 19 through July 24, 2001.  Exh. Q, Franklin Aff. ¶ 11; Exh. L, Bentley Aff. ¶ 13.

132.    Mr. Schnaufer indicated that the trip was an informal visit and that he had agreed to show Rebecca and Jon Lucera around the call center.   Exh. L, Bentley Aff. ¶ 14; Exh. E, Schnaufer dep. at pp. 18, 22.

133.    According to Mr. Schnaufer, no formal interviews took place during the Lucera's visit to Ocala. Exh. Q, Franklin Aff. ¶ 12; Exh. L, Bentley Aff. ¶ 15; Exh. E, Schnaufer dep. at p. 22.

134.    Mr. Schnaufer stated that he had extended an offer of employment to Mr. Lucera but had not  yet extended an offer to Plaintiff. Exh. Q, Franklin Aff. ¶ 13; Exh. L, Bentley Aff. ¶ 16.

135.    Mr. Schnaufer indicated that he did not contact Mr. Johnston prior to the trip as he assumed that Rebecca and Jon Lucera had made the necessary arrangements and obtained the proper authorization and approval prior to the trip. Exh. Q, Franklin Aff. ¶ 14; Exh. L, Bentley Aff. ¶ 17; Exh. E, Schnaufer dep. at pp. 16, 23.

136.    He also indicated that he never agreed to cover any of the expenses incurred by the Luceras from Ocala's budget and assumed that they had made the proper arrangements for reimbursement of their expenses.  Exh. Q, Franklin Aff. ¶ 15; Exh. L, Bentley Aff. ¶ 18.

137.    On August 22, 2001, Ms. Bentley and Ms. Franklin conducted a telephone interview of Plaintiff regarding the trip she and her husband had taken to Ocala, Florida. Exh. Q, Franklin Aff. ¶ 16; Exh. L, Bentley Aff. ¶ 19.

138.    Plaintiff confirmed that she was not formally interviewed when she went to Ocala. Exh. L, Bentley Aff. ¶ 20.

139.    In her interview with Ms. Bentley and Ms. Franklin, Plaintiff claimed that she contacted Elizabeth Ross to see if she would sign-off on the expense form and that she had sent the request reimbursement form to Elizabeth Ross. Exh. P, Franklin dep. at pp. 57-58; Exh. Q, Franklin Aff. ¶ 18; Exh. L, Bentley Aff. ¶¶ 21-22.

140.    Also on August 22, 2001, Ms. Bentley and Ms. Franklin conducted a telephone interview with Jon Lucera.  Exh. L, Bentley Aff. ¶ 23; Exh. D, J. Lucera dep. at pp. 74-75.

141.    Mr. Lucera informed the Human Resources representatives that he had asked his wife to whom they should submit the form for approval and that she suggested that the form be submitted to Elizabeth Ross.  Exh. D, J. Lucera dep. at pp. 55, 68, 75; Exh. L, Bentley Aff. ¶ 24.

142.    On August 27, 2001, Ms. Bentley and Ms. Franklin interviewed Debbie Thompson regarding the Luceras' trip to Ocala.  Exh. Q, Franklin Aff. ¶ 21; Exh. L, Bentley Aff. ¶ 25.

143.    Ms. Thompson advised Ms. Bentley that Mr. Johnston had stated at a meeting in July 2001, prior to Ms. Lucera's trip to Ocala, that he wanted to approve expenditures. Exh. H, Bentley dep. at pp. 50, 60;  Exh. L, Bentley Aff. ¶ 26; Exh. G, Thompson Aff. ¶7.

144.    Ms. Thompson indicated to Human Resources that Plaintiff had told her that she had not told Mr. Johnston about her trip to Ocala and had no intention of telling him that she was

going to Ocala.  Exh. H, Bentley dep. at pp. 53-54, Exh. G, Thompson Aff. ¶7; Exh. P, Franklin

dep. at p. 83; Exh. Q, Franklin Aff. ¶ 22; Exh. L, Bentley Aff. ¶ 27.

145.    Ms. Thompson also informed Human Resources that at some point around the

time of Rebecca and Jon Lucera's trip to Ocala, Mr. Johnston approached her and asked her if

she knew Rebecca Lucera's whereabouts.  Ms. Thompson recalled feeling uncomfortable that

she knew that Plaintiff was in Ocala but that Mr. Johnston was unaware of her whereabouts.

Exh. Q, Franklin Aff. ¶ 22; Exh. L, Bentley Aff. ¶ 28; Exh. H, Bentley dep. at p. 52; Exh. G,

Thompson Aff. ¶7.

146.    On August 28, 2001, Ms. Gass was interviewed by Peggy Franklin, Human

Resources Consultant, regarding her communications with Plaintiff relative to whether Rantoul

Call Center would reimburse employees for expenses incurred during interview trips to other

locations.  Exh. M, Gass Aff. ¶10.

147.    During the telephone conversation with Ms. Franklin, Ms. Gass relayed to Ms.

Franklin that it was evident to her, based on her July 17, 2001 conversation with Ms. Lucera,

that Ms. Lucera's position was that expenses for interview trips to other locations would not be

reimbursed by the Rantoul Call Center.  Exh. M, Gass Aff. ¶10; Exh. Q, Franklin Aff. ¶ 23-24.

148.    Ms. Gass confirmed that Plaintiff was aware that Mr. Johnston would not approve

travel expenses for employees' interviews at other locations.  Ms. Gass indicated that she was

aware of this because of a July 19, 2001 e-mail sent by Plaintiff to Ms. Gass clarifying this

policy. Exh. Q, Franklin Aff. ¶ 25.

149.    Ms. Gass forwarded Ms. Franklin an e-mail which reiterated that Plaintiff was

definitely aware of proper protocol in submitting expense reimbursement forms because she was

telling Ms. Gass that Anita Moxley's expenses might not be approved by Jack Johnston based on

her meeting with Mr. Johnston during which he stated that he wanted to review all expenditures. Exh. P, Franklin dep. p. 75; Exh. M, Gass Aff. ¶11.

150. On August 29, 2001, Ms. Franklin and Ms. Bentley conducted a follow-up interview with Plaintiff. During that interview Ms. Lucera confirmed that she was aware that Mr. Johnston had required that he review all expenses for all Rantoul Call Center employees. She indicated that was a change for them. According to Plaintiff, they had over four years of being empowered and now Jack Johnston wanted to see the expenses. Exh. Q, Franklin Aff. ¶ 26; Exh. L, Bentley Aff. ¶ 29.

## X.  CONCLUSIONS OF THE HUMAN RESOURCES INVESTIGATION

151. Based on its investigation, Human Resources concluded that Jack Johnston had a meeting with call center managers at which both Ms. Thompson and Plaintiff were present, during which he stated that he wanted to see all expenses prior to submission. Human Resources further concluded that Jack Johnston had informed his managers that he wanted to know the purpose of business trips prior to the employee taking the trip and then wanted to see the expenses prior to submission for reimbursement. Exh. P, Franklin dep. at pp. 75, 78, 80; Exh. H, Bentley dep. at p. 49.

152. Human Resources concluded that Mr. Johnston's policy was that employees needed proper approval before going to another call center to "check it out." Exh. P, Franklin dep. at pp. 32-33, 35.

153. Based on the interviews with Ms. Gass and Plaintiff as well as the e-mails forwarded from Ms. Gass, Ms. Bentley and Ms. Franklin concluded that Plaintiff was aware of Mr. Johnston's pre-approval process and the appropriate procedures for submitting expense

reimbursements. Exh. H, Bentley dep. at p. 50; Exh. P, Franklin dep. at p. 75; Exh. L, Bentley Aff. ¶ 33.

154.    During the investigation, Human Resources reviewed the length of interview trips taken by other employees and determined that the average was two to three days. Exh. P, Franklin dep. at p. 84.   They were unable to find any trips that were in the range of five days in length.  Exh. L, Bentley Aff. ¶ 34.

155.    As a result, Human Resources determined that the length of the trip taken by the Luceras was excessive and not within the customary range.   Exh. P, Franklin dep. at p. 76; Exh. L, Bentley Aff. ¶ 35.

156.    Additionally, the Employee Reimbursement request form included a dinner on July 21, 2001 in the amount of $140.23 for Plaintiff, Jon Lucera, and Joe Schnaufer. Exh. L, Bentley Aff. ¶ 36.

157.    Human Resources also determined that the dinner was excessive and extravagant and outside reasonable and customary scope.  Exh. L, Bentley Aff. ¶ 37.

158.    Finally, Human Resources concluded that Plaintiff purposefully circumvented the expense reimbursement process by submitting her expenses outside of call center hierarchy. Human Resources determined that there was no precedent for an employee going outside of the call center for expense reimbursement approval.  Exh. L, Bentley Aff. ¶ 38.

XI.    **DECISION TO TERMINATE PLAINTIFF**

159.    Mr. Johnston recommended that both Jon and Rebecca Lucera be terminated from the company.  Exh. B, Johnston dep. at p. 112.

160.    Upon the conclusion of the Human Resources Department's investigation, Ms. Bentley and Ms. Franklin recommended that Plaintiff be terminated.  Jim Klimas, Director of

Human Resources, concurred with that recommendation. Exh. S, Klimas Aff. ¶ 7; Exh. L, Bentley Aff. ¶ 39; Exh. Q, Franklin Aff. ¶ 27.

161.    Upon the conclusion of the investigation by Human Resources, meetings were held with various individuals including Cheryl Bentley, Peggy Franklin and Jim Klimas from the Human Resources Department; Susan Rodriguez from Cingular's Legal Department; Grace Seymour, the Regional Vice President; and Jack Johnston.  During those meetings, what actions to take with reference to Jon and Rebecca Lucera were discussed.  Exh. S, Klimas Aff. ¶8; Exh. L, Bentley Aff. ¶ 40; Exh. A, Johnston Aff. ¶ 33; Exh. Q, Franklin Aff. ¶ 28.

162.    Whenever an employee is being considered for termination, the standard practice is to involve the Human Resources Department, the Legal Department, headquarters, and the individual responsible for the organization where the termination is to take place.  Exh. C, Seymour dep. at pp. 29-31.

163.    The decision to terminate Plaintiff and issue a final warning to Jon Lucera was a collaborative decision between Defendant's Human Resources Department, Legal Department, Ethics Department, Regional Vice President Grace Seymour and Jack Johnston. Exh. B, Johnston dep. at p. 83; Exh. S, Klimas Aff. ¶9; Exh. C, Seymour dep. at p. 28; Exh. L, Bentley Aff. ¶ 41; Exh. A, Johnston Aff. ¶ 34; Exh. Q, Franklin Aff. ¶ 29.

164.    As is protocol with regard to termination of a management-level employee, Cingular's Ethics Department reviewed and concurred with the decision to terminate Plaintiff and to issue a final warning to Mr. Lucera. Exh. S, Klimas Aff. ¶10; Exh. L, Bentley Aff. ¶42; Exh. C, Seymour dep. at pp. 59-60.

165.    The reasons for Plaintiff's termination include the following: a) her failure to seek

approval for days off and failure to obtain proper approval for business trip expenses despite knowing that approval should be obtained from Mr. Johnston; b) her submission of an expense report containing expenses Jack Johnston previously told her were not covered by the Rantoul Call Center; c) her attempt to circumvent Mr. Johnston and Rantoul Call Center management in the approval process for her expenses; and d) her attempt to seek reimbursement for excessive expenses incurred on a trip which exceeded customary length.  Exh. S, Klimas Aff. ¶11; Exh. L, Bentley Aff. ¶ 45; Deposition of Jim Klimas ("Klimas dep.") at pp. 31-32, attached hereto as Exhibit R; Exh. P, Franklin dep. at p. 54.

166.    It was determined that Plaintiff had made a significant error in judgment and that her behavior was inappropriate and unacceptable.   Exh. S, Klimas Aff. ¶ 12; Exh. L, Bentley Aff. ¶ 46.

167.    Plaintiff was terminated on August 30, 2001.  Exh. L, Bentley Aff. ¶43.

168.    Rebecca Lucera was replaced by Yolanda Glass.  Exh. B, Johnston dep. at p. 95.

## XII.    FINAL WARNING ISSUED TO JON LUCERA

169.    On August 30, 2001, Jon Lucera received a final warning from Ms. Bentley and Mr. Johnston for his involvement in the incident.  Exh. H, Bentley dep. at p. 30.

170.    Defendant's Ethics Department approved the discipline issued to Jon Lucera. Exh. C, Seymour dep. at pp. 76-77.

171.    Mr. Lucera received a final warning because he was absent on company time without express notification and/or corresponding approval from his immediate supervisor;  he attempted to process an expense reimbursement in conjunction with those of his wife outside of established approval channels and in circumvention of all vertical levels of his immediate

management hierarchy; and certain expenses were deemed excessive on an interview trip which exceeded customary length.  Exh. L, Bentley Aff. ¶ 47.

172.    Because it was determined that the expenses Jon Lucera incurred and submitted for reimbursement were unapproved and that he had not followed established protocol, Jon Lucera was instructed to resubmit his Employee Expense Reimbursement form. Exh. L, Bentley Aff. ¶ 49.

173.    Jon Lucera's discipline differed from Plaintiff's because Human Resources determined that his conduct was different from and not as egregious as the violations committed by Ms. Lucera.   Exh. L, Bentley Aff. ¶ 50

174.    Human Resources concluded that Plaintiff's conduct demonstrated a deliberate intent not to comply with Mr. Johnston's pre-approval process. Exh. L, Bentley Aff. ¶ 51.

175.    Human Resources also concluded that it was Plaintiff who decided that the expense reimbursement form should be submitted to Elizabeth Ross and who contacted Ms. Ross regarding approval of the expenses.  Plaintiff also ultimately forwarded the expense form to Ms. Ross for approval. Exh. L, Bentley Aff. ¶ 52.

176.    Moreover, Human Resources and corporate management determined Plaintiff was aware that Jack Johnston required that his advance approval be obtained for interview trips and that he no longer allowed Rantoul to reimburse employees for interview trips to other call centers.  Exh. L, Bentley Aff. ¶ 53.

177.    Defendant was unable to determine that Mr. Lucera was similarly aware of Jack Johnston's policy that Rantoul would no longer reimburse employees for interview trips.  Exh. L, Bentley Aff. ¶ 50.

178.    Additionally, Mr. Lucera received different treatment because Human Resources determined that he had relatively less involvement with the expense submissions than Plaintiff, and because of his more junior management stature within corporate hierarchy.  Exh. H, Bentley dep. at pp. 54-55.

179.    Human Resources and corporate management determined that Jon Lucera had essentially participated in conjunction with filing an expense report with his wife.  However, they also determined that Plaintiff was aware that Mr. Johnston needed to see all expenses; she had not notified her supervisor that she was going on the trip; and had circumvented the approval process based on the proper routing channels for authorizing expense reports. Exh. H, Bentley dep. at p. 47.

180.    Plaintiff was held to a higher level of expectations and higher accountability than Jon Lucera because she was a second level manager.  Exh. H, Bentley dep. at p. 55; Exh. P, Franklin dep. at p.76.

181.    A higher level manager is held to a higher standard of accountability.  Exh. C, Seymour dep. at p. 74.

## XIII.    INVESTIGATION INTO ALLEGATIONS OF MISCONDUCT BY JOHNSTON

182.    During Ms. Franklin and Ms. Bentley's August 22, 2001 telephone interview with Plaintiff, she indicated that had some "issues"  although she did not specify the nature of the "issues."  Exh. L, Bentley Aff. ¶ 55; Exh. P, Franklin dep. at p. 66.

183.    In response, Ms. Bentley and Ms. Franklin requested that Plaintiff put the "issues" in writing so that they could be addressed.  Exh. Q, Franklin Aff. ¶¶ 30-31; Exh. L, Bentley Aff. ¶ 56. Exh. P, Franklin dep. at p. 66.

184.    On August 27, 2001, Plaintiff sent Ms. Franklin an e-mail outlining her concerns about Mr. Johnston.  Exh. Q, Franklin Aff. ¶ 32 ; Exh. S, Klimas Aff. ¶13.

185.    In her August 27, 2001 e-mail, Plaintiff complained generally about the following issues:  1) Mr. Johnston had purportedly "threatened" the leadership team when they inquired about the future status of the Rantoul Call Center; 2) Mr. Johnston allegedly made the false statement that his position as Director of the Rantoul Call Center was permanent and such statement was inconsistent with Human Resource's alleged position that Mr. Johnston was only temporary; 3) on or about June 18, 2001, she had lunch with Johnston during which allegedly no business was discussed but Johnston said he would pick up the bill stating, "I will expense this one;"  4) Mr. Johnston allegedly did not institute a merit pay increase requested by Ms. Lucera for two employees; 5)  Mr. Johnston stated  in front of leaders and area managers that Mr. Schnaufer should not have approved a thirty day leave of absence for a Call Center employee;  6) Mr. Johnston cancelled a security team in the Rantoul Center which had been set up after an incident between Ms. Lucera and an ex-employee; 7) Mr. Johnston wanted non-union labor to assist with high call volume due to the Springfield Call Center being down which was allegedly a violation of the Union contract;  8) Mr. Johnston did not approve releasing employees to begin working at other Call Centers in accordance with the plan proposed by Ms. Lucera; 9) Mr. Johnston was inconsistent in the manner in which he granted release dates; 10) Mr. Johnston questioned Plaintiff's submission of her expense reimbursement to Elizabeth Ross and the length of Plaintiff's trip to Ocala; 11) Mr. Johnston allegedly asked Ms. Lucera if she was aware that Cingular had a nepotism policy; 12) on August 11, 2001 and August 18, 2001, Mr. Johnston came into the Rantoul Call Center and, although he was allegedly was only there for a short time, he expensed mileage to and from the Call Center; 13) when Mr. Johnston's car broke down, he

expensed a rental car, allegedly in violation of company policy; and 14) on August 16, 2001, Mr. Johnston cancelled a reservation at the Crown Plaza in Springfield in favor of the Drury Inn allegedly due to the fact that he gains frequent traveler bonus points at the Drury Inn.  Exh. Q, Franklin Aff. ¶ 33.

186.    On August 28, 2001, Plaintiff sent a second e-mail to Ms. Franklin complaining that on July 21, 2001, Mr. Johnston stayed in Champaign at the Drury Inn which was direct billed to the Rantoul Call Center.  He then allegedly signed off on his "AP-1" form which was impermissible. Exh. Q, Franklin Aff. ¶ 34 .

187.    Also in the August 28, 2001 e-mail, Plaintiff claimed that Mr. Johnston had inquired why she had purchased new business cards.  Exh. Q, Franklin Aff. ¶ 35 .

188.    Plaintiff's alleged written complaints about Mr. Johnston seeking reimbursement for expenses which were not in fact earned consists of the August 27, 2001 e-mail sent to Ms. Franklin.  Exh. K, Plaintiff dep. at pp. 169-170.

189.    Other than the August 27th and 28th e-mails to Ms. Franklin, Plaintiff made no other complaints in writing regarding Mr. Johnston's conduct.  Exh. K, Plaintiff dep. at p. 170.

190.    The reason Plaintiff e-mailed her "issues" to Ms. Franklin, was because "she was told to," and "had ethical concerns" which consisted of nothing more than alleged violations of Defendant's internal rules and procedures.  Exh. K, Plaintiff's dep. at pp. 157, 166-168, 178-179.

191.    When specifically questioned about whether she believed there "was anything illegal about what [Mr. Johnston] was doing," Plaintiff replied:  "Not that I am aware of."  Exh. K, Plaintiff's dep. at p. 275.

192.    When she was asked if she thought Mr. Johnston's expenditures were illegal, Plaintiff replied: "I don't know the answer to that." Exh. K, Plaintiff's dep. at p. 275

193.    The Human Resources Department conducted an investigation into the allegations made in the August 27th and 28th e-mails and it was determined that Mr. Johnston did not engage in any inappropriate conduct and had not violated any of Cingular's policies. Exh. S, Klimas Aff. ¶¶15-16; Exh. P, Franklin dep. at p. 73; Exhibit Q, Franklin Aff. ¶ 39.

194.    During the course of the investigation, Mr. Johnston provided a written response to the August 27 and 28th e-mails sent by Plaintiff to Ms. Franklin. Exh. Q, Franklin Aff. ¶¶ 36, 38 .

195.    Neither Ms. Franklin nor Ms. Bentley informed Mr. Johnston about the complaints made against him by Plaintiff until early September 2001 after Plaintiff had been terminated. Exh. L, Bentley Aff. ¶ 58; Exh. Q, Franklin Aff. ¶ 37.

196.    Mr. Johnston was unaware of the allegations made against him by Plaintiff as contained in the August 27th and 28th e-mails until after she had been terminated. Exh. B, Johnston dep. at pp. 86-87, 110; Exh. S, Klimas Aff. ¶17.

197.    The complaints made by Plaintiff about Mr. Johnston played no role in the investigation of the allegations of misconduct by Ms. Lucera and did not influence the decision to terminate Plaintiff. Exh. H, Bentley dep. at p. 34; Exh. S, Klimas Aff. ¶18; Exh. L, Bentley Aff. ¶59.

198.    Ms. Seymour does not recall being aware of any allegations made against Jack Johnston at the time that they were discussing the Luceras' discipline. Exh. C, Seymour dep. at p. 73.

199.    The investigation into Plaintiff's allegations about Mr. Johnston was treated separately from the investigation which led to Ms. Lucera's termination.  Exh. H, Bentley dep. at p. 35; Exh. S, Klimas Aff. ¶ 19; Exh. L, Bentley Aff. ¶60.

200.    The August 27th and 28, 2001 e-mails were never considered or even mentioned at any time during the discussions between Human Resources, the Legal Department, Grace Seymour and Jack Johnston relative to the actions to be taken with regard to the Luceras' trip to Ocala.  Exh. S, Klimas Aff. ¶ 20; Exh. L, Bentley Aff. ¶ 61; Exh. A, Johnston Aff. ¶¶ 35-36.

201.    No allegations of impropriety by Mr. Johnston were ever discussed during the process which resulted in Ms. Lucera's termination and Mr. Lucera's warning. Exh. S, Klimas Aff. ¶ 21; Exh. L, Bentley Aff. ¶ 62; Exh. Q, Franklin Aff. ¶¶ 40-42.

## XIV.    COMPLAINTS TO THE ETHICS LINE AND OFFICE OF THE PRESIDENT

202.    On August 22, 2001 at 2:40 p.m., a call was received by Cingular's Ethics hotline from an unknown caller stating that on August 20, 2001, Jack Johnston had an issue with the expenses of an employee incurred while she was on a business trip in Ocala.  According to the caller, Mr. Johnston had stated that the employee took too many days for the trip although there were other employees who went on the same trip and their expenses were approved.  Johnston allegedly told the employee "off the record," that there is a nepotism policy and its time the employee and his/her spouse are split up.  The caller indicated that Johnston appeared to be trying to get the employee to quit because of his hostile behavior.  The caller maintained Johnston appeared to look for anything to harass the employee and make him/her feel his/her job was in jeopardy.  The caller indicated that Johnston was slandering the employee's name by mentioning the expense issue to other Directors.  Exh. Q, Franklin Aff. ¶ 43.

203.    The August 22, 2001 call to the Ethics line was investigated by Peggy Franklin, Employee Relations Specialist.    During her investigation, Ms. Franklin interviewed Jack Johnston and reviewed relevant documentation.  Exh. Q, Franklin Aff. ¶ 44.

204.    Based on her investigation, Ms. Franklin prepared a response to the ethics line call.  Exh. Q, Franklin Aff. ¶ 45.

205.    Ms. Franklin concluded that Plaintiff had traveled on company time without prior approval; that she told the other Area Manager that she was not going to tell Johnston about the trip; that she did not apprise Johnston about the expenses as required; and that Plaintiff and her husband did not go through proper channels to get reimbursement in that they submitted the expense report to Elizabeth Ross who had no relevant function or reporting relation to the Luceras.  Ms. Franklin also determined that the length of the trip was excessive in duration.  Exh. Q, Franklin Aff. ¶ 46.

206.    Plaintiff called the Ethics Line after the conversation she had with Jack Johnston during which he allegedly asked her if she was aware of the nepotism policy and that it was time the two Lucera's were split up.  Exh. K, Plaintiff's dep. at pp. 133-134.

207.    The reason Plaintiff called the Ethics Line was because she felt that her job was in jeopardy and she felt uncomfortable and harassed.  Exh. K, Plaintiff's dep. at pp. 135, 142.

208.    During the call to the Ethics Line, Plaintiff mentioned the alleged comment about the nepotism policy, Johnston's threat to split up the Lucera team, that she felt harassed and feared retaliation.  Exh. K, Plaintiff's dep. at p. 137.

209.    Plaintiff's only other call to the Ethics Line was to follow-up on the status of the initial call.  She did not did not provide any additional information during the follow-up call.

Exh. K, Plaintiff's dep. at pp. 144, 148.   She does not recall making any other calls to the Ethics line.  Exh. K, Plaintiff's dep. at p. 145.

210.    At no point during the August 22nd call did the caller mention anything related in anyway to Mr. Johnston's personal expense reimbursement practices.  Exh. Q, Franklin Aff. ¶ 47.

211.    Other than the August 22, 2001 call to the Ethics Line about Plaintiff's trip to Ocala and Mr. Johnston's alleged reaction to the trip, the only other call to the Ethics Line about Mr. Johnston occurred after Ms. Lucera had been terminated.  Exh. S, Klimas Aff. ¶ 22.

212.    On September 5th, 8th, and 10th, 2001, after Ms. Lucera's termination, several e-mails were sent to Cingular's internet customer care relating to Ms. Lucera's termination and purported inappropriate conduct by Mr. Johnston.  The e-mails were forwarded to the Office of the President.  Exh. S, Klimas Aff. ¶¶ 23-27.

213.    On or about September 14, 2001, Jim Klimas, Director of Human Resources, commenced an investigation into the e-mail allegations regarding Jack Johnston's treatment of women and supposedly inappropriate expense reporting.  Exh. S, Klimas Aff. ¶¶ 28-29.

214.    As part of his investigation, Mr. Klimas requested that Ms. Bentley travel to Rantoul and conduct on-site interviews with female employees  at various levels.  Exh. S, Klimas Aff. ¶ 30.

215.    On September 21, 2001, Ms. Bentley interviewed four female employees who reported directly or indirectly to Mr. Johnston in the Rantoul Call Center regarding their work situation or whether they had experienced any unfair or inappropriate treatment.  None of the women identified any concerns about Mr. Johnston's personal conduct or the manner in which they were treated by Mr. Johnston.   Exh. L, Bentley Aff. ¶ 63.

216.    On or about September 17, 2001, Mr. Klimas interviewed Mr. Johnston regarding the allegations made in the September e-mails.   Specifically, Mr. Klimas questioned Mr. Johnston regarding the complaints that he treated men differently than women and had not followed prior expense report procedures.  Exh. S, Klimas Aff. ¶ 31.

217.    With regard to the AP1 forms, Mr. Johnston indicated that he may have signed invoices if it was directly billed from a vendor.  He indicated that he had obtained approval to do so from his supervisor Grace Seymour, Regional Vice President of Customer Operations. Exh. S, Klimas Aff. ¶ 32.

218.    During his investigation, Mr. Klimas also spoke with Grace Seymour who indicated that she had given her approval for Mr. Johnston to sign-off on direct bills from hotels due to the frequency with which he traveled.  Exh. S, Klimas Aff. ¶ 33.

219.    Mr. Klimas also audited each expense report submitted by Mr. Johnston since he assumed his responsibilities at the Rantoul Call Center and determined that Mr. Johnston had not violated the expense reimbursement guidelines or any Cingular policies, rules or procedures. Exh. S, Klimas Aff. ¶ 34.

Dated: October 1, 2004                              Respectfully submitted,


                                                    s/Jane M. McFetridge
                                                    Illinois Bar No. 6201580
                                                    Attorney for Defendant
                                                    FISHER & PHILLIPS LLP
                                                    420 Marquette Building
                                                    140 South Dearborn Street
                                                    Chicago, Illinois 60603
                                                    Telephone:  (312) 346-8061
                                                    Fax: (312) 346-3179
                                                    E-mail: jmcfetridge@laborlawyers.com

s/Nadine C. Abrahams

Illinois Bar No. 6209382

Attorney for Defendant

FISHER & PHILLIPS LLP

420 Marquette Building

140 South Dearborn Street

Chicago, Illinois 60603

Telephone:  (312) 346-8061

Fax: (312) 346-3179

E-mail: nabrahams@laborlawyers.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 1, 2004, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Nadine C Abrahams    nabrahams@laborlawyers.com, llewandowski@laborlawyers.com

Richard P Klaus    rklaus@hrva.com, urbecf@hrva.com

Gary R Lietz    glietz@lbflaw.com, slong@lbflaw.com

Jane M McFetridge    jmcfetridge@laborlawyers.com, llewandowski@laborlawyers.com

Edward M Wagner    ewagner@hrva.com, urbecf@hrva.com

and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:  N/A

Respectfully submitted,

s/Jane M. McFetridge
Illinois Bar No. 6201580
Attorney for Defendant
FISHER & PHILLIPS LLP
420 Marquette Building
140 South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 346-8061
Fax: (312) 346-3179
E-mail: jmcfetridge@laborlawyers.com

s/Nadine C. Abrahams
Illinois Bar No. 6209382
Attorney for Defendant
FISHER & PHILLIPS LLP
420 Marquette Building
140 South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 346-8061
Fax: (312) 346-3179
E-mail: nabrahams@laborlawyers.com