**E-FILED**
Friday, 01 October, 2004  04:44:58 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| REBECCA LUCERA, | ) | |
| | ) | |
| Plaintiff, | ) | Judge Baker |
| | ) | No. 02-2268 |
| v. | ) | |
| | ) | |
| CINGULAR WIRELESS, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |

### EXHIBITS A-K  ATTACHED TO DEFENDANT'S STATEMENT
### OF UNDISPUTED MATERIAL FACTS PURSUANT
### TO LOCAL RULE 7.1

## **APPENDIX**

Exhibit A ............................................................................Affidavit of Jack Johnston

Exhibit B ...........................................................Deposition Transcript of Jack Johnston

Exhibit C ...........................................................Deposition Transcript of Grace Seymour

Exhibit D ............................................................................Deposition of Jon Lucera

Exhibit E .............................................................Deposition of Joseph Schnaufer

Exhibit F ..........................................................................................Complaint

Exhibit G ............................................................Affidavit of Debbie Thompson

Exhibit H ...............................................................Deposition of Cheryl Bentley

Exhibit I ................................................................Deposition of Sandy Gammage

Exhibit J ...............................................................Affidavit of Nancy Wells

Exhibit K ...............................................................Deposition of Plaintiff

Exhibit L ...............................................................Affidavit of Cheryl Bentley

Exhibit M ...............................................................Affidavit of Connie Gass

Exhibit N ...............................................................Affidavit of Anita Moxley

Exhibit O ...............................................................Statement of Elizabeth Ross

Exhibit P ...............................................................Deposition of Margaret Franklin

Exhibit Q ...............................................................Affidavit of Margaret Franklin

Exhibit R ...............................................................Deposition of Jim Klimas

Exhibit S ...............................................................Affidavit of Jim Klimas

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

|  |  |  |
|---|---|---|
| REBECCA LUCERA, | ) | |
| | ) | |
| Plaintiff, | ) | Judge Baker |
| | ) | |
| | ) | No. 02-2268 |
| v. | ) | |
| | ) | |
| CINGULAR WIRELESS, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |

### AFFIDAVIT OF JACK JOHNSTON

I, Jack Johnston, being first duly sworn on oath, depose and state as follows:

1.      I am currently employed as Director of Cingular's Rantoul Call Center located in Springfield, Illinois and Cingular's Schaumburg Call Center located in Schaumburg, Illinois.

2.      I have been employed by Cingular Wireless or one of its predecessor companies since February 1998.

3.      Cingular Wireless is a provider of wireless telephone services.

4.      In 2001, Cingular Wireless was broken down into internally into various geographic regions including the Great Lakes Region. The Great Lakes Region encompassed Illinois, Wisconsin, Ohio, Michigan and Indiana.

5.      On or about June 25, 2001, I assumed the responsibilities of the Director of Customer Operations at the Rantoul Call Center.

6.      As Director of Customer Services for the Rantoul Call Center I was the highest level manager at the call center. Beginning on or about June 25, 2001, until the date of her termination, Area Manager Rebecca Lucera reported directly to me.

**EXHIBIT**

**A**

7.    Within the Rantoul Call Center there were four management levels.  The first level was manger; second level was Area Manager; third level was Director; and fourth level was Regional Vice President.

8.    Ms. Lucera's husband Jon Lucera was a Customer Service Manager in the Rantoul Call Center in July 2001.

9.    Jon Lucera's position was a first level front line manager.  He was at a lower level in the management hierarchy than Rebecca Lucera and reported directly to Debbie Thompson, the other Area Manager and Ms. Lucera's peer.

10.    In the summer of 2001, a higher number of employees than usual were traveling from Rantoul, Illinois to other call centers to explore their options due to the fact that there were more opportunities in the organization around that time.

11.    In 2001, the customary and reasonable length of time for interview trips to other locations was one to two days.

12.    During my tenure as Director of the Shaumburg and Rantoul Call Centers, I cannot recall approving an interview trip of four or more days in length.

13.    In 2001, the policy of Grace Seymour, Regional Vice President of the Great Lake Region, which includes the Rantoul Call Center, Schaumburg Call Center and the Springfield Call Center was that if an employee went on an interview trip to another call center, the call center to which the employee was traveling would be responsible for bearing the costs associated with the trip.

14.    Within approximately one week of assuming responsibility for the Rantoul Call Center, I informed my staff, including the two Area Managers Rebecca Lucera and Debbie

Thompson, that I needed to approve in advance all proposed call center expenses, including travel expenses, for all employees.

15.    Additionally, at a second meeting with my management staff, I informed my management team, including Ms. Lucera, that the Rantoul Call Center would not be reimbursing employees for interview trips to other call centers. The second meeting occurred prior to Ms. Lucera leaving for her trip to Ocala, Florida.

16.    Shortly after I started as Director of the Rantoul Call Center, I discovered that Rantoul had reimbursed Victoria Bean-Lewsader for the expenses incurred with her trip to Ocala, Florida on July 9 and July 10, 2001. Her trip was approved by Rebecca Lucera. I did not approve such payment and was not aware that Ms. Lewsader had been reimbursed by Rantoul until after payment had already been made.

17.    I subsequently discovered that Mike Mallin and Carla Gass had taken and been reimbursed for interview trips without my knowledge.

18.    I was also requested to reimburse Joe Abbott for an interview trip he had taken on July 13, 2001. Based on the fact that other employees had been reimbursed for such expenses, I approved Mr. Abbott's expenses.

19.    After July 14th but prior to Ms. Lucera leaving on her trip to Ocala, I made it clear to both Rebecca Lucera and Debbie Thompson that this policy would cease.

20.    A few days after the reiteration of my policy, Connie Gass advised me that Rebecca Lucera had refused to sign-off on some travel expenses incurred by Anita Moxley stating that she believed I would not approve them. Ms. Gass asked me if I would approve the expenses for the interview trip taken by Ms. Moxley on July 14th. I reluctantly approved the

expenses because Ms. Moxley had traveled with the mistaken impression that she would be reimbursed for her trip.

21.     I once again reiterated to my Area Managers that no travel expenses for interview trips would be reimbursed by the Rantoul Call Center.   Again, this occurred prior to Ms. Lucera going to Ocala.

22.     I was not on vacation between July 28 and August 30, 2001.

23.     From July 2nd until August 14th, 2001, I was physically present at the Rantoul Call Center on at least the following dates 7/2-7/3, 7/5-7/6, 7/9-7/11, 7/12-7/13, 7/16-7/18, 7/20-7/23, 7/30, 8/2-8/3, 8/6-8/7, 8/10- 8/11 and 8/13-8/14.

24.     At some point between August 10, 2001 and August 16, 2001, I was  contacted by Elizabeth Ross regarding the Employee Expense Reimbursement form submitted to her in connection with the Lucera's trip to Ocala.

25.     Neither Rebecca Lucera nor Jon Lucera had any functional or reporting relationship with Ms. Ross nor was she within either of their chain-of-commands.

26.     Elizabeth Ross indicated to me that it had never been her practice in the past to sign-off on expenditures for employees from other locations.

27.     Up to the time of my conversation with Ms. Ross, I was unaware that Ms. Lucera was absent from work on July 19-24, 2001 because she was on a fact-finding trip to Ocala, Florida.

28.     On or about August 16, 2001, I contacted Margaret (Peggy) Franklin, Employee Relations Specialist in Cingular's Human Resources Department located in Schaumburg, Illinois and informed her that I believed Rebecca and Jon Lucera had engaged in misconduct in relation to a trip they had taken to Ocala, Florida.

29.    Also, on August 16, 2001, I faxed a copy of the Employee Expense Reimbursement form I had received from Elizabeth Ross from my office in Rantoul to the Human Resource's Office.

30.    I informed Ms. Franklin that Ms. Lucera had not sought my prior approval for the days off or for business travel; the expense report contained excessive expenditures; and the expenses for which she sought reimbursement were ones which I had previously informed her would not be reimbursed by the Rantoul Call Center.

31.    During my conversation with Ms. Franklin, I also informed her that rather than submitting the expense reimbursement form to me for approval as was the practice, Ms. Lucera had attempted to circumvent me and all Rantoul Call Center management by sending the expense form to a manager outside the Rantoul Call Center.

32.    I requested that Human Resources conduct an investigation into the potential misconduct of Rebecca Lucera and her husband Jon Lucera.

33.    Upon the conclusion of the investigation by Human Resources, members of the Human Resources Department (including Jim Klimas, Cheryl Bentley and Peggy Franklin); Cingular's Legal Department; Grace Seymour, the Regional Vice President; and I met to discuss what action to take with regard to the Luceras.

34.    A collaborative decision, involving all of the individuals and Departments named above, was subsequently made to terminate Ms. Lucera and issue a final warning to Jon Lucera.

35.    I was unaware of any allegations of impropriety relative to expense or mileage reimbursement made against me by Ms. Lucera at the time we were considering what disciplinary action to take in connection with the Luceras' trip to Ocala.

36.     No allegations of impropriety by me were ever discussed during the process which resulted in Ms. Lucera's termination and Mr. Lucera's final warning.

This affidavit is based upon my personal knowledge. It is true and correct to the best of my knowledge, information and belief. If sworn as a witness, I could testify competently to the foregoing.

THIS ENDS MY AFFIDAVIT.

_____

Jack Johnston

Subscribed and sworn to
before me this 3O day of
September 2004.

_Mary E Pointer_
Notary Public

OFFICIAL SEAL
MARY E POINTER
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:03/03/08

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

REBECCA LUCERA,                    )
                                   )
            Plaintiff,             )
                                   )
      vs.                          )      No. 02-2268
                                   )
CINGULAR WIRELESS,                 )
                                   )
            Defendant.             )

COPY

        The deposition of JACK JOHNSTON, called by the
Plaintiff Rebecca Lucera for examination, taken pursuant
to notice and pursuant to the Federal Rules of Civil
Procedure for the United States District Courts
pertaining to the taking of depositions, taken before
Candace G. Jaggers, Certified Shorthand Reporter, at 140
South Dearborn Street, Suite 420, Chicago, Illinois,
commencing at 1:25 p.m. on the 31st day of August, A.D.,
2004.



EXHIBIT
B



205 WEST RANDOLPH STREET, SUITE 510 **(312)**
CHICAGO, ILLINOIS 60606
www.jensenreporting.com    **236-6936**

1     Q.   As of May 2001, what was your job title, and

2     where were you located?

3          A.   I believe specifically in May of 2001 I was

4     director of custom operations.  I had responsibility

5     for the Schaumburg call center.  It was following the

6     month in June that I also took on responsibility for

7     the Rantoul call center.

8          Q.   What are the job duties of the director of

9     customer service operations of Schaumburg?

10         A.   They are the same as any call center.

11    Directors of call centers are responsible for all

12    personnel matters; all P&L or profit and loss, which

13    means budgetary responsibility; responsibilities for a

14    variety of performance measurements of those centers

15    whether it be from a custom satisfaction and/or

16    employee performance perspective; and all other

17    matters that would relate to the efficient and fluent-

18    operation of a call center.

19         Q.   In May of 2001, how many call centers were

20    part of the Great Lakes call center operation or

21    group?

22         A.   I can tell you with certainty that at that

23    point there was Schaumburg, Rantoul, Springfield,

24    Indianapolis, and I do not recall when we consolidated

1     the Detroit call center.  It is possible, and I

2     believe my recollection is that the Farmington Hills

3     or Detroit call center was also part of that region at

4     that time.

5         Q.    So four and maybe five call centers as part

6     of the Great Lakes region in 2001?

7         A.    Correct.

8         Q.    Is it my understanding that starting in

9     December of 2000 or January of 2001 there was a merger

10    effectuated between Cingular or SBC Cellular and

11    Ameritech Cellular?

12        A.    The date I'm not certain of, but, yes, that

13    would coincide.  There was -- Around that time, there

14    was a merger plan that took the national assets of SBC

15    which included former Ameritech as well as Bell South.

16        Q.    By May of 2001, you would have been a

17    director or had worked your way to a directorship of

18    the Schaumburg call center for the past year and a

19    half approximately?

20        A.    Correct.

21        Q.    How many bargain 4 employees or collective

22    bargain employees did Schaumburg have in May of 2001

23    roughly?  100?  200?  400?

24        A.    Schaumburg call center has a capacity of

1    service now.  But I believe we did at that time.  The
2    main purpose is to answer and resolve customer
3    concerns or issues.
4        Q.    What would the operational payroll cost for
5    the Schaumburg center for 2001?  You've got three
6    hundred employees that are bargain 4.  You've got
7    maybe 50 non-bargain.  We are looking at, you know,
8    ten million dollars a year just to pay payroll?
9        A.    Payroll is certainly the largest embedded
10   cost in a call center operation.  But --
11       Q.    Retirement and benefits?
12       A.    Absolutely.  Retirement, benefits and
13   facilities cost, and all other aspects of the
14   overhead.
15       Q.    Forgetting the facilities costs and those
16   kinds of things because then you can start messing
17   with depreciation and things of that nature.  I'm more
18   worried about payroll and bonus and benefits.  Are we
19   looking at 10-, 12 million dollars?
20       A.    I don't know specifically.  I don't think
21   that that figure is far off.  I would say maybe
22   25 million for the whole operation -- 20, 25.  So
23   I think that's a fair enough figure.
24       Q.    I think I read somewhere that in late June

1    of 2001 you were asked on some basis or another to

2    proceed to replace Joe Schnaufer, S-C-H-N-A-U-F-E-R,

3    as the call center director in Rantoul.  Is that date

4    roughly accurate, sometime late June?

5        A.    Late June is roughly accurate.  The

6    characterization I think would be better reflected as

7    assuming his responsibilities, not replacing.

8        Q.    Before the end of June, I take it you knew

9    Joe?

10        A.    Yes.

11        Q.    You had interacted with him and met with him

12    both professionally and socially?

13        A.    I wouldn't say socially, no.  I would say

14    professionally, yes.  Although, if you include a

15    cocktail party at the end of a meeting or an event

16    such as we attended together down at Stone Mountain,

17    Georgia, that was Cingular sponsored, then the answer

18    would be yes to that as well.  But Joe and I did not

19    socialize outside of work.

20        Q.    What kind of events or event was at Stone

21    Mountain, Georgia?

22        A.    It was a national call center

23    meeting/conference that was conducted by the then

24    officer level of overall customer service to bring all

1    ask you just do it by job description.

2        A.    The leadership team I will use synonymously

3    with management team with, if that's okay, is

4    managers, area managers, and a director.

5        Q.    And their staff?

6        A.    Pardon me?

7        Q.    Their staff, assistance, secretaries?

8        A.    I would not include them in that definition.

9        Q.    How many managers did you have in Rantoul in

10   June or July of 2001?

11       A.    I believe it was probably in the 20 to 30

12   range.

13       Q.    Okay.  How many area managers?

14       A.    Two.

15       Q.    One director, right?

16       A.    Correct.

17       Q.    Two area managers were Debbie Thompson and

18   Rebecca Lucera?

19       A.    Correct.

20       Q.    Who had the higher seniority?

21       A.    Rebecca.

22       Q.    Do you know by how much?

23       A.    No.

24       Q.    Debbie Thompson no longer works in the

1   Rantoul call center?

2        A.    Correct.

3        Q.    When was her last day of employ?

4        A.    I do not recall.

5        Q.    Do you remember what year it was?

6        A.    That was either late -- Well, I think it was

7   2002.  First or second quarter is my best recollection

8   when she left.

9        Q.    You were assuming the responsibilities for

10  Joe Schnaufer in late June 2001?

11       A.    Correct.

12       Q.    Because he was going to take on the same

13  responsibilities at a new call center in Florida?

14       A.    Yes, he was going to be one of two directors

15  at a call center in Florida.

16       Q.    How many seats does the call center in

17  Florida going to be scheduled to take?

18       A.    I don't know, but it was a large center.  It

19  was probably in the 8- to 900 range.

20       Q.    Would that call center based upon that size

21  be larger than any of the call centers in the Great

22  Lakes group?

23       A.    Yes.

24       Q.    Obviously this would be owned and operated

1    in terms of seats?

2         A.   I don't remember, but it was smaller.   I

3    believe it was in the 200 range.

4         Q.   The director was Minnie Hundley?

5         A.   Correct.

6         Q.   When was the last time you had communication

7    with Minnie Hundley?

8         A.   It was --

9         Q.   Was it after the call center closed?

10        A.   No, it was before.  We went up to Farmington

11   Hills on a trip to recognize either an anniversary

12   date or a retirement of hers prior to the call center

13   closing.  I believe that was my last contact with her.

14        Q.   Was Farmington Hills an Ameritech call

15   center?

16        A.   Yes.

17        Q.   Was Indianapolis an Ameritech call center?

18        A.   No.  It was a Bell South center.

19        Q.   Springfield was constructed or started after

20   the merger was initiated?

21        A.   Correct, after the SBC/Ameritech merger.

22        Q.   So it was therefore Cingular call center?

23        A.   Yes.  We had a smaller call center in

24   Springfield already that was operating as an SBC call

1          A.    No, I went by myself.

2          Q.    You think that this lasted approximately two

3     days?

4          A.    Two to three days.

5          Q.    During the course of those conversations,

6     did Joe indicate to you anyone who was a manager, an

7     assistant manager, an area manager who would be

8     interested in or who had expressed an interest to him

9     at least in relocating to where he was going in

10    Florida?

11         A.    He did not indicate specifically anyone who

12    had contacted him.  He did say that he had been

13    contacted by some folks in the Rantoul call center.

14    He was very noncommittal about being able to offer any

15    opportunities having not been on site at that point.

16    He did mention in his own volition the names of about

17    six to eight individuals that if an opportunity were

18    to arise that he'd be interested in interviewing, but

19    in his position, I would understand he was not able

20    to, you know, confirm with anybody that he'd even be

21    in a position because he wouldn't know who was

22    available locally and whether or not there would be

23    opportunity.  So he didn't want to promise or lead

24    anybody to believe that there -- overextend any hope

1    or optimism.

2         Q.   So the answer was, yes, he was aware of

3    people, and he did tell you about some people?

4         A.   Yes, but not specific people.  He did not

5    tell me who contacted him specifically.  He told me

6    specific names of those who he would be interested in

7    if there were opportunities.

8         Q.   Who was he interested in?

9         A.   Like I said, about six to eight names

10   that -- Victor Lucader, Gloria Jackson, the Luceras at

11   the time, and a couple of other managers that ...

12        Q.   I'm sorry, did you say Heather McGreeney

13   (Phonetic)?

14        A.   I did not.

15        Q.   Cindy Valerio (Phonetic)?

16        A.   I believe Cindy was part of that, yes.

17        Q.   He was interested in Cindy?  Might be?

18        A.   I believe so, yes.

19        Q.   Did he express any interest in Debbie Grilo?

20        A.   Not to my recollection.

21        Q.   Did he write any of those names down or give

22   you any of those names in writing?

23        A.   No.

24        Q.   Did you write those names down?

1    call center?  Would it have been at the same time you

2    spent these two days with Joe Schnaufer or subsequent

3    to that or before?

4        A.    It would have been after.  I met with them

5    after Joe left, or it would have been officially out

6    of his capacity.  So sometime probably the time Joe

7    and I met probably within a week to ten days I had met

8    with all the management staff and all the employees of

9    the call center.

10       Q:    I think I saw somewhere the date June 26 is

11   when you started?

12       A.    25th, I believe.  It's somewhere around

13   there, yeah.  I thought it was 25th, but I think it's

14   somewhere in that.

15       Q.    You're thinking that approximately ten days

16   thereafter you would have met with --

17       A.    Within ten days I would have and possibly

18   less.

19       Q.    If Schaumburg had 300 collective bargain

20   employees and 50 on the management team and Rantoul

21   had 150 and 20 or 30, could I assume that the

22   taking -- just extrapolating the numbers -- that the

23   Rantoul call center cost of operations for payroll

24   would have been somewhere around 7 or 8 million

1    what that early directive was?

2        A.    The directive was that I needed to see all

3    budgetary items, all expenditures prior to the actual

4    expense with exception of things like your utilities,

5    lease, payments that were fixed cost overhead.  And

6    that specifically included travel, and that I made it

7    clear that we would not be reimbursing or paying for

8    travel for interviews to other call centers.  In fact,

9    that was made twice in two separate meetings.  Dates

10   of which I don't -- will not be able to provide, but

11   it was immediately upon my arrival within days.

12       Q.    I want to make sure I understand this

13   completely.  You indicated that now that you were

14   assuming Joe's position and responsibilities, you

15   needed to see all budgetary items prior to

16   expenditure, and this would specifically include

17   travel expenditures?

18       A.    Correct.

19       Q.    You indicated that you made this clear; that

20   people would not be reimbursed; that you made it clear

21   to them twice; you made it clear to them twice in two

22   separate meetings; and that those two meetings would

23   have been soon after or immediately upon your arrival?

24       A.    The first would have been --

1          Q.    First of all, did I summarize that
2     accurately?
3          A.    Yes.
4          Q.    Now, go ahead with your answer.
5          A.    First such meeting would have been soon
6     after the two that I've referenced after my arrival.
7     The second one would have been probably within a few
8     weeks as a reiteration.    That edict was given to all
9     leadership as we defined it earlier.
10          Q.    Just again, so I'm confirming, the first
11     meeting you said would have occurred within ten days
12     of your start, June 25 of '01?
13          A.    Correct.
14          Q.    And the second meeting would have occurred
15     within maybe two weeks after the first meeting?
16          A.    Well, meeting in reference to these topics.
17     But I had continuous meetings from the time I started
18     there until -- up until now.    Especially during that
19     time because of the uncertainty of the future, the
20     call center, the trepidation that was felt by all
21     staff regardless of level or employee status that I
22     spent a lot of time meeting with employees.    The
23     meetings I referenced when I first started were the
24     initial meetings or gatherings of all employees and

```
 1        then leadership only.  But there were continuous
 2        operational meetings that I conducted where topics, as
 3        I mentioned, this topic was a main focus early on.
 4        And then we reiterated another meeting after that.
 5        But there were -- These were not the only meetings
 6        that took place within the first weeks.
 7             Q.   But you know that you issued this edict or
 8        brought this rule up at least at those two management
 9        level meetings?
10             A.   I know I brought it up two times, yes, and I
11        know that I brought it up the first time extremely
12        early because of the obvious nature of my
13        responsibility which is to spend money wisely, and so
14        I wanted to be clear.  And Rantoul and Ameritech both
15        by representation and by action in my own observation
16        had a much looser or less conservative fiscal policy
17        than the SBC side had.  And I wanted to be sure that -
18        that was -- that was clearly understood right up
19        front.
20             Q.   Why was the staff feeling trepidation?
21             A.   There had been a significant period of
22        attrition without hiring.  There was a brand-new call
23        center, a large call center, being built just down the
24        road in Springfield, Illinois.  So there was a lot of
```

1    but you would expect the interviewing office to pay?

2         A.   Correct.

3         Q.   Of the four or five people that we list here

4    on D00106 -- Victoria Beam Lucader, Anita Moxley,

5    Gloria Masterson, Mike Malin, Carla Gas -- of those

6    people, you said you knew about them ahead of time.

7    Do you remember if Rantoul --

8         A.   No.  I said I knew about them.  Not

9    necessarily ahead of time.

10        Q.   Okay.  You knew about them?

11        A.   Yes.

12        Q.   Okay.  That they had an interview.

13             Of those names I just mentioned -- Lucader,

14   Malin, Gas, Moxley, and Masterson -- of those, how

15   many did Rantoul pay for any reimbursement?

16        A.   I believe Rantoul paid for Victoria Beam

17   Lucader, which was signed off not by me.  Mike Malin

18   Carla Gas, although those trips were -- had already

19   taken place prior to my knowledge and/or the ability

20   to state that we were not paying.  Anita Moxley, the

21   same, if you look at the dates.  Gloria Masterson,

22   Janet Donnelley, we did not pay for.  They were

23   reimbursed directly from that organization.  And

24   Gloria Jackson was not paid for because there was a

1    cutoff.  I would call or characterize Victor, Mike,

2    and Carla as transitional between the time they

3    traveled, my edict, and the fact that they had

4    incurred expenses.  The others -- The other side of

5    that transition that were clearly within the edict or

6    in compliance.  That's the only reason that those

7    expenses were ultimately approved or signed or not

8    contested by me.  That is also what prompted the

9    second meeting that I've referred to for the

10   reiteration.

11        Q.   Can you give me a date for that second

12   meeting?

13        A.   No, not a specific one.

14        Q.   Well, I notice here that Lucader, Malin,

15   Gas, Moxley -- that those four had trips starting July

16   9th and ending at the latest, July 16th?

17        A.   Correct.

18        Q.   Is it your belief that you had a meeting

19   after maybe the 16th to reiterate your edict?

20        A.   No, I believe it was sometime in that period

21   was a reiteration.

22        Q.   Was this --

23        A.   Which they may have or may not have

24   attended.

1    would be understandable for the wife to go along on

2    the trip and find out about neighborhoods, schools,

3    houses, those kinds of things?

4         A.   No.

5         Q.   Why not?

6         A.   Cingular has -- SBC, whatever company -- I

7    say this from my own knowledge having relocated three

8    times with this current company, whatever title or

9    umbrella you put it under -- that it's understood that

10   the employee of the company will travel to the

11   location for the interview; may at their own, on their

12   own time, if they have any time, although it's not --

13   it's not generally, so typically you go down.  You

14   interview.  And you come back.  And the decision is

15   made as to whether or not the job is the fit first.

16   And then if there is a fit and there's an offer and

17   acceptance, the company provides a relocation package

18   that at that point has built into that budget the

19   ability to take house-hunting trips,

20   neighborhood-finding trips.  But that the company's --

21   from my interpretation and what I've seen practiced --

22   The company's expectations are there's a determination

23   if the job fit is correct first.  If it is, then

24   there's -- then you move on.  You make that decision

1    on your own.  And after which, you can go down and

2    house-hunt and find neighborhoods.  That decisions are

3    not from a company perspective contingent upon a

4    spousal accompaniment and/or a fit with regards to

5    community or schools or neighborhoods.

6         Q.    So what you're suggesting is that if the job

7    appears to be a good potential fit, that after the

8    employee who went down to investigate about the

9    potential relocation, that there would be a second

10   trip made by that employee and/or his own spouse?

11        A.    Only after --

12        Q.    Please let me finish my question.  That

13   there would be a second trip made?

14        A.    Only if they have accepted the position

15   already.  Like I said, the decision would not be --

16   There's not an allowance for the decision to be made

17   contingent upon spousal approval and/or accompaniment

18   and/or if whether or not the community has a fit.

19   It's purely based on the business need and the

20   business need only.  After which, if there's an offer

21   and acceptance, that point a relocation package is

22   issued, and that factors in and includes trips which

23   are now the precursor to that assignment for spouses

24   and anybody to go down and shop communities and

1       the purposes of the Lucera's trip, both or just one?

2           A.    I didn't have any understanding.  I found

3       out about the trip after the fact.

4           Q.    Doesn't answer my question.  What was your

5       understanding after the fact about the purpose of the

6       trip?  For both of them to be interviewed, or just one

7       of them to be interviewed?

8           MS. ABRAHAMS:  Objection to the form.

9       BY MR. LIETZ:

10          Q.    You can answer.

11          A.    I'm not sure either of them.

12          Q.    So neither one of them were going down for

13      an interview?

14          A.    If there was potentially, it was one.  But

15      my understanding is that -- First of all, from my

16      perspective, that wasn't an interview.  It wasn't an

17      authorized interview in advance.

18          Q.    How did you come to that conclusion?

19          A.    After the fact.

20          Q.    Not when.  How?

21          A.    How?  Through some communication with Joe

22      Schnaufer about -- and in release dates.

23          Q.    When did that communication with Joe

24      Schnaufer occur?

1          Q.    You need to say yes for the record.

2          A.    Yes.   Somewhere in those dates it was

3     brought to my attention that they were both off, and

4     that was fine because there were some -- I knew that

5     in the transition that there were some preapproved

6     time and/or -- I know from Rebecca's standpoint

7     that -- Let me restate this again.  Rebecca would have

8     talked to me about the time off.  I did not know where

9     they were at, if it was vacation.  But they had

10    blocked off time there that I did not preapprove as

11    business time off.  My assumption was at the time that

12    they had taken days as vacation.  I found subsequently

13    that that was not the case after the fact.

14         Q.    I just want to make sure I understand this

15    properly.  You're saying that it's your recollection

16    that when you were made aware that Rebecca and/or John

17    were not at the Rantoul call center that you assumed -

18    this was personal time or vacation time that they were

19    taking off?

20         A.    When I found out during that period that

21    they were not in the call center, that was my

22    assumption, yes.

23         Q.    You based that on what?

24         A.    The fact that I had not preapproved business

1    time offer prior to that or knew of any business

2    travel or bona fide business purpose for travel.

3         Q.    Before July 19th, you were not aware of

4    Rebecca saying to you that she and John were going to

5    Ocala?

6         A.    That is correct.

7         Q.    When did you find out that they had been in

8    Ocala and had gone down to Ocala?

9         A.    When I received those -- the reimbursement

10   form from Liz Ross.

11        Q.    When was that?

12        A.    I don't know the date of that.

13        Q.    I'm going to show you what was marked as

14   Lucera No. 5, dated January 22, '04, as an exhibit.

15        A.    Okay.

16        Q.    Is that the reimbursement -- employee

17   expense reimbursement that you are alluding to?

18        A.    Yes.

19        Q.    Who signed that reimbursement expense form?

20        A.    There's one signature, John M. Lucera.

21        Q.    How is it sent to?

22        A.    I know it was sent -- It doesn't reflect

23   here on the form, but the next signature is Elizabeth

24   Ross.  Elizabeth Ross who I know this was sent to

1    day that you received that phone call from Elizabeth

2    Ross later in the afternoon, there was a regularly

3    scheduled staff meeting, and she happened to give you

4    a copy of what is marked as Exhibit 5?

5        A.    Right.  I just -- I asked her to give it to

6    me then rather than fax it or send it since we were

7    going to see each other.

8        Q.    As you sit here now, do you know whether or

9    not you were in the Rantoul call center on Friday,

10   August the 10th?

11       A.    I was in the Rantoul call center August 10th

12   and August 11th.

13       Q.    How do you know that?

14       A.    I know that from travel reimbursement forms.

15       Q.    Your own travel reimbursement forms?

16       A.    Yes.

17       Q.    Where did you spend the night on the 9th or

18   the 10th or the 11th?

19       A.    In Springfield, Illinois.

20       Q.    Would you have driven over from Springfield

21   during the day to Rantoul?

22       A.    I would have gone to Rantoul and then gone

23   to Springfield in the evening and come back to Rantoul

24   the next day which was that Saturday in my work in the

1          MS. ABRAHAMS:  What's the relevance?

2          THE WITNESS:  I'd prefer not to answer.

3     BY MR. LIETZ:

4          Q.   Okay.  What did you do after you heard from

5     Elizabeth Ross next regarding -- in light of Exhibit

6     No. 5?

7          A.   Say that again, I'm sorry.

8          Q.   What did you do after you heard from

9     Elizabeth Ross about Luceras?

10         A.   I spoke with my boss.

11         Q.   Who is?

12         A.   Who was Grace Seymour at the time, and

13    expressed some concern that I had, based on the

14    concern that Liz Ross had expressed in receipt of this

15    employee expense reimbursement form.  And we made a

16    determination that at that point it was best to have

17    HR involved and for them to proceed if they deemed

18    necessary to investigate what was seemingly

19    inconsistent or inappropriate actions.

20         Q.   What was inconsistent?  What was

21    inappropriate?

22         A.   The inconsistency was not following, first

23    of all, the getting preapproval on business time.

24         Q.   Your edict?

1          A.    In general, getting preapproval about

2     business travel from your supervisor.  My edict.  The

3     fact that the expense reimbursement had not been

4     submitted within the call center hierarchy.  It had

5     been submitted outside the hierarchy which clearly

6     made Elizabeth Ross or Liz Ross uncomfortable.  And

7     that after reviewing the receipts it seemed, one, the

8     number of days for an interview based on past or

9     historical precedent was fairly elongated, and that

10    specific expenses here seemed to be a little

11    exorbitant.  Based on that, it was remanded over to

12    HR, and HR then took the lead on everything going

13    forward.

14         Q.    You testified that you don't remember being

15    told by Rebecca Lucera that she was going to Ocala,

16    Florida on the dates in question before she left?

17         A.    Correct.

18         Q.    And you would have been her supervisor?

19         A.    I was her supervisor, yes.

20         Q.    John Lucera's supervisor was?

21         A.    Debbie Thompson.

22         Q.    Had Debbie Thompson been told ahead of time?

23         A.    I don't know.  You have to ask Debbie.

24         Q.    You have no recollection of that as you sit

1    here?

2        A.    I believe so, but like I said, I believe so,

3    but Debbie would be the one to confirm that.

4        Q.    Second point you mentioned was that they

5    hadn't submitted this pursuant to your rule, correct?

6        A.    Correct.

7        Q.    You suggested that it was inappropriate for

8    them to submit it to Liz Ross?

9        A.    I believe it was inappropriate and did not

10    follow any past practice which I later confirmed.

11        Q.    With who?

12        A.    With Minnie Hundley.

13        Q.    How?

14        A.    I spoke to her by telephone, and Elizabeth

15    Ross had also confirmed that had never been the

16    practice in the past, and that was the reason --

17        Q.    How long had Minnie Hundley been in that

18    position as of August 2001?

19        A.    I don't know.

20        Q.    How many work days were involved?

21        A.    I'd have to look and see here.  I believe it

22    was three work days, is my recollection.  I'm looking

23    at the same information as you on the 2001 calendar.

24        Q.    Well, I noticed that Friday is the 20th.

```
 1    between the dates of the 19th and the 24th?

 2         A.    No.

 3         Q.    Same question as to June.

 4         A.    No.

 5         MR. LIETZ:  Let's take a break.

 6                     (A short break was had.)

 7    BY MR. LIETZ:

 8         Q.    Who decided that there had been any

 9    employment violations by Rebecca?  Who made that

10    determination?

11         A.    A collaboration between HR and HR

12    investigation, legal, the ethics group -- ethics group

13    out of our headquarters, Grace Seymour, and myself, we

14    are all involved in all of the decision process.

15         Q.    You've named entities.  I need name names,

16    please.  Grace Seymour.  Who else?

17         A.    I don't know which -- Susan Rodriguez was an

18    attorney that worked on it.  The ethics person, I

19    don't know.  I'll defer to HR on that.  Cheryl Bentley

20    is HR.  Jim Climus is HR.  Grace Seymour, RVP.

21    Myself.

22         Q.    RVP?

23         A.    The regional vice president, excuse me.

24         Q.    And that's Grace?
```

1           A.    It was decided on a conference call which

2    would have included folks from Rantoul, Schaumburg,

3    Hoffman Estates, our region headquarters building,

4    those three locations.

5           Q.    Have you ever been the subject of an

6    investigation for ethics violation?

7           A.    Prior to this?

8           Q.    At any time.

9           A.    Not other than this, no.

10          Q.    So the only time you've been subject to an

11   ethics hotline accusation was in I assume August of

12   2001?

13          A.    Somewhere in 2001, yes.

14          Q.    When did you first hear about it?

15          A.    I heard about it sometime after the actual

16   delivery of the final written in the separation of

17   Rebecca.

18          Q.    So that would have been near the very end of

19   August?

20          A.    I believe it was in September.  It was

21   already in September.  During the course of the

22   investigation, I was approached to answer whatever

23   applicable questions there were, and that's when I was

24   made aware.

1          Q.    Well, then, I just got confused by your

2     answer.    I think I understand what you're saying.    You

3     said during the course of the investigation.    You mean

4     during the course of your investigation of you?

5          A.    Correct.

6          Q.    You didn't mean during the course of the

7     investigation involving the Luceras?

8          A.    Correct.

9          Q.    Who told you?

10         A.    It was Peggy Franklin.  Margaret is her

11    official name.

12         Q.    Where is she located?

13         A.    She's located in Schaumburg.

14         Q.    Was she in Schaumburg in 2001?

15         A.    Yes.

16         Q.    Were you in her office or your office?

17         A.    It was by telephone.

18         Q.    What was your first immediate reaction?

19    Anger?  Defensive?

20         A.    Indifferent.

21         Q.    Why were you indifferent?

22         A.    Because I knew that there was no basis to

23    any of the allegations, but I also wanted to be

24    cooperative, which I was.

1    any adverse way with respect to bonus, salary,

2    promotion, anything like that?

3         A.    No.

4         Q.    Same question.  To your knowledge, has the

5    hotline ethics investigation impacted or affected you

6    adversely in any way?

7         A.    Not to my knowledge.

8         Q.    Did you replace Rebecca Lucera after, say,

9    September 1, 2001?

10         A.    At one point I did, yes.

11         Q.    What was the name of that person?

12         A.    It was Yolanda Glass.

13         Q.    Had Yolanda Glass been part of the Rantoul

14    operation before the termination of Rebecca Lucera?

15         A.    Yes.

16         Q.    What was her job title before her promotion

17    to replace her?

18         A.    Well, she -- If my recollection is right,

19    there's a little overlap.  She had left on a

20    promotion -- I'm sorry.  She had worked in the Rantoul

21    call center prior, and I think in

22    nonmanagement/management capacity.  She had been

23    working on the landline side of the business, had been

24    given an opportunity to be promoted in our Springfield

1    approval, would you agree or disagree with that

2    comment?

3        MS. ABRAHAMS:  Objection, calls for speculation.

4    BY THE WITNESS:

5        A.   I would say that's hypothetical.  I had

6    conversations with Minnie Hundley about it.  I had

7    conversations with Liz Ross about it.  I did not have

8    a conversation with Joe about it with regards to that.

9        Q.   In the conversation with Minnie Hundley, did

10   she say whether or not she thought sending it to Liz

11   Ross --

12       A.   She thought that it was out of the norm.

13   More specifically, she said that it was a rare

14   occurrence, and that typically when that did happen,

15   it was prearranged from peer to peer, director to

16   direct, to say, you know, what, I'm going to be gone

17   for the next week or two weeks on vacation or some

18   place.  Could you please -- I'm telling my direct

19   reports to come directly to you, so you can sign off.

20   She said it was not a normal course of business to do

21   that from her experience there, Liz Ross.  Especially

22   -- The oddest factor here is she went out of call

23   center management and went to Liz Ross who was not in

24   call center management at the time.  Liz Ross

1      expressed the exact same concern, that she hadn't been

2      approached, or that had been normal to her to the

3      extent that she was uncomfortable.  That is the reason

4      she came back to me with the receipts.

5           Q.   You indicated that you had not talked to

6      Sandy Gammage about the termination of the Lucera

7      matter?

8           A.   That is correct.

9           Q.   How about Debbie Grilo?

10          A.   That's correct.

11          Q.   You did not talk to her about it?

12          A.   I have not talked to anybody.

13          Q.   Prior to her termination, did you like

14     Rebecca Lucera as a person?

15          MS. ABRAHAMS:  Object to the form.  It's vague.

16     BY THE WITNESS:

17          A.   We had a professional relationship.

18          Q.   Did you respect her?

19          A.   I'd say we had a professional relationship.

20          Q.   I have a professional relationship with lots

21     of people, but I want to know the differences --

22          A.   I believe that's -- You know, respect is

23     definable in many ways, and I would not want to answer

24     that specifically.

1          A.    No.

2              Q.    It's your testimony that you have never

3      suggested that game, that you never suggested playing

4      that game in an office or quasi-office environment?

5          A.    Correct.

6              MR. LIETZ:  I think that's all I have.

7              MS. ABRAHAMS:  I have some follow-up questions.

8                        CROSS-EXAMINATION

9      BY MS. ABRAHAMS:

10             Q.    Can you tell me about your conversation with

11     Liz Ross at the time that she contacted you and told

12     you that she received a request of reimbursement from

13     John Lucera?  What did she say to you during that

14     conversation?  What did you say to her?

15             A.    Well, she stated that she had been contacted

16     by Rebecca and asked if she'd be willing to sign an

17     expense reimbursement in my absence or -- in my

18     absence.  And Liz was hesitant, but from my

19     understanding of the conversation that there was

20     either a credit card or some kind of billing pressure

21     that was causing them to want to get these -- this

22     signed despite the fact that I was available except

23     for only one or two days during that period to either

24     have the forms faxed to me or sent to me or given to

1    me in person;  that she had hesitation, but she agreed

2    if that was their only recourse.  And that in fact

3    from the time that she had that actual call where the

4    request was made by Rebecca, there was quite a few

5    days even up to a couple of weeks that it took for

6    them to send the actual form to her at which point

7    when she received those forms, we happened to be on a

8    conversation call together that morning, and she

9    called me right after the conference call and said

10   I've got this expense sheet here.  This is how this is

11   transpired up to this point.  I don't feel comfortable

12   signing them.  You're here.  And we agreed that she

13   would hand them over to me when we were able to meet

14   later.  But that she expressed her concern about the

15   bypassing of, one, a direct supervisor; two, call

16   center leadership to somebody on the staff side or

17   outside of that which was her capacity at the time.

18        Q.   You were also asked about when you first

19   became aware of any calls to ethics hotline made about

20   you.  And I think you -- Do you know first of all when

21   the first time a call was made to that hotline about

22   you?

23        A.   I do not.

24        Q.   Would it surprise you to know it was

1          Q.    Do you recall if this -- Did you receive

2     this e-mail from Peggy Franklin dated September 10th?

3          A.    Yes.

4          Q.    Do you recall if this was the first time

5     that you were aware of the specific allegations made

6     by Rebecca Lucera?

7          A.    I do not believe it was the first time.  I

8     believe a phone call preceded this and that there was

9     an e-mail that followed it up.

10         Q:    Do you recall if the phone call was the day

11    or two before?

12         A.    Yeah, within a few days prior to that.

13         Q.    Was it sometime in September of 2000 --

14         A.    Yes.

15         Q.    -- and 1?

16         A.    Yes.

17         Q.    Your conversation with Joe Schnaufer about -

18    the Luceras going out to Ocala, did he tell you in

19    that conversation if there was a formal job available

20    for Rebecca Lucera at the time she went down to Ocala?

21         MR. LIETZ:  Objection as to the foundation of

22    time and which conversations.

23    BY THE WITNESS:

24         A.    Yeah, there was not a posting.  There was

1    had been contacted.  He knew they were coming because

2    he met them and took them around.

3         Q.   With regard to John Lucera, did you

4    recommend that he be reprimanded?

5         A.   Yes.  I actually recommended that both he

6    and Rebecca be terminated or separated from the

7    company.  I felt they had equal culpability and

8    accountability in the actions and was disappointed

9    that my recommendation was ultimately not fulfilled to

10   terminate both of them.

11        MS. ABRAHAMS:  I have nothing else.

12                    REDIRECT EXAMINATION

13   BY MR. LIETZ:

14        Q.   Follow-up questions.  You indicated that in

15   your conversation with -- In one of your conversations

16   with or the conversation you had with Joe Schnaufer in

17   August of 2001, did Schnaufer tell you that he met

18   them when they came into town?

19        A.   Yeah, I believe so, yes.  That certainly was

20   what I extracted.

21        Q.   Did you extract that he took them around,

22   showed them Ocala?

23        A.   Yes.

24        Q.   Did you understand in your conversation with