**E-FILED**
Friday, 01 October, 2004 04:46:53 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

REBECCA LUCERA,             )
                            )
           Plaintiff,    )
                            )
      vs.                )    No. 02-2268
                            )
CINGULAR WIRELESS,       )
                            )
           Defendant.    )

The subpoenaed deposition of GRACE
SEYMOUR, called by the Plaintiff for examination,
taken pursuant to notice and pursuant to the
Federal Rules of Civil Procedure for the United
States District Courts pertaining to the taking of
depositions, taken before Elizabeth E. Pusch,
Certified Shorthand Reporter and Notary Public, at
2000 West Ameritech Center Drive, Hoffman Estates,
Illinois, commencing at 10:55 a.m. on the 21st day
of September, A.D., 2004.

```
+---------------------+
|      EXHIBIT        |
|                     |
|         C           |
|        ___          |
+---------------------+
```



**JENSEN**
**REPORTING**
**SERVICE**

205 WEST RANDOLPH STREET, SUITE 510 **(312)**
CHICAGO, ILLINOIS 60606
w w w . j e n s e n r e p o r t i n g . c o m  **236-6936**

```
 1        Q.    When you took on the customer service
 2   roles in the Great Lakes region, what states were
 3   included?
 4        A.    Illinois, Wisconsin, Ohio, Michigan, and
 5   Indiana.
 6        Q.    Approximately when was that?
 7        A.    In 2000.  It was in 2000.  It was with the
 8   Ameritech merger.  I don't remember the day.
 9        Q.    So a moment ago when you made reference to
10   when there was a merger, you took on the customer
11   service roles and you were assigned the Great Lakes
12   region?
13        A.    Uh-huh.
14        Q.    Yes?
15        A.    Yes.
16        Q.    And that was approximately 2000 and that
17   was the merger with Ameritech?
18        A.    Yes.
19        Q.    When did you start working in this
20   building in Hoffman Estates?
21        A.    I believe it was -- I don't remember the
22   exact date of when we moved, if it was 2000 or
23   2001.  I don't remember.
24        Q.    You indicated five states as part of the
```

1   Great Lakes region.  Can you tell me how many call

2   centers were included in the Great Lakes region in

3   approximately the first part of 2000 or the year of

4   2000 -- I'm sorry, the first part of 2001 or the

5   year of 2001?  Would those offices have included

6   Rantoul, Illinois?

7       A.   Yes.

8       Q.   Springfield, Illinois?

9       A.   Yes.

10      Q.   I'm expanding on.  The third call center,

11  I think, might have been Farmington Hills near

12  Detroit, Michigan?

13      A.   Yes.

14      Q.   Also a call center in Indianapolis?

15      A.   Yes.

16      Q.   A call center in Schaumburg?

17      A.   Yes.

18      Q.   Was there any call center in Wisconsin?

19      A.   No.

20      Q.   So there were five call centers that we're

21  talking about?

22      A.   Yes and no.

23      Q.   Okay.  Please tell me why?

24      A.   Indianapolis came later, came with the

JENSEN REPORTING SERVICE (312) 236-6936

1    And it's your testimony that once the merger

2    occurred, it's merged?

3        A.    Yeah.  I don't remember the exact date

4    when the merger occurred.  It was in 2000, the end

5    of year.  I don't remember if it was November,

6    December, October.  I do not remember.

7        Q.    In the first half of 2000 -- Well, in

8    2001, was there some concern that the Rantoul call

9    center might be diminished or closed down?

10       A.    Concern from me?  Concern from whom?

11       Q.    From the employees in Rantoul, that they

12   might not have an office there?

13       A.    There may have been, yes.

14       Q.    Okay.  What's your current title?

15       A.    Regional vice president, customer

16   operations.

17       Q.    How long have you had that title?

18       A.    The last -- It will be a year in October.

19       Q.    Did you remain in the position and

20   remain -- and keep the title of vice president of

21   customer operations through the end of 2001?

22       A.    No.

23       Q.    When did it change?

24       A.    October of 2001.

1    to give approval or know what the expenses were?

2            Were you familiar with Jack having a rule

3    like that in June of 2001 at Schaumburg?

4       A.    Sounds like my rule, preapproval for all

5    travel expenses.

6       Q.    Tell me about that rule in June of 2000?

7       A.    I don't remember to June of 2000, you

8    know, per se.

9       Q.    You said it was your rule.

10       A.    Sounds like -- Well, as a business

11    practice, knowing that all centers were going up at

12    the time, we put rules in place so that we would

13    know who would be transferring where and we would

14    be preapproving all of those expenses.

15       Q.    I believe your testimony was that it

16    sounded like your rule. So I don't want to put a

17    copyright next to Jack Johnston's name for it.

18       A.    It sounds like something that I would say

19    that I want to know and Jack would implement the

20    rule as his rule in his center because that's the

21    only way that we would know. And we wouldn't have

22    people going back and forth and losing employees

23    and nobody answering calls.

24       Q.    Was this rule -- I understand the purpose

23

```
 1   directly related to the Ameritech merger?

 2        A.   Not necessarily.

 3        Q.   Okay.  You said you had call centers going

 4   up and so I was wondering if maybe it had something

 5   to do with the Ameritech merger in December of

 6   2000?

 7        A.   No.  It had to do probably more with the

 8   Bell South, Southwestern Bell alliance as we became

 9   Cingular and we expanded our operations.

10        Q.   Was this rule, that you indicate sounds

11   like might have been yours, was that rule, to your

12   knowledge, put in writing?

13        A.   Not per se -- our expense policy is in

14   writing and says all trips need prior approval.  So

15   clarification would be going out, you know,

16   verbally.  Not everybody reads all their policies

17   and we wanted to be sure everyone understood.  So

18   we do have standard policies and procedures.  And

19   those are all in writing.

20        Q.   Is this rule about preapproval before a

21   trip -- was it in writing in -- from before one

22   went on a fact-finding trip -- is that in writing

23   before July 2001?

24        A.   Should have been, yes.
```

1 | meeting or group or any of the details.

2 | Q. Okay. Do you remember the detail that

3 | Rebecca Lucera was terminated?

4 | A. Yes.

5 | Q. Do you remember the detail that Jon Lucera

6 | was warned?

7 | A. No.

8 | Q. Okay. Who else was part of this

9 | discussion?

10 | A. The discussion would -- and I know because

11 | I read it here -- would be our HR and legal.

12 | Q. Those are departments, correct, HR and

13 | legal?

14 | A. Yes.

15 | Q. Tell me some names of who participated, if

16 | you would, please. HR would have included Cheryl

17 | Bentley?

18 | A. According to this, yes. According to what

19 | I read. I don't remember.

20 | Q. Would it include Margaret Franklin?

21 | A. According to this, yes.

22 | Q. Would it have included Jim Klimis

23 | (phonetic)?

24 | A. Yes. According to the documents, yes.

1      Q.    Do you remember who was involved in

2   legal?

3      A.    Only from what Nadine told me.  She said

4   Susan Rodriguez (phonetic).  I don't remember the

5   discussion.

6      Q.    And where's Ms. Rodriguez?  In September

7   of 2001, where did she work?

8      A.    She works for Cingular.  She's in the

9   legal department.

10     Q.    Where?  Which office?

11     A.    In Hoffman Estates.

12     Q.    Thank you.  That's all I wanted to know,

13   what city.

14         Do you remember at whose suggestion this

15   group was put together?

16     A.    I do not remember, no.

17     Q.    Do you remember why it was created?

18     A.    I'm not following you.

19     Q.    What don't you follow?  Why was this

20   discussion group created?

21     A.    Usually if there's a termination, our

22   policy is to involve our HR department, our legal

23   department, and whoever was over the organization

24   where the termination is going to take place.  And

```
 1    it would also be -- if it was the director, it
 2    would be the director involved.  It's standard
 3    business practice on any termination.
 4        Q.   Well, the decision to terminate or the
 5    actual termination would occur at the end of the
 6    process.  My question is why was it created in the
 7    first instance?
 8        MS. ABRAHAMS:  Object to the form.  It's vague.
 9        MR. LIETZ:  You may answer.
10        MS. ABRAHAMS:  If you understand what he says.
11        THE WITNESS:  I don't understand, no.
12        MR. LIETZ:  What is hard to understand about
13    this question?
14    BY MR. LIETZ:
15        Q.   You just gave me an answer saying that
16    whenever someone is terminated, the following
17    participants are part of this discussion:  HR,
18    legal, the department or area within the
19    organization that it affects, and maybe the
20    director of the call center.
21        A.   Uh-huh.
22        Q.   Yes?
23        A.   Yes.
24        Q.   Okay.  But when a discussion group is
```

1    created, you don't know whether or not termination

2    is necessarily going to be the end result, do you?

3        A.    That's why we have the discussion prior to

4    the termination so that everyone can disclose the

5    facts and discuss what the situation is and then

6    it's taken on for -- and I believe -- and I don't

7    recall what the policy was at the time -- I think

8    it even goes to our headquarters organization for

9    final approval.  And I don't remember what the

10   policy was at the time.

11          There are a lot of parties that need to be

12   involved when a termination occurs and all the

13   facts need to be discussed.  But it's not at the

14   final point of determination.  It's to determine

15   what type of discipline is going to happen and what

16   would be appropriate.

17       Q.    What caused the discussion group to be

18   created in the first place?

19       A.    The incident that had occurred.

20       Q.    What was the incident that occurred?

21       A.    The incident was the expense.

22       Q.    The submission of the expense

23   reimbursement?

24       A.    Submission of the expense reimbursement

1    3 August '01.  It's been signed and dated

2    August 10, '01, and was submitted to Elizabeth

3    Ross.  Do you see that document in front of you?

4        A.    Yes.

5        Q.    Who is Elizabeth Ross or was she in

6    August of 2001?

7        A.    Elizabeth Ross was a director located here

8    in Hoffman Estates.  She reported to me.  She

9    worked on our staff side of the organization.

10       Q.    Does she still work for Cingular or SBC?

11       A.    No, she does not.

12       Q.    Do you know when she stopped working for

13   Cingular or SBC?

14       A.    No, I do not.

15       Q.    Okay.  Do you know where she lives?

16       A.    No, I do not.

17       Q.    Okay.  I take it the last time you would

18   have seen her or talked with her would have been

19   while she still worked for Cingular?

20       A.    While I still worked for Cingular.

21       Q.    While she still worked -- while you both

22   worked?

23       A.    Right.

24       Q.    Who signed the reimbursement expense

1  that were part of the reason why the action was

2  taken against those two employees?

3      A.   I don't remember.

4      MR. LIETZ:  Mark this 2.

5                      (Seymour Deposition Exhibit No. 2

6                      marked as requested.)

7  BY MR. LIETZ:

8      Q.   I'm handing you what's been marked as

9  Seymour Exhibit No. 2.  I'm asking if you've ever

10  seen that document before today.

11     A.   I don't recall it.

12     Q.   Please take a moment and familiarize

13  yourself with the document?

14     A.   I don't recall this document.

15     Q.   I'm sorry?

16     A.   I don't recall ever seeing this.

17     Q.   I'm going to ask you two questions about

18  that and before I do, I want to make sure I ask one

19  other question.  With respect to Exhibit -- Seymour

20  Exhibit No. 1 and Lucera Exhibit No. 18, do you

21  remember if headquarters in Atlanta gave approval

22  for that action that was taken to Rebecca Lucera in

23  Exhibit 18 and Jon Lucera on Seymour Exhibit 1 in

24  late August of 2001?

1    A.    On the incident report, Exhibit 18, ethics

2  office concurrence, Sylvia Holler, 8/30/01.   That's

3  headquarters.

4    Q.    Okay.   I'm sorry what was the date again?

5    A.    8/30/01.

6    Q.    Calling your attention back to Seymour

7  Exhibit No. 2, does that appear to be an e-mail --

8  a one-page e-mail document?

.9    A.    Yes.

10    Q.   Does it appear to be an e-mail from

11  Jack S. Johnston to Cheryl -- to Margaret Franklin

12  and Cheryl Bentley?

13    A.    Yes.

14    Q.    Regarding -- or the subject of which was

15  just labeled information?

16    A.    Yes.

17    Q.    Does it appear to be dated or sent Friday,

18  August 21 -- I'm sorry, August 24, 2001 at

19  11:40 a.m.?

20    A.    Yes.

21    Q.    Calling your attention to the last

22  two-thirds of the e-mail from Mr. Johnston, there

23  is reference there in what appears to me to be

24  under the second paragraph under that dotted line

1          A.    That everything was cleared.

2          Q.    Do you remember Peggy Franklin ever

3     mentioning Jack Johnston was under investigation

4     for a reimbursement in 2001?

5          A.    I don't remember who would have told me.

6          Q.    You do remember Jack, but you're not

7     certain of anybody else?

8          A.    It would have been someone from HR.  I

9     would have assumed being that it was Jack that it'd

10    be Jim Klimis, because that's usually what would

11    happen as opposed to Peggy Franklin.

12         Q.    Why?

13         A.    Jim's a higher level.  And, I mean, and

14    that's where I would hear it from normally.

15         Q.    Okay.

16         MR. LIETZ:  Off the record.

17                       (Discussion off the record.)

18                       (A short break was had.)

19         MR. LIETZ:  Nothing further.

20         MS. ABRAHAMS:  I just have a few follow-up

21    questions.

22                       EXAMINATION

23    BY MS. ABRAHAMS:

24         Q.    You were asked about your conversation

1    with Elizabeth Ross when she brought to your

2    attention the expense form that had been submitted

3    by the Luceras.  Do you recall, generally, what

4    Elizabeth Ross said to you during that

5    conversation?

6        A.    Liz is the one who brought it to my

7    attention.  And I believe, you know, as I'm

8    recollecting it, it was Lucia that was with me.

9    And she just said she received this.  She was not

10   comfortable in signing it and wanted to know why it

11   didn't go to Jack.

12            And I asked her if that was a common

13   practice in the past, because Liz was an Ameritech

14   employee, that she would get something like this.

15   And she said never had she seen something like

16   that.  So that's when we pursued it.

17       Q.    Okay.  At the time that you were

18   discussing what discipline to issue to the Luceras,

19   do you remember being aware of any investigation or

20   allegations against Jack Johnston?

21       A.    No.  I don't remember anything going on at

22   that time.

23       Q.    Jon Lucera, on one of the exhibits you

24   have in front of you, his title was manager of

1  customer operation, I believe, for the final

2  warning?

3       A.   Yes.

4       Q.   Do you see that and Rebecca Lucera was an

5  area manager.  I believe that's on her discipline.

6  Do you recall that being her title, area manager?

7       A.   I just don't recall the titles.

8       Q.   Was Rebecca Lucera a higher management

9  level than Jon Lucera?

10      A.   Yes, that would indicate a higher level,

11  yes.

12      Q.   Now, a higher level manager is held to a

13  higher standard of an accountability?

14      A.   Definitely.

15      MR. LIETZ:  Objection, leading.

16  BY MS. ABRAHAMS:

17      Q.   You also were asked about Exhibit 2.  And

18  on Exhibit 2, halfway down, there are dates that it

19  looks like Jack Johnston -- it says the time line

20  for the following events fall between July 25th and

21  August 3rd.  Do you see that?

22      A.   Yes.

23      Q.   And the rest of those events are a summary

24  of events that occur in that time frame, from what

1   August 3rd -- August 30th discipline, I think it's

2   exhibit -- the incident report.

3      A.    The incident report.  Okay.

4      Q.    It's marked as Exhibit 5 -- Exhibit 18.

5      A.    Exhibit 18.

6      Q.    Yes.  On that exhibit there, the first --

7   the second full paragraph states, "before Rebecca

8   went on the interview trip, Jon informed management

9   he changed existing practice of reimbursing

10  Interview trips and this practice would cease."

11          Do you see that sentence?

12     A.    Yes.

13     Q.    Were you aware when Jack Johnston went to

14  Rantoul that his policy was that he would not

15  reimburse for trips taken by employees to other

16  call centers?

17     A.    As I said, it sounds like something that I

18  would have asked him to do.

19     Q.    Was it your policy in the summer of 2001

20  that your centers would not reimburse employees

21  traveling to other centers for interview trips?

22     A.    Correct.

23     Q.    If you can also look at -- I'm going to

24  show you -- it's Bates stamped 147, which is the

1    discipline -- the incident report that was issued

2    to -- regarding Jon Lucera.  Do you see that

3    document?

4         A.    Yes.

5         Q.    And was that also approved by

6    headquarters?

7         A.    Yes.

8         Q.    And how can you tell that?

9         A.    Ethics office concurrence, Sylvia Holler,

10   8/29/01.

11        Q.    Do you see in the second paragraph of that

12   document, there's a paragraph that reads in a

13   conversation with Debbie Thompson, Jon Lucera's

14   manager, "Deb said she first knew about the trip to

15   Florida when Rebecca came to her and discussed it.

16   Due to this factor, she did not consider Jon AWOL."

17             Do you see that sentence?

18        A.    Yes, I do.

19        Q.    And if you compared that to the bottom of

20   Exhibit 18 where it states that Rebecca was AWOL

21   and circumvented her director regarding the

22   expenses.  Do you see that?

23        A.    Yes, I do.

24        Q.    Do you see that that indicates a

```
 1   BY THE WITNESS:
 2       A.    I don't see anything.
 3       Q.    Do you know what the average length of
 4   interview trips were for employees in the summer of
 5   2001?
 6       A.    Should have been a day.
 7       Q.    Would five days be viewed as excessive?
 8       A.    Yes.
 9       Q.    Can you recall any other interview trips
10   that you're aware of that were in the four- to
11   five-day range?
12       A.    Not that I'm aware of.
13       Q.    Okay.
14       MS. ABRAHAMS:  I have nothing further.
15       MR. LIETZ:  Mark this 3.
16                      (Seymour Deposition Exhibit No. 3
17                       marked as requested.)
18                   FURTHER EXAMINATION
19   BY MR. LIETZ:
20       Q.    I'm showing you what's been marked
21   Exhibit 3.  Can you tell us what that is, please?
22       A.    Looks like the same -- Well, I guess
23   they're different.
24       Q.    Looks like the same as what?
```

1    A.    It says that in a conversation with Debbie

2    Thompson, Jon Lucera's manager, Deb said she first

3    knew about the trip to Florida when Rebecca came to

4    her and discussed it.  And she did not consider Jon

5    AWOL.

6    Q.    Elizabeth Ross, you testified to as saying

7    that she -- you indicate that she had or had not

8    reviewed any expense reimbursement requests from

9    Rebecca Lucera?

10    A.    She had not.  It was sent to her is what

11    Elizabeth Ross indicated, and she would not approve

12    it.  It was just not standard protocol for her to

13    approve.

14    Q.    It is your --

15    A.    She couldn't understand why she got it.

16    Q.    Is it your recollection that she had ever

17    been requested to review or approve an expense

18    report from Ms. Lucera?

19    A.    I specifically asked her if that was a

20    business practice, and she said it was not.

21    Q.    My question remains:  Did she ever

22    indicate to you that she had ever been asked to

23    review or approve an expense report from

24    Mrs. Lucera?

1       A.    She said she has never approved expense

2    reports from the call centers.  So I don't know

3    whether Rebecca ever worked anywhere else or if she

4    ever approved a report for Rebecca.  I don't know

5    that.  She did not approve expense reports from the

6    call centers.

7       Q.    I understand she didn't approve it.  My

8    question was, was she ever asked to review one of

9    Mrs. Lucera?

10      A.    I did not ask her if she was ever asked to

11   review them.

12      Q.    Did she ever tell you she had?

13      A.    No.

14      Q.    Okay.

15      MR. LIETZ:  Mark this.

16                      (Seymour Deposition Exhibit No. 5

17                       marked as requested.)

18   BY MR. LIETZ:

19      Q.    How long did you work with Elizabeth Ross?

20      A.    I believe a year and a half, 2 years.

21      Q.    I'm handing you what's been marked as

22   Seymour Exhibit No. 5.  Does that appear to be her

23   signature at the bottom of that document?

24      A.    I don't remember what her signature looks

Page 1

```
 1              UNITED  STATES  DISTRICT  COURT

 2              CENTRAL  DISTRICT  OF  ILLINOIS

 3

 4     ------------------------------------------------

 5   REBECCA  LUCERA,

 6

 7            Plaintiff,

 8

 9      vs.                          Case  Number  02  C  2268

10

11   CINGULAR  WIRELESS,

12

13            Defendant.

14     ------------------------------------------------

15

16           Deposition  of  Jon  Matthew  Lucera

17

18                   June  16,  2004

19

20                       -at-

21

22              Fisher  &  Phillips,  LLP

23           140  South  Dearborn  Street

24               Chicago,  Illinois

25
```

EXHIBIT

D

Page 10

1      Q.    Did you start -- when did you start working for

2   Ameritech?

3      A.    July of '97.

4      Q.    And it was Ameritech at the time or was it

5   Cingular?

6      A.    It -- it was Ameritech at the time.  And actually

7   the initial -- the initial hiring process begins with

8   Manpower.  So I became officially Ameritech as of September.

9   I started in July.

10     Q.    Okay.  And you said at the time your title was

11  online associate --

12     A.    Yes.

13     Q.    -- when you were hired?  Did you ever have any

14  changes in that title?

15     A.    Yes, certainly.  I went from the billing

16  consultant to a senior consultant/technical assistant.

17     Q.    And were you promoted from that position?

18     A.    Yes, I was.

19     Q.    To -- what was the next position?

20     A.    Promoted to a manager, customer service manager.

21     Q.    Do you remember what year that was?

22     A.    I was promoted in -- believe April of 2001 or

23  thereabouts.

24     Q.    Okay.  And during this period from '97 to 2001,

25  did you always work in Rantoul?

Page 11

1    A.    Yes.

2    Q.    In April of 2001 when you were promoted to manager

3  of customer service, did your -- the individual you reported

4  to change or did -- did you report to someone new at that

5  time?

6    A.    Yes, because I was at a different level so you'd

7  report through a different channel.

8    Q.    Okay.  Who did you report to beginning in April of

9  2001?

10    A.    I believe the first person I reported to was Lisa

11  Holt.

12          MR. LIETZ:  Can you spell the last name for us,

13  please?

14          THE WITNESS:  Sure.  H-o-l-t.

15    Q.    How long did you report to Lisa?

16    A.    Lisa took a promotion to the Springfield call

17  center.  I don't recall the exact time line.

18    Q.    Okay.

19    A.    I -- I believe probably at least six months, but

20  it may have been less than that.

21    Q.    Okay.  Who -- who did -- who replaced Lisa?

22    A.    Debbie Thompson.

23    Q.    And then did you report to Debbie?

24    A.    Yes.

25    Q.    Okay.  What were Debbie and Lisa's titles?

Page 12

```
 1       A.   They were area managers.

 2       Q.   How many other area managers were there at the

 3  time?

 4       A.   Just one.

 5       Q.   So only an area manager would be -- for the whole

 6  call center there was only one area manager?

 7       A.   No, you asked -- you asked me how many other --

 8  there were two area managers, one other than Debbie

 9  Thompson.

10       Q.   Okay.  And who was that?

11       A.   Rebecca Isom Lucera.

12       Q.   Okay.  When Lisa Holt was the area manager, was

13  Rebecca the other area manager?

14       A.   Yes.

15       Q.   And then when Debbie Thompson was area manager,

16  Rebecca was still the other --

17       A.   Yes.

18       Q.   Okay.  Did you ever report to Rebecca Lucera?

19       A.   No.

20       Q.   How many other managers, customer service managers

21  were there working with you under either Lisa or Debbie?

22       A.   That I don't know.  I'd just be guessing.

23       Q.   Okay.  I mean, more -- more than just you?

24       A.   Yes.

25       Q.   Okay.  When you left Rantoul, who -- were you
```

Page 13

1    reporting to at the time?

2        A.    When I went to Florida?

3        Q.    Yes.

4        A.    Carline Henry.

5        Q.    No, when you -- when you left Rantoul, who was

6    your supervisor at Rantoul?

7        A.    It was still Debbie Thompson.

8        Q.    Okay.

9        A.    I apologize.  I thought --

10       Q.    No --

11       A.    -- you -- I thought --

12       Q.    I wasn't clear.  Was the manager of customer

13   service the highest position you achieved at -- in Rantoul?

14       A.    Yes, it was.

15       Q.    And that was the title you had when you left?

16       A.    That's correct.

17       Q.    And at the time you left, do you know what your

18   wife's title was?

19       A.    She was still an area manager.

20       Q.    What were your general duties as manager --

21   customer service manager?

22       A.    To -- to assist the floor, a team of -- had

23   usually between eight and twelve representatives, with any

24   difficulties they're having with their calls, such as taking

25   supervisor calls as well as my moderating their phone calls

Page 17

1  our call center.  Joe Schnaufer was still the director and

2  he was -- he was at a -- a luncheon event.  It's probably at

3  least six months prior to him being the director.

4      Q.   Now, when you were first hired in Rantoul, it was

5  an Ameritech facility, is that right?

6      A.   That's correct.

7      Q.   Do you recall when it no -- ceased to be

8  Ameritech?

9      A.   Yeah, it was -- it was part of a merger, basically

10  in name.  Cingular became the name.  But as far as the date,

11  I -- I can't tell you a date.

12     Q.   Do you know where Jack Johnson came from, what

13  company?

14     A.   Yes, he came from Cell One, I believe, and SBC

15  prior to that.

16     Q.   And you had mentioned Joe Schnaufer.

17     A.   Mm-hmm.

18     Q.   Was he the director of the call center prior to

19  Jack Johnson?

20     A.   Yes.

21     Q.   Do you know, was he an Ameritech employee?

22     A.   Yes, he was.

23     Q.   Were you friendly with Joe Schnaufer outside of

24  work?

25     A.   Yes.

Page 18

1      Q.    Okay.  Did -- would you say that you got along

2   with him also in -- in -- at work?

3      A.    Yes.

4      Q.    Did you have a good working relationship with him?

5      A.    Yes, although it's -- it was a very limited --

6   most -- most of my dealings were with the area managers.

7      Q.    Do you know if your enjoyed working for Joe

8   Schnaufer?

9      A.    I believe she did, yes.

10     Q.    Did she ever complain to you about Joe?

11     A.    No, I -- I can't recall her complaining.

12     Q.    What was your reaction when Jack Johnson replaced

13  Joe Schnaufer?

14     A.    My -- my reaction was -- was very little, other

15  than, you know, what was an Ameritech property prior now had

16  somebody from SBC, you know, running -- running our call

17  center, essentially.

18     Q.    And did that concern you, that someone from SBC

19  was coming in?

20     A.    Most definitely, only based on the fact that we

21  had entirely different systems which, you know, he wasn't

22  aware of, as well as we have different policies and

23  procedures.

24     Q.    Would you say that SBC had a different reputation

25  for management than Ameritech?

Page 32

1      A.   Yes, he did.

2      Q.   Did he also express interest in her coming down to

3  work for him?

4      A.   Yes, he did.

5      Q.   Before you went to Ocala, did you have any

6  discussions with Joe Schnaufer about which facility would be

7  responsible for reimbursing your travel expenses?

8      A.   No, no discussion.

9      Q.   Did you have any discussions with him when you

10  were in Ocala about that?

11      A.   No.

12      Q.   What about when you returned to Rantoul?

13      A.   No discussion.  I didn't -- I didn't see the

14  relevance.  It's -- it's all Cingular call centers, so, you

15  know, it's gonna expensed by -- by one of the centers.  I,

16  you know, didn't see the relevance in asking that.

17      Q.   Do you know if the call centers have separate

18  budgets?

19      A.   Yes, I believe they do.

20      Q.   When you said it would all -- that they're both

21  Cingular facilities, wouldn't the expenses then come from

22  different budgets, either Rantoul budget or the Ocala

23  budget?

24      A.   Yes, perhaps.  Now, I don't know -- like I said, I

25  didn't ask Joe.  They may not have even had a operating

Page 33

1  budget at the time, being a new call center.  That's --
2  that's something that could have certainly been found out if
3  there was an issue with -- with expensing that.  That's
4  something the directors could have discussed.
5      Q.   But you don't know if -- if they did have a
6  budget?
7      A.   No, I don't know.
8      Q.   And just so I'm clear, Joe didn't give you any
9  direction as to who would pay for the expenses?
10     A.   No.
11     Q.   When did you first mention anything to anyone at
12 Rantoul about you going to Ocala to interview for a job?
13     A.   I -- I believe before I had an interview
14 scheduled, I had already talked to Debbie Thompson, who was
15 aware that, you know, it was something I was considering,
16 and I would be -- I would be going down to interview at some
17 point.
18     Q.   Was there anyone else you can remember telling?
19     A.   Jack was aware when he came that if the right
20 opportunity came along, that -- that I might consider it.
21 That is something we discussed in a one on one meeting.  And
22 I'm also aware that prior to me visiting, Joe and Jack spoke
23 about us visiting, as well as possibly relocating.
24     Q.   Okay.  Now, you said during the one on one
25 meeting, and that -- just so I'm clear on the time frame,

Page 42

1  she wasn't gonna tell Jack --

2      A.   No.

3      Q.   -- that she was going to Ocala?  Did you have a

4  formal interview set up for your trip to Ocala?

5      A.   No.  Again it -- it was an informal interview.

6      Q.   Was there a specific position you were looking at?

7      A.   The call -- call center manager position, a

8  vertical move.

9      Q.   Do you know if your wife had any formal interview

10 set up for Ocala?

11     A.   No, again Joe had already expressed his interest

12 in having both of us there, so we were as much interviewing

13 him as him interviewing us.

14     Q.   Do you know if there was a specific position he

15 had in mind for Rebecca?

16     A.   Area director, just as she was in Rantoul.

17     Q.   So a lateral transfer?

18     A.   Sure.

19     Q.   Do you remember the date that you left for Ocala?

20     A.   I don't.  I could -- I can look at my -- my notes

21 again.  I believe it was a Thursday, a Thursday night, to

22 Indianapolis --

23     Q.   I'm sure --

24     A.   -- to catch a plane.

25          MS. ABRAHAMS:  If you can mark this.

Page 43

1          MR. LIETZ:  What's the old exhibit number,

2  Counsel?

3          MS. ABRAHAMS:  You know, I don't know.

4          MR. LIETZ:  This one's the other one.

5          MS. ABRAHAMS:  Yeah.

6     Q.    And I'm showing you what's been marked as Exhibit

7  -- I think JL Exhibit 1.  Okay, does that refresh your --

8  your recollection when you left to go to Ocala?

9     A.    Yes, looks like July 19th, based on -- based on

10  Exhibit 1.

11     Q.    And just for the record, that's 2001?

12     A.    Yes, 2001.

13     Q.    And do you remember how many days you were in

14  Ocala, total number of days?

15     A.    I'd have -- I'd have to refer again back to this

16  -- we didn't get into Ocala until late on July 20th.  We

17  arrived late in Ocala.  So that's the first day, the 21st,

18  the 22nd, the 23rd.  And left on the 24th, so five days, I

19  guess, roughly.

20     Q.    Why did you need to be there for five days?

21     A.    Well, not only did we want to see -- see the call

22  center and talk to Joe and find out this the -- you know --

23  the -- the center, what the center had to offer, not only

24  did we want to make sure that we were comfortable with the

25  call center aspect of it; we want to be sure that the

Page 44

1  lifestyle of the area as well as, you know, the

2  neighborhoods and schools were acceptable.

3      Q.   Okay.  Did you interview with anyone when you were

4  in Ocala?

5      A.   Other than the informal interviews with Joe, no.

6      Q.   Do you know if there was a vacancy in the position

7  that you were seeking?

8      A.   Yes, I believe those positions when -- while we

9  were there had already been opened up for -- for my

10 position, yes.

11     Q.   What about for the area director position that

12 your wife was seeking?

13     A.   I don't believe they were yet available.  They

14 hadn't yet been opened up anyway.  They were -- they weren't

15 hiring yet for that position, but he knew that there was

16 gonna be positions available.

17     Q.   Were you aware before you went to Ocala that the

18 area director position was not yet vacant?

19     A.   I -- I wasn't aware of that, no.  I mean, it

20 didn't pertain to -- to my situation.

21     Q.   Other than visiting the call center in Ocala, what

22 else did you do in the five days that you were down there?

23     A.   Well again like the fifth day was basically a

24 travel day just to get back to Orlando 'cause there's no

25 local airport.  The day we got in was pretty much a wash

Page 54

1        Q.    Did you do that or did Rebecca type in the

2    information that's contained on Exhibit 1?

3        A.    To the best of my knowledge, I did -- I did all of

4    the expense.

5        Q.    And was that from your computer at home or

6    computer at work?

7        A.    Would have been from my work computer.

8        Q.    At the top it says date.  It says 3 August '01.

9    Do you --

10       A.    Mm-hmm.

11       Q.    -- see that?  What is that date referencing?

12       A.    Possibly the first time I opened the Excel

13   spreadsheet to start doing the expenses.

14       Q.    Why did you wait from your return to work July

15   25th to August 3rd to first open the Excel spreadsheet?

16       A.    Well, as much as I wanted -- want to get paid for

17   my expenses, I also had a lot of other duties to attend to.

18   And as what usually happens, you -- you take care of the

19   most pressing matters first, which sometimes sacrifices your

20   -- your own -- your own needs.

21       Q.    At -- at the bottom, is that -- the bottom of

22   Exhibit 1, is that your signature on the signature line?

23       A.    Yes, it is.

24       Q.    And there's a date of 8/10/01 --

25       A.    That's --

Page 55

1    Q.    -- do you see that?

2    A.    Uh-huh.

3    Q.    What does the August 10th, '01 date reference?

4    A.    Well, to the best of my knowledge, that would have

5    been the date that I had finally completed the form and

6    printed out to sent it out to have it expensed.

7    Q.    Do you recall why there was another gap between

8    August 3rd and August 10th --

9    A.    I could --

10    Q.    -- in completing the form?

11    A.    Like I said, I opened it initially probably on

12    August 3rd.  That's the only reason I could give.  So it

13    kept the August 3rd date.  However, when I went back into

14    the document after -- after that time to finish it, this is

15    probably seven days have elapsed, and then it was now August

16    10th.

17    Q.    Okay.  Once you completed Exhibit 1, had you had

18    any discussions with anyone about whom -- to whom you should

19    submit Exhibit 1 to be approved?

20    A.    Yes, I -- I remember questioning Rebecca who she

21    -- who she thought I should have -- I should have it sent

22    to.

23    Q.    And what did she say?

24    A.    Well, you know, obviously we had talked, and

25    Debbie could certainly not sign off on it because she was at

Page 56

1  the same level as Rebecca, and this expense had charges

2  incurred not only from me but also Rebecca, so Debbie

3  couldn't have signed off on it.  She -- she knew Elizabeth

4  Ross, who was a director, at director level, so above her,

5  so she recommended that Elizabeth Ross could sign off on it.

6       Q.   Did she say why she recommended Elizabeth Ross?

7       A.   No, other than -- other than the fact that, you

8  know, quite a bit of time had elapsed and it needed to be

9  completed.

10      Q.   Who was Rebecca's supervisor at the time, on

11  August 10th of '01?

12      A.   It would have been Jack Johnson.

13      Q.   Why did Rebecca not suggest that you turn it in to

14  Jack Johnson?

15      A.   Actually, as -- as I recall, Jack was often in and

16  out and in transit, spent a lot of the week in Schaumburg or

17  Springfield and a lot of times wasn't in our call center to

18  be available.

19      Q.   Do you have any personal recollection that you

20  attempt -- strike that.  Did you attempt to see if Jack

21  Johnson was in his office on August 10th, '01 when you

22  completed this form?

23      A.   No, I didn't seek him out.  It wasn't a concern of

24  mine.  It just needed to be signed off on to a higher level.

25      Q.   Do you know if Rebecca went to see if Jack was in

Page 57

1  his office on August 10th of 2001?

2      A.    I don't know.

3      Q.    And do you know if Jack was working on that day,

4  August 10th of '01?

5      A.    I -- I can't recall.

6      Q.    Do you know if Rebecca had ever had -- or had Jack

7  Johnson approve her expenses in the past?

8      A.    I would -- I would just be guessing.  I assume --

9  I assume yes.

10     Q.    Do you know why this time would be different?

11     A.    Again, as I stated, it needed -- it needed to be

12 completed, and Elizabeth Ross was at a director level so

13 that she would be able to sign off on that.

14     Q.    Okay.  Why did it need to be competed?

15     A.    Because quite a bit of time was elapsing and I

16 needed to have it paid, you know, regardless of whether I

17 was -- whether I was -- had already paid it, which I -- I

18 don't recall if I had.  That was quite a bit of money to --

19 bit of money to have tied up.

20     Q.    Okay.

21     A.    And as well as the policy states that they should

22 be completed in a timely manner.

23     Q.    How many times a week would you say Jack was in

24 the Rantoul call center?

25          MR. LIETZ:  At what point in time?

Page 65

1    Q.    I'm sorry.  Who else higher than you would have

2  been appropriate to submit the expense reimbursement form

3  to?  Or actually strike that.  Who else higher than Rebecca

4  would have been appropriate to submit the expense

5  reimbursement form to in Rantoul?

6    A.    In -- in Rantoul the only person above her would

7  be Jack Johnson.

8    Q.    Okay.  And you said according to guidelines.  Have

9  you seen any written guidelines about who is appropriate to

10  submit expense reimbursement forms to?

11    A.    This is my understanding of the guideline.  So I

12  -- I don't recall if -- if it specifically states in the

13  Ameritech handbook that policy.

14    Q.    Did you have any conversations with Elizabeth Ross

15  regarding submission of your expense reimbursement?

16    A.    No.

17    Q.    Do you know if she ever agreed to sign off on the

18  expense reimbursement?

19    A.    No, I don't.

20    Q.    Did you mail Exhibit 1 to Elizabeth Ross?

21    A.    Actually I believe I handed that to Rebecca.  At

22  that point I'm not -- I'm not certain who mailed it, but I

23  gave it to Rebecca.

24    Q.    Did you know if it was sent by interoffice mail or

25  U.S. mail or do you have any --

Page 66

1    A.    I believe interoffice -- yeah, inter -- in a

2  interoffice envelope.

3    Q.    Do you know how often mail was transferred between

4  the Rantoul call center and Hoffman Estates?

5    A.    I couldn't tell you specifically but I believe

6  daily.  Believe we received mail from them daily and they

7  would receive our mail daily.

8    Q.    Do you know when your wife had the conversation

9  with Elizabeth Ross about submission of the form?

10    A.    I don't.

11    Q.    And do you know how long after August 10th of '01

12  your wife submitted Exhibit 1 to Elizabeth Ross?

13    A.    I don't.

14    Q.    Did Elizabeth Ross ever tell you that she would

15  not sign off on the expenses?

16    A.    No.

17    Q.    Do you know if she ever told you why that she

18  would not sign off?

19    A.    I'm not aware of that.

20    Q.    After you gave Exhibit 1 to Rebecca, did you --

21  did it ever come to your attention that Elizabeth Ross was

22  refusing to sign off on the expenses?

23    A.    I don't -- I don't believe so, until -- until I

24  had an interrogation with Jack.

25    Q.    Just -- just to be clear, you never received --

Page 68

1  but there's -- there's no specifics of who needs to sign off

2  on it, so I'm sure it occurred.

3       Q.    But are --

4       A.    I can't -- I can't -- I'm not aware of a specific

5  occurrence of that, no.

6       Q.    Did you ask your wife if she'd attempted to locate

7  Jack Johnson at the time that you were attempting to submit

8  the form for signature?

9       A.    No, I don't recall asking her.

10      Q.    Did you consider faxing it to Schaumburg to Jack

11 Johnson's attention?

12      A.    No.   I -- I discussed with Rebecca what she

13 thought we should do, being that he wasn't available, and

14 she had said go ahead and go and fill it out and, you know,

15 we can have it mailed.

16      Q.    How do you know he wasn't available?

17      A.    Again I don't know that this date is the specific

18 date, but as -- as far as I'm aware, the time frame when --

19 when this actually was sent, he was not available.  He was

20 not in the office.  So I don't know if that's August 10th or

21 if that's August 11th, but I know he wasn't in the office.

22      Q.    How do you know that?

23      A.    He -- he wasn't available.  He wasn't there.

24      Q.    Did you try to find him?

25      A.    No, I don't -- I don't recall doing so.

Page 69

1     Q.    So then how do you know he wasn't available?

2     A.    Well, because I -- I was sending that to Ameritech

3  in Elizabeth Ross's name at the time that it was completed

4  because I knew he wasn't available.  I -- I can't -- I can't

5  tell you the specific date but I don't believe he was in the

6  office at the time -- at the time this was filed.

7     Q.    Okay.  I still don't think you -- maybe I'm just

8  asking right, but how did you know that he wasn't available?

9     A.    Per -- perhaps I may have called his -- his

10  administrative assistant, Sandy.  I can't -- I can't tell

11  you for sure that I did, or if I spoke with her.  One way or

12  another I knew he wasn't in his office, wasn't in the office

13  at that -- at that particular day.

14     Q.    Okay.  Did you know if he was gonna be back the

15  next day?

16     A.    I -- I don't know.

17     Q.    Did you attempt to find out what his schedule

18  would be for that week?

19     A.    No.

20     Q.    Did you call him to see where he was?

21     A.    No.  I'd -- I'd never had a phone call with him.

22     Q.    Did you ask Sandy to find out where he was that

23  particular day?

24     A.    I don't -- I don't recall doing so.  I very well

25  may have though.

Page 74

1    A.    You know, again, as I stated, he -- he thought

2   that -- that I should -- I should use my relocation

3   expenses, which came -- came after the fact, to pay for

4   them, as well as questioned why I'd been there so long and,

5   you know, questioned whether my supervisor was aware of me

6   -- of me going.

7    Q.    Anything else you can recall him questioning you

8   about?

9    A.    I don't recall that first conversation for sure,

10  but I -- I think he went into the detail of wanting to know

11  what happened each specific date.

12   Q.    When you were in Ocala?

13   A.    Correct.

14   Q.    That second conversation, was that also just with

15  you and Jack or was anyone else present?

16   A.    To the best of my knowledge, I believe the second

17  conversation was -- was with the HR department online with

18  us with a phone connection.  Nobody present in the room, but

19  with a phone -- you know -- a phone connection.

20   Q.    A speakerphone?

21   A.    Sure.

22   Q.    Okay.  And do you know who that was from HR?

23   A.    I believe Peggy Franklin and Cheryl Bentley.  I

24  could be wrong but I'm pretty sure both of them were both

25  party to that.

Page 75

1     Q.    Do you remember what either Peggy or Cheryl said

2 during that conversation?

3     A.    I remember again wanting a detailed account of --

4 day -- day by day what -- what I was doing. And obviously

5 at this point I was -- I was feeling like my judgment was

6 being questioned and -- you know -- I -- I was very much

7 aware that there is -- there is investigation going on

8 where, you know, they were -- they were looking to do

9 something -- do something with the situation, and as well

10 were -- were questioning me about Rebecca along with that.

11     Q.    What about Rebecca were they questioning you?

12     A.    They were -- they were wanting to know who had --

13 who had mailed the expense -- who had told me to send it to

14 Cheryl Bentley, why it was sent to Cheryl Bentley.

15     Q.    Do you mean Elizabeth Ross?

16     A.    I'm sorry --

17     Q.    Okay, just so the record's clear.

18     A.    I'm sorry.

19     Q.    Okay.

20     A.    Yeah, scratch that. Elizabeth Ross.

21     Q.    Anything else you can recall them asking you about

22 Rebecca?

23     A.    No, I don't -- I can't recall specifics of it.

24 It's been -- too much time has passed and I don't -- I don't

25 have notes, you know, that I've -- that I've looked at on