REBECCA LUCERA v. CINGULAR WIRELESS     JOSEPH SCHNAUFER

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

REBECCA LUCERA,                    )
                                   )
              Plaintiff,           )
                                   )
      Vs.                          )   CASE NO. 02-2268
                                   )
CINGULAR WIRELESS,                 )
                                   )
              Defendant.           )
                                   )
                                   )
                                   )
                                   )

DEPOSITION OF JOSEPH SCHNAUFER,

taken on behalf of the Defendant, on the 10th day of September,

2004, from 11:00 a.m. to 12:45 p.m. pursuant to the Federal

Rules of Civil Procedure, at the residence of Joseph

Schnaufer,1900 North Sixth Street, Broken Arrow, Oklahoma,

before Frank L. Peterson, CSR, in and for the State of

Oklahoma.

**EXHIBIT**

E

REBECCA LUCERA v. CINGULAR WIRELESS    JOSEPH SCHNAUFER

```
 1        working in the Schaumburg, Illinois, office.
 2  Q.    What was your position at that time in July of '91?
 3  A.    Customer Service Manager.
 4  Q.    How long were you a Customer Service Manager in
 5        Schaumburg?
 6  A.    One year.
 7  Q.    And then where did you go?  Is that approximately July of
 8        '92?
 9  A.    Correct.  I became Manager of Technical Support for
10        Ameritech.
11  Q.    Was that also in Schaumburg?
12  A.    That's correct.
13  Q.    How long did you have that position?
14  A.    Approximately three years.
15  Q.    Sometime in 1995; is that right?
16  A.    Correct.
17  Q.    Did your title change in '95?
18  A.    I became Manager of Retail and Customer Service
19        Operations, still working out of Schaumburg.  It was a
20        field position.
21  Q.    How long did you have that position?
22  A.    Eight or nine months.
23  Q.    Then after that?
24  A.    After that, I became a Project Manager of Customer
25        Operations for Ameritech in Hoffman Estates.
```

1  Q.   How long did you have that position?

2  A.   Eight or nine months.

3  Q.   Would this be in 1997, approximately?

4  A.   Correct, right about up until May of '97.

5  Q.   Beginning in May of '97?

6  A.   I became Director of Customer Operations in Rantoul.

7  Q.   Was that an Ameritech facility?

8  A.   That was an Ameritech facility, through the point that SBC

9       came into the picture and it eventually became Cingular.

10 Q.   Do you recall when that was that SBC came into the

11      picture?

12 A.   Somewhere around 2001, I believe; end of 2000, early 2001.

13 Q.   How long were you Director of Customer Operations in

14      Rantoul?

15 A.   Four years.

16 Q.   The date that you left?

17 A.   I believe my last day in Rantoul was in June of 2001.  The

18      end of June 2001, and I began first of June 1997.

19 Q.   Why did you leave Rantoul?

20 A.   I left Rantoul for an opportunity to run a start-up Call

21      Center for Cingular Wireless in Florida.

22 Q.   It was a voluntary move?

23 A.   Yes.

24 Q.   During the period that you were in Rantoul from '97 until

25      2001, how many direct reports did you have?

1  Q.  In July of 2001, what was your understanding of the future

2      of the Call Center at Rantoul?

3  A.  There was somewhat uncertainty; didn't know if the Center

4      was going to remain open or not.

5  Q.  Was that well known amongst the employees of Rantoul?

6  A.  It was speculated.

7  Q.  Again, in that time period of July of 2000, June or July

8      of 2000 -- I think you left at the end of June; is that

9      right?

10 A.  Correct.

11 Q.  Let's just say in June of 2001, was there a large number

12     of employees from Rantoul traveling to other Call Centers

13     to explore employment opportunities?

14 A.  I guess I am just at odds at what "large numbers" are.   If

15     we can define that, I might be able to answer that.

16 Q.  Do you recall any employees traveling around that time

17     period to other Call Centers?

18 A.  I believe there were a couple or several.

19 Q.  Was it a higher number in the four years that you have

20     been in Rantoul or was it pretty much the same?

21 A.  Probably a higher number.  There were more opportunities

22     in the organization as it was growing rapidly.

23 Q.  At that time, if it changed over the time that you were at

24     Rantoul -- during the time period that you were at

25     Rantoul, who would pay for interview trips that an

REBECCA LUCERA v. CINGULAR WIRELESS    JOSEPH SCHNAUFER

| | | |
|---|---|---|
| 1 | A. | In my office, do you mean? |
| 2 | Q. | Yes. |
| 3 | A. | Yes. |
| 4 | Q. | At that time, were you aware of what positions were |
| 5 | | available in Ocala? |
| 6 | A. | I don't believe so. |
| 7 | Q. | Did you ever tell Jack Johnston that Rebecca Lucera was |
| 8 | | coming down to Ocala to meet with you? |
| 9 | A. | I don't believe I told him that. |
| 10 | Q. | What about that Jon Lucera was coming down to Ocala? |
| 11 | A. | Jack and I didn't have conversation -- you mean about |
| 12 | | their visit? |
| 13 | Q. | Before the visit. |
| 14 | A. | He knew they had an interest in coming down in that |
| 15 | | conversation I had in my office, but we didn't have |
| 16 | | follow-up conversation. |
| 17 | Q. | Do you recall being interviewed by telephone by Cheryl |
| 18 | | Bentley of Cingular's Human Resources? |
| 19 | A. | Yes, I do. |
| 20 | Q. | Regarding the Lucera trip? |
| 21 | A. | Yes. |
| 22 | Q. | Do you recall the date that you had that telephone |
| 23 | | interview? |
| 24 | A. | On or about August 21st. |
| 25 | Q. | And how many conversations did you have with Cheryl |

1  A.   And Gloria Jackson.

2  Q.   Did she also work in Ocala?

3  A.   No, she did not take the opportunity.

4  Q.   Do you recall when the first time was that you spoke to

5       either Jon or Rebecca Lucera about them coming to Ocala?

6  A.   I don't recall the date.

7  Q.   What was the purpose of Rebecca traveling to Ocala in

8       July 2001?

9  A.   I think they were both interested in exploring

10      opportunities.  They wanted to explore the area; probably

11      take a look at housing, if there was a good school system

12      in the area, that the move was a right move for them both

13      personally and professionally.

14  Q.  Are you aware of a relocation package that was available

15      for employees through SBC?

16  A.   Yes.

17  Q.   Did that relocation package cover within that package?

18  A.   I am not familiar with all of the details.  I am aware

19      that there is a package.

20  Q.   Was an interview set up for Jon Lucera prior to him coming

21      down to Ocala?

22  A.   I didn't set up a formal interview because I had

23      familiarity with both Jon and Rebecca.

24  Q.   There wasn't a formal interview set up for either of them.

25  A.   No.

REBECCA LUCERA v. CINGULAR WIRELESS    JOSEPH SCHNAUFER

```
 1   A.   The position extended to him?

 2   Q.   Yes.

 3   A.   Manager of Customer Service.

 4   Q.   Do you know who specifically extended that offer to him?

 5   A.   I believe Jodi Most.

 6   Q.   And he ultimately accepted that position.

 7   A.   Yes.

 8   Q.   Just so I can finish the thought.  He did start working in

 9        Ocala in the position of Manager of Customer Service?

10   A.   Yes.

11   Q.   Do you know how long he held that position?

12   A.   Approximately a year.

13   Q.   Are you aware of the circumstances whereby he left Ocala?

14   A.   I have familiarity, but he wasn't reporting directly to

15        me.

16   Q.   How are you familiar?  Is that from conversations with

17        Jon?

18   A.   Not from conversations with Jon.  Conversations with my

19        peer in Ocala.

20   Q.   With regard to Rebecca Lucera, was there any specific jobs

21        available for her when she travelled to Ocala?

22   A.   At the time, no, but it was imminent that several would be

23        posted shortly.

24   Q.   What jobs did you anticipate would be posted?

25   A.   The lateral portion for her, the Area Manager of Customer
```

```
 1        Service.
 2   Q.   How many area managers were there in Ocala at that time?
 3   A.   There were five at that time, and there were going to be
 4        two additional, and actually there were three additional
 5        positions added.
 6   Q.   Do you recall when the positions were added?
 7   A.   I don't recall the dates.  Sometime in the third quarter
 8        of 2001; September, October, November.
 9   Q.   What was your position when you went down to Ocala?
10   A.   Director of Customer Operations.
11   Q.   Were there two directors or --
12   A.   There were two directors.
13   Q.   What was the name of the other director?
14   A.   Karen Reed.
15   Q.   Did you have hiring authority for upper level management
16        or did they need to go through both of you and your peer?
17   A.   We both discussed positions there.
18   Q.   Did either Rebecca or Jon Lucera interview with Ms. Reed
19        on their trip to Ocala?
20   A.   I am not sure.
21   Q.   Did you have an employee -- I think she was a director
22        --by the name of Dorothy at that time?  Does that sound
23        familiar?
24   A.   Dorothy?
25   Q.   Dorothy. I don't know her last name.
```

```
 1   A.   Are you speaking of someone that reported to me or someone
 2        I reported to?
 3   Q.   Someone that reported to you.
 4   A.   No.
 5   Q.   When Rebecca went down to Ocala, do you know if she met
 6        with anyone, other than you, about employment in Ocala?
 7   A.   I am not certain if she did or didn't.
 8   Q.   Would she have to travel back to Ocala to interview with
 9        other individuals if an Area Manager position was to
10        become available?
11   A.   Possibly.  Although I had had conversation with Karen
12        about her.
13   Q.   Just to be clear.  You never extended or Ocala never
14        extended a job offer to Rebecca when she was in Ocala?
15   A.   No.
16   Q.   She never received a job offer at any point after that.
17   A.   No.
18   Q.   Did you consider the Lucera trip to Ocala to be an
19        interview trip?
20   A.   I believed it to be a fact-finding trip.
21   Q.   Was it Cingular's policy to reimburse employees for
22        fact-finding trips?
23   A.   Yes.
24   Q.   Did you ever see that in writing anywhere?
25   A.   Not at Cingular but at Ameritech.
```

```
 1   Q.   You saw that there was an Ameritech policy that stated

 2        that.

 3   A.   Yes, we covered -- that was considered business travel.

 4   Q.   Do you still have a copy of that policy?

 5   A.   I do not.

 6   Q.   Do you remember, was it in a handbook, or was it a

 7        specific stand-alone policy?

 8   A.   It was probably in the travel and reimbursement policy.

 9   Q.   Would the trips be considered business trips even if there

10        was no formal interview?

11   A.   Yes.

12   Q.   Do you know if Cingular has that same policy of

13        reimbursing --

14   A.   I do not.

15   Q.   -- people on fact-finding trips?

16   A.   I do not.

17   Q.   Did you speak to either Jon or Rebecca Lucera about who

18        should pay for the trip to Ocala?

19   A.   No.

20   Q.   Did either of them ask you which budget it should come out

21        of, their reimbursement for their trip?

22   A.   No.

23   Q.   Was it your assumption that they were responsible for

24        making their own arrangements with regard to costs?

25   A.   Yes.
```

REBECCA LUCERA v. CINGULAR WIRELESS    JOSEPH SCHNAUFER

```
 1   A.   I am not aware if she did or didn't.

 2   Q.   Do you know if Jon Lucera was given a relocation package?

 3   A.   He was given a relocation package, yes.

 4   Q.   When you were the director of Rantoul, did you have a

 5        policy of requiring employees to request and receive

 6        approval from you before they went for an interview trip?

 7   A.   I don't think I had it formally stated, no.

 8   Q.   Was that the practice, that employees would request and

 9        receive approval from you?

10   A.   Typically, yes.

11   Q.   What was your practice or policy regarding submission of

12        requests for reimbursement from your employees?

13   A.   Could you be more specific, Nadine?

14   Q.   If an employee had been on an interview trip or had any

15        expense that they needed to be reimbursed, where would

16        they submit that request for approval?

17   A.   Likely my employees would have submitted it to me, or in

18        my absence, to one of my peers.

19   Q.   Who were your peers at that time?  Let's say --

20   A.   Minnie Hundley would have been in the Farmington Hills,

21        Michigan, office.  Jack Johnston was in Schaumburg.  Nancy

22        Wells was in Springfield.  I am trying to think at the

23        time in Hoffman Estates was either Marsha Howting or Liz

24        Ross.

25   Q.   When you say in your absence, is that if you were on
```

```
 1        vacation or --
 2   A.   If I wasn't in the office or wasn't there immediately to
 3        sign it.  As long as it was approved by the next level of
 4        authority.
 5   Q.   How frequently would an employee in Rantoul submit a
 6        document to someone other than you for approval?
 7                  MR. LIETZ:  I am going to object to that because
 8        there is no foundation as to at what level those employees
 9        are, if it needs his approval or someone beneath his
10        approval.
11
12   Q.   (By Ms. Abrahams) Let me ask you this way.  How frequently
13        would any of your direct reports submit requests for
14        reimbursement; let's say, in June of 2001, to someone
15        other than you for approval?
16   A.   How frequently?  It happened.  It was an exception.  It
17        wasn't the rule.
18   Q.   When you were going on vacation, would you make
19        arrangements for someone in another Call Center, one of
20        your peers that you just identified, to sign off on forms
21        in your absence?
22   A.   In some cases, yes; in some cases I must admit, it slipped
23        my mind.
24   Q.   If you did remember to do so, you would do so?
25   A.   Yes.
```

1  Q.  And on the other situations, would you inform your direct

2      reports that you were going to be on a two week vacation,

3      if they needed anything signed they should go to Minnie

4      Hundley for signature?

5  A.  Or the next level; anyone at the peer level, the director

6      level.

7  Q.  Would you contact Minnie Hundley to make sure -- would you

8      contact any of your peers to make sure that that was

9      acceptable, they would be available and willing to do that

10     for you?

11 A.  Not always.  It was an understood practice.

12 Q.  I think you said that it was an exception, it wasn't the

13     rule.

14 A.  Correct.  I wasn't always out of the office.

15 Q.  When you say "out of the office," are you referring to --

16     would that mean if you were out -- if you took an

17     afternoon off, would someone then be permitted to submit

18     an expense to one of your peers?

19 A.  Not likely would they submit it if I was gone for a day.

20 Q.  What about if you went to a two-day training in another

21     Ameritech location?

22 A.  It's possible it could happen.

23 Q.  Do you recall any times that that did happen?

24 A.  I don't recall.

25 Q.  When you say it was the exception, how frequently do you

```
 1        recall it occurring that someone signed off on something
 2        on a document in your absence?
 3   A.   How many times?
 4   Q.   Yes.
 5   A.   I don't know how many times.
 6   Q.   Do you recall any specific times when it did occur?
 7             MR. LIETZ:  Objection; he has answered that.
 8   Q.   (By Ms. Abrahams) You can answer.
 9   A.   I said I didn't recall any specific times.
10   Q.   Do you remember any specific -- do you remember if Jack
11        Johnston ever signed off on any document for you?
12   A.   I don't believe he did.
13   Q.   What about Nancy Wells?
14   A.   I don't believe she did.
15   Q.   What about Marsha Howting?
16   A.   Marsha likely may have, or Minnie Hundley likely may have,
17        or Keith Fezzey, even.
18   Q.   They may have but you don't recall any specific times that
19        they did?
20   A.   Correct.
21             MR. LIETZ:  I am sorry.  I have to interrupt.
22        After you mentioned Hundley and Howting, you mentioned a
23        third name that you hadn't mention before, what name was
24        that.
25   A.   Keith Fezzey..
```

```
 1              MR. LIETZ:   Thank you.

 2   Q.   (By Ms. Abrahams)   Where was he located?

 3   A.   He was in Hoffman Estates.

 4   Q.   Do you recall ever signing off on expenses from an

 5        employee from another Call Center?

 6   A.   I don't recall any specific instances.

 7   Q.   Do you recall that ever happening?

 8   A.   I don't recall.

 9   Q.   I think you had, when I asked you who paid for interview

10        or fact-finding trip you had indicated --correct me if I

11        am wrong -- that during the period that you were in

12        Rantoul, Rantoul would pay for those trips?

13   A.   That was my understanding.

14   Q.   Could you explain to me why Rantoul would basically pay

15        for an employee to do the type of location to possibly

16        leave Rantoul?

17   A.   We were supporting their career development.  It was

18        keeping the individual and their talent within the

19        business.

20   Q.   Did it ever come to your attention that that policy had

21        been curtailed, that Rantoul would no longer pay for

22        those?

23   A.   No, it never came to my attention.

24   Q.   Do you know why Rebecca Lucera was terminated?

25   A.   I am not certain of the circumstance.
```

REBECCA LUCERA v. CINGULAR WIRELESS    JOSEPH SCHNAUFER

```
 1   Q.   Mr. Johnston initiated the call to tell you?

 2   A.   Yes.

 3   Q.   You had no prior conversations with Mr. Johnston during

 4        the month of August or the latter part of July regarding

 5        the Lucera trip?

 6   A.   No.

 7   Q.   Your testimony is, that you did not have a call either

 8        initiated by you or Mr. Johnston during August of 2001

 9        regarding the background of the information concerning the

10        Luceras' trip down to visit you in Ocala in late July?

11   A.   Correct.

12   Q.   I believe you indicated that -- can you tell us what Jon

13        Lucera's position level was, whether 1, 2 or 3?

14   A.   He was a Level 1 Manager, front line supervisor.

15   Q.   And during the summer of 2001, what was Rebecca Lucera's

16        position level?

17   A.   She would have been the next level, Level 2.  She was Area

18        Manager of Customer Service.

19   Q.   And the job position that you said was posted regarding

20        Jon, that job position that was posted in Ocala, was that

21        the same job Mr. Lucera had been performing in Rantoul?

22   A.   Yes.

23   Q.   The same job Mr. Lucera had been performing in Rantoul

24        while you were the Director there?

25   A.   Yes.
```

REBECCA LUCERA v. CINGULAR WIRELESS    JOSEPH SCHNAUFER                      September 10, 2004

```
 1   A.   Yes, I do.

 2   Q.   You responded to that, "No, it was an informal process.  I

 3        know their work history.  I was happy to show them around.

 4        I have even been a tour guide for some when they come

 5        down," end quote.  Did I read that accurately?

 6   A.   Yes.

 7   Q.   First of all, when you say you know "their work history,"

 8        do you mean the Luceras?

 9   A.   Yes, I know them as an individual.  Jon as a Manager and

10        Rebecca as a Manager and Area Manager.

11   Q.   So a formal interview was not conducted.  It was an

12        informal process; correct?

13   A.   Yes.

14   Q.   Which is exactly what your answer says on Exhibit 2.

15   A.   Yes.

16   Q.   Also you indicated in answering questions of Ms. Abrahams

17        that Bruce Larson, Victoria Bean Lewsader and Gloria

18        Jackson all came down to Ocala.  I take it they also had

19        been in the Rantoul office while you were director there.

20   A.   Yes, that's correct.

21   Q.   Would you have been familiar with their records?

22   A.   Yes.

23   Q.   And their performance as employees?

24   A.   Yes.

25   Q.   Are you referring to them when you say, "I have even been
```

```
 1   A.   No.

 2   Q.   Are you aware that she did do so?

 3   A.   Yes.

 4   Q.   How do you know that

 5   A.   Because we have been talking about it.

 6   Q.   Who is "we," you and Rebecca?

 7   A.   No, today.

 8   Q.   If you knew that the Luceras had waited a period of time,

 9        approximately two weeks, prior to submitting their expense

10        reimbursement form to Liz Ross and that Jack Johnston was

11        in the office during that period, do you still believe it

12        would have been appropriate for them to submit their form

13        to Liz Ross?

14   A.   Repeat that one more time.  Nadine, I got lost in that.

15   Q.   If you knew that the Luceras waited a few weeks before

16        they submitted the expense reimbursement form after their

17        trip, and during the time period that they waited, Jack

18        Johnston was in the office of Rantoul, do you still

19        believe it would be appropriate for them to wait until you

20        were out of the office and then submit it to Liz Ross?

21   A.   It wouldn't be inappropriate to wait two weeks, but if he

22        was in the office, I would say it probably should have

23        went to him.

24   Q.   Jack Johnston, I believe, had a schedule where he was in

25        Rantoul on certain days and Schaumburg on certain days;
```

REBECCA LUCERA v. CINGULAR WIRELESS    JOSEPH SCHNAUFER    September 10, 2004

```
 1        were you aware of that?
 2   A.   Yes.
 3   Q.   On the days that he was in Rantoul, because he was not in
 4        Rantoul every day, would it be appropriate for the Luceras
 5        to attempt to find out when he was going to be in Rantoul
 6        and then attempt to submit the form to him when he was in
 7        Rantoul?
 8   A.   I suppose, yes.
 9   Q.   Could the Luceras have sent the form to Mr. Johnston's
10        office in Schaumburg via office mail?
11   A.   Yes.
12   Q.   And that could have been done on the days that he was not
13        in the Rantoul office.
14   A.   Correct.
15   Q.   You also said that you were aware, or you believed it was
16        Ameritech's policy or in Rantoul to reimburse for travel
17        expenses to other facilities; is that correct?
18   A.   Yes.
19   Q.   And I think you indicated that when you were in Ocala you
20        were unaware of what Cingular's policies were with regard
21        to reimbursement; is that correct?
22   A.   I wouldn't say I was unaware.  I wasn't as familiar.  They
23        were new to me.
24   Q.   Do you know of any occasion where Ocala reimbursed an
25        employee who was travelling to another location for an
```

| | | |
|---|---|---|
| 1 | | trips? |
| 2 | A. | It wasn't specified. |
| 3 | Q. | Was the average two to three days for an interview trip? |
| 4 | | MR. LIETZ:  Objection, leading. |
| 5 | A. | It wasn't specified. |
| 6 | Q. | (By Ms. Abrahams) I am not asking what was specified.  I |
| 7 | | am asking in practice, was it two to three days average |
| 8 | | for an interview trip? |
| 9 | A. | I don't know.  Yeah. |
| 10 | Q. | Your answer is "yes"?  Sorry.  I didn't hear. |
| 11 | A. | Yes. |
| 12 | Q. | Can you think of anyone that you are aware of who spent, |
| 13 | | say, four or five days on an interview trip? |
| 14 | A. | I can't. |
| 15 | Q. | You cannot?  I am sorry. |
| 16 | A. | No, I can't; I cannot. |
| 17 | Q. | You were asked again about that incident of "who would you |
| 18 | | do" game. |
| 19 | A. | Correct. |
| 20 | Q. | What specific comments do you recall, if any, that Jack |
| 21 | | Johnston made that had such connotations? |
| 22 | A. | He was bringing up individual names, who anyone in the |
| 23 | | group would have sex with, Person A or Person B.  I gave a |
| 24 | | couple of examples.  I believe Grace Seymour's name was |
| 25 | | mentioned.  I believe Lucia's name was mentioned.  We |

| | | |
|---|---|---|
| 1 | | talked about having sex with them. |
| 2 | Q. | Do you recall, specifically -- other than mentioning their |
| 3 | | names, do you recall anything else specifically he said |
| 4 | | about them or about any other individuals? |
| 5 | A. | I don't. |
| 6 | Q. | If you were absent from work for a day or so, could an |
| 7 | | employee wait until you returned to have you sign off on |
| 8 | | the reimbursement form? |
| 9 | A. | They could wait, yes. |
| 10 | Q. | Are you aware of anytime anyone signed off, any of your |
| 11 | | peers, signed off on expense forms for you or for any of |
| 12 | | your employees when you were out of the office? |
| 13 | A. | I am not aware of any specific time, no. |
| 14 | Q. | What is the purpose of having an employee submit expense |
| 15 | | forms to the Director or Supervisor for approval? |
| 16 | A. | I would say number one, from a standpoint of budget |
| 17 | | management; from a standpoint of convenience.  Those would |
| 18 | | probably be two. |
| 19 | Q. | Would it also be important that the Supervisor verify? |
| 20 | A. | Absolutely. |
| 21 | Q. | Expenses that are contained on the form? |
| 22 | A. | Absolutely. |
| 23 | Q. | If an individual who was appearing, who was not located in |
| 24 | | the Rantoul Center, received an expense reimbursement |
| 25 | | form, when they need to make an independent certification |





FILED

DEC 2 0 2002

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, IL

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

|  |  |  |
|---|---|---|
| REBECCA LUCERA, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 02-**2268** |
| CINGULAR WIRELESS, | ) | JURY TRIAL DEMANDED |
| Defendant. | ) | |

## COMPLAINT

NOW COMES the Plaintiff, REBECCA LUCERA, by and through her attorney, Gary Lietz of LIETZ, BANNER & FORD, and complains of the Defendant, CINGULAR WIRELESS, and states as follows:

### The Parties

1.    Plaintiff, REBECCA LUCERA   was employed as an Area Manager at CINGULAR WIRELESS in Rantoul, Illinois, before she was terminated on August 30, 2001.

2.    CINGULAR WIRELESS is a corporation with offices nationwide, but specifically operating one of its centers in Rantoul, Illinois.

### Jurisdiction

3.    The Defendant, CINGULAR WIRELESS, also operated under the name of SOUTHWESTERN BELL, (also known as "SBC"), and was formerly referred to as AMERITECH CELLULAR, but at all times mentioned herein CINGULAR WIRELESS (hereinafter "CINGULAR") was doing business under that name, or separately/collectively under one of the other corporate names referred to herein, in the Central District of the State of Illinois.

-1-

EXHIBIT

F



4.    This action arises under Title 42 U.S.C. §2000 (e)-2(a)(1).

5.    The jurisdiction of this Court is invoked pursuant to Title 28 U.S.C. §1343 (a)(4).

<u>Venue</u>

6.    This action properly lies in the Central District of Illinois, pursuant to 28 U.S.C. §1391 (b)(1-2) and §1391 (c).

<u>Facts</u>

7.    From approximately January, 1995, if not before, through August 30, 2001, REBECCA LUCERA had performed her duties satisfactorily as an Area Manager for CINGULAR, however, before July, 1999, worked for a predecessor thereof namely either AMERITECH CELLULAR or SOUTHWESTERN BELL. For purposes of convenience, all such parties will be referred to as "CINGULAR."

8.    On August 30, 2001, REBECCA LUCERA was discharged and told by her Director Jack Johnston that it was due to insubordination.

9.    Defendant CINGULAR accused REBECCA LUCERA of insubordination and being absent without leave despite knowing that REBECCA LUCERA and her husband, Jon Lucera (who was also employed at the Rantoul center of Defendant, CINGULAR, as a Manager), had traveled to Ocala, Florida, as both were considering transfer and relocation to a center there.

10.    CINGULAR, by and through its Director, Jack Johnston, knew and had reason to know the time and the purpose of the trip to Ocala, Florida, by virtue of the fact that an expense report had been submitted by Jon Lucera on behalf of both and he and his wife, REBECCA LUCERA.

-2-

11.    On the date of termination, August 30, 2001, Plaintiff, REBECCA LUCERA was terminated from employment, but her husband, Jon Lucera, was not terminated but was suspended instead.

### Count I - Sex Discrimination

12.    Plaintiff, REBECCA LUCERA, has timely filed charges of sex discrimination with the Equal Employment Opportunity Commission and the Illinois Department of Human Rights, has met all of the necessary administrative prerequisites for filing a suit, and attaches hereto as "Exhibit A" her Right to Sue Letter received from the EEOC on September 26, 2002.

13.    Management at Defendant CINGULAR, acting through its Director, Jack Johnston, selectively chose to terminate Plaintiff, REBECCA LUCERA, without prior warning, while allowing a male employee (Jon Lucera) to merely be suspended.

14.    The Defendant, CINGULAR, has willfully discriminated against the Plaintiff on the basis of her sex by terminating her and treating her differently, solely because of her gender.

15.    The above-described actions are unlawful employment practices as set forth in Title 42 U.S.C. §2000e-2(a)(1).

16.    As a result of the above-described conduct, Plaintiff REBECCA LUCERA has lost salary and other benefits entitling her to damages in the amount of at least $12,000 per annum and future salary.

17.    As a result of the above-described conduct, Plaintiff REBECCA LUCERA is entitled to compensatory damages in the amount of $100,000.

18.    Defendant's conduct entitles Plaintiff REBECCA LUCERA to punitive damages, pursuant to Title 42 U.S.C. §1981(a)(1), in the amount of $100,000.

WHEREFORE, the Plaintiff, REBECCA LUCERA, respectfully prays for judgment in her favor and against the Defendant CINGULAR WIRELESS and for lost salary and benefits in the amount of at least $12,000 per annum and future salary, compensatory damages for $100,000, and $100,000 in punitive damages. Plaintiff further prays for trial by jury. Plaintiff further prays for attorney's fees and costs.

### Count II - Retaliatory Discharge

19.     Plaintiff reported Director, Jack Johnston, for seeking reimbursement of mileage, hotel/lodging and related expenses that were not, in fact, earned by verbally reporting such information through the Integrity Hotline of Defendant CINGULAR on or about July and August, 2001.

20.     In mid-August, 2001, Plaintiff, REBECCA LUCERA, reported Director, Jack Johnston, in writing for seeking reimbursement of expenses as set forth in the paragraph immediately preceding.

21.     Less than ten days after the submission of the written reporting of such conduct, Plaintiff, REBECCA LUCERA, was terminated by Director, Jack Johnston.

22.     Plaintiff, REBECCA LUCERA, was acting in good faith and reporting Director Jack Johnston and was not discharged for exercising a purely private right.

23.     As a result of the above-described conduct, Plaintiff REBECCA LUCERA has lost salary and other benefits entitling her to damages in the amount of at least $12,000 per annum and future salary.

24.     As a result of the above-described conduct, Plaintiff REBECCA LUCERA is entitled to compensatory damages in the amount of $100,000.

25.     Defendant's conduct entitles Plaintiff REBECCA LUCERA to punitive damages in the amount of $100,000.

WHEREFORE, the Plaintiff, REBECCA LUCERA, respectfully prays for judgment in her favor and against the Defendant CINGULAR WIRELESS and for lost salary and benefits in the amount of at least $12,000 per annum and future salary, compensatory damages for $100,000, and $100,000 in punitive damages. Plaintiff further prays for trial by jury. Plaintiff further prays for attorney's fees and costs.

REBECCA LUCERA, Plaintiff

BY:    LIETZ, BANNER & FORD

BY:    _____
                Gary Lietz

Prepared By:

Gary Lietz
Lietz, Banner & Ford
2504 Galen Dr., Ste. 106
Champaign, IL 61821
Telephone: (217) 353-4900
Facsimile: (217) 353-4901
*ARDC# 01659774*