UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| REBECCA LUCERA, | ) |
| Plaintiff, | ) Judge Baker |
| v. | ) No. 02-2268 |
| CINGULAR WIRELESS, | ) JURY TRIAL DEMANDED |
| Defendant. | ) |

## AFFIDAVIT OF DEBBIE THOMPSON

I, Debbie Thompson, being first duly sworn on oath, depose and state as follows:

1. From approximately Spring 2001 through May 2002, I was employed by Cingular Wireless as an Area Manager in the Rantoul Call Center. Beginning at the end of June 2001, I reported directly to Jack Johnston.

2. Shortly after Jack Johnston assumed responsibility for the Rantoul Call Center at the end of June 2001, he had a meeting at which I was present during which he stated that he wanted to approve expenditures prior to the expenses being incurred. I believe that Rebecca Lucera, the other Area Manager, was present at the meeting.

3. From approximately the Spring of 2001 until the end of August 2001, Jon Lucera, a Manager of Customer Relations in the Rantoul Call Center was one of my direct reports.

4. In July 2001, I recall Rebecca Lucera telling me that she and her husband Jon Lucera were traveling to Ocala, Florida to visit the new call center.

5. During the conversation I had with Rebecca Lucera, she informed me that she had not told Jack Johnston that she was traveling to Ocala and that she had no intention of telling him about the trip.

6. At some point around the time of Rebecca and Jon Lucera's trip to Ocala, Jack Johnston approached me and asked me if I knew Rebecca Lucera's whereabouts. I recall

EXHIBIT G

feeling uncomfortable that I knew that Rebecca was in Ocala but that Mr. Johnston was unaware of her whereabouts.

7. On August 27, 2001, I was interviewed over the telephone by Cheryl Bentley and Margaret Franklin of Cingular's Human Resources Department, with regard to my recollection of the circumstances surrounding Rebecca's and Jon's trip to Ocala, Florida. During the interview, I relayed that Rebecca Lucera had informed me that she had not told Jack Johnston that she was traveling to Ocala and that she had no intention of telling him about the trip. I also informed Ms. Bentley and Ms. Franklin that around the time of Rebecca and Jon Lucera's trip to Ocala, Jack Johnston approached me and asked me if I knew Rebecca Lucera's whereabouts. I informed them that I recalled feeling uncomfortable that I knew that Rebecca was in Ocala but that Mr. Johnston was unaware of her whereabouts.

8. The average length of time for interview trips taken by Rantoul Call Center employees to other call centers was two to three days.

9. During the period I worked at the Rantoul Call Center as Area Manager, the practice was that employees were required to submit their requests for expense reimbursement to their direct supervisors for approval. I cannot think of any circumstances that would have been so urgent to justify submitting expenses for approval to a supervisor outside the Rantoul Call Center.

10. If Jack Johnston was not in the Rantoul Call Center on any particular day and I needed his approval on documents, my practice was to forward the documents via overnight mail to his Schaumburg office for his signature.

11. I cannot recall any situation when I, as Area Manager, was informed that it was acceptable to submit expenses for approval outside the Call Center.

12. I am unaware of any SBC, Ameritech or Cingular policies which would prohibit employees from becoming members of frequent traveler programs such as frequent flyer miles or hotel bonus point programs.

This affidavit is based upon my personal knowledge. It is true and correct to the best of my knowledge, information and belief. If sworn as a witness, I could testify competently to the foregoing.

THIS ENDS MY AFFIDAVIT.

_____
Debbie Thompson

Subscribed and sworn to
before me this _11_ day of
September 2004.

_____
Notary Public

```
OFFICIAL SEAL
PAULA S. HARDY
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 9/29/04
```

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF ILLINOIS

 3                        URBANA DIVISION

 4    REBECCA LUCERA,              )
                                   )      COPY
 5           Plaintiff,            )
                                   )
 6           -vs-                  )  No. 02-2268
                                   )
 7    CINGULAR WIRELESS,           )
                                   )
 8           Defendant.            )

 9

10           The deposition of CHERYL L. BENTLEY,

11    called for examination pursuant to the Rules of

12    Civil Procedure for the United States District

13    Courts pertaining to the taking of depositions,

14    taken before STEVEN J. MAZA, a notary public within

15    and for the County of Cook and State of Illinois,

16    at 140 South Dearborn Street, Illinois, on the 20th

17    day of July, 2004, at the hour of 1:50 o'clock p.m.

18

19

20

21

22                                              EXHIBIT
                                                   H
23    Reported by:  Steven J. Maza, CSR

24    License No.:  084-002479
```

EXHIBIT H

1

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

```
 1      Q.   Does 4.2 specifically address the
 2  situation where both employees are making the same
 3  trip and they are both employed by SBC?
 4      A.   Yes.
 5      Q.   Okay.  And it says that, does it not, in
 6  the second paragraph under IRS Rules?
 7      A.   Yes.
 8      Q.   Okay.  And other than those IRS rules that
 9  are summarized there, is there any other special
10  rule that applies to husband and wives who both
11  work for SBC when it comes to travel or
12  reimbursement?
13      A.   Not that I'm aware of.
14      Q.   All right.  How many investigations have
15  you participated in while employed with Cingular
16  Wireless, dozens, hundreds?
17      A.   Dozens.
18      Q.   Okay.  Have you ever been involved in an
19  investigation involving discipline for both a
20  husband and wife, both of whom were employed by
21  SBC?
22      A.   No.
23      Q.   Other than the investigation of Rebecca
24  Lucera, have you ever involved yourself with an
```

14

1     A.    I am not familiar with that information.

2     Q.    Okay. Also on the exhibit in front of
3  you, I am correct, am I not, in understanding that
4  on the 23rd and the 24th, Jack Johnston is not in
5  the office, reference is made to a trip Indy or
6  Indianapolis?

7     A.    It references Indy.

8     Q.    Thank you.

9           Did you ask Mr. Johnston if on Friday, the
10 20th, or Monday or Tuesday, the 23rd or 24th, he
11 asked regarding the whereabouts of either Rebecca
12 or Jon Lucera?

13    A.    I don't remember.

14    Q.    Jon Lucera was not terminated, correct?

15    A.    Correct.

16    Q.    At the time that -- however, Jon was
17 suspended, is that correct?

18    A.    That's not correct.

19    Q.    What happened to Jon?
20          Did he receive a warning?

21    A.    Jon received an incident report, correct.

22    Q.    So he was not suspended, he continued to
23 work, he received a warning?

24    A.    Yes.

30

```
1    or anybody asking to see a schedule?
2        A.   I don't.
3        Q.   Do you know whether or not that schedule
4    is immediately available to just the people in
5    Rantoo1 or would it have been retrievable by you up
6    here in Schaumburg?
7        A.   I'm not sure.
8        Q.   Okay.  Did you participate in the
9    investigation of Jack Johnston?
10       A.   Did I participate in the investigation of
11   Jack Johnston?
12       Q.   Right.
13       A.   Jack assisted us with addressing some
14   concerns that were presented by Rebecca.
15            Jim Klimas interviewed Jack Johnston
16   directly.
17       Q.   Were you part of that investigation team?
18       A.   Not directly, no.
19       Q.   Did that investigation of Mr. Johnston
20   have anything to do with the decision regarding
21   Rebecca Lucera?
22       A.   No.
23       Q.   Or Jon Lucera?
24       A.   No.
```

34

```
1    Q.   Was the investigation of Mr. Johnston also
2  occurring in late August 2001?
3    A.   I can't recall the specific dates that
4  were cited, but we treated those as separate issues
5  for investigation.
6    Q.   I understand that.
7         My question was did the investigation of
8  Mr. Johnston occur in approximately late August of
9  2001 at or right before the time of the termination
10 of Ms. Lucera?
11   A.   I think the investigation with Jack was
12 after.
13   Q.   You are not sure?
14   A.   I'm not sure.
15   Q.   Okay.  You indicated that you were
16 involved in compensation matters for employees.
17        Would you have been familiar with the
18 compensation received by Ms. Lucera in 2001?
19   A.   I would access to view her salary panels
20 and People Soft.
21   Q.   What's People Soft?
22   A.   Our employee tracking system.
23   Q.   And that's internal just for SBC Cingular?
24   A.   Correct, for HR individuals.
```

35

```
1      Q.    Her title at that time and her position

2   was area manager?

3      A.    Correct.

4      Q.    There was a call center director that was,

5   obviously, Mr. Johnston, and before Mr. Johnston

6   that would have been Mr. Schnaufer, correct?

7      A.    Correct.

8      Q.    They would have been the only persons at

9   that particular level?

10     A.    For that center, yes.

11     Q.    And for that center there were two people

12  at area managers, Debbie Thompson and Rebecca

13  Lucera, in the summer of 2001?

14     A.    Yes, I believe so.

15     Q.    Okay.  And then Jon Lucera?

16     A.    Uhm-uhm, yes.

17     Q.    He was probably the third level, he was a

18  customer service manager?

19     A.    He was actually a first level customer

20  service manager.

21     Q.    Which is one step below where Thompson and

22  his wife were?

23     A.    Correct.

24     Q.    And he reported to Debbie Thompson?
```

36

```
1    A.   That's my understanding, yes.
2    Q.   Did you understand that Rebecca Lucera had
3  made a call to the Ethics Hot Line regarding Jack
4  Johnston?
5    A.   I don't know if it was Rebecca.
6    Q.   You know that such a call was made?
7    A.   There was an ethics call made, yes.
8    Q.   Would you consider it to be insubordinate
9  for Rebecca Lucera to have made a call about Jack
10 Johnston?
11   A.   Absolutely not.
12   Q.   Do you know whether Mr. Johnston received
13 any punishment regarding any of the allegations
14 that were presented regarding his conduct?
15   A.   No.
16   Q.   You don't know or?
17   A.   No, he did not.
18   Q.   He did not receive any punishment?
19   A.   Correct.
20   Q.   Did some of those allegations concern
21 whether or not he had, in fact, overnighted at a
22 Drury Inn in Champaign, Urbana, Illinois, and
23 seeking reimbursement for that or do you know?
24   A.   Was one of those the concerns that was
```

37

```
1      Q.   When did the merger or the transition
2  commence?
3      A.   As far as official close date?
4      Q.   Yes.
5      A.   I believe it was in November of '99.
6      Q.   Why did Jon Lucera receive a different
7  treatment than Rebecca Lucera did?
8      A.   After the investigation was concluded, his
9  involvement in the Code of Business Conduct
10 violation was different than the one that Rebecca
11 had committed.
12     Q.   In what way?
13     A.   Jon, essentially, participated in
14 conjunction with filing an expense report with his
15 wife.
16          Rebecca was aware that Jack Johnston
17 needed to see expenses.
18          She had not notified her supervisor that
19 she was going to be going on the trip.
20          She had also circumvented the approval
21 process based on what we would consider to be
22 proper routing channels according to the schedule
23 for authorizations of expense reports.
24     Q.   Are you familiar with any employee
```

47

```
 1     Q.   During that conversation, did you ask her
 2   if she had informed Jack Johnston in writing or in
 3   any other way about her whereabouts?
 4     A.   Yes.
 5     Q.   And what did she tell you?
 6     A.   That an e-mail had been sent.
 7     Q.   Did you ask her if she could produce that
 8   e-mail?
 9     A.   Yes.
10     Q.   Did she do that?
11     A.   No.
12     Q.   You were also asked about whether there
13   was a meeting at which Jack Johnston had said
14   something about approval, need prior approval of
15   expenditures, and I believe you said no, and I just
16   wanted to clarify if that was a correct statement
17   or if you recall ever finding out anything about a
18   meeting during the course of your investigation?
19     A.   There was a meeting with the area managers
20   and Jack.
21     Q.   And did you verify that there was a
22   meeting during your investigation?
23     A.   Yes.
24     Q.   How did you do that?
```

49

```
1              Did you interview anyone about that?
2       A.    I spoke with Peggy Franklin.
3             I spoke with Debbie Thompson.
4       Q.    Do you recall what she told you about that
5    meeting?
6       A.    That --
7       MR. LIETZ:  Objection, hearsay.
8             Go ahead and answer.
9       THE WITNESS:  That the meeting had occurred,
10   and we also had a follow-up e-mail from Rebecca
11   with regards to Connie Gass that also cited that
12   there had been discussion at Rebecca's level with
13   Jack.
14   BY MS. ABRAHAMS:
15      Q.    Okay.  Did Debbie Thompson tell you at
16   that meeting that Jack had said that he wanted to
17   approve expenditures, that he needed to approve
18   travel reimbursement expenditures?
19      MR. LIETZ:  Objection, leading.
20      THE WITNESS:  Yes.  Yes, that's my
21   understanding.
22   BY MS. ABRAHAMS:
23      Q.    You were asked the reasons why Rebecca was
24   terminated, and I think that the reasons you cited
```

50

1   Liz Ross?

2       MR. LIETZ:  Object to the form of the
3   question.

4       THE WITNESS:  Would it have still been
5   inappropriate?

6   BY MS. ABRAHAMS:

7   Q.  Yes.

8   A.  Yes.

9   Q.  You were also asked about whether Jack
10  Johnston knew about Rebecca's whereabouts during
11  the time that she was in Ocala.

12      Did you ever interview anyone who provided
13  you with information regarding whether Jack knew
14  where Rebecca was?

15  A.  I know that Jack approached Debbie
16  Thompson and that she was uncomfortable about
17  sharing with him what she knew of where Rebecca was
18  when he asked where she was.

19  Q.  And did that information, was that
20  provided to you during the interview of Debbie
21  Thompson?

22  A.  Yes.

23  Q.  Did Debbie Thompson tell you about any
24  conversations she had had with Rebecca Lucera about

52

```
1   -- strike that.
2           Did Debbie Thompson tell you if Rebecca
3   Lucera mentioned to her whether she was going to
4   tell Jack Johnston about going to Ocala or whether
5   she had Jack Johnston's approval, anything like
6   that?
7       MR. LIETZ:  Objection to the form the
8   question.
9           Objection to leading, and objection as
10  calling for a hearsay conclusion if this witness
11  didn't interview Debbie Thompson, which she has
12  indicated she did not.
13          You may answer if you know.
14  BY MS. ABRAHAMS:
15      Q.  Let me ask you, first, did you interview
16  Debbie Thompson?
17      A.  I believe it was Peggy and I together.
18      Q.  And during your interview with Debbie
19  Thompson, did she state anything about
20  conversations she had had with Rebecca about
21  Rebecca informing Jack Johnston as to her
22  whereabouts?
23      A.  Yes.
24      Q.  What did she tell you?
```

53

```
1      A.    That she was not going to tell Jack.
2      Q.    And did that factor into your decision to
3   recommend Rebecca Lucera's termination?
4      A.    Yes.
5      Q.    You were an Ameritech employee prior to
6   the merger, is that right?
7      A.    Correct.
8      Q.    After the merger, did you become aware
9   that the SBC policies applied to you?
10     A.    Yes.
11     Q.    And to other Ameritech employees?
12     A.    Yes.
13     Q.    Do you remember when it was or if you can
14  give me the year by which you were aware that SBC
15  Cingular policies applied?
16     MR. LIETZ:   I object to the form of the
17  question; also, she previously answered that, and
18  this is not clarification.
19           This is three or four times we have got
20  entirely different answers from before.
21           You may answer if you know.
22     THE WITNESS:   Where the policies in place post
23  merger after the merge?
24
```

54

```
1    BY MS. ABRAHAMS:
2        Q.   Yes.
3        A.   Yes.
4        Q.   Do you remember what year they were in
5    effect?
6        MR. LIETZ:  Same objection as before.
7        THE WITNESS:  The merger went through in
8    November of '99, if I recall, so approximately
9    2000.
10   BY MS. ABRAHAMS:
11       Q.   You were asked about why Jon Lucera was
12   treated differently to Rebecca Lucera, and I think
13   you started to give the reasons, then you were cut
14   off.
15            Were there any other reasons other than
16   what you had testified to why Jon Lucera was
17   treated differently?
18       MR. LIETZ:  Objection to the form of the
19   question.
20       THE WITNESS:  With regard to his involvement in
21   comparison to her involvement, his level in the
22   company versus her level in the company, we would
23   hold her to a higher level of expectations as a
24   second level manager.
```

55

```
1      A.    There was a varied amount.
2            Most of them, if I recall correctly, were
3   approximately two days.
4      Q.    Okay.  Two work days?
5      A.    That I'm not sure based on the calendar
6   when they traveled.
7      Q.    Okay.
8      A.    I believe it was two days.
9      Q.    Do you know -- obviously, Jon Lucera was
10  reimbursed the $767 on the August 31st, 2001,
11  reimbursement, he received that money?
12     A.    That's my understanding.
13     Q.    Is it your understanding that Ocala
14  reimbursed Rantool for that expenditure?
15     A.    I'm not sure.
16     Q.    Could they have?
17     A.    I'm not sure.
18     Q.    You are not aware that they could or
19  couldn't have?
20     A.    Ocala, could they cross charge Rantool,
21  could that be billed that way?
22     Q.    Yeah.
23     A.    For reimbursement?
24     Q.    Yeah.
```

60