**E-FILED**
Friday, 01 October, 2004  04:49:40 PM
Clerk, U.S. District Court, ILCD

1

```
1              IN THE UNITED STATES DISTRICT COURT
                     FOR THE CENTRAL DISTRICT
2                       STATE OF ILLINOIS

3    REBECCA LUCERA,                    )
                                        )
4         Plaintiff,                    )
                                        )
5          -vs-                         ) No. 02-2268
                                        )
6    CINGULAR WIRELESS,                 )
                                        )
7         Defendant.                    )

8
                             DEPOSITION
9
          The Deposition of SANDRA GAMMAGE, a citizen of
10   the State of Illinois, a witness of lawful age;
     produced, sworn and examined upon her corporeal oath
11   on September 23, 2004 A.D., at the Law Offices of
     Lietz, Banner and Ford, 1605 South State Street,
12   Suite 103, Champaign, Illinois, before Janet E.
     Frederick, CSR, License No. 084-003526, in and for
13   the County of Champaign and State of Illinois, as a
     witness in a certain suit and matter now pending and
14   undetermined in the United States District Court,
     Central District, State of Illinois.
15
          APPEARANCES:
16
              Mr. Gary R. Lietz
17            LIETZ, BANNER and FORD
              1605 South State Street, Suite 103
18            Champaign, Illinois  61820
              Appearing on behalf of the Plaintiff
19
              Ms. Nadine C. Abrahams
20            FISHER & PHILLIPS
              140 South Dearborn Street, Suite 420
21            Chicago, Illinois  60603
              Appearing on behalf of the Defendant
22
          ALSO PRESENT:
23
              Mr. Jack Johnston (where indicated)
24
```

EXHIBIT

I

36

1          Q.    Okay.  Did he prefer to use a different

2     calendar, if you know, in July or August?

3          A.    I don't know.

4               (Whereupon Deposition Exhibit No. 2

5               was marked for identification by the court

6               reporter.)

7          Q.    Handing you what's been marked Exhibit

8     No. 2, can you tell me if you know what that might

9     be?

10         A.    It's an organizational chart.

11         Q.    Okay.  And up at the top under the words

12    Rantoul, does it have a date?

13         A.    July 1st, 2001.

14         Q.    And who is the director at that time?

15         A.    Jack Johnston.

16         Q.    And to the immediate right of that, what

17    does it say?

18         A.    Sandy Gammage, administrative assistant.

19         Q.    All right.  And who is Aimee Halcomb?

20         A.    Aimee Halcomb was a temporary

21    administrative assistant.

22         Q.    And to the far left an area manager.  The

23    name, please?

24         A.    Debbie Thompson.

47

 1    be kept anywhere in the Rantoul call center besides

 2    maybe one kept by the author or the person

 3    submitting the reimbursement request?

 4        A.    I kept copies if the rep gave them to me,

 5    if the manager or whoever was traveling gave them to

 6    me.

 7        Q.    Okay.

 8        A.    And I kept a file of those.

 9        Q.    Okay.  And where did you keep those

10    copies or the file?

11        A.    In a file drawer by my desk.

12        Q.    Okay.  And how long would you keep them?

13        A.    Until I got a notion to clean out the

14    drawers.

15        Q.    All right.

16        A.    At least a year.

17        Q.    And would -- how long have you maintained

18    that policy or that procedure of keeping a copy and

19    maintaining them until you would clean out the

20    drawer?

21        A.    I would say seven or eight years since.

22        Q.    So you did them even with Ameritech

23    reimbursement requests?

24        A.    Yes.

48

1      Q.    And I take it that, so we get our

2    framework properly, I understand that the

3    Ameritech-Cingular merger took place sometime in

4    late 2000, early 2001.

5         A.    Yes.

6         Q.    And it's my understanding also that there

7    was some serious concern about the viability or the

8    ongoing existence of the Rantoul call center during

9    the year 2001.

10        A.    Yes.

11        Q.    Did Mr. Schnaufer know you kept a copy of

12   those reimbursement requests?

13        A.    Yes.

14        Q.    Did his predecessor know you kept a copy

15   of those?

16        A.    Yes.

17        Q.    Were those accessible or could they be

18   retrieved by any of the directors or managers of the

19   call center by coming to your desk and pulling out

20   the documents?

21        A.    Yes.

22        Q.    Did you ever have occasion to see or know

23   of a manager or director ever ask for or went and

24   got them?

53

```
 1                    MS. ABRAHAMS:  I'm going to object to
 2              the form.  Use of the words of unusual,
 3              out of the ordinary, is vague.  Calls for
 4              speculation.
 5         Q.   (by Mr. Lietz)  Do you understand my
 6    question?
 7         A.   Could you repeat it?
 8         Q.   Sure.  In your opinion and based upon
 9    your experience, would you consider it to be unusual
10    or out of the ordinary for Rebecca or Jon Lucera to
11    submit a reimbursement request to Elizabeth Ross?
12                    MS. ABRAHAMS:  Same objection.
13              Vague, calls for speculation.
14         Q.   (by Mr. Lietz)  First of all, do you
15    understand the question?
16         A.   Uh-huh.
17         Q.   Yes?
18         A.   Yes.  I'm sorry.
19         Q.   Now --
20         A.   It would be a little out of the ordinary,
21    but not out of the realm of possibility.
22         Q.   Why would it be a little out of the
23    ordinary?
24         A.   Usually it went to the direct supervisor,
```

54

1    you know, your immediate supervisor.

2         Q.    Mr. Johnston?

3         A.    Mr. Johnston.  Unless he was going to be,

4    say, away from his office for an extended period of

5    time where you would need to get these in in a

6    timely manner to get reimbursed.

7         Q.    So it would depend on the availability or

8    presence of the person such as Mr. Johnston?

9         A.    Yes.

10        Q.    And if he wasn't available or was going

11   to be absent or was anticipated to be absent for an

12   extended period of time, how would that affect your

13   answer as to being out of the ordinary or unusual?

14                  MS. ABRAHAMS:  Object to the form,

15              vague, confusing.

16                  THE WITNESS:  It would be a

17              possibility that it could be.

18        Q.    (by Mr. Lietz)  Do you remember ever

19   overhearing any negative or derogatory remarks

20   expressed by Mr. Johnston regarding Rebecca Lucera

21   during the months of July or August 2001?

22        A.    Nothing that I could testify to

23   specifically, no.

24        Q.    Why do you say that, because you weren't

92

1    Rantoul, was there concern amongst all of you about
2    the future of the Rantoul call center?
3         A.    Yes.
4         Q.    And what was the concern?
5         A.    That we would be closed.
6         Q.    Was there any resentment towards Jack
7    because he came from, I think you said, U.S.
8    Cellular, did you say?
9         A.    Cell One.
10        Q.    Cell One?
11        A.    No.
12        Q.    Was there concern that he had come to
13   Rantoul to close it down?
14        A.    There was that concern, yes.
15        Q.    Now, the comment that you testified to
16   that you overheard Jack making in his office on the
17   telephone, I think you said it was, going to get rid
18   of her if it's the last thing he did, do you
19   remember your testimony on that?
20        A.    Yes.
21        Q.    Are you sure he said her, not them?
22        A.    No, I'm not certain whether it was her or
23   them.
24        Q.    It's possible he said I'm going to get

94

 1    any.

 2          Q.    What about Nancy Wells?

 3          A.    No, not that I know of.

 4          Q.    What about when Joe Schnaufer was

 5    director, are you aware of Jack Johnston ever

 6    signing off on expenses for Rantoul employees?

 7          A.    No.   You mean when Joe was director, Jack

 8    signing off?  No.

 9          Q.    Are you aware of any time an employee at

10    Rantoul submitted an expense form to someone outside

11    the call center for approval?

12          A.    I don't recall, no.

13          Q.    Okay.   And you indicated that Minnie

14    Hundley, Nancy Wells, and I think you said Elizabeth

15    Ross could sign off on expense forms; is that

16    correct?

17          A.    Yes.

18          Q.    And that's because of their level,

19    they're a level one manager?

20          A.    Yes, as long as it was someone below them

21    in title.

22          Q.    Okay.   But you're unaware of any

23    employees who went outside the call center to any of

24    those individuals?

95

1       A.   No, I'm not.

2       Q.   Do you recall seeing any expense forms in

3    your, I think it was -- I think you said you kept

4    forms for seven years; is that right?

5       A.   No, a year or more when I decided to

6    clean out the drawers.

7       Q.   But you had kept -- you would make

8    copies --

9       A.   Oh, you mean, yeah, that had been my

10   practice for that many years, yes.

11      Q.   During that seven year period, do you

12   ever recall seeing an expense form such as the one

13   that Jon Lucera submitted that was signed by someone

14   outside the call center?

15      A.   I don't remember that, no.

16      Q.   You had indicated that your belief was

17   that it would have been okay for the Luceras to

18   submit the form to someone outside the call center

19   if Jack Johnston was out of the office for an

20   extended period?

21      A.   Yes.

22      Q.   Okay.  What would an extended period be?

23      A.   I don't know.  That would depend on how

24   soon they wanted reimbursement because they wouldn't

96

1    get reimbursement until it was approved and
2    processed. So I guess it would depend on their own
3    individual needs.
4        Q.    If Jack Johnston, and if you can look at,
5    I think it's Exhibit 5, Exhibit 5, which is Jon
6    Lucera's expense form is dated August 10th, 2001.
7    Do you see that?
8        A.    Yes.
9        Q.    And at the top, the date on the top
10   where -- the typewritten date is August 3rd, 2001,
11   do you see that?
12       A.    Yes.
13       Q.    If you were aware that Jack Johnston was
14   in the office between August 3rd and August 10th of
15   2001, should he have been the appropriate person to
16   whom the Luceras should have submitted the expense
17   reimbursement form?
18       A.    If I was aware that they were in there?
19       Q.    Knowing that he was in the office between
20   August 3rd and August 10th, should they have
21   submitted the form to Jack Johnston?
22                MR. LIETZ: Objection. Calls for
23                speculation and conclusion. If you have
24                an answer, understand the question --

97

1                    THE WITNESS:  If they had prepared

2            it, they could have submitted it to him.

3            It just depends when they want to prepare

4            it.

5        Q.    (by Ms. Abrahams)  If they had prepared

6    it and signed it on August 10th and he was in the

7    office on August 10th, should they have submitted it

8    to him instead of to Elizabeth Ross?

9        A.    That would have been a normal procedure.

10       Q.    Did either Jon or Rebecca Lucera contact

11   you to find out Jack Johnston's whereabouts at any

12   time in August of 2001?

13       A.    Not that I remember.

14       Q.    In August of 2001, did you have

15   interoffice mail between Rantoul and other call

16   centers?

17       A.    Yes.

18       Q.    Would you send documents to Jack Johnston

19   in the Schaumburg office via interoffice mail?

20       A.    I don't remember specifically.  If there

21   was something that needed to be sent, yes, I would

22   have.  I don't remember doing that.

23       Q.    Okay.  Can employees --

24       A.    I don't remember not doing it either.

98

1      Q.    Okay.  If the Luceras had wanted Jack
2   Johnston to sign what's been marked as -- or it
3   hasn't been marked, but the expense reimbursement
4   form, could they have forwarded it to his Schaumburg
5   office by interoffice mail?
6      A.    I assume so.
7      Q.    And do you know if it takes any
8   additional length of time to get to Schaumburg
9   versus Hoffman Estates?
10     A.    No.  It was all sent next day, was the
11  practice at that time.
12     Q.    If Jack Johnston was out of the office
13  for only one or two days in August of 2001, do you
14  know of any reason why -- or would it be unusual,
15  out of the ordinary, for the Luceras to submit the
16  form to Elizabeth Ross?
17              MR. LIETZ:  Same objection.  Do you
18              understand the -- if you understand the
19              question, you may answer.
20              THE WITNESS:  If he was only in the
21              office --
22     Q.    (by Ms. Abrahams)  If he was not going to
23  be out of the office for any extended period of time
24  in August of 2001, would it have been unusual, out

99

1    of the ordinary, for them to submit the form to

2    Elizabeth Ross?

3         A.    Yes, I believe it would.

4         Q.    Do you have any personal knowledge

5    regarding why Rebecca Lucera was terminated?

6         A.    No.

7         Q.    Do you have any personal knowledge

8    regarding what discipline, if any, was issued to Jon

9    Lucera?

10        A.    No.

11        Q.    Do you believe that any of the actions

12   that or any of the conversation you had with Jack

13   Johnston after Rebecca Lucera was terminated were

14   related in any way to Rebecca Lucera's termination?

15        A.    Yes, I do.

16        Q.    And why is that?

17        A.    The timing.  He knew that we were

18   friends.  The opportunity that he presented to me

19   was the day I returned to work after she was fired.

20        Q.    You had mentioned that there were lots of

21   calls -- do you remember your testimony -- in that

22   time period?

23        A.    Uh-huh.

24        Q.    Before Rebecca Lucera was terminated.  Do

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | | |
|---|---|---|
| REBECCA LUCERA, | ) | |
| | ) | |
| Plaintiff, | ) | Judge Baker |
| | ) | |
| | ) | No. 02-2268 |
| v. | ) | |
| | ) | |
| CINGULAR WIRELESS, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT OF NANCY WELLS

I, Nancy Wells, being first duly sworn on oath, depose and state as follows:

1.    I am currently employed as Director of Cingular's Springfield Call Center located in Springfield, Illinois.

2.    I have been the Director of the Springfield Call Center for the past nine years. Cingular's Springfield Call Center was previously an SBC center.

3.    Since 1995, my policy with regard to employees in my Call Center traveling to other call centers for interview trips was that the center to which the employee traveled was responsible for bearing the costs of such a trip.

4.    In 2001, all employees in my Call Center were required to obtain approval from their managers prior to going on an interview trip to another center.

5.    To the best of my knowledge, my policy with regard to reimbursement for interview trips and pre-approval  was consistent with SBC/Cingular's policies on these matters in the Great Lakes Region.

6.    Since 1995, employees in the Springfield Call Center have been required to submit their requests for expense reimbursement to their direct supervisors for approval.

EXHIBIT

J

7.     I am unaware of any circumstances under which it would have been permissible for an employee in the Springfield Call Center to submit a request for reimbursement for approval to a Director at another call center location.

8.     I cannot recall ever being requested to sign-off on expenditures incurred by employees from any other call center, including the Rantoul Call Center or having such requests for reimbursement submitted to me for approval.

9.     I cannot recall ever being asked by Joseph Schnaufer, former Director of the Rantoul Call Center or Jack Johnston, current Director of the Rantoul Call Center, to sign-off on expenditures of their employees in their absence.

10.     The customary and reasonable length of time for interview trips to other locations is one to two days.  I cannot recall ever approving an interview trip of four or more days in length.

This affidavit is based upon my personal knowledge.  It is true and correct to the best of my knowledge, information and belief.  If sworn as a witness, I could testify competently to the foregoing.

THIS ENDS MY AFFIDAVIT.

_____
Nancy Wells

Subscribed and sworn to
before me this 21 day of
September 2004.

_____
Notary Public

OFFICIAL SEAL
ANGELA M. RARIDON
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 6-8-2006

1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE CENTRAL DISTRICT OF ILLINOIS
2              URBANA DIVISION

3    REBECCA LUCERA,                )
                                    )
4              Plaintiff,           )
                                    )
5      vs.                          )  No. 02 2268
                                    )
6    CINGULAR WIRELESS,             )
                                    )
7              Defendant.           )

8          The deposition of REBECCA LUCERA,

9    called for examination, taken pursuant to

10   the Federal Rules of Civil Procedure of the

11   United States District Courts pertaining to

12   the taking of depositions, before

13   Michele A. Ratkovich, a Notary Public

14   within and for the County of Will, State of

15   Illinois, and a Certified Shorthand Reporter

16   of said state, 140 South Dearborn, Suite

17   420, Chicago, Illinois, on the 22nd day of

18   January, A.D. 2004, at 10:00 a.m.

19

20

21

22

23                          EXHIBIT

                               K
24

37

1      Q.   How do you feel that Cingular                    10:28 AM

2   discriminated against you?

3      A.   My impression is Jon Lucera, male,

4   was treated differently than Rebecca Lucera,

5   female.                                                   10:29 AM

6      Q.   Other than the fact that your

7   husband was not terminated and you were

8   terminated, do you have any other basis for

9   believing you were discriminated against

10   based on your gender?                                    10:29 AM

11      A.   No, not that I recall.

12      Q.   At the time that you were

13   terminated you were at a higher level in the

14   hierarchy than your husband; is that right?

15      A.   We were both in the management.             10:29 AM

16      Q.   Were you a step higher than him?

17      A.   Yes.

18      Q.   Are you aware of any other males

19   who you believe have been given preferential

20   treatment other than your husband?                      10:29 AM

21      A.   Not that I am aware of at this time

22   or that I can recall at this point.

23      Q.   Or any who were treated differently

24   from you?

                                                        38

1        A.    Not that I can recall at this          10:29 AM

2    point.   I think Cingular would have that

3    information for you.

4        Q.    Other than your termination, is

5    there any other way in which you were            10:30 AM

6    discriminated against by Cingular?

7        A.    I was approached by Mr. Johnston in

8    my office based off of a nepotism policy.

9        Q.    What do you mean by that?

10       A.    I was asked if I was aware there        10:30 AM

11   was a nepotism policy.

12       Q.    How was that discrimination?

13       A.    Jon Lucera was not asked that

14   question.

15       Q.    So the mere fact that you were          10:30 AM

16   asked that and Jon was not was the reason

17   you're viewing that as discrimination?

18       A.    Yes.

19       Q.    At the time that you had this

20   conversation with Jack Johnston was he your       10:30 AM

21   supervisor?

22       A.    That was unclear to me.

23       Q.    Did he replace Joe Schnaufer?

24       A.    That was also unclear.

45

1        A.    I'm not sure I understand.                    10:36 AM

2        Q.    Did he give you assignments that

3    you were solely responsible for?

4        A.    Probably.

5        Q.    Did he give you freedom to run        10:37 AM

6    things in your own way?

7        A.    I would need -- I would need more

8    specifics.  If you have a specific, that

9    would be helpful.

10       Q.    Did he micromanage what you did?      12:20 AM

11       A.    No.

12       Q.    Did he give you autonomy to attempt

13    to resolve problems in your own way?

14       A.    Yes.

15       Q.    What was your reaction when you       10:37 AM

16    heard that Joe was leaving?

17       A.    Saddened, disheartened, but a

18    bittersweet.

19       Q.    Did you apply for Joe's position?

20       A.    It was never posted.                   10:37 AM

21       Q.    Did you feel like it should have

22    been posted?

23       A.    Yes.

24       Q.    Were you resentful that it was not

73

1      Q.   And then it says, I want you to be          11:06 AM
2   aware Jack may push it back and you may want
3   to let Anita know that.
4      A.   Yes.
5      Q.   Why did you think Jack may push it          11:06 AM
6   back?
7      A.   Because Jack asked us to tell him
8   if somebody was going to one of the other
9   call centers.
10     Q.   Why would he push it back if you            11:06 AM
11  were going to be informing him that she was
12  going?  Why would he push it back?
13     A.   I think she had already gone.  I
14  don't know why I said that.  I could be
15  reading this wrong.  I thought she had          11:07 AM
16  already gone.
17     Q.   So if she had already gone, then
18  Jack would push it back because --
19     A.   Connie had not notified him.
20     Q.   So it was your understanding at the         11:07 AM
21  time you wrote this e-mail that Jack was
22  requiring to be notified in advance before
23  people went out --
24     A.   Right.

RATKOVICH & LEPORE REPORTING (815) 258-1928

74

1     Q.   -- for interview trips?

2     A.   If I can expand on that, it was

3  brought to our attention that there was a

4  freeze on jobs in Rantoul, that nobody was

5  leaving.

6     Q.   I'm not talking about that.  I'm

7  talking about the sentence --

8     A.   Okay.

9     Q.   -- I want you to be aware Jack may

10  push it back and you may want to let Anita

11  know.  And you said the reason you wrote

12  that is because you were aware that Jack

13  wanted to be informed before people went on

14  trips they were going for interview trips.

15     A.   If I recall correctly, that is

16  correct.  That would have been my reasoning,

17  but, again, this was two years ago, three

18  years ago.

19     Q.   Okay.  But that was your

20  understanding at the time that you wrote

21  this?

22     A.   If I recall correctly, yes.

23     Q.   Do you recall when you went on your

24  trip to Ocala what day that was?

11:07 AM

11:07 AM

11:07 AM

11:07 AM

11:08 AM

75

1        A.    If I recall correctly we left for       11:08 AM

2    Indianapolis the night of the 19th of June.

3        Q.    July?

4        A.    July.  I'm sorry.

5        Q.    And that's 2001?                          11:08 AM

6        A.    Yes.

7        Q.    If you can look back once again at

8    Exhibit 3, that sentence we were just

9    discussing, I wanted you to be aware that

10   Jack may push it back, by push it back did     11:09 AM

11   you mean that he may not sign off on it?  Is

12   that what push it back means?

13       A.    Push it back for more

14   understanding.

15       Q.    Okay.  Were you concerned that Jack     11:09 AM

16   may not sign off on it and she may not get

17   reimbursed?

18       A.    No.  My concern was that Jack may

19   push back for more understanding on where

20   she's going and what she's doing because       11:09 AM

21   there was supposedly a freeze on it.

22       Q.    If she had already gone on her

23   interview trip and what you're submitting is

24   the expense reimbursement that you're

100

1     Q.    It would be inaccurate?

2     A.    Yes.

3     Q.    Did you have any formal interview

4  set up in Ocala before you left?

5     A.    It was an informal interview.  It

6  was not a formal interview.

7     Q.    How long were you in Ocala?

8     A.    We arrived in Ocala on the 20th and

9  we departed I believe it was the 24th.

10     Q.    Do you remember what days of the

11  week those were?

12     A.    I believe that was a Friday that we

13  arrived.  Saturday we there, Sunday we were

14  there, Monday we were there, and we departed

15  on Tuesday.  I could verify on the calendar

16  for you if you would like.

17     Q.    Why did you want to be there over a

18  weekend?

19     A.    It was a cheaper flight.  It was

20  when Joe requested that we're there.  It's

21  less time off during the work week.

22     Q.    Were you applying for a specific

23  position that was open?

24     A.    There was a manager position coming

11:33 AM

11:34 AM

11:34 AM

11:34 AM

11:34 AM

101

1    open.

2        Q.    Was that the title -- manager?

3        A.    I'm sorry.  I believe the title

4    then was area manager, but you would have to

5    check with Cingular.                                    11:35 AM

6        Q.    What about your husband?  Was there

7    a specific position he was applying for?

8        A.    I believe it was a leader position.

9    You may want to check with him, though, or

10   with Cingular.                                          11:35 AM

11       Q.    How much time did you spend in the

12   call center in Ocala?

13       A.    I don't know exactly.  We spent in

14   the call center and then we spent downtown

15   in their temporary quarters on the square.              11:35 AM

16       Q.    Did you have any interviews with

17   any employees of Ocala while you were down

18   there?

19       A.    I spoke briefly with the HR

20   representative.  It was not an interview.               11:35 AM

21   It was very informal.

22       Q.    Do you remember who that was?

23       A.    I don't recall her name.  It was a

24   female.

115

1    Q.   Do you know who the form was

2    submitted to?

3    A.   This front form was submitted to

4    Elizabeth Ross.

5    Q.   Who is Elizabeth Ross?

6    A.   A director.

7    Q.   Where is she located?

8    A.   I believe it was in the Chicago

9    Hoffman Estates office, I believe.

10    Q.   Is this a call center in Hoffman

11    Estates?

12    A.   It's a corporate office.

13    Q.   Had you had any prior interaction

14    with Elizabeth Ross?

15    A.   Not on a personal level.  Just a

16    colleague.

17    Q.   What types of business interaction

18    had you had with her?

19    A.   Very little.

20    Q.   Can you give me any example of

21    anything?

22    A.   No, not really.  It's extremely --

23    very small.  I just know she's a director.

24    Q.   Whose decision was it to submit

12:54 PM

12:54 PM

12:54 PM

12:54 PM

12:54 PM

116

12:55 PM

1    Exhibit 5 to Elizabeth Ross?

2        A.    I'm the one who recommended that.

3        Q.    Why did you recommend Elizabeth

4    Ross?

5        A.    Because she was a director.

12:55 PM

6        Q.    Was she at the same level as Jack

7    Johnston?

8        A.    Title-wise I'm not sure level-wise.

9        Q.    She had the same title?

10        A.    Yes.

12:55 PM

11        Q.    You said you had very little prior

12    interaction with her.  Had you ever asked

13    her to sign off on any expense reimbursement

14    forms before this?

15        A.    No.

12:55 PM

16        Q.    Or approve any vacation?

17        A.    No.

18        Q.    Approve anything related to your

19    employment?

20        A.    No.

12:56 PM

21        Q.    Had you ever met her in person?

22        A.    Yes.

23        Q.    How many times?

24        A.    Two, three, less than ten.

117

1    Q.    What types of occasions?

2    A.    Just business trips to Hoffman

3    Estates.

4    Q.    You said you suggested submitting

5    it to Elizabeth Ross because she's a

6    director?

7    A.    Uh-huh.

8    Q.    Why did you not submit it to Jack

9    Johnston?

10    A.    He was out of the office and it was

11    the deadline for the T and E.

12    Q.    What's T and E?

13    A.    Your travel and expenditures.  It's

14    a deadline cutoff.

15    Q.    Does that mean if you don't submit

16    it by then you don't get paid or you have to

17    wait until the next cycle?

18    A.    You have to wait until the next

19    cycle.

20    Q.    How often are the cycles?

21    A.    I don't know but I'm sure you can

22    find that out.

23    Q.    Was Elizabeth Ross within the chain

24    of your command?

12:56 PM

12:56 PM

12:56 PM

12:56 PM

12:56 PM

133

1   conversation with Jack about your                    01:12 PM

2   reimbursement request?

3       A.   I had a conversation with Jack

4   regarding the nepotism policy where he came

5   up to my office and asked me if I was aware          01:12 PM

6   of a nepotism policy.  And I didn't

7   understand what he was speaking of.  So I

8   said, no, I don't know.  And then he made

9   the comment that it was about time the two

10  Luceras were split up and then received a            01:13 PM

11  phone call and had to leave.

12      Q.   Did Jack ever tell you or did Liz

13  ever tell you that she was not going to sign

14  off on the expense request?

15           MR. LIETZ:  Liz?

16           MS. ABRAHAMS:  Elizabeth.

17           MR. LIETZ:  Elizabeth Ross?

18           MS. ABRAHAMS:  Yes.

19           THE WITNESS:  No, she never told me

20  she was not going to that I can remember,            01:13 PM

21  but I did send it to her.

22  BY MS. ABRAHAMS:

23      Q.   Did you ever get it back from her?

24      A.   I did not, no.

134

1      Q.    Do you know if your husband did?    01:13 PM

2      A.    I'm not aware that he did, but I

3   could be wrong.

4      Q.    Were either of you informed that it

5   was not going to be approved by Elizabeth    12:20 AM

6   Ross?

7      A.    I was not informed, no.  And I can

8   try and speak for Jon, but I don't believe

9   he was.

10     Q.    What exactly did Jack say to you    01:14 PM

11  about the nepotism policy?

12     A.    He asked me -- the same answer.  He

13  asked me if I was aware of the nepotism

14  policy, and I had never even heard of one.

15  And then he went on to tell me that it was    01:14 PM

16  time that we split the Lucera team up.  And

17  then he received a phone call and left my

18  office.

19     Q.    What did you do in response to your

20  conversation with Jack, if anything?    01:14 PM

21     A.    I believe I called the ethics

22  hotline.

23     Q.    Why did you call the ethics

24  hotline?

135

1       A.    Having worked with a leader with          01:14 PM

2    superior work ethic and integrity I was

3    disheartened that I felt threatened and the

4    comments were threatening to me and I did

5    not understand where they were coming from.    01:15 PM

6       Q.    When you say threatened, did you

7    feel your job was in jeopardy?

8       A.    Yes, I felt he was approaching me

9    in a way that I had never been approached

10    before by any leader at any business.          01:15 PM

11       Q.    What way was that?

12       A.    Very direct, very forceful, very

13    did you know, the threat of it's time that

14    the Lucera team be split up.  I have never

15    heard any type of a statement like that in    01:15 PM

16    all of my career.

17       Q.    Had you ever called the integrity

18    hotline before that?

19       A.    No.

20       Q.    About anything?                        01:15 PM

21       A.    Not that I recall, no.

22       Q.    What's your understanding of the

23    purpose of the integrity hotline?

24       A.    My understanding of our ethics

137

1    was?

2        A.    No.   It was sunshine out.

3        Q.    If the record from the ethics

4    hotline reflected that on August 22 an

5    anonymous caller made a call about Jack

6    Johnston and the situation that we just

7    discussed, would that be incorrect or is it

8    possible you did not identify yourself?

9        A.    I don't recall.

10       Q.    So is it possible you did make an

11   anonymous call?

12       A.    I honestly -- I don't recall if it

13   was anonymous or if it was not.   The ethics

14   hotline is a confidential --

15       Q.    It's confidential?

16       A.    Yes.

17       Q.    What exactly did you tell the

18   ethics hotline during that telephone call?

19       A.    I don't recall everything that I

20   told them, but I did speak at the nepotism

21   policy and the threat to split Jon and I up

22   -- the Lucera team up.   And I believe I

23   spoke also of just feeling harassed, feeling

24   as if I were going to be retaliated against.

01:17 PM

01:17 PM

01:17 PM

01:17 PM

01:17 PM

141

| | | |
|---|---|---|
| 1 | you raise that with Peggy Franklin? | 01:21 PM |

2       A.   Because the AP1 came across my desk

3   to sign for Jack at the Drury Inn.

4       Q.   When you spoke to Peggy was it

5   about that AP1?

6       A.   I believe that piece was part of it

7   and there were other -- I'm sure there were

8   other things because our conversation was

9   rather large and in length.

10       Q.   When you called the ethics hotline,    01:22 PM

11   did you mention anything related to

12   expenditures of Jack Johnston?

13       A.   I don't recall if I did or if I did

14   not.

15       Q.   Do you recall anything else you    01:22 PM

16   said to the ethics hotline in August during

17   the call that you made about Jack Johnston?

18       A.   I don't recall if this was

19   documented or if this was at the ethics, but

20   I did speak of a blatant disrespect to HR    01:23 PM

21   when HR had guided us not to put

22   nonbargained for associates on the phones

23   during high call volume times, but I'm not

24   clear if that was with the ethics or if that

142

1    was actually documented to Peggy.                01:23 PM

2        Q.    When you called the ethics hotline

3    obviously it was after your conversation

4    with Jack where he brought up nepotism

5    because you were complaining about            01:23 PM

6    nepotism -- the comment about nepotism.  Do

7    you recall what it was you were hoping to

8    achieve by calling the ethics hotline?

9        A.    It wasn't an achievement.  It was

10   me feeling uncomfortable.  It was me feeling    01:23 PM

11   harassed.  It was me feeling I was working

12   in a hostile work environment, which I had

13   never felt before under the leadership and

14   guidance of Joe Schnaufer.

15       Q.    Other than the fear that your job      01:24 PM

16   would be in jeopardy, how else did you feel

17   threatened by Jack Johnston?

18           MR. LIETZ:  I believe she's

19   answered that question three times.

20              You may answer if you have          01:24 PM

21   something else to say.

22           THE WITNESS:  I think I have been

23   very thorough.

24

144

1       Q.    Did you ever call the ethics                    01:25 PM

2   hotline again after that one time?

3       A.    I called back to the ethics hotline

4   as a return call.

5       Q.    How long after?                                 01:25 PM

6       A.    I don't recall how many days.

7       Q.    It was days not hours?  It wasn't

8   the same day?

9       A.    No, it was days.

10      Q.    And was it before or after your                 01:25 PM

11  termination?

12      A.    It was before my termination.

13      Q.    What did you say at that time?

14      A.    It was a follow-up call to find out

15  the status of it.  I didn't know if it was            01:25 PM

16  pushed under the rug or what the situation

17  may have been.

18      Q.    Did you speak with someone?

19      A.    Yes, I did.

20      Q.    And do you remember who?                         01:26 PM

21      A.    No, I don't believe they gave a

22  name.

23      Q.    What did they tell you about the

24  status?

145

1          A.    That the investigation was still                    01:26 PM

2     pending.

3          Q.    How did they know which

4     investigation you were referring to?  Did

5     they give you a number?

6          A.    You're given a number.

7          Q.    Do you have a record of that number

8     somewhere?

9          A.    No, I do not.

10         Q.    Did you ever find out the outcome              01:26 PM

11    of that investigation?

12         A.    No, I did not.

13         Q.    After that call back did you ever

14    call them again to find out the status?

15         A.    Not that I recall, no.                        01:26 PM

16         Q.    Did you make any other calls to the

17    ethics hotline about Jack Johnston?

18         A.    Not that I recall.

19         Q.    Or about your termination?

20         A.    Not that I recall.                            01:26 PM

21         Q.    About anything else?

22         A.    No, not that I recall.

23         Q.    I think there was a way to e-mail

24    complaints.  Did you ever e-mail complaints

148

1    thing?                                              01:28 PM

2        A.    No.

3        Q.    Like sort of a peer group of women

4    complaining about discrimination?

5        A.    Not that I'm aware of.              01:28 PM

6        Q.    If you can look at I think it's

7    back to Exhibit 1, the interrogatories.  And

8    it's on Page 9.  The question is asking you

9    about telephone calls to the integrity

10   hotline.  And at the top you say two          01:29 PM

11   occasions from late June through August

12   2001.  I just wanted to verify that you can

13   only recall one occasion that you called the

14   ethics hotline; is that correct?

15       A.    Then I called back.                  01:29 PM

16       Q.    In the second conversation, correct

17   me if I'm wrong, you didn't provide any

18   additional information.  You were just

19   asking the status.

20       A.    I believe that's correct, yes.       01:29 PM

21       Q.    Under the second sentence on Page 9

22   it says phone calls were made from

23   plaintiff's office extension at work.  A

24   copy of expense reports had been verified

157

1    inappropriate with that?

2        A.    Not the cheaper part of it but

3    utilizing the reward program to benefit is.

4        Q.    When you traveled by air for

5    Cingular did you get frequent flier miles?

6        A.    No, I did not.

7        Q.    Why not?

8        A.    I was not a member of a frequent

9    flier program.

10        Q.    Do you know if it's inappropriate

11    to obtain miles if you're a Cingular

12    employee?

13        A.    As a Cingular employee I'm not

14    aware of that.

15        Q.    Where is it written down that

16    you're not allowed to be a member of a

17    reward program?

18        A.    You would have that information via

19    Ameritech.

20        Q.    Have you seen it in writing?

21        A.    I have seen it in writing.

22        Q.    What type of policy?

23        A.    Business -- code of business

24    conduct for Ameritech.

01:40 PM

01:40 PM

01:40 PM

01:40 PM

01:40 PM

166

|   |   |
|---|---|
| 1 | A.   No. |
| 2 | Q.   If you can turn to the first page. |
| 3 | A.   Uh-huh. |
| 4 | Q.   Well, let me back up.  What |
| 5 | precipitated you sending this e-mail to |
| 6 | Cheryl? |
| 7 | A.   After our conversations that I had |
| 8 | with Cheryl -- or I'm sorry -- with Peggy. |
| 9 | This came to Peggy.  She asked me to start |
| 10 | documenting some of the facts. |
| 11 | Q.   When you created Exhibit 7, did you |
| 12 | have any notes that you created it from? |
| 13 | A.   Yes. |
| 14 | Q.   What happened to those notes? |
| 15 | A.   Those would be part of my Franklin |
| 16 | planner, which I no longer have. |
| 17 | Q.   Did you show Exhibit 7 to anyone |
| 18 | before you sent it to Peggy? |
| 19 | A.   Sandy Gammage saw this, and I |
| 20 | believe Debbie Thompson did as well. |
| 21 | Q.   How did they see it? |
| 22 | A.   They were in my office. |
| 23 | Q.   Did they give input into it? |
| 24 | A.   I don't believe.  I don't recall if |

01:54 PM

01:54 PM

01:55 PM

01:55 PM

167

1    they did or if they didn't.                          01:55 PM

2        Q.  So you don't remember if one of

3    them said, that's wrong, add this or --

4        A.  No, I don't recall that.

5        Q.  On August 27 when you sent this       01:55 PM

6    e-mail to Peggy what were you hoping to

7    achieve by sending this e-mail?

8        A.  Nothing.  She wanted me to send

9    this documentation because I had

10   conversations with her since the arrival of    01:55 PM

11   Jack.

12       Q.  Were you attempting to show that

13   Jack -- it appears from this that you found

14   fault in Jack's conduct; is that correct?

15           MR. LIETZ:  No.  Objection.  She's    01:56 PM

16   answered twice why she sent it and you're

17   now leading her with a totally different

18   answer.

19   BY MS. ABRAHAMS:

20       Q.  Is it correct that at the time you     01:56 PM

21   wrote this you had found fault with certain

22   conduct of Jack's?

23       A.  I had concerns.  Ethical concerns.

24       Q.  And at this point you had already

168

01:56 PM

1    been confronted with your expense

2    reimbursement form?

3        A.    I believe so, yes.

4        Q.    And you felt like Jack shouldn't

5    cast any stones based on his own conduct?

01:56 PM

6            MR. LIETZ:  Objection.

7            THE WITNESS:  No.

8            MR. LIETZ:  Third time.  She said

9    two times that she was told to document her

10   thoughts.  She's documenting them and

01:56 PM

11   sending them by e-mail.

12   BY MS. ABRAHAMS:

13       Q.    You can answer.

14       A.    That's correct.

15       Q.    Did you --

01:56 PM

16           MR. LIETZ:  For the record, what's

17   correct?  My objection or --

18           THE WITNESS:  Your comment.

19           MR. LIETZ:  Thank you.

20   BY MS. ABRAHAMS:

21       Q.    Were you angry with Jack Johnston

22   at the time that you wrote the August 27

23   e-mail?

24       A.    Concerned.

169

1        Q.   At the time that you wrote the         01:57 PM

2    e-mail did you feel like he was threatening

3    your job?

4        A.   I felt that I had worked in a

5    hostile work environment for some time.         01:57 PM

6        Q.   Hostile based on what?

7        A.   I think I explained those several

8    times.

9        Q.   Hostile based on your gender or

10   hostile because he didn't like you or how        01:57 PM

11   did you feel it was hostile?

12       A.   The comments that were made to me

13   about the nepotism policy.  The comments

14   that were not made to Jon about the nepotism

15   policy.  The comments that were made to me       01:57 PM

16   about regarding splitting the Lucera team

17   up.

18                  (WHEREUPON, said document was

19                   marked Exhibit No. 9

20                   for identification.)

21   BY MS. ABRAHAMS:

22       Q.   I'm showing you what's been marked

23   as Exhibit 9.  This is a copy of the

24   complaint that your attorney filed in this

170

1    case.  If you can look at paragraph 20 which          01:58 PM

2    states, in mid August 2001 plaintiff Rebecca

3    Lucera reported director Jack Johnston in

4    writing for seeking reimbursement of

5    expenses as set forth in the paragraph              01:58 PM

6    immediately preceding.  Just for

7    clarification is Exhibit 7 the e-mail that

8    you are referencing in paragraph 20?

9        A.   I believe so.

10       Q.   Did you make any other complaints          01:59 PM

11   in writing about Jack Johnston's conduct

12   other than Exhibit 7 and Exhibit 8, which

13   I'm about to hand you?

14       A.   I think these --

15            MR. LIETZ:  Have you read all of           01:59 PM

16   it?

17            THE WITNESS:  No.

18            MR. LIETZ:  Before you answer, I

19   would like the court reporter to reread the

20   question after we've gone through the               01:59 PM

21   document if you don't mind.

22                 (WHEREUPON, the record was read

23                  as requested.)

24            THE WITNESS:  Not that I recall.

172

1          Q.    Was anything illegal about what

2     Jack was doing?

3          A.    Illegal?

4          Q.    Yes.

5          A.    Not that I am aware of.

6          Q.    If you can look at the second --

7     actually the next bold issue that begins,

8     Jack's position is it permanent or

9     temporary.

10         A.    You want me to stop at the fact?

11         Q.    Yes.

12         A.    Okay.

13         Q.    Can you tell me what your concerns

14    were and how that conduct was harassment?

15         A.    Concerns were, one, again I am

16    accustomed to and the leaders at the Rantoul

17    call center were accustomed to working with

18    a director that was open to communication

19    two-way and wanted to know the facts when,

20    one, an e-mail said it was temporary and,

21    two, it was contradicted by Jim Klimas that

22    it was not or stated by Jack that it was

23    permanent and, two, it was contradicted by

24    Jim that it was not permanent and the fact

02:02 PM

02:02 PM

02:02 PM

02:03 PM

02:04 PM

178

02:11 PM

1    Cingular or SBC's policies.

2         Q.    When you were referring to the EEO

3    policy, what policy were you referring to?

4         A.    Ameritech.

02:11 PM

5         Q.    But at this point was this company

6    Ameritech?  Were you working for Cingular?

7         A.    We were merging.  Cingular had not

8    been created until right before -- the name

9    had been created right before I left.

02:12 PM

10         Q.    The next issue on the -- these

11    pages aren't numbered but the one that

12    begins, Joe Schnaufer had approved a leave

13    of absence for Dawn Curtis.

14         A.    That's correct.

02:12 PM

15         Q.    If you can tell me what you recall

16    about that and what your issue with Jack was

17    regarding that incident?

18         A.    Again, the code of business conduct

19    clearly stated for Ameritech Cellular that a

20    director had the right to give a leave of

21    absence.  The defamation of character -- the

22    director in place that approved that leave

23    of absence was the director Joe Schnaufer.

24    And we were put in a position, meaning we

179

1    being Debbie Thompson and myself and the

2    director that direct reported to Dawn Curtis

3    that we had to go deliver a message and

4    counteroffer something that the previous

5    director had already put into place.

6        Q.    And, again, did you view that as

7    discriminatory?

8        A.    Discriminatory, no, not

9    discriminatory.

10       Q.    Unethical?

11       A.    Unethical, yes.

12       Q.    And that was because in your

13   opinion it violated the policies of

14   Ameritech?

15       A.    Absolutely.

16       Q.    The next issue involved Jack

17   cancelling a security team.  Do you remember

18   that?

19       A.    Yes.

20       Q.    What was wrong with Jack making a

21   business decision to cancel a security team?

22       A.    My life was threatened by an

23   employee that we later had to terminate yet

24   Jack cancelled the security before even

02:13 PM
02:13 PM
02:13 PM
02:13 PM

RATKOVICH & LEPORE REPORTING (815) 258-1928

182

1    hostile, yes.                                02:17 PM

2        Q.   And hostile in what way?

3        A.   Basically do as I say.

4        Q.   Was hostile because you were a

5    female?                                      02:17 PM

6        A.   No.  I don't feel that.  Just

7    hostile in general as to you need to do what

8    I say regardless of union agreements or what

9    HR is giving us a different direction in.

10       Q.   Do you believe his conduct was      02:17 PM

11   illegal in giving you that direction?

12       A.   Illegal for the law, you would have

13   to tell me that.  Illegal for the bargaining

14   agreements, yes.

15       Q.   So it violated the bargaining       02:17 PM

16   agreement in your opinion?

17       A.   Yes.  Per the books of the

18   bargaining agreement.  Nonbargained

19   employees do not do bargained employees'

20   work.                                        02:18 PM

21       Q.   After this incident on July 17 how

22   long after did you and Debbie speak to

23   Peggy?

24       A.   We spoke to Peggy that day.

214

1        A.    No.

2        Q.    Are you aware of any employees at

3    Cingular who were allowed to take five-day

4    trips without receiving prior approval from

5    their supervisor and were reimbursed for

6    those trips?

7        A.    You would have to seek out

8    employees that took those trips.

9        Q.    I'm asking you if you are aware of

10    any.

11        A.    Am I aware of any?

12        Q.    Yes.

13        A.    No, I'm not aware of any.

14        Q.    Are you aware of any employees who

15    took five-day recruiting trips?

16        A.    I don't know how many days they

17    took.  We gave them as many days as they

18    needed.

19                    (WHEREUPON, said documents were

20                    marked Exhibit No. 10-11

21                    for identification.)

22    BY MS. ABRAHAMS:

23        Q.    Exhibit 10, do you recognize this

24    document?  It's two pages.

02:59 PM

02:59 PM

03:00 PM

03:00 PM

RATKOVICH & LEPORE REPORTING (815) 258-1928

                                                              275

1      conduct.

2      BY MS. ABRAHAMS:

3          Q.    Let's take your termination out of

4      it.  Other than your termination, any of the

5      conduct that you're reporting to Peggy?

6          A.    His expenditures, yes.

7          Q.    You think those were illegal?

8          A.    I think they were --

9              MR. LIETZ:  Same -- pardon me.

10     Same objection to the -- whether it's a              04:15 PM

11     legal conclusion or not, you're asking her

12     whether it's legal.  You could also ask

13     whether or not it's ethical.  That's for a

14     higher power than for her to answer.

15              If you know the answer, you may        04:15 PM

16     answer.

17              THE WITNESS:  I don't know the

18     answer to that.

19              MS. ABRAHAMS:  If you can read back

20     the question.  I think she started answering     04:15 PM

21     it.

22              (WHEREUPON, the record was read

23                 as requested.)

24