```
 1            IN THE UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF ILLINOIS

 3                      URBANA DIVISION

 4   REBECCA LUCERA,             )
                                 )
 5              Plaintiff,       )
                                 )
 6         -vs-                  )  No. 02-2268
                                 )
 7   CINGULAR WIRELESS,          )
                                 )
 8              Defendant.       )

 9

10         The deposition of PEGGY FRANKLIN, called

11   for examination pursuant to the Rules of Civil

12   Procedure for the United States District Courts

13   pertaining to the taking of depositions, taken

14   before STEVEN J. MAZA, a notary public within and

15   for the County of Cook and State of Illinois, at

16   140 South Dearborn Street, Illinois, on the 20th

17   day of July, 2004, at the hour of 9:18 o'clock a.m.

18

19

20

21

22   Reported by:  Steven J. Maza, CSR

23   License No.:  084-002479

24
```

EXHIBIT P

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

```
 1   a thousand.
 2       Q.   And was there also one opening up in 2001
 3   or soon thereafter in Charlotte, North Carolina?
 4       A.   Charlotte?
 5       Q.   Yes.
 6       A.   I don't know about that one.
 7       Q.   Ocala, Florida?
 8       A.   Yes, I do know about that.
 9       Q.   Any others?
10       A.   Not that I was knowing that these are
11   coming in to that are opening up.
12       Q.   Okay.  If someone worked at a Farmington
13   Hills call center or a Rantool call center and they
14   had concerns about their future viability or
15   status, could they go look at another call center
16   in terms of relocating themselves?
17       A.   We do have as far as an Intranet that does
18   post positions, that what we do have.
19       Q.   Suppose someone knew that there was going
20   to be an opening at a call center, say, in Ocala?
21       A.   Uhm-uhm.
22       Q.   Do they have to wait for the job posting
23   to be posted on the Intranet or can they make
24   arrangements to go down to Ocala and check it out
```

32

```
 1   themselves?
 2        A.   Well, you, obviously, need proper approval
 3   before just going down there.
 4        Q.   Okay.  Where is it written in the employee
 5   manual regarding proper approval before going down
 6   there?
 7        A.   Because if it's a business expense, a
 8   business trip that is part of protocol where we
 9   have to get approval from our managers.
10        Q.   Which manager?
11        A.   Your immediate manager who you're
12   reporting to.
13        Q.   You mean the call center manager?
14        A.   Which individual?
15        Q.   My question was where is that policy, and
16   you answered the question that you needed prior
17   approval and repeated what you said before.
18             My question is where is that in the
19   handbook?
20        A.   Not having the handbook in front of me, I
21   guess it's hard for me to answer.
22        Q.   Well, I am handing you what has been
23   supplied to us as a multiple page document --
24        A.   Okay.
```

33

```
1    Q.   My question is in that document that
2  you're thumbing through now, does it say
3  pre-approval required before going on a trip to
4  look for relocation?
5    A.   It's a pretty thick document.
6         What if I miss something?
7    Q.   So you are saying it could be in there,
8  you are just not sure?
9    A.   Right, exactly.
10   Q.   Are you familiar with that rule about
11 pre-approval being part of the employee expense
12 reimbursement policy before September of 2001, the
13 date of that document in front of you?
14   A.   Yes, you have to get pre-approval for all
15 business expenditures.
16   Q.   And you are confident that the employee
17 manual regarding expense reimbursement before
18 September 2001 requires that?
19   A.   Requires, the document requires that.
20        I mean I'm sure the document would
21 address, No. 1, like legitimate expenditures, then
22 as far as --
23   Q.   My question is only with respect to
24 pre-approval before the trip is initiated.
```

35

```
1    point we regroup and come to a determination.
2       Q.   How many investigations had you performed
3    before July of 2001 in that year from July of 2000,
4    July of 2001, how many investigations had you
5    performed by then?
6       A.   A lot.  A number.  Let's see.
7            Probably I would say under a hundred.
8       Q.   Dozens, but not more than a hundred?
9       A.   Correct.
10      Q.   In that 12-month period?
11      A.   Dozens.
12      Q.   Would you investigate with other people in
13   human resources or would you typically do it on
14   your own?
15      A.   I have done investigations both ways.
16      Q.   And for an area manager such as Rebecca
17   Lucera, what would be the protocol or the standard
18   way you'd do that, with someone else or alone?
19      A.   With someone else.
20      Q.   Who helped investigate Rebecca Lucera?
21      A.   Cheryl Bentley.
22      Q.   Anyone else?
23      A.   No.
24      Q.   What did you and Cheryl do as part of this
```

43

```
 1    investigation?
 2    A.    We, as far as with the ones we received
 3    the information, we at that point started
 4    conducting investigations.
 5    Q.    What did you do?
 6    A.    We actually spoke with Joe Schnaufer.
 7    Q.    And who else?
 8    A.    We did also speak with -- there was
 9    Rebecca, herself.
10          We spoke with Jon.
11          There were conversations also with Connie
12    Gass, Deb Thompson.
13    Q.    Were these communications in person or
14    over the phone or by e-mail?
15    A.    Over the phone and e-mail.
16    Q.    Did you do any in person?
17    A.    No.
18    Q.    In July of 2000 and August -- I'm sorry,
19    in July of 2001 and August of 2001, where were you
20    employed?  Where were you located?
21    A.    July 2001?
22    Q.    Yes.
23    A.    I was with SBC.
24    Q.    Where?
```

44

1    A.    I was actually out of the -- over at
2    Schaumburg at that particular time frame.
3    Q.    Was Cheryl Bentley also there?
4    A.    Yes, she was.
5    Q.    So all of your communications would have
6    come out of Schaumburg to either Rantool to talk to
7    these individuals or Joe Schnaufer would have been
8    in Ocala?
9    A.    Joe Schnaufer at that point was in Ocala.
10    Q.    So the answer is yes to both?
11    A.    Yes.
12    Q.    Who brought the allegations?
13    A.    Jack Johnston.
14    Q.    Were those allegations validated by human
15    resources before you started your investigation?
16    A.    Excuse me?
17    Q.    Were those allegations validated before
18    you started your investigation?
19    MS. ABRAHAMS: Object to the form.
20    BY MR. LIETZ:
21    Q.    Well, it's your answer.
22         You stated, did you not, that when
23    allegations were brought, that HR has to see if
24    they are worth pursuing.

45

```
 1    approval.  That I remember.
 2        Q.    Would it be fair to say that that policy
 3    that you remember reading and seeing in document
 4    form, in your mind, is that the primary reason for
 5    Rebecca Lucera being terminated?
 6        MS. ABRAHAMS: Object to the form.
 7              You can answer if you can.
 8        THE WITNESS:  There are multiple reasons.
 9    BY MR. LIETZ:
10        Q.    Well, let's go through them.
11              Would that be one reason?
12        A.    Misconduct.
13        Q.    I'm sorry?
14        A.    Misconduct, code of -- a code violation.
15        Q.    Okay, the misconduct is what?
16        A.    Misconduct, number one, not getting the
17    approval, okay, to notify your boss where you are
18    going to be, what your intentions are.  That was
19    the first thing.
20              Second thing is when she is down there,
21    there was excessive -- an expense for dinner, so it
22    was excessive.
23              She comes back.  She doesn't give the
24    expense report like she should to her immediate
```

54

```
 1      A.   That's correct.
 2      Q.   But she didn't sign it?
 3      A.   That's correct.
 4      Q.   How is it processed?  How is it sent, by
 5   overnight courier?
 6           How is it sent, by electronically?
 7      MS. ABRAHAMS: Go ahead if you know.
 8           Object.  Calls for speculation.
 9           If you know how she sent it, you can
10   testify.
11      THE WITNESS:  I don't know.
12      MS. ABRAHAMS:  If we can take a five-minute
13   break so I can see what's going on.
14      MR. LIETZ:  All right.
15                  (Whereupon there was a short
16                   break in the proceedings.)
17                  (Whereupon, Mr. Klimas enters
18                   the deposition.)
19                  (Record read as requested.)
20   BY MR. LIETZ:
21      Q.   Back on.
22           So then you are not sure who sent it; it
23   could have been Jon, it could have been Rebecca?
24      A.   No, Rebecca did say that she sent it to
```

57

```
1    Liz Ross.
2         Q.   Between the time that Jack Johnston
3    started as the area call manager or the call center
4    manager in Rantool, through the end of August or
5    I'm sorry -- strike that.
6              From the time that Jack Johnston started
7    as the call manager at the call center in Rantool
8    until you started the investigation of Rebecca
9    Lucera, how many times did you have any
10   communications with Rebecca Lucera?
11        A.   I know one time for sure face-to-face,
12   possibly there might have been some disciplines
13   that we were working together on the telephone.
14        Q.   All right.  Disciplines of other call
15   center employees?
16        A.   Correct.  That would be our standard
17   procedure if there was going to be our highest
18   level of discipline at the time is a DML, and that
19   had to be -- actually with our process, it had to
20   be with the area manager and manager and a member
21   of HR, so they would call me letting me know I'd
22   have to concur on the discipline, and at that time
23   that was standard procedure, so she could have been
24   calling me for, per se, discipline of this type,
```

58

1    Q.    Okay. Why was that investigation

2    initiated?

3    A.    Because during our questioning with

4    Rebecca Lucera, we were trying to get her input.

5    We had specific questions we were asking her.

6          She said I have some issues, and so we

7    told her, okay, wait till near the end of the

8    conversation.

9          We at that point heard that there were

10   issues. It wasn't just some question she was

11   asking us, so at that point we told her, please,

12   submit that in writing, and that's exactly then

13   what she did do. She put her issues in writing.

14   Q.    In July and August of 2001, did Cingular

15   or SBC have something referred to as an ethics hot

16   line?

17   A.    Yes, we did.

18   Q.    Do you remember if an anonymous call was

19   made to the ethics hot line regarding Mr. Johnston

20   at that time?

21   MS. ABRAHAMS: Object to the form.

22   MR. LIETZ: You can answer.

23   THE WITNESS: I believe there was.

24

66

1  Cheryl asked me to call her.

2  There was a conversation or a voice mail

3  that I left with her that we were trying to, I

4  think, resolve a check. That was it. One

5  conversation, and either it was in voice mail or a

6  conversation with her.

7  Q.  Before I forget, what happened with

8  respect to the investigation of Mr. Johnston, what

9  ultimately --

10  A.  That Mr. Johnston was cleared.

11  Q.  When you had your last conversation with

12  Mrs. Lucera, did you indicate to her that one day

13  it may be necessary for her to call upon you, and

14  you indicated that you would be there for her, do

15  you remember saying that?

16  A.  No. I did not say that.

17  MR. LIETZ:  Nothing further.

18  MS. ABRAHAMS: Okay, can I just take a

19  five-minute break for the bathroom?

20  MR. LIETZ:  All right.

21           (Whereupon there was a short

22            break in the proceedings.)

23              EXAMINATION

24  BY MS. ABRAHAMS:

1    investigation discovering that Jack Johnston had
2    had a meeting with his employees telling them that
3    he needed -- that they needed to seek pre-approval
4    for travel expenses?
5        A.   Yes, that happened in our investigation.
6             We have written testimony, and our
7    evidence did show that Jack did meet with all the
8    call center managers and where both area managers
9    were present, and he said that he wanted to see all
10   expenses prior to being submitted.
11       Q.   Okay.  During your investigation of the
12   allegations that were brought to you by Jack
13   Johnston, did you also look at an e-mail from
14   Connie Gass?
15       A.   Yes.  The e-mail from Connie Gass to me,
16   it reiterated that Rebecca was definitely aware of
17   proper protocol because she was telling Connie Gass
18   about referencing another employee, Anita Moxley,
19   about proper -- that these expenditures might not
20   be paid by Jack, and that was due to the meeting
21   that they all sat in on where Jack told them he
22   wanted to review all expenditures, and it was on
23   the same day when she was leaving for her trip is
24   when she actually to me verified she was aware of

75

1  proper procedures.

2     Q.  Okay.  You were asked about reasons for
3  Rebecca Lucera's termination, and you had said one
4  was excessive expenses.

5        Were her expenses also excessive in the
6  length of time she had taken her trip?

7     A.  Yes.  She had her -- the time frame was
8  five days, and the trips prior to that were
9  normally one to two days, so not only were they the
10 excessive with the expense amount, but also the
11 time frame.

12    Q.  Okay.  Was Rebecca Lucera an exempt level
13 employee?

14    A.  Yes, she was.

15    Q.  For exempt level employees, does the
16 progressive discipline process that you described
17 apply?

18    A.  The stages of discipline would not.

19       We have as far as a we hold managers at a
20 higher accountability, and so we do have as far as
21 an incident report that we put them on, and in her
22 -- I'm sorry.

23    Q.  Okay.

24    A.  Rephrase that one more time.

76

```
1    2001 or possibly that it was verbally
2    communicated,, do I understand that correctly?
3        A.   I remember --
4        Q.   I'm sorry, can you just answer that yes or
5    no?
6        A.   Then -- okay, if you say that.  Repeat
7    that.
8        MR. LIETZ:  Please repeat the question.
9                    (Record read as requested.)
10       THE WITNESS:  Yes.
11   BY MR. LIETZ:
12       Q.   Also, you testified that Mr. Johnston met
13   with the employees --
14       A.   Uhm-uhm.
15       Q.   -- and told the employees of this policy,
16   is that correct?
17       A.   Mr. Johnston met the new area managers and
18   the management team since he was now their, you
19   know, new with his new position, and in the meeting
20   conveyed to everyone all the expenditures must go
21   through him is what he said in that meeting.
22       Q.   Then it is possible that this verbal
23   communication was through Mr. Johnston to the
24   Rantool call center managers and management team,
```

78

```
 1   a business trip.
 2        Q.   How would they know what expenses would be
 3   incurred for the actual hotel stay, meals and
 4   transportation by rental car before the trip was
 5   taken?
 6        A.   The purpose of the trip.
 7        Q.   I understand that, but how would anyone
 8   know what the expenditures would be for meals, car
 9   rental or hotel bills before the trip was
10   undertaken?
11        A.   What he wanted was as far as knowledge of
12   anyone that were under him as far as a purpose for
13   a business trip, he would want that, and then once
14   the expenditure is occurred, he wanted to see them
15   and approve them prior, you know, to being
16   submitted to being paid.
17        Q.   So he didn't want them before they took
18   the trip, he wanted them after they came back from
19   the trip?
20        A.   The expenditures.
21             The purpose, he wanted to know the purpose
22   prior to the trip, but the expenditures he wanted
23   after the trip.
24        Q.   Do you remember that being specifically
```

80

```
 1               I don't keep these particular records.
 2        Q.     Do you remember during the investigation
 3   of Rebecca Lucera, Rebecca Lucera saying that she,
 4   in fact, had told Jack Johnston that she was going
 5   to take a trip to Florida, to Ocala?
 6        A.     Say that one more time.
 7        Q.     Do you remember Rebecca Lucera telling you
 8   during your investigation that she, in fact, had
 9   told Jack Johnston that she was going to take a
10   trip to Ocala?
11        A.     In our conversation with Miss Lucera, she
12   said she sent him an e-mail, and she could not
13   produce the e-mail.
14        Q.     And you chose not to believe that?
15        A.     No, we had Debbie then that also said that
16   she told Debbie, Jon and I are going to Florida,
17   and she said she had purposely circumvented Jack
18   and said that she was not going to be telling Jack
19   that she is going to Florida, and she told that to
20   Debbie, Debbie told that to me during the
21   investigation.
22        Q.     Did you ask Mr. Johnston if he received an
23   e-mail from Ms. Lucera?
24        A.     I believe we did, but that was quite a
```

83