**E-FILED**
Friday, 01 October, 2004 04:53:07 PM
Clerk, U.S. District Court, ILCD

```
 1   while ago.

 2        Q.   And were all those documented in these

 3   interviews that were transcribed?

 4        A.   Yes.

 5        Q.   You indicated that the excessive expenses

 6   included an excessive length of time?

 7        A.   Uhm-uhm, that's correct.

 8        Q.   When compared to prior trips?

 9        A.   Yes.

10        Q.   You indicated, however, that you never

11   participated in any other investigations regarding

12   questions -- regarding reimbursement for prior

13   trips?

14        A.   Uhm-uhm, that is correct.

15        Q.   All right.  Whose prior trips did you look

16   at?

17        A.   We actually had some records pulled during

18   this investigation to see what some of the other

19   employees were doing.

20             They were some other employees were also

21   going on, per se, interviews, and those employees,

22   one was -- there was like two or three that we saw,

23   and they were all within two days, one to two days

24   time frame.
```

                                                              84

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| REBECCA LUCERA, | ) | |
| | ) | |
| Plaintiff, | ) | Judge Baker |
| | ) | |
| | ) | No. 02-2268 |
| v. | ) | |
| | ) | |
| CINGULAR WIRELESS, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |

### AFFIDAVIT OF MARGARET FRANKLIN

I, Margaret (Peggy) Franklin, being first duly sworn on oath, depose and state as follows:

1.　　I am currently employed as Employee/Labor Relations Consultant for Cingular Wireless in Schaumburg, Illinois.

2.　　I have held the position of Employee Relations Specialist since July 17, 2000.

3.　　In my capacity as Employee Relations Specialist my duties include conducting investigations into allegations of misconduct by Cingular employees.

4.　　In July and August 2001, I reported directly to Cheryl Bentley, Senior Human Resources Manager.

5.　　On or about August 16, 2001, Jack Johnston contacted me and informed me that he believed Rebecca and Jon Lucera had engaged in misconduct in relation to a trip they had taken to Ocala, Florida.

6.　　Also, on August 16, 2001, Jack Johnston faxed to the Human Resources Department a copy of the Employee Expense Reimbursement form he had received from Elizabeth Ross related to the trip taken by the Luceras to Ocala.

**EXHIBIT**

**Q**

7.    Mr. Johnston informed me that Ms. Lucera had not sought his prior approval for the days off or for business travel; that the expense report contained excessive expenditures; and that the expenses for which Ms. Lucera sought reimbursement were ones which Mr. Johnston had previously informed her would not be reimbursed by the Rantoul Call Center.

8.    During our conversation, Mr. Johnston also informed me that rather than submitting the expense reimbursement form to him for approval as was the practice, Ms. Lucera had attempted to circumvent him and all Rantoul Call Center management by sending the expense form to a manager outside the Rantoul Call Center.

9.    Mr. Johnston requested that Human Resources investigate the potential misconduct of Ms. Lucera and her husband Jon Lucera.

10.    On August 21, 2001, Ms. Bentley and I conducted a telephone interview of Joseph Schnaufer, the Director at the Ocala, Florida Call Center and former Director of the Customer Operations for the Rantoul Call Center.

11.    Mr. Schnaufer confirmed that Rebecca and Jon Lucera had visited the Ocala Call Center from July 19 through July 24, 2001 and that the trip was an informal visit.

12.    According to Mr. Schnaufer, no formal interviews took place during the Luceras' visit to Ocala.

13.    Mr. Schnaufer stated that he had extended an offer of employment to Mr. Lucera but had not yet extended an offer to Ms. Lucera.

14.    Mr. Schnaufer also informed us that he did not contact Mr. Johnston prior to the trip as he assumed that Rebecca and Jon Lucera had made the necessary arrangements and obtained the proper authorization and approval prior to the trip.

15.     He also indicated that he never agreed to cover any of the expenses incurred by the Luceras from Ocala's budget and assumed that they had made the proper arrangements for reimbursement of their expenses.

16.     On August 22, 2001, Ms. Bentley and I conducted a telephone interview of Ms. Lucera regarding the trip she and her husband had taken to Ocala, Florida.

17.     Ms. Lucera confirmed that she was not formally interviewed when she went to Ocala.

18.     Ms. Lucera stated that she had contacted Elizabeth Ross to see if she would sign-off on the expense form and that she had sent the request reimbursement form to Elizabeth Ross.

19.     Also on August 22, 2001, Ms. Bentley and I conducted a telephone interview with Jon Lucera.

20.     Mr. Lucera informed us that the expenses were for both he and Ms. Lucera and that his wife did not want Debbie Thompson to sign off on the expenses since Rebecca Lucera and Debbie Thompson are at the same level.

21.     On August 27, 2001, Ms. Bentley and I interviewed Debbie Thompson regarding the Luceras' trip to Ocala.

22.     Ms. Thompson also indicated that Ms. Lucera had told her that she had not told Mr. Johnston about her trip to Ocala and had no intention of telling him that she was going to Ocala. According to Ms. Thompson, at some point around the time of Rebecca and Jon Lucera's trip to Ocala, Mr. Johnston approached her and asked her if she knew Rebecca Lucera's whereabouts. Ms. Thompson recalls feeling uncomfortable that she knew that Ms. Lucera was in Ocala but that Mr. Johnston was unaware of her whereabouts.

23.    On August 28, 2001, I interviewed Connie Gass regarding her communications with Ms. Lucera related to whether Rantoul Call Center would reimburse employees for expenses incurred during interview trips to other locations.

24.    Ms. Gass relayed to me that it was evident based on a conversation she had with Ms. Lucera on July 17, 2001, that Ms. Lucera's position was that expenses for interview trips to other locations would not be reimbursed by the Rantoul Call Center.

25.    Ms. Gass forwarded to me an e-mail from Ms. Lucera that I construed as clear evidence that Ms. Lucera was definitely aware of proper protocol in submitting expense reimbursement forms.  In the e-mail, Ms. Lucera informed Ms. Gass that Anita Moxley's expenses might not be approved by Jack Johnston based on the meeting Mr. Johnston had with Ms. Lucera during which he stated that he wanted to review all expenditures.

26.    On August 29, 2001, Ms. Bentley and I conduced a follow-up interview with Ms. Lucera during which she confirmed that she was aware that Mr. Johnston had required that he review all expenses for all Rantoul Call Center employees.  She indicated that that was a change for them.  According to Ms. Lucera, they had over four years of being empowered and now Jack Johnston wanted to see the expenses.

27.    At the conclusion of the investigation, Ms. Bentley and I recommended that Ms. Lucera be terminated.

28.    Upon the conclusion of our investigation, Cingular's  Human Resources Department (including Jim Klimas, Cheryl Bentley and myself); Cingular's Legal and Corporate Ethics Departments; Grace Seymour, the Regional Vice President; and Jack Johnston met to discuss what action to take with regard to the Luceras.

29.    A collaborative decision, involving all of the individuals and Departments named above, was subsequently made to terminate Ms. Lucera and issue a final warning to Jon Lucera.

30.    During the August 22, 2001 telephone interview with Ms. Lucera, she indicated that had some "issues" although she did not specify the nature of the "issues."

31.    In response, Ms. Bentley and I requested that Ms. Lucera put the "issues" in writing so that they could be addressed.

32.    On August 27, 2001 at approximately 5:33 p.m., Ms. Lucera sent me an e-mail outlining concerns she had with Mr. Johnston. A true and accurate copy of the August 27th e-mail is attached hereto as Exhibit 1.

33.    In her August 27, 2001 e-mail, Ms. Lucera complained generally about the following issues: 1) Mr. Johnston had purportedly "threatened" the leadership team when they inquired about the future status of the Rantoul call Center; 2) Mr. Johnston allegedly made the false statement that his position as Director of the Rantoul Call Center was permanent and such statement was inconsistent with Human Resource's alleged position that Mr. Johnston was only temporary; 3) on or about June 18, 2001, she had lunch with Johnston during which allegedly no business was discussed but Johnston said he would pick up the bill stating, "I will expense this one;" 4) Mr. Johnston allegedly did not institute a merit pay increase requested by Ms. Lucera for two employees; 5) Mr. Johnston stated in front of leaders and area managers that Mr. Schnaufer should not have approved a thirty day leave of absence for a Call Center employee; 6) Mr. Johnston cancelled a security team in the Rantoul Center which had been set up after an incident between Ms. Lucera and an ex-employee; 7) Mr. Johnston wanted non-union labor to assist with high call volume due to the Springfield Call Center being down which was allegedly a violation of the Union contract; 8) Mr. Johnston did not approve releasing employees to begin

working at other Call Center in accordance with the plan proposed by Ms. Lucera; 9) Mr. Johnston was inconsistent in the manner in which he granted release dates; 10) Mr. Johnston questioned Plaintiff's submission of her expense reimbursement to Elizabeth Ross and the length of Plaintiff's trip to Ocala; 11) Mr. Johnston allegedly asked Ms. Lucera if she was aware the Cingular had a nepotism policy; 12) on August 11, 2001 and August 18, 2001, Mr. Johnston came into the Rantoul Call Center but although he was allegedly was only there for a short time, he expensed mileage to and from the Call Center; 13) when Mr. Johnston's car breaks down, he expenses a rental car which violates company policy; and 14) on August 16, 2001, Mr. Johnston cancelled a reservation at the Crown Plaza in Springfield in favor of the Drury Inn allegedly due to the fact that he gains frequent traveler bonus points at the Drury Inn.

34.     On August 28, 2001 at 8:36 a.m., Ms. Lucera sent me a second e-mail complaining that on July 21, 2001, Johnston stayed in Champaign at the Drury Inn which was direct billed to the Rantoul Call Center. He then allegedly signed off on his "AP-1" form which was purportedly impermissible. A true and accurate copy of the August 28, 2001 e-mail I received from Ms. Lucera is attached hereto as Exhibit 2.

35.     Also in the August 28, 2001 e-mail, Ms. Lucera claimed that Mr. Johnston had inquired why she had purchased new business cards.

36.     On September 10th and September 19, 2001, I forwarded a copy of the August 27th and 28th e-mails respectively to Mr. Johnston and requested that he provide a written response.

37.     I did not make Mr. Johnston aware of the e-mails sent to me by Ms. Lucera or the content of Ms. Lucera's issues with him prior to Ms. Lucera's termination.

38.    On September 14th and September 19, 2001, Mr. Johnston provided me with written responses to the August 27 and 28th e-mails respectively. A true and accurate copy of the responses provided by Mr. Johnston is attached hereto as Exhibit 3.

39.    I conducted an investigation into the allegations made in the August 27th and 28th e-mails and determined that Mr. Johnston did not engage in any inappropriate conduct and had not violated any of Cingular's policies.

40.    The issues raised by Ms. Lucera about Mr. Johnston played no role in the investigation of the allegations of misconduct by Ms. Lucera and did not influence the decision to terminate Ms. Lucera.

41.    The investigation into the allegations brought by Ms. Lucera (relative to Mr. Johnston) was treated separately from the investigation into allegations of misconduct by the Luceras.

42.    No allegations of impropriety by Mr. Johnston were ever discussed during the process which led to Ms. Lucera's termination and Mr. Lucera's warning.

43.    On August 22, 2001 at 2:40 p.m., a call was received by Cingular's Ethics hotline from an unknown caller stating that on August 20, 2001, Jack Johnston had an issue with the expenses of an employee incurred while she was on a business trip in Ocala. According to the caller, Mr. Johnston had stated that the employee took too many days for the trip although there were other employees who went on the same trip and their expenses were approved. Johnston allegedly told the employee "off the record," that there is a nepotism policy and its time the employee and his/her spouse are split up. The caller indicated that Johnston appeared to be trying to get the employee to quit because of his hostile behavior. The caller stated that Mr. Johnston appears to look for anything to harass the employee and make him/her feel his or her

job is in jeopardy. The caller indicated that Johnston was slandering the employee's name by mentioning the expense issue to other Directors. A true and accurate summary of the call received by the Ethics Line is attached hereto as Exhibit 4.

44.    The August 22, 2001 call to the Ethics line was referred to me for investigation. During the investigation, I interviewed Jack Johnston and reviewed relevant documentation.

45.    Based on my investigation, I prepared a response to the ethics line call. A true and accurate copy of the response I prepared is attached hereto as Exhibit 5.

46.    I concluded that Ms. Lucera had traveled on company time without prior approval; that she told the other Area Manager that she was not going to tell Johnston about trip; that she did not apprise Johnston about the expenses as required; and that Ms. Lucera and her husband did not go through proper channels to get reimbursement in that they had submitted the expense report to Elizabeth Ross who had no relevant function or reporting relation to the Luceras. I also determined that the length of the trip was excessive in duration.

47.    At no point during the August 22nd call did the caller mention anything related in anyway to Mr. Johnston's personal expense reimbursement practices.

This affidavit is based upon my personal knowledge. It is true and correct to the best of my knowledge, information and belief. If sworn as a witness, I could testify competently to the foregoing.

THIS ENDS MY AFFIDAVIT.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _September 30, 2004_

_Margaret Franklin_
Margaret Franklin

**. BENTLEY, CHERYL L**

| | |
|---|---|
| **From:** | FRANKLIN, MARGARET (SBMS) |
| **Sent:** | Monday, August 27, 2001 5:33 PM |
| **To:** | BENTLEY, CHERYL L (AIT); KLIMAS, JIM (SBMS) |
| **Subject:** | RE: documentation |

-----Original Message-----
| | |
|---|---|
| **From:** | ISOM-LUCERA, REBECCA D (AIT) |
| **Sent:** | Monday, August 27, 2001 4:54 PM |
| **To:** | FRANKLIN, MARGARET (SBMS) |
| **Subject:** | documentation |

Peggy,

Here is some of my documentation.

Thanks,
Rebecca



HRjack.doc

<< File: HRjack.doc >>

EXHIBIT

1

1

**Issue:** On June 14, 2001 at 10:30 Jack met with the Rantoul Leadership team for the very first time. Jill Dautzenberg made the comment that she was concerned about the moral issues in our call center due to the unknown status of the center. Jill asked what ideas did Jack have or what best practices did he find that worked in the Schaumburg call center with moral issues.

**Jacks answer:** There are two paths that you can take. One it is your job as a supervisor to correct moral and if you can't do that then there is always the other path and "if *you* can't handle correcting morale I have know problem steering *you* down the other path of your job."

Jack Johnston also made a similar comment during Team meetings with associates & their Leaders. Associates were asking questions regarding the fate of this call center, etc and Jack made the comment again to some of our associates, "There are two paths that you can go down the right one or the one that we can help you down".

**Fact:** Jack Johnston threatened the entire Leadership and some associates during team meeting to steer them down a path regarding their jobs.
**Fact:** This is violation of Code of Business Conduct/ /discrimination and harassment

**Issue :** Jack's position is it permanent or is it temporary, Jim Klimas sent out an email that stated Jack Johnston would over see Rantoul temporarily and Lisa Mayo would be the main contact for Schaumburg. During a staff meeting on June 14th Lois Happ asked the question of Jack when will they be posting for the Director's job ? Jack replied " I am the Director and yes I am permanent". Two leaders Victoria Bean-Lewsader & Debbie Grilo later that same day contacted Jim Klimas to confirm Jacks comments regarding his position. Both Ladies were confused that Jack would say it was permanent but Human Resource would send an email to the Great Lakes Region stating it was temporary. Debbie Grilo emailed Jim Klimas and Victoria Bean Lewsader called and left him a voice mail they both received the same answer. Jim shared with both of them that they were NOT permanent positions. Jim was asked by both parties when would these positions post? Jim responded by saying, Positions at this level no longer post, however a decision has not been made as to whom or when they will have a permanent person in the role. Both ladies came to see me regarding this issue and Jack's integrity, a decision with both of them I shared that I would bring this information to Jack attention.

    That same day I ran into Jack in the back parking lot leaving for the day. I shared with Jack the Leaders concerns regarding his comments in the staff meeting and the conversation and response that these ladies received from Jim Klimas. Jack's response to me was " HR needs to get their facts straight, I am the director of this call center and Lisa Mayo was promoted to Director of Schaumburg, in fact she is moving into my old office as we speak". Surprised by Jacks comment regarding Human Resources and the tone he took it in, I wished him a safe trip home and never brought up the concern again.

**Fact:** HR sent an email stating these positions are temporary, Jim Klimas agreed with two different Leaders that these positions were temporary. Jack's head count is not included in the Rantoul Call Center . In fact it comes from the Schaumburg call center.

**Fact:** Deformation of character is violation of Code of Conduct

Questions?

Why? Is it okay for Jack to falsify information to the Rantoul Management team and associates?

Why? Is it okay that Jack falsely accuses our Cingular Human Resource Department of not having their facts straight?

D00176

**Issue:** Jack was supposed to meet with me on June 18 (this date may not be exact he scheduled a couple of meeting but had to cancel them). At 11:00 AM this got pushed back to 12:00 AM then it became a 12:35 PM lunch meeting where no business was discussed just Jack talking about his mountain climbing endeavors and the time that he has been allowed to take to do them in. However we did rush through lunch so that Jack could be back to for a 1:00 PM conference call, and Jack did pick up the bill stating "I will expense this one".

**Fact:** Expensed lunches are for business purposes only, mountain climbing is not Cingular business.

**Issue:** On June 29, 2001 I spoke with Jack regarding Jay & Vic's pay increase that should have occurred in May 2001. Jack said he would take it to Grace on Wednesday's meeting. I did not hear back from Jack so I called and left a message for Rick Robinson regarding this issue on Monday July 9th, on Wednesday July 11th I heard back from Christine Murray and she discussed that nothing was put into their permanent files regarding this increase so we were unable to bumped them up to the minimum as promised in February by Rick Robinson, Keith Fezzey, Joe Schauafer and myself, I also shared that the job was posted with a salary range of $42,700 - $53,300 dated 11/29/2000 Jay & Victoria were made offers on 02/01/2001. Christine did share that they fell within the new Cingular Manger salary range P1 $28,347 - $56,000. I explained to Christine that Victoria personally spoke with Rick in February and he promised her that she would be reviewed in 3 months and bumped up to the minimum. Jay Creek email Cory Bolanowski and was quoted that "The Old Ameritech policy of automatically bringing employees to the minimum of the salary range hand not been in effect since the time of merger between SBC and Ameritech." The merger between SBC & Ameritech took place in October 1999. Victoria & Jay are very much aware that 5 Leaders were brought to the minimum in April & May of 2000. Christine asked me to fax this email, I did. Then later received a call from Christine along with an email, attached to the email were the Ameritech Cellular and Paging status form change that were backdated to 5/13/01. During our conversation Christine asked me to share with Victoria & Jay that this is now in Call Center Operations and that HR would not be handling this anymore. Christine shared that I would need to sign off on these then have Jack sign and then they would need to go to VP level (Grace Seymour). I spoke with Jay & Victoria and explained that HR has completed their role in this process and that they would not be hearing back from them however they have sent me the forms to have completed and have signed off in the call center operations command. I signed off on the forms then walked them down to Jack' office. Jack was out of the office so I came back upstairs. Jack was in the office the next day so I worked them down to him along with documentation of the occurrences that have taken place during the promotion of Jay Creek & Victoria Bean-Lewsader. Jack said he would take them to Grace on his next staff meeting 7/18/01. (Jack drives to Schaumburg every Wednesday to attend Grace's staff meetings) On 7/25/01 Jack shared that Grace said this was an HR issue and that she would not sign them, so I asked Jack if he wanted me to call Rick he said no that he would. On 8/14/01 I sent an email to Jack asking him what our status was on Jay & Victoria, he replied that he has spoken to Christine Murray and that she had passed them to Rick for final signature. Jack met with Jay & phoned Victoria to share that they would not be receiving a bump in pay to the minimum that was posted, he also shared with both of them that "Joe Schnaufer and others bit off more than they could chew". These Leaders brought this back to me, I apologized for Jack's comment about our former Director and explained to both of them that this is not what Cingular meant when they created the logo 'Express Yourself'

**Fact:** I Rebecca Isom-Lucera being the hiring manager did and do have every right to request the merit increase, based on the salary treatment sent by Michelle Morgan on February 1, 2001. This form clearly states that the hiring manager has the right to request a ramp up to the minimum.

**Fact:** Deformation of character is a violation of Code of Business Conduct & EEO policy.

Issue: Joe Schnaufer approved a leave of absence for Dawn Curtis for 30 days. When Jack found out about this he stated to Debbie Thompson & myself that "Joe had no right to approve this leave of absence and wanted Debbie and Ron Titsworth to go back to Dawn and tell her she could not have it." Fearful we did not do this because we felt if Joe made this arrangement than we needed to stick with it. Jack later shared that he spoke with Jim Klimas and Jim said that Joe should have never done this. I then showed Jack where in the LOA policy it states that a Director may give a 30 LOA.

Fact: Jack strikes out against the Joe Schanufer stating he has not right to give a LOA in front of Leaders & Area Managers.
Fact: Deformation of character is a violation of Code of Business Conduct & EEO policy.

Issue: 5/13/01 – 6/30/01
On 5/13/01 Corporate Security put in place a Security Team in the Rantoul Call Center due to an incident regarding and ex-employee, Debbie Grilo & myself. This team was scheduled to be here from 45 and up to 60 days. On July2, 2001 I received a phone call from Jack Johnston explaining that he didn't think that the security team was doing a lot and that they were very costly to our budget and would it be okay if he canceled them? At this point I was not sure what to say, Jack is telling me that they are costly to our budget & that he thinks they aren't really doing anything. Truly feeling like Jack cares more about our budget then the safety of employee's. I responded to Jack by saying … what ever you think is best Jack.

Fact: Jack called me to cancel Security on 7/2/01, security was canceled on 6/30/01

Issue: Tuesday July 17th, Jack called Jay Creek & wanted Quality Assurance to go on line and take calls due to the Springfield call center being down. Jay remembering the Labors agreements did not feel comfortable and decided to get clarification from HR, Jay called Peggy Franklin to determine if QA could get on line and take calls, he did advise her that Springfield was down and that this would be a one-time exception type of thing. Peggy got clarification for Cherly Bently who responded via email to all parties involved that QA can not take calls per Terry Pluta regional union president and per labor. Once Jay received clarification from HR he spoke with Jack and advised of HR & labors decision and Jack went around to say this is an emergency situation and to put them on line and Jay still refused to do it. Jay went to Debbie Thompson who was working on the Springfield issues and notified her of this issue. Debbie had to call Jack back at that time Jack through Jim Klimas's name in stating that due to the circumstances we needed to get these people on line. Debbie & Jay then called Jim Klimas to confirm, Jim was getting ready to board a plane and stated he knew their was an issue in Springfield but he did not have to discuss it. QA was not put on line based on the email from Peggy Franklin & Cherly Bentley; Jay advised QA that they might be utilized to assist with escalated calls.

Issue : Release dates: As all the mega centers began to start up and hire we had several individuals that were interested in relocating.
• Victoria Bean-Lewader –Ocala
• Bruce Larsen- Ocala
• Carla Gass- Johnson City
• Michelle Masters- N C
• Anita Moxley – Johnson City
• Connie Gass – Engineering / Springfield
• Jon Lucera – Ocala

Jack, Debbie and I had several conversations on how we could work this out. Debbie & I put together a proposal to staff teams 17 to 1 and add 2 HELP Desk persons. This relieving manager from some questions and supervisor calls, allowing them to coach & develop their teams, this would also allow Managers to take various opportunities as they came available. We also recommended additional

headcount. Both ideas were pushed to the back burner and Jack told us that Grace said we need to hold people until the Telegence conversation is complete. (The telegence conversion is associate effecting, leaders may not take calls to assist with call volume based on Labor agreement) I personally shared this with Jack several times but he would not hear it. His only response was that we need to have our Leaders and associates here and that Grace said we are on a freeze. I spoke with Lea Knight in Detroit to see if this was the case in Detroit, she shared no that they are releasing Leaders & associates in their call center and have not heard of any kind of freeze due to Telegence. I questioned Jack later if there truly was a freeze and he said yes Grace said there was. I brought to his attention that I was concerned that we were not being consistent across the Region, that Detroit was releasing individuals and we were not. I said I would like to run this by HR? He reminded me that this was not an HR issue and that Grace said we are on a freeze. Jack also told me that he did not appreciate me going out of the chain of command by going to HR. I shared with Jack that it is my responsibility as an Area Manager to make sure we are being consistent. And it is my right as a Cingular employee to seek HR's assistance at anytime. The next day one of my Leaders came to see me (they have been asked to remain nameless, they are fearful of retaliation) they were down stairs waiting to speak with Jack when they overheard the following information: "Rebecca is on her way to talk to HR about being consistent and I want to make sure you have my back on this one.... So you have my back correct?" I told the Leader thank you for sharing this information with me, and not to worry I would not share there name with anyone. Jack called me to his office the following day, Jack shared that he did not like the way I approached him yesterday, and did not like the way I said I would go to HR and that I have no right to go to HR over this,. That Grace has made a decision and we are standing firm. Jack shared with me that I was very assertive, and I agreed with him. I also agreed that assertive is part of my personality and my personality is something that Jack will learn over time and I will do the same with his. Jack shared with me that he had dealt with very strong personalities from women in the past and named Lucia & Grace but never anyone like me. I shared with Jack that I did not appreciate the fact that he was pointing out the fact that I was one a **women and two assertive and that he had to deal with me.** I said to Jack a business person is a business person ,regarless if they are a women or not and you do not deal with your business partners you work with them.

Jack also shared that he had discussed this with a peer just to make sure he was not missing anything and that he was being consistent. I told Jack I was aware that he discussed it with a peer and that it was brought to my attention that he discussed it yesterday. Then Jack shared with me that he discussed it with Jim Klimas, I was very upset at this point and made the following statement to Jack. "Jack, you have brought me down here to tell me that you do not like the way I approached our conversation yesterday and that I have no right to go to HR but yet you called Jim Klimas to make sure he had your back?" Jack response was that him and Jim were long time friends and he was just bouncing this off of him. I shared with Jack that I looked at it as more of slandering my name in HR's eyes. Jack continued to tell me that this is a closed case and all jobs would be frozen until Telegence was completed his calculation would be around late September or sometime in October 2001 with the exception that something goes wrong.

I did remind Jack of one other point, when AIT was being inindated with calls due to the CDMA to TDMA conversation, we took the hit and mandated OT so that we could assist our sister call center get up and running. I asked Jack to look at the big picture holding these individuals from Ocala & Engineering was only hurting Cingular. I also made the recommendation to see if Nancy would loan us some of her Floating Supervisors . We (Debbie, Jack and I) ended up calling Joe Schnaufer and conferencing him on the line to tell him that we could not release these individuals. By the end of the conversation Jack was willing to try and work something out with Joe Schnaufer.

**Fact :** Jack Johnston made arrangements and was okay with releasing the following persons regardless of the Telegence conversion.
- Anita Moxley – Johnson City
- Carla Gass – Johnson City
- Michelle Masters- NC
- Connie Gass- made arrangements to do a job share with Engineering

However, Jack Johnston held the following persons due to the Telegence conversion
Victoria Bean Lewsader – Ocala
Bruce Larsen - Ocala
Jon Lucera – Ocala

**Fact :** Associate Katina Smith interviewed with an Area Manager in Johnson City on  07 /19 /01 10:00 AM during the follow up conversation Katina asked what time frame they were looking at to hire this Manager, the area manager quoted " Well considering we are having trouble getting release dates from your director I am not sure". But I will tell you that I need someone soon so this will play a role in my decision.

**Fact:** It is against the Code of Business Conduct Discrimination & Harassment we intend to provide equal employment for all person in all aspects of their employment relationship- promotion and transfers.

**Issue:** 8/11/2001 Jack Johnston came into the Rantoul Call Center. He came upstairs to Heather Magrini's team asked where Heather was, her team replied at lunch, Heather went to lunch from 11:15 to 12:15 when Heather returned her team shared that Jack was looking for her  Heather walked the entire building and Jack was not there stopped by his office he was not there. Heather turbo paged Jack to see if he needed anything. No response.

On Monday 8/13/2001 Heather followed up with Jack to see if he got her page and If he needed anything, Jacks said he did her page but he didn't need anything he only popped in for only a short moment.

8/18/2001 Jack Johnston came to the Rantoul Call Center from the Springfield Call Center where he stayed the night. Jack came in after the tornado warnings were over and the associates were back on line, this was after at 2:30 PM time frame. Heather Magrini took a half-day at 1:00 PM and never saw Jack this day. Jack left before 3:30 PM per the Leaders on duty.

**Fact:** Jack expensed mileage to and from the call center for Saturday's work, when work was not done nor was he in the center more than an hour. **Fact** this is against the company's Expense Policy.

When Jack's car breaks down he then expenses a rental car , where is this ethical and in compliance of the Expense Policy.

*****Please keep in mind that Jack did enjoy his time at the Illinois State Fair during his hotel stay in Springfield, he shared that with us.

**Issue:** On Friday August 16, 2001 Sandy Gammage made hotel reservations for Jack Johnston in Springfield  who needed to have a business dinner that night with Nancy. Sandy made the hotel reservations at the Crown Plaza, due to the fact that we get a discount there because we housed so many individuals from Cingular there during the launch of our Springfield call center. Jack had Sandy cancel the reservations due to the fact he had a Gold Club membership for the Drury Inn where he gains points. He currently stays at the Drury in Champaign also to gain these points. Jack stayed the evening in Springfield on Thursday, drove back to Rantoul on Friday then drove back to Springfield Friday night.

**Fact:** It is in violation of business code of conduct, Employees are not to decline a negotiated hotel rate in order to accumulate points toward a frequent-stay program.

**Issue:** 3:00 PM on Monday August 20th, Jack came into my office regarding mine & Jon's expense to Ocala Florida. Jack integrated me with several questions and statements ranging from, why did I send this to Liz Ross to him making the comment that we took to long to make a decision.  I shared with Jack that he was out of the office so I sent it to Liz, I told Liz the only reason I was asking her was because he was out of the office most of last week & this week. I told Liz if she did not feel comfortable signing not a problem I would just wait longer. (T&E cut off was coming up)  I also shared with Jack that this was normal signing off on other cost centers.  Example:  Rantoul Leaders & Area Manager signed off on all the Springfield expensese under the Training Cost Center  Debbie Thompson signed off on the Cedar Town Cost center for Gloria Masterson & Janet Donnelly.

I also shared with Jack that I didn't think that we took to much time in Ocala. I shared with Jack that is a big move and we need to decide if this is what we really want for our family, and if this is what Ocala is looking for in Leadership. I also shared with Jack the company has been paying for him to eat breakfast, lunch and sometimes dinner, to drive back and forth or and stay in hotels either in Rantoul or Springfield for over two months and he and his wife have not made a decision to move down here. So for him two months is not enough time, so how can he judge that my time was to long? Jack instructed me that we should have flown up and then back the same day that this is how he did it when he took a job coming from Texas. I shared again with Jack that everyone is different including himself with his current situation. Jack continued to question me then he received a radio call from Aimee Halcomb that Lucia needed to speak with him. Jack commented before he left my office on 8/20/2001. " Are you aware we have a nepotism policy?" I looked at Jack oddly knowing that we do not. Jack then stated and I quote" well it's time the Lucera team is split up and I guess you will think twice about doing your expenses together again." Jack then left my office to take his call from Lucia.

Fact: AIT nor Cingular have a nepotism policy.
Fact: Cell One has a nepotism policy, fact I have never worked for Cell One
Fact: Harassment & threats are a violation of Code of Business Conduct.
Fact: Working in a hostile environment is a violation of Code of Business Conduct & EEO
Fact: We have signed off on other cost center codes besides our own.

These are just a few of the facts that have been happening in the Rantoul Call Center in the past 60 days. I work in a hostile & discriminative condition, I am fearful for my job because of my Director Jack Johnston . I am currently seeking medical treatment because of stress and feel this is not the Cingular way.

I have mentioned several people's names in this document. These individuals have no fear in speaking with HR however they are fearful of repercussions for Jack including myself.

# BENTLEY, CHERYL L

| | |
|---|---|
| **From:** | FRANKLIN, MARGARET (SBMS) |
| **Sent:** | Tuesday, August 28, 2001 9:37 AM |
| **To:** | BENTLEY, CHERYL L (AIT); KLIMAS, JIM (SBMS) |
| **Subject:** | FW: more documentation |

-----Original Message-----
| | |
|---|---|
| **From:** | ISOM-LUCERA, REBECCA D (AIT) |
| **Sent:** | Tuesday, August 28, 2001 8:36 AM |
| **To:** | FRANKLIN, MARGARET (SBMS) |
| **Subject:** | more documentation |

Peggy ,

I am sorry I forgot to add the following two issues.

**Issue:** On 07/21/01 Jack Johnston stayed in Champaign at the Drury Inn, This was direct billed to the Rantoul cost center (invoice number 138570) Jack Johnston signed for his own AP1. This AP1 was pushed back to Aimee Halcomb stating "the person that the invoice is for can NOT sign off on their own AP1, this needs to be the next level or higher to them.

**Fact:** Everyone knows you can not sign off on your own AP1 or T&E

**Issue:** Jack Johnston called my office on 08/14/01 inquiring why I purchased business cards and if these were for the Ocala call center. I told him that I did not have the job in Ocala , so obviously these were for the Rantoul call center with my new name. He asked me if I could return them? I asked him if he would be asking everyone that purchased business cards to return them? he had no answer. Then I went forward to say I have already sent some out to customers, so the answer would be no I would not be able to return them.

**Fact:** Our local office manager took it upon herself to order a new name plate for my office door. however Jack has an issue with me purchasing business cards with my new name on them !!!!!

I would have to agree with Senior Vice President of Human Resources. "I regard harassment in any form as being a serious impediment to us being able to achieve our goals

As an employee, you have the right to carry out your job duties in an environment that is free from *any* unwelcome conduct (verbal, physical or visual) based on race, national origin, age, physical or mental disability, religion, gender, or any other basis protected by federal, state or local law. To better support this right, we've developed guidelines that will help employees distinguish between which actions are accepted and which are not.
If you ask three different people to define "harassing conduct," chances are they will all have different definitions. However, the following examples should help you better understand the term.

- Degrading words, humor and jokes used to describe someone's race, national origin, age, physical or mental disability, religion, **gender** or sexual orientation

- Displaying derogatory objects or pictures in the workplace

- Transmission of derogatory messages via voice mail, regular mail, electronic mail (e-mail), interactive page or the Internet/Intranet

- **Continual or repeated offensive verbal comments**

Food for thought:
I find it ironic that Jack has an issue with anything I do or say. I am sure it has to do with his statement to me that "I am an assertive women".

Thank you,

**EXHIBIT**

**2**

D00182

Rebecca D. Isom-Lucera
GLR-Area Manager
Rantoul Call Center
Office 217/893/2693
Fax 217/893/2640
Pager 217/261/0513

D00183

| From: | FRANKLIN, MARGARET |
|---|---|
| Sent: | Monday, February 25, 2002 5:18 PM |
| To: | BENTLEY, CHERYL L |
| Subject: | FW: Confidential |

Sensitivity:    Confidential

-----Original Message-----
| From: | JOHNSTON, JACK S (SBMS) |
|---|---|
| Sent: | Friday, September 14, 2001 2:11 PM |
| To: | FRANKLIN, MARGARET (SBMS) |
| Subject: | RE: Confidential |
| Sensitivity: | Confidential |

Hi Peggy,

I apologize that this has taken so long to return. the detail that is involved is simply incredible and I wanted to make sure I addressed every point. in addition, I have tried to work on it between all other business.. let me know if you have any questions/comments..

Jack

-----Original Message-----
| From: | FRANKLIN, MARGARET (SBMS) |
|---|---|
| Sent: | Monday, September 10, 2001 8:29 PM |
| To: | JOHNSTON, JACK S (SBMS) |
| Subject: | Confidential |
| Importance: | High |
| Sensitivity: | Confidential |

Hello Jack,
Thanks for your time & assistance on this.   Please respond & forward back. Bolded words were already in bold when I received them.
Call if you have ?'s

**Issue:** Jack was supposed to meet with me on June 18 (this date may not be exact he scheduled a couple of meeting but had to cancel them). At 11:00 AM this got pushed back to 12:00 AM then it became a 12:35 PM lunch meeting where no business was discussed just Jack talking about his mountain climbing endeavors and the time that he has been allowed to take to do them in. However we did rush through lunch so that Jack could be back to for a 1:00 PM conference call, and Jack did pick up the bill stating "I will expense this one".

**Fact:** Expensed lunches are for business purposes only, mountain climbing is not Cingular business.

Upon my arrival to this new position, I decided to take each new direct report out to lunch to build better general rapport. I am sure that schedule changes were made along the way as with most days. I cannot confirm the date, but I had invited Rebecca Isom-Lucera to lunch. That day had been busier than expected, but I preferred to still meet rather than cancel with an option to find another, more lengthy opportunity in the future.

General conversation was mixed with both business and personal topics discussed as originally intended. I have no doubt that I discussed mountaineering during the personal topic portions. I do remember being asked how I was able to get so much time off consecutively, which I explained. The 30-minute lunch covered myriad topics and was a reasonable business expenditure.

**Issue :** Release dates: As all the mega centers began to start up and hire we had several individuals that were interested in relocating.
- Victoria Bean-Lewader -Ocala
- Bruce Larsen- Ocala
- Carla Gass- Johnson City
- Michelle Masters- N C
- Anita Moxley - Johnson City
- Connie Gass - Engineering / Springfield
- Jon Lucera - Ocala



EXHIBIT

3

D00184

Jack, Debbie and I had several conversations on how we could work this out. Debbie & I put together a proposal to staff teams 17 to 1 and

add 2 to the Desk persons. This relieving manager from some questions and supervisor calls, allowing them to coach & develop their teams, this would also allow Managers to take various opportunities as they came available. We also recommended additional headcount. Both ideas were pushed to the back burner and Jack told us that Grace said we need to hold people until the Telegence conversation is complete. (The telegence conversion is associate effecting, leaders may not take calls to assist with call volume based on Labor agreement) I personally shared this with Jack several times but he would not hear it. His only response was that we need to have our Leaders and associates here and that Grace said we are on a freeze. I spoke with Lea Knight in Detroit to see if this was the case in Detroit, she shared no that they are releasing Leaders & associates in their call center and have not heard of any kind of freeze due to Telegence. I questioned Jack later if there truly was a freeze and he said yes Grace said there was. I brought to his attention that I was concerned that we were not being consistent across the Region, that Detroit was releasing individuals and we were not. I said I would like to run this by HR? He reminded me that this was not an HR issue and that Grace said we are on a freeze. Jack also told me that he did not appreciate me going out of the chain of command by going to HR. I shared with Jack that it is my responsibility as an Area Manager to make sure we are being consistent. And it is my right as a Cingular employee to seek HR's assistance at anytime. ...Jack called me to his office the following day, Jack shared that he did not like the way I approached him yesterday, and did not like the way I said I would go to HR and that I have no right to go to HR over this, That Grace has made a decision and we are standing firm. Jack shared with me that I was very assertive, and I agreed with him. I also agreed that assertive is part of my personality and my personality is something that Jack will learn over time and I will do the same with his. Jack shared with me that he had dealt with very strong personalities from women in the past and named Lucia & Grace but never anyone like me. I shared with Jack that I did not appreciate the fact that he was pointing out the fact that I was one a **women and two assertive and that he had to deal with me.** I said to Jack a business person is a business person , regardless if they are a women or not and you do not deal with your business partners you work with them.

I shared with Jack that I looked at it as more of slandering my name in HR's eyes. Jack continued to tell me that this is a closed case and all jobs would be frozen until Telegence was completed his calculation would be around late September or sometime in October 2001 with the exception that something goes wrong.

I did remind Jack of one other point, when AIT was being inundated with calls due to the CDMA to TDMA conversation, we took the hit and mandated OT so that we could assist our sister call center get up and running. I asked Jack to look at the big picture holding these individuals from Ocala & Engineering was only hurting Cingular. I also made the recommendation to see if Nancy would loan us some of her Floating Supervisors . We (Debbie, Jack and I) ended up calling Joe Schnaufer and conferencing him on the line to tell him that we could not release these individuals. By the end of the conversation Jack was willing to try and work something out with Joe Schnaufer.

Fact : Jack Johnston made arrangements and was okay with releasing the following persons regardless of the Telegence conversion.
- Anita Moxley - Johnson City
- Carla Gass - Johnson City
- Michelle Masters- NC
- Connie Gass- made arrangements to do a job share with Engineering

However, Jack Johnston held the following persons due to the Telegence conversion
Victoria Bean Lewsader - Ocala
Bruce Larsen - Ocala
Jon Lucera - Ocala

Associates need leadership during times of significant change The company needs certain subject matter expertise during those times, which the leaders named above possessed. The company was not as pressed for representatives at that time. A mutual decision was made by Grace and I at a specific point to delay release dates in Rantoul until after the Telegence conversion based on the needs of the business.

Connie Gass did not have a role related to or crucial to the Telegence conversion and correspondingly was able to be released rather quickly. In addition, a regional business need existed.

Victoria Bean Lewsader was actually released within the quickest turnaround without regard to Telegence due to a special need to enroll her child in the Florida school year, which started a month earlier than Illinois.

Bruce and Jon were held in anticipation of the Telegence conversion. I stated originally that it could be as late as September or October for everyone beyond that point. Upon cancellation, release dates were arranged.

Gloria Jackson, not mentioned above, had also been offered a position in Ocala, but wanted the latest possible release date due to the fact that her daughter was graduating in December.

All individuals were considered on a first come, first served basis and each handled independently of the rest. The reason that Ocala individuals appear separated and last on a list is simply because that center opened the latest and made corresponding offers as such. The requested release dates were also the closest to the time of the actual Telegence conversion.

Rebecca never mentioned a concern about maintaining regional consistency in release dates or the fact she wanted to go to HR concerns related to the above individuals.

The conversations referred to above regarding release dates are simply not accurate. The series of conversations that included Joe Schnaufer were only related to Jon Lucera and Bruce Larsen.

D00185

Rebecca has actually told me that she and her husband had been offered positions in the Ocala center. I stated that at that point we were freezing release dates until after the Telegence conversion. Those affected were Rebecca, Jon, Victoria and Bruce. Joe Schnaufer and I did have conversation about release dates where we disagreed on which perceived needs of the business should prevail. As a courtesy, I offered to look into the matter further, but made no commitment nor optimistic view.

Rebecca returned shortly thereafter stating that release dates for both she and Victoria were even more important due to the fact that the Florida school district started one month earlier than Illinois. There was a concern that the Florida attendance requirements would mean that any delayed release date could jeopardize the entire school year for their children. It was an emotional plea.

I spent quite a few hours trying to devise a plan. I went back to Grace with a proposal on how we could release Victoria and Rebecca to meet our business needs and those personal needs of these employees. She agreed and I met with Rebecca to share what I thought was good news.

However, when I mentioned to her that I would be able to release her almost immediately, she stated that she and her son preferred that Jon be released first. I stated the business needs for keeping Jon and why I could justify losing an Area Manager more than a frontline supervisor. She stated that my proposal was unacceptable. She then stated it would be better for her to stay behind to arrange the sale of the home since she would be getting the relocation package and Jon was considered a "trailing spouse." I stated that I had relocated three times and understand the trips back and forth were part of a relocation process and that monies were made available for exactly that within the package, but that at least her son would be able to enroll in school on time. She then stated that her ex-husband was creating some problems with regards to out of state custody and that she needed to stay to arrange those items. I stated that she did not have to be released, but that I needed Jon for the Telegence conversion. She became enraged and began demanding that I release Jon and speak to whoever I needed to in order to make that happen. She yelled this directly at me with a pointed finger. It was by far the most unprofessional and insubordinate tone I have ever experienced in a professional setting. I calmly tried to reiterate the progress that had been made since our previous conversation when no release dates were available. She stated that if I did not give her what she wanted that she would go to HR. I agreed that was her right. She made a final plea, but I reiterated that this was the best that I could offer. I suggested that we adjourn our meeting since we were not making any progress and her tone was only getting more belligerent.

I was out of town the next day. Upon my return the following day, I was told by Rebecca in a very matter of fact tone that she no longer needed a release date and that she had decided to home school her son like she had done when he was in second grade. I did ask to speak with her regarding the outburst surrounding our previous conversation. I tried to be complimentary whenever possible, but made it clear that I found her approach in interacting with me inappropriate and unacceptable. Rebecca became very tearful and stated that it had been tough transitioning from one director to another. She had a good relationship with the previous and felt very comfortable in just coming around on a lighter level. She stated that she felt that we hadn't built enough of a trust factor to achieve similar status. She stated that this behavior was indicative of her personality and that I would get used to it like she would get used to me over time. I stated that I appreciated assertiveness and that she was an assertive woman, but that some actions went beyond that definition and those I could not allow to proliferate with myself or anyone else for that matter. I do not remember any specific reference to Lucia and/or Grace. Rebecca made no mention or correction of any gender specific reference. I have no recollection as to whether or not I used the expression "dealt with" but if I did, it was certainly not rebutted in any way.

In the end, her actions were reasoned by the fact that she had not been offered a position in Florida at that point, contrary to what she stated and tried to negotiate so desperately.

**Fact :** Associate Katina Smith interviewed with an Area Manager in Johnson City on 07/19/01 10:00 AM during the follow up conversation Katina asked what time frame they were looking at to hire this Manager, the area manager quoted " Well considering we are having trouble getting release dates from your director I am not sure". But I will tell you that I need someone soon so this will play a role in my decision.

**Fact:** It is against the Code of Business Conduct Discrimination & Harassment we intend to provide equal employment for all person in all aspects of their employment relationship- promotion and transfers.

I don't recall ever speaking with Kitina Smith or a hiring Area Manager regarding a potential job opportunity. Had they done so, I would have worked to the best of my ability to achieve a balance. I am not sure that Kitina was ever even offered a position because she still works in Rantoul.

Anita Moxely and Connie Gass were released to Johnson City prior to this without hesitation or complaint. Although some unwanted delays have occurred, nobody has ever lost an opportunity during my tenure due to an inability to be released.

**Issue:** 8/11/2001 Jack Johnston came into the Rantoul Call Center - Must have left before 12:15pm.

The previous evening I did stay in Springfield to go to the State Fair. I did not expense mileage, meals or hotel for that stay. The following day, I only worked half day until approximately 1.00pm. I wanted to spend some time reviewing Saturday operations, which I had not done up to that point

Springfield Call Center where he stayed the night. Jack came in after the tornado warnings were over and the associates were back on line, this was after at 2:30 PM time frame. Jack left before 3:30 PM

The very next week I decided to return for simply a surprise element and to observe Saturday afternoon operations — the previous week I had only seen the morning operations. The RVP new of my strategy in advance.

I arrived sometime after 2:00pm and left around 6:00pm -- I was actually the last to leave the building and greeted by an empty parking lot. I was on the operations floor for the first hour after the tornado scare and in my office the rest of the time. It may be important to note that my office is on the first floor, secluded from the second floor Saturday operations. No mileage was expensed. Actual gas usage, lodging and meals were expensed.

**Fact:** Jack expensed mileage to and from the call center for Saturday's work, when work was not done nor was he in the center more than an hour. Fact this is against the company's Expense Policy.

When Jack's car breaks down he then expenses a rental car, where is this ethical and in compliance of the Expense Policy.

With relation to my car breaking down -- although legitimate business expense hotel, meals and 3-day rental car were expensed to my personal AAA membership instead of Cingular (Company Savings: $127.17). In addition and although also legitimate business expense, neither the applicable one-way mileage (I simply forgot) nor $29.25 in gas receipts (I thought AAA would cover it and when I found out it wouldn't, I simply absorbed the cost rather than submit the expense so late after the fact) was submitted for reimbursement (Company Savings: approximately $100).

Total Company Savings: approximately $227.17

The Expense Policy does not require an employee to use their car under such extensive travel circumstances that I am faced with weekly. The rental car option was invoked with RVP knowledge after initial 3-day AAA reimbursed period after loss of personal vehicle and unwillingness to put the larger number of mileage on any newly purchased vehicle. The actual projected expense to the company is comparable to the $345 mileage reimbursement rate on a monthly basis.

*****Please keep in mind that Jack did enjoy his time at the Illinois State Fair during his hotel stay in Springfield, he shared that with us.

**Issue:** On Friday August 16, 2001 Jack Johnston was to be in Springfield attending a business dinner that night with Nancy. Reservations at the Crown Plaza were originally made, due to the fact that we get a discount there. Jack had a Gold Club membership for the Drury Inn where he gains points. He currently stays at the Drury in Champaign also to gain these points. Jack stayed the evening in Springfield on Thursday, drove back to Rantoul on Friday then drove back to Springfield Friday night.

**Fact:** It is in violation of business code of conduct, Employees are not to decline a negotiated hotel rate in order to accumulate points toward a frequent-stay program.

The actual date was Friday August 17th.

The Crowne Plaza does have a discounted corporate rate for Cingular. The Drury has a cheaper corporate rate. This was the basis of my decision to change locations. The fact that I would also gain Gold Club points was simply a byproduct of that change.

The Drury in Champaign was recommended by local management from my very first trip to Rantoul -- the company has a direct bill relationship. I have stayed at this location almost exclusively unless unable to get a room, in which case I have sought other comparable alternatives.

The purpose of the Springfield trips/stays was to have dinner with colleagues. The first evening dinner was cancelled en route (so I simply stayed) and was rescheduled for the next evening. No dinner expenses were submitted for reimbursement. As stated above, actual gas usage was submitted for reimbursement.

**Issue:** 3:00 PM on Monday August 20th, Jack came into my office regarding mine & Jon's expense to Ocala Florida. Jack integrated me with several questions and statements ranging from, why did I send this to Liz Ross to him making the comment that we took to long to make a decision. I shared with Jack that he was out of the office so I sent it to Liz, I told Liz the only reason I was asking her was because he was out of the office most of last week & this week. I told Liz if she did not feel comfortable signing not a problem I would just wait longer. (T&E cut off was coming up) I also shared with Jack that this was normal signing off on other cost centers. Example: Rantoul Leaders & Area Manager signed off on all the Springfield expenses under the Training Cost Center. Debbie Thompson signed off on the Cedar Town Cost center for Gloria Masterson & Janet Donnelly.

    I also shared with Jack that I didn't think that we took to much time in Ocala. I shared with Jack that is a big move and we need to decide if this is what we really want for our family, and if this is what Ocala is looking for in Leadership. I also shared with Jack the company has been paying for him to eat breakfast, lunch and sometimes dinner, to drive back and forth or and stay in hotels either in Rantoul or Springfield for over two months and he and his wife have not made a decision to move down here. So for him two months is n

D00187

**DOMBROWSKI, MARY C.M.**

| | |
|---|---|
| From: | FRANKLIN, MARGARET |
| Sent: | Monday, February 25, 2002 5:19 PM |
| To: | BENTLEY, CHERYL L |
| Subject: | FW: Confidential |
| | |
| Sensitivity: | Confidential |

——Original Message——

| | |
|---|---|
| From: | JOHNSTON, JACK S (SBMS) |
| Sent: | Wednesday, September 19, 2001 6:08 PM |
| To: | FRANKLIN, MARGARET (SBMS) |
| Subject: | RE: Confidential |
| Sensitivity: | Confidential |

Peggy,

Here you go...please see response below..thanks again for all of your kind sentiments earlier today...have a great night.

Jack

——Original Message——

| | |
|---|---|
| From: | FRANKLIN, MARGARET (SBMS) |
| Sent: | Wednesday, September 19, 2001 12:45 PM |
| To: | JOHNSTON, JACK S (SBMS) |
| Subject: | Confidential |
| Importance: | High |
| Sensitivity: | Confidential |

Hi Jack,

Per our conversation, I have an alleged issue listed below. I appreciate your time, assistance, and the clarification you can enlighten me on this.

**Issue:** On 07/21/01 Jack Johnston stayed in Champaign at the Drury Inn, This was direct billed to the Rantoul cost center (invoice number 138570) Jack Johnston signed for his own AP1. This AP1 was pushed back to Aimee Halcomb stating "the person that the invoice is for can NOT sign off on their own AP1, this needs to be the next level or higher to them".

Aimee Halcomb had only been working several months on processing the call center direct billed items..she had many times asked Area Managers to sign these AP1 forms if Joe was unavailable for whatever reason..Joe signed off on my first Drury expense..but, when my Drury Hotel bills began rolling in consistently after his departure, she continued going to Area Managers because she was unsure as to what else to do. therefore, there are a series of such forms with their approval (Jim Klimas has copies). I was unaware that this was happening.

At one point, and rightfully so, Debbie Thompson questioned whether or not she should be signing such forms. this whole situation was unique because these were direct operational budgetary expenses, but related to a hotel stay that would typically be a reimbursement expense submitted through a different process. Directors have P/L responsibility for operational expenditures, and this seemed to qualify as such plus had directly implied approval from my superiors. Joe signed my original expense, for example, under this viewpoint. other examples: I may sign expenditures for an office supply inventory that I may ultimately extract from or pay for a training class tuition for several individuals that includes myself, etc.

Aimee brought the disputed form (I am unsure of the date so have no reason to dispute the above-mentioned data) to me, which I signed under these pretenses. but, A/P kicked it back stating they wanted the next higher level signature. hence, the form was rewritten to include my signature and Grace Seymour's and that has remained the process ever since.

Therefore, there are no processed AP1 forms with my signature that contain expenses exclusively related to me.

Please call me if you have ?,s.
Thanks again,
Peggy

D00189

1

that this is how he did it when he took a job coming from Texas. I shared again with Jack that everyone is different including himself with his current situation. Jack continued to question me then he received a radio call from Aimee Halcomb that Lucia needed to speak with him. Jack commented before he left my office on 8/20/2001. " Are you aware we have a nepotism policy?" I looked at Jack oddly knowing that we do not. Jack then stated and I quote" well it's time the Lucera team is split up and I guess you will think twice about doing your expenses together again." Jack then left my office to take his call from Lucia.

Fact: AIT nor Cingular have a nepotism policy.
Fact: Cell One has a nepotism policy, fact I have never worked for Cell One
Fact: Harassment & threats are a violation of Code of Business Conduct.
Fact: Working in a hostile environment is a violation of Code of Business Conduct & EEO
Fact: We have signed off on other cost center codes besides our own.

Liz Ross is not from another call center and, as such, was concerned that she was asked to sign any expenses. There was no precedent for her involvement in any budgetary expenditures. In extraordinary and rare cases, another call center director has signed off on such expenses, but almost exclusively on a pre-arranged basis. The established policy was that immediate supervisors were always sought out for expense approval before and after the fact, even if some wait was involved.

Liz stated to me that Rebecca had called her and stated that I was out of town and asked if she would mind signing some expenses because there was a payment deadline (credit card, T&E, ???.) Liz reluctantly agreed. However, she was confused when I was on a conference call with her the same day. Liz has stated that Rebecca never mentioned that if she was uncomfortable signing the expenses that she simply send them back. In addition, the actual receipts did not arrive to Liz for some time (up to a few weeks) during which almost all of that time I was in the office accessible to Rebecca. During my entire time I have only been out of the office two consecutive business days. The perceived lack of protocol and the actual expenses raised serious questions and Liz brought the issue to my attention upon receipt of the mailed expenses.

The Training Cost Center is not a call center, but a pre-arranged group of codes set up by Kim Holinbeck in Training for everyone involved in bringing up the new Springfield center. Costs signed off on were for Rantoul employees assessing in the effort, not actual Springfield employees. Debbie Thompson did sign for the Cedar Town cost center at the direct written request of the Cedar Town call center director, Tom Brogan, to simply expedite reimbursement.

In all of my experience I have never heard of a 5-day interview trip that included an all expense paid weekend. I checked with all other directors, Lucia and Grace to confirm this belief. It as agreed that a standard interview was a single overnight stay with a maximum of two nights if flight/expense logistics warranted. I shared as an example that I had flown Chicago - Austin roundtrip in a single day for an interview. I did not state that she should have done the same. I stated that an interview was to simply make a decision as to whether or not there was a mutual interest in working for the business unit. If so, then a generous relocation package was provided that includes monies for spending time in the area and arranging a fluid transition.

I did not go into detail to clarify that my current position was assigned to me on an indefinite basis and is considered a commuter assignment. Therefore, my wife and I were not considering a move to the local area. All of my expenses were authorized by my supervisor under the business travel expense guidelines.

I did question specific expenditures from her trip that I thought were high.

Although I was fully aware that an SBC nepotism policy existed, I stated that I was not exactly sure of any specific details related to submitting expenses, yet regardless of any such knowledge it was my suggestion that spousal expenses be separated to avoid any exposure to criticism or scrutiny. It was my understanding that all AIT employees were under SBC policies, with exception to specifics outlined in the merger agreement, which I don't believe included operating/conduct policies.

I did not at any time make any threats, raise my voice or speak in a condescending manner. The quotes stated above are utterly false. I do remember leaving the office after receiving a radio call that Lucia was on the line waiting to speak with me.

## BENTLEY, CHERYL L (AIT)

| | |
|---|---|
| From: | RICHARDS, SUSAN (SBMS) |
| Sent: | Thursday, August 23, 2001 9:58 AM |
| To: | FRANKLIN, MARGARET (SBMS) |
| Subject: | FW: Claim-B662766-CING01-CLE 08/23/2001 00:17 |

Below is a Compliance Call from The Network. This case is a Priority C. Priority C cases require the closure details be provided within fourteen (14) calendar days.

Please provide the closure details as follows:
   -Issue
   -Process
   -Conclusion

Please email the closure details to ethics@cingular.com.

Thanks,
Susan Richards
Employee Relations Specialist
Cingular Wireless
972-733-6115
fax: 972-733-8190
interactive pager: susanrichards@imcingular.com

-----Original Message-----
From: TNW [mailto:TNW@tnwinc.com]
Sent: Wednesday, August 22, 2001 11:18 PM
To: 'ethics@cingular.com'
Subject: Claim-B662766-CING01-CLE 08/23/2001 00:17


SUBJECT: CINGULAR WIRELESS REPORT #B662766

SYNOPSIS OF ISSUES REPORTED / ALLEGED:
Employee Relations

TYPE OF CALL:   Original Issue
DATE OF REPORT:  08/22/2001 02:40 PM
INTERVIEW SPECIALIST: LJACKSON

DBA:      CINGULAR WIRELESS
UNIT/NUMBER: UNKNOWN
ADDRESS:    1 AVIATION CENTER DRIVE
CITY/ST/ZIP:  RANTOUL, IL 61866

OPTIONAL CALLER INFORMATION:
Name:  Name Refused

WHO IS RESPONSIBLE:
Name:   JACK JOHNSTON
Gender:
Age:
Title:  Director
Tenure:  Two years

WHAT:
Caller, name refused, reported employee relations issues involving JOHNSTON.

WHEN:



EXHIBIT
4

D00190

August 20, 2001 at 2 pm, and other occasions since July 2001

WHERE:
At the location

HOW:
Caller reported that on August 20, 2001, JOHNSTON had an issue with
the expenses of an employee, name refused, made while on a business
trip in Ocala, California. JOHNSTON stated that he/she took too many
days for the trip although there were other employees who went on the
same trip and their expenses were approved. After all of the
questioning was over, the caller stated that JOHNSTON told the
employee, "Off the record, I'm not sure if you are aware, but there is
a nepotism policy and it's time that [the employee and his/her spouse]
are split up." JOHNSTON was referring to the fact that the employee
and his/her spouse work for the same company.

The caller stated that JOHNSTON appears to be trying to get the
employee to quit because of his hostile behavior. He appears to look
for anything to harass the employee about, making him/her feel his/her
job is in jeopardy. Sometimes, when the two discuss issues in private,
the comments made during the meeting are being misconstrued by
JOHNSTON to others in public. JOHNSTON is slandering his/her name with
the expense issue by spreading the information to other Directors. The
caller would like someone to investigate this matter.

HOW LONG HAS THIS BEEN OCCURRING AND HOW OFTEN IN THE PAST? Ongoing
since July 2001

HOW DO YOU KNOW ABOUT THIS? Caller would not state knowledge of
incident.

IS THERE ANY DOCUMENTATION THAT WOULD HELP THE COMPANY INVESTIGATE
THIS? Yes. Approved expense forms of other employees

HAVE YOU REPORTED THIS TO ANYONE IN MANAGEMENT? No.

IS THERE ANYONE ELSE WHO KNOWS ABOUT THIS? Yes
Name: Names Refused
Title, work area, or responsibility: Other employees

INTERVIEW NOTES:
None

CALL BACK ARRANGEMENTS:
WCB in two weeks

CONDITIONS:
The information contained in this report was provided by a third party
source. The Network, Inc. does not verify the accuracy or the
correctness of the information contained in this report. Accordingly,
CINGULAR WIRELESS will hold harmless and indemnify The Network, Inc.
from any claims or demands resulting from action CINGULAR WIRELESS
takes based on information contained in incident report #B662766, or
CINGULAR WIRELESS's failure to secure information contained in this
report after receipt.
In order to add information to this report, please do not reply to
this message. Instead, forward this message, along with your comments,
to lynnmumford@tnwinc.com or dianefolio@tnwinc.com.

D00191

<u>Cingular Wireless Ethics Line Response</u>

Case Number: B662766
Caller: Anonymous
Priority C

## Background:

The Ameritech Cellular Rantoul Call Center is located in a very rural town in Central Illinois. The workforce is comprised of many friends and family members. The Call Center has been careful in designing reporting relationships so those family members are restricted from reporting to one another.

The former Rantoul Director received a new assignment as Director CS Operations – Ocala, FL. Call Center.

Jack Johnston, started his new assignment on 6/25/01, as Director – Rantoul Call Center. Within the 1st week of Jack Johnston's new assignment, he informed both Area Managers – (Rebecca Isom-Lucera and Deborah Thompson) that he wanted to see all expenditures at all levels of the department.

The caller made several allegations regarding employee Jack Johnston, Director - Rantoul Call Center. Below are the issues from the call that needed to be answered/addressed:

> **Allegation:** The Caller stated on August 20, 2001, Mr. Johnston had an issue with the expenses of an employee, name refused, made while on a business trip in Ocala, Florida.

> **Response:** Jack verified he did question the submitted expenses regarding Jon Lucera and Rebecca Isom-Lucera on their trip to Ocala, FL. Jack states Rebecca traveled on company time without prior approval. Rebecca told the other Area Manager she was not going to tell Jack she went on the trip. Also, Rebecca did not apprise Jack of the expenses, as he required. In addition, Rebecca and Jon Lucera did not go through proper reimbursement procedures, when they submitted their expense report to Liz Ross, who has no relevant functional organizational and or reporting relation.

> **Allegation:** Johnston stated the they took too many days for the trip (an interview) although there were other employees who went on the same type of trip (an interview) and their expenses were approved. )

> **Response:** One specific issue discussed was the length of the trip (5 days and over a weekend)
> Listed below show the expenses that were approved as mentioned by the caller but all of the trips were only a few days. The trip Jon and Rebecca Lucera took to Ocala, Florida was from 7/19 – 7/24.
> - Victoria Bean-Lewsader traveled to Ocala per Rebecca Isom-Lucera's approval only. Trip: 7/9 –7/10.
> - Debbie Thompson, asked Jack if the Call Center would help with some travel expenses for Joe Abbott, and mentioned precedent with 2 individuals (who also took a few days). The expenses were approved. Trip 7/13-7/14.

EXHIBIT

5

D00192

- No other trip that Jack was able to find in the expense archives even matched that duration and/or timing. Jack with some retrospective review, held a mgr.'s staff mtg., to inform mgmt he was changing an existing practice of reimbursing interview trips – this practice would cease.

- Afterwards, Rebecca Isom-Lucera refused to sign some travel expenses after the fact for Anita Moxley stating (in an e-mail from Rebecca to Connie Gass, Anita Moxley's supervisor- in bold) "I want you to be aware Jack may push it back and you may want to let Anita know this." The e-mail was dated 7/19/01 @ 7:34 am. Later that day Rebecca & Jon Lucera, left to go to Ocala for their interview. Rebecca confirmed her knowledge of this policy change by the e-mail to Connie Gass prior to her Florida trip.

**Allegation:** After all of the questioning was over, the caller stated that Johnston told the employee, "Off the record, I'm not sure if you are aware, but there is a nepotism policy and it's time that the employee and his/her spouse are split up." Johnston was referring to the fact that the employee and his/her spouse work for the same company.

**Response:** Jack stated, he did mention to Rebecca Isom-Lucera, that although unsure of the specifics of the company nepotism policy regarding expenses, Jack suggested that it was prudent to submit separate spousal expense reimbursements. There were not any "off the record" comments. Jack states, "the paraphrased quote and implications reflected above are misleading and inaccurate."

Please feel free to call me if you have any further questions. I can be reached at 847-413-7871.

Peggy Franklin
Employee Relations Specialist