E-FILED
Friday, 01 October, 2004, 04:53:38 PM
Clerk, U.S. District Court, ILCD

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF ILLINOIS

 3                       URBANA DIVISION

 4   REBECCA LUCERA,            )

 5              Plaintiff,      )

 6        -vs-                  )  No. 02-2268

 7   CINGULAR WIRELESS,         )

 8              Defendant.      )

 9

10        The deposition of JIM KLIMAS, called for

11   examination pursuant to the Rules of Civil

12   Procedure for the United States District Courts

13   pertaining to the taking of depositions, taken

14   before STEVEN J. MAZA, a notary public within and

15   for the County of Cook and State of Illinois, at

16   140 South Dearborn Street, Illinois, on the 20th

17   day of July, 2004, at the hour of 11:30 o'clock

18   p.m.

19

20

21

22

23   Reported by:  Steven J. Maza, CSR

24   License No.:  084-002479
```

COPY

EXHIBIT
R

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

1  spouse that wasn't employed by the company? Yes.

2  Q. Okay. Do you remember how much

3  participation you had in the investigation of

4  Rebecca Lucera in August of 2001?

5       I mean, did you have as much or more than

6  Cheryl Bentley or Peggy Franklin or less?

7  A. Less.

8  Q. Who was the primary investigator, if there

9  was one, who spent the most amount of time?

10 A. Cheryl Bentley.

11 Q. Did you also consult the reimbursement

12 request that was submitted by Jon Lucera and signed

13 by Jon Lucera, did you actually look at that?

14 A. I did, yes.

15 Q. What did you think were the reasons for

16 Rebecca Lucera's termination?

17 A. She was terminated because she did not

18 have approval for this trip.

19      She didn't have approval to be out of

20 work, you know, away from work whatsoever on

21 company time.

22      She attempted to coordinate expense

23 reimbursement approval by circumventing the

24 process.

31

```
 1            The appropriate process and some of the
 2   expenses were extravagant.
 3      Q.    So in other words, the first reason was
 4   didn't get pre-approval for the trip?
 5      A.    Uhm-uhm.
 6      Q.    Yes?
 7      A.    Yes.
 8      Q.    No. 2, that she was out of the office and
 9   it was not known where she was, yes?
10      A.    Yes.  And I would add to that she made the
11   decision to be away from the office and on company
12   time that wherever she was, it was not approved.
13      Q.    That goes back to the first one?
14      A.    It's related, certainly.
15      Q.    So she didn't have pre-approval -- she was
16   gone, and she did needed pre-approval, those are
17   the first two reasons, yes?
18      A.    Yes.
19      Q.    Third reason was that she tried to get
20   approval for this outside the normal policy?
21      A.    Uhm-uhm.
22      Q.    Yes?
23      A.    Outside of the approval process, right.
24      Q.    Approval process.
```

32

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| REBECCA LUCERA, ) | |
| ) | |
| Plaintiff, ) | Judge Baker |
| ) | |
| ) | No. 02-2268 |
| v. ) | |
| ) | |
| CINGULAR WIRELESS, ) | JURY TRIAL DEMANDED |
| ) | |
| Defendant. ) | |

## AFFIDAVIT OF JIM KLIMAS

I, Jim Klimas, being first duly sworn on oath, depose and state as follows:

1. I am currently employed as Director of Human Resources for Cingular Wireless in Hoffman Estates, Illinois.

2. I have held the position of Director of Human Resources since June of 1999.

3. In July 2001, the headquarters for Cingular's Great Lakes Region which includes Illinois, Wisconsin, Indiana, Michigan and Ohio was located in Hoffman Estates.

4. In my capacity as Director of Human Resources my duties include conducting investigations into allegations of misconduct by Cingular employees and overseeing such investigations conducted by members of my staff.

5. In July and August 2001, Cheryl Bentley, Senior Human Resources Manager reported to me and Peggy Franklin, Employee Relations Specialist, reported to Cheryl Bentley.

6. Ms. Bentley and Ms. Franklin were responsible for conducting an investigation into allegations made by Jack Johnston regarding a trip Rebecca and Jon Lucera had taken to Ocala, Florida.

**EXHIBIT S**

7.  Upon the conclusion of their investigation, Ms. Bentley and Ms. Franklin recommended that Rebecca Lucera be terminated. I concurred with that recommendation.

8.  Upon the conclusion of the investigation by Human Resources, meetings were held with various individuals including Cheryl Bentley, Peggy Franklin and myself from the Human Resources Department; Susan Rodriguez from Cingular's Legal Department; Grace Seymour, the Regional Vice President; and Jack Johnston. During those meetings, we discussed what actions to take with reference to Jon and Rebecca Lucera.

9.  The ultimate decision to terminate Ms. Lucera and issue a final warning to Jon Lucera was a collaborative decision involving Cingular's Human Resources Department, Legal Department, Regional Vice President Grace Seymour and Jack Johnston.

10. As is protocol with regard to termination of a management-level employee, Cingular's Ethics Department reviewed and concurred with the decision to terminate Ms. Lucera and to issue a final warning to Mr. Lucera.

11. The reasons for Ms. Lucera's termination include the following: a) her failure to seek approval for days off and failure to obtain proper approval for business trip expenses despite knowing that approval should be obtained from Mr. Johnston; b) her submission of an expense report containing expenses Jack Johnston previously told her were not covered by the Rantoul Call Center; c) her attempt to circumvent Mr. Johnston and Rantoul Call Center management in the approval process for her expenses; and d) her attempt to seek reimbursement for excessive expenses incurred on a trip which exceeded what was customary for the length of such trips.

12. It was determined that Ms. Lucera had made a significant error in judgment and that her behavior was inappropriate and unacceptable.

13. On August 27th and 28th, 2001, Ms. Lucera sent Peggy Franklin two e-mails containing various issues she had with Mr. Johnston.

14. Prior to reading the e-mails I had no knowledge that Ms. Lucera had any issues or concerns regarding Mr. Johnston.

15. I requested that Ms. Franklin conduct an investigation into the issues raised by Ms. Lucera.

16. At the conclusion of Ms. Franklin's investigation, it was determined that Mr. Johnston did not engage in any inappropriate conduct and had not violated any of Cingular's policies.

17. To the best of my knowledge, Mr. Johnston was not informed about the complaints made against him by Ms. Lucera until after Ms. Lucera had been terminated. I did not have any discussions with him regarding such complaints prior to Ms. Lucera's termination.

18. The issues raised by Ms. Lucera in her August 27th and 28th e-mails played no role in the investigation of the allegations of misconduct by Ms. Lucera and did not influence the decision to terminate Ms. Lucera.

19. The investigation into the issues raised by Ms. Lucera (relative to Mr. Johnston) was treated separately from the investigation which led to Ms. Lucera's termination.

20. Ms. Lucera's August 27th and 28, 2001 e-mails were never considered or even mentioned at any time during the discussions between Human Resources, the Legal Department, Grace Seymour and Jack Johnston relating to what actions to be taken with regard to the Luceras' trip to Ocala.

21. No allegations of impropriety by Mr. Johnston were ever discussed during the process which resulted in Ms. Lucera's termination and Mr. Lucera's warning.

22.  Other than a call on August 22, 2001 to the ethics line about Ms. Lucera's trip to Ocala and Mr. Johnston's alleged reaction to the trip, the only other calls to the ethics line related to Mr. Johnston occurred after Ms. Lucera had been terminated.

23.  Additionally, in September 2001, several e-mails were sent to Cingular's internet customer care relating to Ms. Lucera's termination and Mr. Johnston's purported inappropriate conduct.

24.  Specifically, on September 5, 2001, an anonymous e-mail was sent to Cingular's internet customer care complaining about the termination of Ms. Lucera, the difference in treatment received by Jon Lucera and Mr. Johnston's involvement in the termination. On September 6, 2001, the e-mail was forwarded to the Office of the President.

25.  A second anonymous e-mail was sent to Cingular's internet customer care on September 5, 2001. The second e-mail complained about Jack Johnston's expenses and alleged that he had incurred outlandish expenses and believed it was acceptable to sign-off on his own AP 1's. The e-mail was forwarded to the Office of the President on September 6, 2001.

26.  On September 8, 2001, another anonymous e-mail was sent to Cingular's internet customer care complaining about the termination of Ms. Lucera and Mr. Johnston's involvement in her termination. The e-mail was forwarded to the Office of the president on September 10, 2001.

27.  On September 10, 2001, a final anonymous e-mail was sent to Cingular's internet customer care regarding the termination of Ms. Lucera. This e-mail was also forwarded to the Office of the President on September 10, 2001.

28.  On September 14, 2001, I sent my supervisor Bob Reed, former Executive Director of Customer Relations for Human Resources, a memorandum regarding the September

5th, September 8th and September 10th e-mails which had been forwarded to the Office of the President. A true and accurate copy of the September 14, 2001 memorandum is attached hereto as Exhibit 1.

29. I also commenced an investigation into the allegations made during the anonymous calls including allegations regarding Jack Johnston's treatment of women and inappropriate expense reporting by Mr. Johnston.

30. As part of the investigation, I requested that Ms. Bentley travel to Rantoul and conduct on-site interviews with female employees at various levels.

31. Additionally, on or about September 17, 2001, I interviewed Mr. Johnston regarding the allegations made in the September anonymous e-mails. Specifically, I questioned Mr. Johnston regarding the complaints that he treated men differently than women and had not followed prior expense report procedures. A true and accurate summary of my interview with Mr. Johnston is attached hereto as Exhibit 2.

32. With regard to the AP1 forms, Mr. Johnston indicated that he may have signed invoices if it was directly billed from a vendor. He indicated that he had obtained approval to do so from his supervisor Grace Seymour, Regional Vice President of Customer Operations.

33. During my investigation, I spoke with Ms. Seymour who indicated that she had given her approval for Mr. Johnston to sign-off on direct bills from hotels due to the frequency with which he traveled.

34. During my investigation, I audited each expense report submitted by Mr. Johnston since he assumed his responsibilities at the Rantoul Call Center and determined that Mr. Johnston had not violated the expense reimbursement guidelines or any Cingular polices, rules or procedures.

This affidavit is based upon my personal knowledge. It is true and correct to the best of my knowledge, information and belief. If sworn as a witness, I could testify competently to the foregoing.

THIS ENDS MY AFFIDAVIT.

_____
Jim Klimas

Subscribed and sworn to
before me this 29th day of
September 2004.

_____
Notary Public

"OFFICIAL SEAL"
KRISTINE FELIX
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 12/10/2006

# Memorandum

Date:   September 14, 2001

To:     Bob Reed

From:   Jim Klimas

Re:     Rantoul Employee Complaints

---

It has been brought to my attention that several anonymous complaint letters have been written to Mr. Carter and sent to the Great Lakes Office of the President e-mail account. I'd like to offer some background information that may assist those who review those letters in assessing the complaints.

The e-mailed letters are all apparently from Rantoul employees who are upset that a well-liked Area Manager was recently terminated. The letters allege that the Director, Jack Johnston, has treated women differently than men, has not followed proper procedures for submitting company expenses for reimbursement, and is generally unfair and ineffective. Mr. Johnston has been on assignment in Rantoul since June 11th when the previous director accepted an assignment in Ocala. Jack Johnston has held various leadership positions with SBC and SBC Wireless, and until his assignment in Rantoul, was Director of Chicago (Schaumburg) Customer Service.

The complaint letters focus on a recent decision to terminate Rebecca Isom-Lucera, an Area Manager at the Rantoul Call Center. Employees perceive her termination to be unfair. Rebecca traveled to Florida to consider career opportunities at the new Ocala Call Center without approving the absence or expenses. Although she was aware of the procedures, she attempted to further circumvent her supervisor, Jack Johnston, by having the expenses reimbursed by seeking approval from a third party. Rebecca was terminated on August 30th.

Rebecca's husband, John Lucera, is a Manager at the Rantoul Call Center and also traveled to Florida to consider career opportunities. Although his travel was also not formally approved, it seems travel policies and approval requirements were not clearly communicated to him. John received a Final Warning. All of the appropriate persons from Legal, Ethics, Field HR, and Call Center leadership were involved in the termination and disciplinary decisions.

The letters to Mr. Carter include remarks that question Jack Johnston's treatment of women and accuse him of inappropriate expense reporting. I am beginning an investigation to evaluate these accusations. I plan to interview Jack Johnston myself and I am making plans for random interviews of management and non-management employees in Rantoul that should uncover any discriminatory or inappropriate practices if they exist.

Please let me know if you have any questions about this situation or the handling of it. I can be reached at (847) 765-5323.



EXHIBIT

1

**Confidential & Proprietary**
**Attorney – Client Privileged Information**

<u>Jack Johnston Interview Notes</u>                                                    <u>September 17, 2001</u>

Jim Klimas interviewed Jack Johnston, Director-Customer Service, after anonymous complaints were made to the Great Lakes Office of the President. The complaints alleged that Mr. Johnston treated women differently than men and that he had not followed proper expense report procedures.

Q: How long have you been assigned to manage Customer Service operations for the Rantoul call center?
A: The announcement was made in mid-June, but I've really been involved since about May 28th.

Q: Has anyone brought any kind of complaint to your attention about how employees are treated at the Rantoul facility?
A: No.

Q: What is an "AP1" and what is the approval process? [Klimas: Violation of "AP1" was mentioned in complaints.]
A: The AP1 is the Ameritech expense reimbursement form. I have submitted some expenses via the SBC process. Others expenses like hotel costs were direct billed but the approval process is similar.

Q: Have you ever signed or approved your own "AP1"?
A: I've followed all approval processes. It's possible that I signed the invoice if we were direct billed for expenses, but I obtained the approval to do so from Grace Seymour. [Klimas: Verified with Ms. Seymour that this is accurate.]

Q: Did you ever tell Rebecca Isom-Lucera that she was an assertive woman?
A: This conversation spans over two events regarding release dates for Florida [job opportunities]. Release dates had been frozen because of Telegence. I considered options and I put together a plan and presented it to Rebecca. I explained in detail that I might be able to accommodate the request. Rebecca became insubordinate, accusatory, and argumentative about John [her husband] being replaced first because her ex-husband was giving her trouble about their son leaving the state. [Rebecca wanted to be released before her husband.] Rebecca revisits and is okay. I discussed Rebecca's tone and yelling with her. She explained that it is part of her personality. I said that she is an assertive woman and that I respect that but her approach is inappropriate. [Klimas: Jack went on to explain that if had been talking to a male, he would have said, "You're an assertive man." He mentioned that in hindsight, it would have been better to say, "You're assertive" to avoid any misinterpretation or misunderstanding that gender was relevant.]

Q: Have you incurred any strange expenses?
A: No. Gas for rental car, mileage for personal car, meals, hotel, and a trip to Dallas, pizza for meetings. I went to the state fair on August 11th but no expenditures were submitted. Rental car after car broke down. Even when the car broke down, I used my personal AAA membership. One-way personal mileage was not submitted. Due to the AAA membership, I saved $200. The car rental was agreed to by Grace Seymour because of the travel to Rantoul for this assignment. I set up monthly rates and I don't drive the car on Saturday or Sunday.

Q: What hiring decisions have you made while in Rantoul?
A: I hired two new managers – Deb Danker and Jan Vance out of 25 candidates. Out of the final candidates, there were three women and one man. Two women were ultimately selected. I also promoted two Office of the President Reps. The permanent selections haven't been made; both

EXHIBIT 2

individuals in the temp assignment are women Decisions will be made solely by seniority because these are bargained-for jobs. To fill John Lucera's vacancy, it was my decision to move Heather Magrini to that job because she desired the lateral change.

Q: What firing decisions have you made while in Rantoul.
A: There haven't been any management terminations during my tenure.

Q: What other employee-impacting decisions have you made while in Rantoul?
A: Two Leaves of Absence were requested by women who wanted to use LOA instead of vacation time. One wanted to spend more time with child and church during the summer. She decided not to take the time The other wanted to go to Wisconsin to fix up a house for sales. The sale fell through The LOA were not likely but the situations fell through as I was exploring options

Q: Have there been any other delicate employee issues in Rantoul that you have handled where people may have misunderstandings about how you handled them?
A: Victoria Bean-Lewsader and Jay Creeks issue about pay. I continued to raise the issue for them but it was handled outside of Rantoul. Gloria Masterson, a Rep, was disappointed that she couldn't see Mr. Carter when he visited Schaumburg No reps were allowed to go and Gloria received the invitation by mistake.

Q: Any other issues that I need to know about?
A: I met with every team upon my arrival and all employees seem fragile about surplus possibilities and other changes. There is a big issue with the trust factor in Rantoul

In addition to this interview, I audited each expense report submitted by Mr Johnston since he assumed his role in Rantoul. I did not find any violations of the expense reimbursement guidelines. I also discussed his expenses with his supervisor, Grace Seymour, Regional Vice President of Customer Operations. She has also reviewed the expenses and explained that all of the expenses had been approved and agreed that nothing was out of line